Lincoln D. Bandlow (SBN: 170449)
Lincoln@BandlowLaw.com
Rom Bar-Nissim (SBN: 293356)
Rom@BandlowLaw.com
**Law Offices of Lincoln Bandlow, P.C.**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.556.9680
Facsimile: 310.861.5550

Attorneys for Defendants
Ted Entertainment, Inc., Teddy Fresh, Inc.,
Ethan Klein and Hila Klein

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TRILLER FIGHT CLUB II LLC, a Delaware limited liability company, | Case No.: 2:21-cv-03942-JAK-KS |
| Plaintiff, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12(b)(6)** |
| v. | |
| TED ENTERTAINMENT, INC., a California corporation; TEDDY FRESH, INC., a California corporation; ETHAN KLEIN, an individual; HILA KLEIN, an individual; and DOES 1-10 | [Declarations of Ethan Klein and Lincoln D. Bandlow; Request for Judicial Notice; Notice of Lodging and Compendium of Exhibits filed concurrently herewith] |
| Defendants. | Assigned to: Hon. John A. Kronstadt |
| | Date:  November 22, 2021<br>Time: 8:30 a.m.<br>Place: Courtroom 10B |

# **TABLE OF CONTENTS**

I.      INTRODUCTION……………………………………………...1

II.     THE SAC AND PROCEDURAL BACKGROUND……..………...2

        A. The Allegations of the SAC…...…………………………….....2

        B. The Incorporation by Reference Doctrine and Judicial Notice..........3

        C. Relevant Procedural History………………………...…………..5

III.    ARGUMENT……..…………………………………..………...6

        A. Legal Standard…………….. …………………………………....6

        B. Triller's Copyright Infringement and Vicarious Copyright
           Infringement Claims Fail as a Matter of Law Because Watching a
           Transmission Does Not Constitute Copyright Infringement………8

        C. Triller's Copyright Infringement Claim and Vicarious Copyright
           Infringement Claims Fail as a Matter of Law under Fair Use…..…10

           1. The "Intermediate Use" Doctrine Applies to Defendants' Use..10

           2. The First Fair Use Factor Weighs in Favor of Fair Use……....12

              a. Defendants' Use of the Broadcast was Transformative…....12

              b. Any Purported "Commercial" Use by Defendants of the
                 Broadcast does not Weigh Against Fair Use………………16

              c. "Bad Faith" is No Longer a Valid Fair Use Consideration...16

           3. The Second Fair Use Factor Favors Fair Use…………………17

           4. The Third Fair Use Factor Favors Fair Use……………………18

           5. The Fourth Fair Use Factor Favors Fair Use..…………………19

        D. Triller's Vicarious Copyright Infringement Claims Also Fails
           Because Triller Fails to Plead a Direct Financial Interest……....…20

        E. Triller's FCA Claim Fails as a Matter of Law.. …………………....22

        F. Triller's Alter-Ego Allegations Fail as a Matter of Law………....24

IV.     CONCLUSION …………………………………………………25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abilene Music, Inc. v. Sony Music Entertainment, Inc.*,
    320 F.Supp.2d 84 (S.D.N.Y. 2003) ........................................................................ 19

*Adjmi v. DLT Entertainment, Ltd.*,
    97 F.Supp.3d 512 (S.D.N.Y. 2015) ........................................................................ 13

*American Broadcasting Companies, Inc. v. Aereo, Inc.*,
    573 U.S. 431 (2014) ................................................................................................. 9

*American Geophysical Union v. Texaco, Inc.*,
    60 F.3d 913 (2d Cir. 1994) ............................................................................... 11, 12

*Atari Games Corp. v. Nintendo of America, Inc.*,
    975 F.2d 832 (Fed. Cir. 1992) .......................................................................... 16, 17

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ................................................................................... 17

*Benavidez v. County of San Diego*,
    993 F.3d 1134 (9th Cir. 2021) .............................................................................. 6, 7

*Beverly Oaks Physicians Surgical Center, LLC v. Blue Cross and Blue Shield of Illinois*,
    983 F.3d 435 (9th Cir. 2020) ................................................................................... 7

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ........................................................................................ *passim*

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*
    536 F.3d 121 (2d Cir. 2008) ..................................................................................... 9

*Ceder Point Nursery v. Shiroma*,
    923 F.3d 524 (9th Cir. 2019) .................................................................................... 8

*Dent v. National Football League*,
    968 F.3d 1126 (9th Cir. 2020) .................................................................................. 7

*Dollar Tree Stores, Inc. v. Toyama Partners, LLC*,
    2011 WL 872724 (N.D. Cal. 2011) ....................................................................... 24

*Erickson Productions, Inc. v. Kast*,
    921 F.3d 822 (9th Cir. 2019) .................................................................................. 21

*G & G Closed Cir. Events, LLC v. Espinoza*,
    2020 WL 7861971 (C.D.Cal., Oct. 5 2020) ........................................................... 22

*G & G Closed Cir. Events, LLC v. Rojas*,
    2020 WL 7861979 (C.D. Cal., Oct. 5, 2020) .................................................................. 22, 23

*Gerritsen v. Warner Brothers Entertainment, Inc.*,
    116 F.Supp.3d 1104 (C.D. Cal. 2015).......................................................................... 24, 25

*Google, LLC v. Oracle America, Inc.*,
    141 S.Ct. 1183 (2021) ......................................................................................................... *passim*

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 549 (1985) ............................................................................................................... 16, 17

*Hoang v. Vinh Phat Supermarkets, Inc.*,
    2013 WL 4095042 (E.D. Cal. 2013) .................................................................................. 24

*Hokama v. E.F. Hutton & Co., Inc.*,
    566 F.Supp. 636 (C.D. Cal. 1983).................................................................................... 24

*Hosseinzadeh v. Klein*,
    276 F.Supp.3d 34 (S.D.N.Y. 2017) ............................................................................. *passim*

*Hughes v. Benjamin*,
    437 F.Supp.3d 382 (S.D.N.Y. 2020)........................................................................... *passim*

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
    796 F.2d 1148 (9th Cir. 1986)............................................................................................ 13

*J & J Sports Productions, Inc. v. Bigalbal*,
    2016 WL 1651067 (C.D. Cal., Sep. 20, 2016)............................................................ 22, 23

*J & J Sports Productions, Inc. v. Tamayo*,
    2016 WL 2855126 (E.D. Cal., May 16, 2016)............................................................... 23

*Joe Hand Promotions v. Albright*,
    2013 WL 2449500 (E.D. Cal., June 5, 2013).............................................................. 23

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
    2002 WL 432390 (S.D.N.Y. Mar. 20, 2002) ............................................................... 24

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
    156 F.Supp.3d 425 (S.D.N.Y. 2016)............................................................................... 13

*Mattel, Inc. v. Walking Mountain Productions*,
    353 F.3d 792 (9th Cir. 2003).................................................................................. 13, 17, 18

*NXIVM Corp. v. Ross Institute*,
    364 F.3d 471 (2d Cir. 2004)......................................................................................... 13, 17

*Oracle America, Inc. v. Hewlett Packard Enterprise Company*,
    971 F.3d 1042 (9th Cir. 2020)............................................................................................. 8

*In re Packaged Seafood Products Antitrust Litigation,*
   277 F.Supp.3d 1167 (S.D. Cal. 2017) .................................................................. 25

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   508 F.3d 1146 (9th Cir. 2007) ................................................................... 13, 17

*Sega Enterprises Ltd. v. Accolate, Inc.,*
   977 F.2d 1510 (9th Cir. 1992) .......................................................................... 11

*Seltzer v. Green Day, Inc.,*
   725 F.3d 1170 (9th Cir. 2013) ........................................................ 12, 13, 17, 19

*Sony Computer Entertainment, Inc. v. Connectix Corp.,*
   203 F.3d 596 603-608 (9th Cir. 2000) ............................................................. 11

*Swatch Group Management Services, Ltd. v. Bloomberg L.P.,*
   756 F.3d 73 (2d Cir. 2014) ............................................................................... 14

*TCA Television Corp v. McCollum,*
   839 F.3d 168 (2d Cir. 2016) ............................................................................. 19

*Wady v. Provident Live and Accident Insurance Co. of America,*
   216 F.Supp.2d 1060 (C.D. Cal. 2002) .............................................................. 24

*Whitaker v. Tesla Motors, Inc.,*
   985 F.3d 1173 (9th Cir. 2021) ............................................................................ 7

*Zuffa, LLC v. Justin.tv, Inc.,*
   838 F.Supp.2d 1102 (D. Nev. 2012) ................................................................ 23

**California Cases**

*Associated Vendors, Inc. v. Oakland Meat Co.,*
   210 Cal.App.2d 825 (1962) .............................................................................. 24

**Federal Statutes**

17 U.S.C. § 101 .................................................................................................... 8, 9

17 U.S.C. §106 ................................................................................................... 8, 11

17 U.S.C. § 107 .................................................................................. 10, 11, 13, 16

47 U.S.C. § 605 ....................................................................................... 1, 3, 22, 23

**Federal Rules of Civil Procedure**

Rule 12(b)(6) ..................................................................................................... 6, 25

Rule 11 ................................................................................................................. 1, 5

**Legislative History**

H.R. REP. 94-1476, 53, 1976 U...................................................................................................... 9

DEFENDANTS' MEMORANDUM OF POINTS AND AUTORITIES ISO ANTI-SLAPP MOTION

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

The Second Amended Complaint ("SAC") of plaintiff Triller Fight Club II, LLC ("Triller") is fatally defective on its face. The SAC is Triller's ***fifth*** attempt to draft a well-pleaded complaint regarding Defendants'[1] critical use of the Triller broadcast entitled *Jake Paul vs. Ben Askren* (the "Broadcast") in the TEI produced H3 Podcast. Despite numerous opportunities, Triller consistently files complaints that are a mangled and mangy mess that are devoid of any merit.

Triller's persistent failure to properly plead a complaint is particularly egregious. In response to Triller's previous attempts, the Honorable Percy Anderson dismissed Defendants, *sua sponte*, for improper joinder because Triller relied on "***the barest legal conclusions … without any well-pleaded factual allegations***" that "***calls into question the adequacy of [Triller's] compliance with its pre-suit investigation obligations under Federal Rule of Civil Procedure 11***."[2] Triller's SAC merely confirms Judge Anderson's suspicions.

Triller's SAC centers around TEI's use of an excerpt of the Broadcast for purposes of commentary and criticism in the YouTube video entitled – *Jake Paul Fight Was A Disaster – H3 Podcast #244* (the "4/22/21 Podcast"). To facilitate the 4/22/21 Podcast's commentary and criticism of the Broadcast, TEI employees watched the Broadcast. Afterwards, TEI uploaded an excerpt of the Broadcast (the "Reference Video") onto YouTube as an "unlisted" video (*i.e.*, the Reference Video could only be accessed via hyperlink or manually entering the URL).

Triller's SAC alleges that Defendants' conduct constitutes: (1) copyright infringement; (2) vicarious copyright infringement; and (3) violation of the Federal Communications Act ("FCA"), 47 U.S.C. § 605. Additionally, Triller seeks to hold

---

[1] The term "Defendants" shall mean defendants Ted Entertainment, Inc. ("TEI"), Teddy Fresh, Inc. ("Teddy Fresh") Ethan Klein ("Ethan") and Hila Klein ("Hila").

[2] *See* Request for Judicial Notice ("RJN"), ¶ 1, Ex. A.

Teddy Fresh, Ethan and Hila liable by alleging that TEI is their alter-ego.

Anyone who watches the 4/22/21 Podcast can instantly recognize the true purpose of Triller's SAC: retaliation against the 4/22/21 Podcast because it excoriated the Broadcast and its main event – the boxing match between Jake Paul and Ben Askren (the "Fight"). In other words, Triller's SAC is a brazen and unabashed attempt to intimidate, punish and silence lawful and protected criticism. This is emphasized by Triller's parent company, Triller, LLC, also suing Defendants for tortious interference after the H3 Podcast criticized and commented on the present lawsuit, Triller, its parent company and its owner, Ryan Kavanaugh.

This is not the first time Ethan and Hila have been victims of an abusive lawsuit that seeks to punish and silence their lawful criticism. Rather, both lawsuits are hauntingly reminiscent of Ethan and Hila's prior lawsuit, entitled *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017). In that case, the Court found that Ethan and Hila's use of 60% of another YouTuber's video for purposes of commentary and criticism constituted fair use. The Court also found that their criticism and commentary of the plaintiff's lawsuit was completely lawful.

This case stands on firmer ground than *Hosseinzadeh* because the 4/22/21 Podcast used only .3% of the Broadcast to criticize and comment on it. Triller's remaining claims are defective as well – not only because they are comprised of threadbare recitals and legal conclusions – but because the SAC unequivocally demonstrates that those claims fail as a matter of law.

It is time for Triller's abuse of Defendants as well as the judicial process to come to an end. For these reasons and those set forth below, Defendants respectfully request this Court dismiss Triller's SAC with prejudice.

## II.     THE SAC AND PROCEDURAL BACKGROUND

### A.     The Allegations of the SAC

The SAC is not a paragon of clarity, but the following can be discerned from its allegations. Triller alleges that it is the owner of the copyright in the Broadcast,

which was first published on April 17, 2021. SAC, ¶ 1, Ex. A. Triller further alleges that it transmitted the Broadcast to authorized third parties for retransmission to the public via "online platforms" (*i.e.*, the internet). *Id.*, ¶¶ 2, 21, 31, 39.

Triller alleges that Defendants' wrongful conduct was: (1) watching a "pirated" or "bootleg" version of the Broadcast; (2) uploading the Reference Video as an "unlisted" video to YouTube; and (3) showing the URL of the Reference Video and an excerpt of it in the 4/22/21 Podcast. SAC, ¶¶ 3-5, 22-24, 32, 34, 41. In the screenshot provided by Triller, the URL of the Reference Video is illegible and Triller failed to provide the URL for the Reference Video. *Id.*, ¶ 5. Triller alleges that Defendants profited from their purported wrongful conduct because the H3 Podcast and H3 Podcast channel: (1) are part of the YouTube Partner Program; (2) contain sponsorships; and (3) sells merchandise. *Id.*, ¶¶ 3, 13, 28, 36, 44.

Based on this alleged conduct, Triller attempts to plead three claims for relief: (1) copyright infringement (SAC, ¶¶ 19-28); (2) vicarious copyright infringement (*id.*, ¶¶ 29-36); and (3) violation of the FCA, 47 U.S.C. § 605 (*id.*, ¶¶ 37-44). Triller also seeks to hold Teddy Fresh, Ethan and Hila liable by alleging that TEI is their alter-ego. *Id.*, ¶¶ 17-18.

**B.    The Incorporation by Reference Doctrine and Judicial Notice**

The Broadcast is a four hour long audiovisual work comprised of: (1) six boxing matches (including the Fight); (2) musical performances by prominent musicians, such as *The Black Keys*, *Diplo*, *Doja Cat*, Justin Bieber, *Major Lazer*, *Saweetie*, *Snoop Dogg*, *Ice Cube*, *Too $hort* and *E-40*; and (3) interviews of the boxers by comedian and *Saturday Night Live* star Pete Davidson. RJN, ¶ 2, Ex. B.

On April 18, 2021 (*i.e.*, the day after the Broadcast), the Reference Video was uploaded to YouTube as an "unlisted video" to the *Zach The Sound Lad* YouTube channel (the "ZTSL Channel"). RJN, ¶¶ 3-4, Exs. C-D. As defined by Google, an "unlisted" YouTube video can only be accessed by having the URL for the video and not through a channel's list of uploaded videos or through YouTube

search results. *Id.*, ¶ 5, Ex. E. The Reference Video was under fourteen minutes long and contained the prologue of the Fight, the Fight itself and its aftermath. *Id.*, ¶ 6, Ex. F. The Reference Video did not contain sponsorships or offers to sell merchandise. *Id.* Also, the Reference Video was not monetized as part of the YouTube Partner Program. To be eligible for that program, YouTube requires (amongst other things) that a YouTube channel have one thousand subscribers. *Id.*, ¶ 7, Ex. G. The ZTSD Channel has not met this requirement. *Id.*, ¶ 4, Ex. D.

On April 22, 2021, the over two-hour-long 4/22/21 Podcast – entitled *Jake Paul Fight Was A Disaster – H3 Podcast #244* – was uploaded to YouTube. SAC, ¶¶ 5, 24, 32, 41; RJN, ¶¶ 3, 8, Exs. C, H. Nearly three-quarters into the 4/22/21 Podcast, the cast of the H3 Podcast began commenting on and critiquing the Fight and Broadcast (including its participants) for approximately twelve minutes. *Id.*, 1:25:58-1:37:32. In the middle of the cast's commentary and critique, the 4/22/21 Podcast played forty-two seconds of the Reference Video, which was comprised of five seconds exclusively of audio, nine seconds of both audio and video and twenty-eight seconds exclusively of video (with six seconds comprised exclusively of video being repeated). *Id.*

The 4/22/21 Podcast never zoomed in on the URL for the Reference Video. RJN, ¶ 8, Ex. H, 1:25:58-1:37:32. No cast member of the 4/22/21 Podcast: (1) instructed viewers to watch the Reference Video; (2) directed viewers to the Reference Video's URL; or (3) stated the Reference Video's URL. *Id.* The only way to identify the Reference Video's URL is to: (1) watch nearly an hour and a half of the 4/22/21 Podcast; (2) pause the 4/22/21 Podcast when the URL for the Reference Video appears; (3) zoom in on the URL or enlarge the 4/22/21 Podcast so that the URL is visible; (4) manually write down the URL https://www.youtube.com/watch?v=-G7u36dpmL8; and (5) manually enter the URL into an internet browser. *Id.* The Reference Video received only sixty-five views. *Id.*, ¶ 4, Ex. D. In the 4/22/21 Podcast, Ethan states that TEI employees

watched the Broadcast via a "link" (*i.e.*, the internet). *Id.*, at 1:31:54-1:32:35.

## C. <u>Relevant Procedural History</u>

This if Triller's ***fifth*** attempt to properly draft a complaint against the Defendants concerning the Broadcast. On April 23, 2021, "Triller, Inc." filed the initial complaint (that did not name Defendants) in *Triller, Inc. v. Filmdaily.com*, Case No. 2:21-cv-03502-PA-RAO (the "Filmdaily Action"). RJN, ¶ 9, Ex. I. On April 28, 2021, Judge Anderson (who presided over the Filmdaily Action) issued an Order to Show Cause, *sua sponte*, regarding why the majority of the defendants in the Filmdaily Action should not be dismissed for improper joinder. *Id.*, ¶ 10, Ex. J.

On April 29, 2021, Triller filed an amended complaint in the Filmdaily Action. RJN, ¶ 11, Ex. K. The sole additions were to name the "H3 Podcast" and "H3H3 Productions" as defendants and Triller as the plaintiff. *Id.* On May 5, 2021, Triller responded to Judge Anderson's Order to Show Cause and included a proposed second amended complaint, which included Defendants (*i.e.*, Triller's ***second*** attempt to draft a complaint against Defendants). *Id.*, ¶ 12, Ex. L.

On May 6, 2021, Judge Anderson dismissed Defendants (and all but one of the other defendants in the Filmdaily Action) for improper joinder. RJN, ¶ 1, Ex. A. Judge Anderson publicly chastised Triller for relying on "the barest legal conclusions … without any well-pleaded factual allegations" which he noted "calls into question the adequacy of [Triller's] compliance with its pre-suit investigation obligations under Federal Rule of Civil Procedure 11." *Id.*

On May 10, 2021, Triller filed its initial complaint against the H3 Podcast in the present action – *i.e.*, its ***third*** attempt to draft a complaint against Defendants. Dkt. No. 1. On May 21, 2021, Triller filed its first amended complaint in the present action ("FAC") – *i.e.*, its ***fourth*** attempt to draft a complaint against Defendants. Dkt. No. 10. Every version of Triller's complaints were merely cut and paste rehashes of the initial complaint in the Filmdaily Action. RJN, ¶¶ 9, 11, Exs. I, K; Dkt. Nos. 1, 10. The sole additions to the FAC were: (1) naming TEI as a

defendant and including Ethan and Hila as defendants based on an alter-ego theory comprised of threadbare recitals and conclusory allegations; and (2) identifying (without describing) the Reference Video and 4/22/21 Podcast. Dkt No. 10.

On June 29, 2021, TEI, Ethan and Hila sent a detailed meet and confer letter to Triller demonstrating how each claim in the FAC failed as a matter of law. Declaration of Lincoln D. Bandlow ("LDB Decl."), ¶ 7, Ex. M. On July 12, 2021, Triller submitted its proposed SAC – *i.e.*, its ***fifth*** attempt to draft a complaint against Defendants. *Id.*, ¶ 8, Ex. N. The proposed SAC contained nominal additional allegations, dropped three claims and added Teddy Fresh as a defendant under an equally threadbare alter-ego theory. *Id.*

On July 14, 2021, counsel for the parties met and conferred telephonically about the defects of the FAC and proposed SAC. LDB Decl., ¶ 9. Triller was unpersuaded by Defendants' arguments regarding the fatal defects of the proposed SAC. *Id.* To avoid burdening this Court with an anti-SLAPP motion and addressing claims that Triller effectively conceded lacked merit, Defendants stipulated to the filing of the SAC – which this Court granted. Dkt. Nos. 22-23.

On July 19, 2021, Triller, LLC (Triller's parent company) filed an action against Defendants in Los Angeles Superior Court alleging tortious interference claims entitled *Triller, LLC v. Ted Entertainment, Inc.* (Case No. 21SMCV01225). RJN, ¶ 7, Ex. O. This action targeted statements made in various H3 Podcasts criticizing Triller, its parent company and its majority owner, Ryan Kavanaugh. *Id.* Defendants shall respond with an anti-SLAPP motion on September 8, 2021.

## III.   ARGUMENT

### A.   Legal Standard

To draft a well-pled SAC that can survive dismissal under Federal Rule of Civil Procedure ("F.R.C.P.") Rule 12(b)(6), Triller was required to "allege 'enough facts to state a claim to relief that is plausible on its face.'" *Benavidez v. County of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (*quoting Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility standard is not akin to a 'probability requirement'" and, instead, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Dent v. National Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 556)). In particular, this requires Triller "to include enough facts to raise a right to relief above a speculative level." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (*quoting Twombly*, 550 U.S. at 555).

In stark contrast to Triller's fatally defective SAC, a well-pled complaint must contain sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Benavidez*, 993 F.3d at 1144 (*quoting Iqbal*, 556 U.S. at 678). Instead, Triller's SAC relies merely on "labels and conclusions," "formulaic recitation of the elements," and "conclusory allegations of law and unwarranted inferences" which simply "will not do." *Benavidez*, 993 F.3d at 1145 (*quoting Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555). Further, Triller's "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are woefully inadequate. *Whitaker*, 985 F.3d at 1176 (*quoting Iqbal*, 556 U.S. at 678-679).

Triller cannot, as here, "rely on anticipated discovery to satisfy" its pleading requirements; "rather, pleadings must assert well-pleaded factual allegations to advance to discovery." *Whitaker*, 985 F.3d at 1177 (*citing Iqbal*, 556 U.S. at 678-79). Triller was required to plead sufficient facts to demonstrate that "it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Whitaker*, 986 F.3d at 1177.

The Ninth Circuit has repeatedly held that on a motion to dismiss, a court can review "unattached evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Beverly Oaks Physicians Surgical Center, LLC v. Blue Cross and Blue Shield of Illinois*, 983 F.3d

435, 439 (9th Cir. 2020) (quoting *United States v. Corinthian Colleges*, 655 F.3d 984, 998-99 (9th Cir. 2011)). The Ninth Circuit also authorizes courts to consider "matters of which the court may take judicial notice." *Ceder Point Nursery v. Shiroma*, 923 F.3d 524, 530 (9th Cir. 2019) (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008)).

### B. <u>Triller's Copyright Infringement and Vicarious Copyright Infringement Claims Fail as a Matter of Law Because Watching a Transmission Does Not Constitute Copyright Infringement</u>

Triller's copyright infringement claim relies on Ethan's statement that he "bootlegged" or "pirated" the April 17, 2021 transmission of the Broadcast. SAC, ¶¶ 4, 22. Additionally, Triller's vicarious copyright infringement claim appears to rely on the allegation that third parties engaged in copyright infringement by watching the Reference Video and 4/22/21 Podcast on YouTube.[3] SAC, ¶¶ 32-35.

Viewing a transmission – whether it be Triller's April 17, 2021 transmission of the Broadcast, the Reference Video or the 4/22/21 Podcast – does not constitute copyright infringement. Viewing a transmission is not a public display, public performance, public distribution or derivative work of the original copyrighted work. *See* 17 U.S.C. §101 (definitions of "display," "perform," "transmit," "publicly," and "derivative work); 17 U.S.C. §106(2-5).

Nor does viewing a transmission implicate the reproduction right of 17 U.S.C. Section 106(1). The reproduction right grants a copyright owner the exclusive right to "reproduce the copyrighted work in ***copies.***" 17 U.S.C. § 106(1) (emphasis added). To constitute a copy, the copy must be "***fixed.***" *Id.* § 101 (definition of "copies") (emphasis added). A work is "fixed" when "its embodiment in a copy … is sufficiently ***permanent or stable*** to permit it to be perceived,

---

[3] For its vicarious copyright infringement claim, Triller must plead and prove "direct infringement by third parties." *Oracle America, Inc. v. Hewlett Packard Enterprise Company*, 971 F.3d 1042, 1050 (9th Cir. 2020) (*quoting Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007)).

reproduced, or otherwise communicated for *a period of more than transitory duration*." *Id.* (definition of "fixed") (emphasis added).

Critically, when "a work consisting of sounds, images, or both [is] transmitted" – like the Broadcast, 4/22/21 Podcast or Reference Video, a copy is only "fixed" when the "fixation of the work is being made *simultaneously with its transmission*." 17 U.S.C. § 101 (definition of "fixed") (emphasis added). Congress clarified this point in the legislative history of the Copyright Act: the "definition of 'fixation' would exclude from the concept purely evanescent or transient reproductions such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or captured momentarily in the 'memory' of a computer."[4] H.R. REP. 94-1476, 53, 1976 U.S.C.C.A.N. 5659, 5666.

Here, the SAC concedes that the Broadcast, Reference Video and 4/22/21 Podcast were transmitted. SAC, ¶¶ 1-2, 5-6, 11-12, 19-22, 24-27, 29-35. The SAC explicitly alleges that Defendants did ***not*** simultaneously fix the Broadcast with its transmission on April 17, 2021[5] and does not (and cannot) allege that third parties did the same to the Reference Video or 4/22/21 Podcast. *Id.*

---

[4] The transitory nature of digital streaming (*i.e.*, digital transmission) is emphasized by the Supreme Court's definition of "streaming" as "the process of providing a steady flow of audio or video data so that an internet user is able to access it *as it is transmitted*." *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 437 (2014) (brackets omitted; emphasis added) (quoting A Dictionary of Computing (6th ed. 2008)); *see also Cartoon Network LP, LLLP v. CSC Holdings, Inc.* 536 F.3d 121, 129-130 (2d Cir. 2008) (holding that streaming a video involves "only a minuscule portion of a work" that does not result in "'a work' [being] embodied" – *i.e.*, the data is "rapidly and automatically overwritten as soon as it is processed."); RJN, ¶ 13, Ex. P, (Merriam Webster Dictionary defining "stream" as "to transfer (digital data, such as audio or video material) in a continuous stream especially for immediate processing and playback).

[5] Exhibit A to the SAC demonstrates that the "Date of 1st Publication" for the Broadcast was "April 17, 2021." The SAC alleges that Defendants uploaded the Reference Video and 4/22/21 Podcast on April 22, 2021 (*i.e.*, five days after the April 17, 2021 transmission of the Broadcast). *See* SAC, ¶¶ 5, 24, 32. Technically speaking, the Reference Video was uploaded on April 18, 2021 (*i.e.*, a day after the April 17, 2021 transmission of the Broadcast). *See Id.*, ¶ 5, RJN, ¶¶ 3-4, Exs. C-D.

### C. Triller's Copyright Infringement Claim and Vicarious Copyright Infringement Claim Fail as a Matter of Law under Fair Use

The "fair use of a copyrighted work … *for purposes such as criticism [and] comment* … is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). As the Supreme Court explained: the fair use doctrine is "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Google, LLC v. Oracle America, Inc.*, 141 S.Ct. 1183, 1196 (2021).

Section 107 contains four factors that courts consider in analyzing fair use:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted works.

17 U.S.C. § 107.

These factors are "not exhaustive" and "set forth general principles, the application of which requires judicial balancing, depending on the circumstances." *Google*, 141 S.Ct. at 1197 (*citing Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)). Fair use is "not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Id.,* 577. "Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purpose of copyright." *Id.* at 578 (*citing* Level, *Towards a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110-1111 (1990) ("Leval")).

#### 1. The "Intermediate Use" Doctrine Applies to Defendants' Use

Triller appears to allege that the Reference Video and Defendants' viewing of the Broadcast should be viewed in isolation from the use of the Broadcast in the

4/22/21 Podcast.[6] The Supreme Court, Ninth Circuit and Second Circuit have explicitly rejected this approach under the doctrine of "intermediate use."

In *Google*, the Supreme Court cited with approval two Ninth Circuit decisions for the proposition that "intermediate copying" or copying as a "preliminary step" in the creation of a fair use work also qualifies as fair use. 141 S.Ct. at 1198-99 (*citing Sony Computer Entertainment, Inc. v. Connectix Corp.* ("*Sony*"), 203 F.3d 596 603-608 (9th Cir. 2000); *Sega Enterprises Ltd. v. Accolate, Inc.*, 977 F.2d 1510, 1521-1527 (9th Cir. 1992)).[7]

*Sega* and *Sony* stand for the proposition that intermediate copying **must** be examined in light of the overall purpose of the final use. *See Sega*, 977 F.2d at 1522; *Sony*, 203 F.3d at 599. In both cases, the Ninth Circuit found that defendants' copying of the plaintiffs' copyrighted software were "intermediate copies" that qualified as fair use because their primary "purpose" was to create non-infringing works – *i.e.*, new videogames. *Id.* As the Ninth Circuit stated in *Sony*:

> The intermediate copies made and used by Connectix during the course of its reverse engineering of the Sony BIOS were protected fair use, necessary to permit Connectix to make its non-infringing Virtual Game Station function with PlayStation games. ***Any other intermediate copies made by Connectix do not support injunctive relief, even if those copies were infringing***.

203 F.3d at 599 (emphasis added).

The Second Circuit takes an identical approach and applied it to the use of science articles. *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir.

---

[6] As discussed in Section III.B., *supra*, merely viewing the Broadcast or Reference Video does not constitute copyright infringement. For purposes of Section III.C. only, Defendants will assume *arguendo* that such conduct does constitute copyright infringement. Defendants' position is (and shall remain) that merely viewing a transmission of a copyrighted work does not constitute copyright infringement.

[7] Indeed, the fair use provision itself supports this interpretation by focusing on whether the "use" – as opposed to a particular copy or act of infringement – served a fair use "purpose." 17 U.S.C. § 107 ("the fair use of a copyrighted work, including ***use*** by reproduction in copies … or by any other means specified [in 17 U.S.C. 106], for ***purposes*** such as criticism, comment [or] news reporting … is not an infringement of copyright.") (emphasis added).

1994). In that case, Texaco made copies of individual articles from a science journal for its research scientists. *Id.*, 918-19. The Second Circuit characterized the copies as an "intermediate use" whose "primary purpose" was to "abet [the scientists'] research." *Id.*, 919-20 & fns. 6-7. The primary purpose of the copies was not for fair use, however, because the scientists did not quote or cite the articles in their publications or use them in their experimentation. *Id.*, 920 fn. 7.

Here, the SAC explicitly concedes that the Reference Video was used in the 4/22/21 Podcast. SAC, ¶¶ 5, 24, 32. Further, the 4/22/21 Podcast (which is incorporated by reference in the SAC), clearly uses the Reference Video to comment on and critique the Broadcast. *Id.*; RJN, ¶ 8, Ex. H. Therefore, the Reference Video and Defendants' viewing of the Broadcast cannot be viewed in isolation. As discussed below, it is readily apparent that the primary purpose of the Reference Video and Defendants' viewing of the Broadcast was to prepare for and create the commentary and criticism of the Broadcast in the 4/22/21 Podcast.

As such, Triller's attempt to view Defendants' alleged acts of infringement in isolation from the 4/22/21 Podcast is precluded as a matter of law.

## 2. **The First Fair Use Factor Weighs in Favor of Fair Use**

### a. **Defendants' Use of the Broadcast was Transformative**

The "'central purpose' of the first fair use factor is to see 'whether and to what extent the new work is transformative.'" *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) (*quoting Campbell*, 510 U.S. at 579). A use is transformative when it "adds something new, with a further purpose or different character, altering the copyrighted work with new expression, meaning or message." *Google*, 141 S.Ct. at 1202 (internal quotes omitted) (*quoting Campbell*, 510 U.S. at 579). The Ninth Circuit has also explained that if the allegedly infringed work "is ***used as raw material,*** transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of

society." *Seltzer*, 725 F.3d at 1176 (emphasis added) (*quoting* Leval, at 1111).

Moreover, "the ***more*** transformative the new work, the ***less*** will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579 (emphasis added); *Perfect 10,* 508 F.3d at 1166 (same); *Seltzer*, 725 F.3d at 1176 (same).

Critically, it is "well established that 'among the best recognized justifications for copying from another's work is to ***provide comment on it or criticism of it.***'" *Hosseinzadeh*, 276 F.Supp.3d 34, 42 (S.D.N.Y. 2017) (emphasis added; internal brackets omitted) (*quoting Authors Guild v. Google, Inc.*, 804 F.3d 202, 214-15 (2d Cir. 2015)). Indeed, the Supreme Court concurs. *See Google*, 141 S.Ct. at 1203 (a subsequent work is "transformative because it ***comments on the original or criticizes it***") (emphasis added); *Campbell*, 510 U.S. at 583 ("***comment and criticism*** … traditionally have had a claim to fair use protection as transformative works.") (emphasis added).

Thus, "there is a ***strong presumption*** that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107, including ***criticism and comment***." *Hosseinzadeh*, 276 F.Supp.3d at 42 (emphasis added; internal quotes omitted);[8] *see also Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 800 (9th Cir. 2003) ("works that comment and criticize are by their nature often sufficiently transformative to fit clearly under the fair use exception"); *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986) ("Section 107 expressly permits fair use for the purposes of criticism and comment").

In *Hosseinzadeh*, the court found that Ethan and Hila's use of a YouTuber's video was "quintessential criticism and comment … [i]rrespective of whether one

[8] Quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991); citing *TCA Television Corp v. McCollum*, 839 F.3d 168, 179 (2d Cir. 2016); *NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 477, 482 (2d Cir. 2004); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F.Supp.3d 425, 444-45 (S.D.N.Y. 2016); *Adjmi v. DLT Entertainment, Ltd.*, 97 F.Supp.3d 512, 531 (S.D.N.Y. 2015).

finds it necessary, accurate, or well-executed." 276 F.Supp.3d at 45-46. This case

is no different. While showing excerpts of the Reference Video, the cast of the

4/22/21 Podcast: (1) critiqued Ben Askren's physical fitness, including his ability

to box and how he was knocked out by Jake Paul; and (2) critiqued the Fight itself,

including the mismatch between Jake Paul and Ben Askren, the Fight's brevity and

the referee's decision to call the Fight for Jake Paul (and whether one of the

fighters "took a dive"). RJN, ¶ 8, Ex. H, 1:29:18-1:30:06.

The commentary and criticism surrounding the 4/22/21 Podcast's use of the

Reference Video further emphasizes the transformative use of the Broadcast. *See*

*Swatch Group Management Services, Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d

Cir. 2014) ("the altered purpose or context of the work [is] evidenced by

***surrounding commentary or criticism***") (emphasis added) (citing *Bill Graham*

*Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 609-610 (2d Cir. 2006)).

***Prior*** to showing an excerpt of the Reference Video, the cast for the 4/22/21

Podcast: (1) made overarching critiques of the Broadcast, including its quality and

decision to include mainstream musical acts in a fight between a YouTuber and

former mixed martial arts fighter and wrestler; and (2) directly critiqued Ben

Askren's physical fitness to participate in the Fight, including comparing his

previous physical fitness with his current physical fitness and how this created a

lopsided matchup with Jake Paul. RJN, ¶ 8, Ex. H, 1:25:58-1:29:17.

*After* showing an excerpt of the Reference Video, the cast of the 4/22/21

Podcast: (1) further critiqued the referee's premature decision to call the Fight for

Jake Paul and discussed whether the Fight was staged; (2) further critiqued the poor

quality of the Fight and Jake Paul himself; and (3) commented upon the number of

reported viewers of the Broadcast, its purported revenue and Jake Paul's financial

take for the Fight. RJN, ¶ 8, Ex. H, 1:30:06-1:37:32.

In addition, the title of the 4/22/21 Podcast transforms the Broadcast. *See*

*Hughes v. Benjamin*, 437 F.Supp.3d 382, 390-91 (S.D.N.Y. 2020) (granting motion

to dismiss because the title of the defendant's YouTube video – *SJW Levels of Awareness* – served to comment and critique the plaintiff's YouTube video). Here, the title of the 4/22/21 Podcast was "***Jake Paul Fight Was A Disaster***" (*see* SAC, ¶ 5 (emphasis added)) and people watched because they wanted to hear the cast of the 4/22/21 Podcast ruthlessly critique Jake Paul, the Fight and Broadcast. Therefore, like in *Hughes*, "a reasonable observer who came across the video would quickly grasp its critical purpose." *Hughes*, 437 F.Supp.3d at 392.

Finally, it is readily apparent that the primary purpose of the Reference Video and Defendants' initial viewing of the Broadcast was to facilitate the commentary and criticism of the Broadcast in the 4/22/21 Podcast. Without the Reference Video and initial viewing of the Broadcast, the aforementioned commentary and criticism of the Broadcast and Fight in the 4/22/21 Podcast would lose all context and utility. *See Hosseinzadeh*, 276 F.Supp.3d at 46 ("Without using actual clips, the commentary and critique here would lose context and utility").

This is further emphasized by the Reference Video being "unlisted" (*i.e.*, the only way to access it was knowing the Reference Video's URL). SAC, ¶ 5; RJN, ¶ 4-5, Exs. D-E. The 4/22/21 Podcast did not: (1) zoom in on the Reference Video's URL; (2) direct viewers to watch the Reference Video; or (3) state the Reference Video's URL. *Id.*, ¶ 8, Ex. H, 1:25:58-1:37:32  Indeed, the only way to access the URL for the Reference Video was: (1) to watch approximately an hour and a half of the 4/22/21 Podcast; (2) pause the 4/22/21 Podcast when the Reference Video's URL appears; (3) enlarge the 4/22/21 Podcast and/or zoom in on the URL; (4) write down the URL; and (5) manually enter the URL. *Id.* It is evident that the vast majority of viewers of the 4/22/21 Podcast did not do this because the Reference Video received ***only sixty-five views – i.e., less than .0065% of the over one million views received by the 4/22/21 Podcast***. *Id.*, ¶¶ 3-4, Exs. C-D.

In sum, the first fair use factor weighs heavily in favor of fair use because the use of the Broadcast in the 4/22/21 Podcast was highly transformative.

**b.** **Any Purported "Commercial" Use by Defendants of the Broadcast does not Weigh Against Fair Use**

As previously discussed in Section III.C.2., *supra*, "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." This is because, as the Supreme Court noted, "many common fair uses are indisputably commercial." *Google*, 141 S.Ct. at 1204; *see also Campbell*, 510 U.S. at 585 ("the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research … are generally conducted for profit in this country"). Thus, any commerciality is outweighed by other factors.

Once again, *Hughes* is directly on point. In *Hughes*, the court explicitly stated that "the commercial nature of an allegedly infringing work is not necessarily a significant factor." 437 F.Supp.3d at 392. Exactly like Triller, the plaintiff in *Hughes* tried to argue that the defendant "unfairly derived profits from [plaintiff's video] in the form of advertising revenues generated from its upload to and availability on YouTube." *Id.* The court rejected this argument and stated: "insofar as there is a commercial aspect to [defendant's video], it *pales in significance* to the considerations discussed above" – *i.e.*, defendant's transformative criticism of the plaintiff's video. *Id.* (emphasis added).

Therefore, the first fair use factor still weighs heavily in favor of fair use.

**c.** **"Bad Faith" is No Longer a Valid Fair Use Consideration**

Triller will argue that Defendants' alleged unauthorized access to the Broadcast forecloses Defendants' ability to raise the fair use defense. *See Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832, 843 (Fed. Cir. 1992); *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 549, 562-63 (1985).

In decisions rendered *after Atari* and *Harper & Row*, the Supreme Court has expressed "skepticism" about whether such "bad faith" considerations play any role

in fair use analysis. *See Google*, 141 S.Ct. at 1204 ("As for bad faith, our decision in *Campbell* expressed some skepticism about whether bad faith has any role in a fair use analysis. [Citation] We find this skepticism justifiable, as '***copyright is not a privilege reserved for the well-behaved***.'") (emphasis added) (*quoting* Leval at 1126; citing *Campbell*, 510 U.S. at 585 fn. 18 ("being denied permission to use a work does not weigh against a finding of fair use.").

Further, the Ninth and Second Circuits have explicitly rejected reading *Atari* and *Harper & Row* to require access to an authorized copy to invoke fair use. *See Perfect 10*, 508 F.3d at 1168 fn. 8 ("we conclude that Google's inclusion of thumbnail images derived from infringing websites in its Internet-wide search engine activities does not preclude Google from raising a fair use defense"); *NXIVM*, 364 F.3d at 478-479 (despite unauthorized access to the copyrighted work "the first factor still favors defendants in light of the transformative nature of the secondary use as criticism").

In sum, Triller's argument that access to an authorized copy is a precondition for Defendants to invoke the fair use is, itself, a bad faith argument.

### 3.      The Second Fair Use Factor Favors Fair Use

The second fair use "factor typically has not been terribly significant in the overall fair use balancing." *Mattel,* 353 F.3d at 803; *see also Author's Guild*, 804 F.3d at 220 (Level, J.) ("The second factor has rarely played a significant role in the determination of a fair use dispute").

Here, Triller controlled the "first public appearance" of the Broadcast because the copyright registration states that the "Date of 1st Publication" was April 17, 2021. *See* SAC, Ex. A; *Harper & Row*, 471 U.S. at 564; *Seltzer*, 725 F.3d at 1178 (same). Further, the 4/22/21 Podcast used an excerpt of the Broadcast that was primarily factual because the excerpt used from the Reference Video only showed two men fighting. *See Hughes*, 437 F.Supp.3d at 393 (video of plaintiff's experience witnessing the 2016 presidential election results was "factual or

informational in that it provides a first-hand account of a newsworthy event").

Therefore, the second fair use factor weighs heavily in favor of fair use.

### 4. The Third Fair Use Factor Favors Fair Use

The third fair use factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586; *Mattel,* 353 F.3d at 803 (same). Courts are tasked with examining the "justification for the particular copying done" and recognize the "extent of permissible copying varies with the purpose and character of the use." *Mattel*, 353 F.3d at 803 (*quoting Campbell*, 510 U.S. at 586-87).

The Supreme Court recently clarified both the quantitative and qualitative analysis for this fair use factor. As to the quantitative analysis, the Supreme Court explained, "copying a larger amount of material can fall within the scope of fair use where the material copied … is ***central to a copier's valid purpose***." *Google*, 141 S.Ct. at 1205 (emphasis added). This also requires taking into account the amount the alleged infringer "did not copy" from plaintiff's work. *Id*. As to the qualitative analysis, even when the secondary user takes the "heart" of the work, the "substantiality factor will generally weigh in favor of fair use where, as here, the amount of copying was tethered to a valid, and transformative, purpose." *Id.*

The facts of this case stand on even firmer ground than in *Hosseinzadeh*. In that case, Ethan and Hila used "three minutes and fifteen seconds of [a] five minute, twenty-four second long" video (*i.e.*, 60% of the original) in their "almost fourteen minutes long" critique video. *Hosseinzadeh*, 276 F.Supp.3d at 40. Here, the 4/22/21 Podcast played only 42 seconds from the Reference Video – which consisted of five seconds exclusively of audio, nine seconds of both audio and video and twenty-eight seconds exclusively of video (with six seconds exclusively of video being repeated). RJN, ¶ H, Ex. I at 1:29:18-1:30:06. The Broadcast was essentially ***four hours long*** (3:57:04). *Id.*, ¶ 2, Ex. B. In other words, the 4/22/21 Podcast used less

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES ISO ANTI-SLAPP MOTION

than .3% of the Broadcast. Therefore, the quantity of the Broadcast used in the 4/22/21 Broadcast was nascent compared to *Hosseinzadeh* and very reasonable in relation to the 4/22/21 Podcast's transformative purpose of commentary and criticism of the Broadcast and Fight. *See Seltzer*, 725 F.3d at 1178 ("This factor captures the fact that an allegedly infringing work that copies little of the original is likely to be fair use").

Further, insofar as the Fight was the "heart" of the Broadcast, its use in the 4/22/21 Podcast was tethered to its valid purpose of commenting on and critiquing the Fight itself. This is no different than *Hosseinzadeh* and, without question, the Court's analysis applies:

> It is evident that to comment on and critique a work, clips of the original may be used. [Citation] Without using actual clips, the commentary and critique here would lose context and utility. Here, the 'extent' and 'quality and importance' of the video clips used by the defendants were ***reasonable to accomplish the transformative purpose of critical commentary*** [Citation]. … [A] great deal of plaintiff's work was copied, but such copying was ***plainly necessary to the commentary and critique***.

*Hosseinzadeh*, 276 F.Supp.3d at 46 (emphasis added).[9]

Therefore, the third fair use factor weighs heavily in favor of fair use.

### 5. The Fourth Fair Use Factor Favors Fair Use

The "fourth statutory factor focuses upon the 'effect' of the copying in the 'market for or value of the copyrighted work.'" *Google*, 141 S.Ct. at 1206 (*quoting* 17 U.S.C. § 107(4)); *see also Campbell*, 510 U.S. at 590. Therefore, courts "must consider not just the amount but also the source of the loss." *Google*, 141 S.Ct. at 1206. This requires "distinguish[ing] between 'biting criticism that merely ***suppresses demand*** and copyright infringement which ***usurps it*." *Campbell,* 510 U.S. at 592 (emphasis added; internal brackets omitted).

[9] Citing *Campbell*, 510 U.S. at 588; *TCA*, 839 F.3d at 185, *Abilene Music, Inc. v. Sony Music Entertainment, Inc.*, 320 F.Supp.2d 84, 89 (S.D.N.Y. 2003).

It is axiomatic that market harm from criticism, "even if directly translated into foregone dollars, is 'not cognizable under the Copyright Act.'" *Google*, 141 S.Ct. at 1206 (quoting *Campbell*, 510 at 592). This is because "the law recognizes no derivative market for critical works." *Campbell*, 510 U.S. at 592. Criticism that "may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market." *Id.* at 593; *see also Google*, 141 S.Ct. at 1206 (a 'lethal parody, like a scathing theater review,' may 'kill demand for the original'") (*quoting Campbell*, 510 at 591-92).

Here, the 4/22/21 Podcast provided scathing criticism of the Broadcast and used the Reference Video to serve that purpose. *Hosseinzadeh* is directly on point:

> Here, it is clear to the Court that the [4/22/21 Podcast] does ***not*** serve as a market substitute for the [Broadcast]; anyone seeking to enjoy [the Broadcast] on its own will have a ***very different experience*** watching the [4/22/21 Podcast], which responds to and transforms the [Broadcast] into fodder for caustic, moment-by-moment commentary and mockery. Because the [4/22/21 Podcast] does not offer a substitute for the original, ***it does not (and indeed, cannot) usurp a market that properly belongs to the copyright-holder***.

*Hosseinzadeh*, 276 F.Supp.3d at 47 (internal quotes and brackets omitted).

*Hughes* is also instructive. In *Hughes*, the court found that the fourth fair use factor favored fair use because: the defendant's "***target audience*** (generally political conservatives and libertarians) is ***obviously not the same*** as [plaintiff's] target audience (generally political liberals)" and, therefore, there was "no reason" plaintiff's audience would watch the defendant's "derisively titled" video "simply because it contains parts of her work." 437 F.Supp.3d at 394 (emphasis added).

Here, the derisive title for the 4/22/21 Podcast makes it clear that the 4/22/21 Podcast did not cater to an audience that wanted to sit back and enjoy the event, but rather to an audience that wanted hear why the Broadcast and Fight were a total "disaster." To think anyone would watch the 4/22/21 Podcast as a substitute for the

Broadcast (or to identify the URL for the Reference Video) is comically absurd. This absurdity is emphasized by the Reference Video obtaining ***only sixty-five views***. RJN, ¶¶ 3-4, Exs. C-D. This dispels any doubt whether the 4/22/21 Podcast or the Reference Video served as a market substitute of the Broadcast.

The Supreme Court has also recently stated that the market harm factor "must take into account the public benefits the copying will likely produce" such as "copyright's concern for the creative production of new expression." *Google*, 141 S.Ct. at 1206. The 4/22/21 Podcast is a work of humorous and biting criticism of the Broadcast, which serves the public policy of the Copyright Act to stimulate the creation of new works. Indeed, as the Supreme Court stated: "humorous forms of criticism … ***provide social benefit***, by shedding light on an earlier work, and in the process, creating a new one." *Campbell*, 510 U.S. at 579 (emphasis added).

Therefore, the fourth fair use factor weighs heavily in favor of fair use and, indeed, every fair use factor favors fair use as a matter of law.

### D. <u>Triller's Vicarious Copyright Infringement Claim Also Fails Because Triller Fails to Plead a Direct Financial Interest</u>

For its vicarious copyright infringement claim, Triller also fails to properly plead that Defendants had a "direct financial interest in the infringing activity" for its vicarious copyright infringement claim. *See Erickson Productions, Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) (quoting *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 745 (9th Cir. 2019)). To satisfy this requirement, Triller must plead "a ***causal relationship*** between the infringing activity and any financial benefit a defendant reaps." *Erickson Productions*, 921 F.3d at 829 (emphasis added) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)).

Contrary to Triller's allegations, the Reference Video did not contain any sponsorships or offer for sale any merchandise. RJN, ¶¶ 4, 6 , Exs. D, F. Nor was the Reference Video eligible for monetization under the YouTube Partner Program because the Reference Video was uploaded to the ZTSD Channel, which had less

than one thousand subscribers. *Id.*, ¶¶ 4, 7, Exs. D, G.

Therefore, in addition to the reasons set forth in Sections III.B-C, Triller's vicarious copyright infringement claim fails as a matter of law.

**E.     Triller's FCA Claim Fails as a Matter of Law**

As a threshold matter, Triller's FCA claim fails because it relies solely on legal conclusions and threadbare recitals to allege that Defendants unlawfully intercepted the Broadcast. *See* SAC, ¶¶ 37-44. Further, Triller's FCA claims are barred because Triller explicitly alleges that the Broadcast was transmitted to the public via "online platforms" (*i.e.*, the internet) and after the April 17, 2021 transmission of the Broadcast.[10] *See* SAC, ¶¶ 2, 5, 21, 24, 31-32, 39, 41.

Courts within the Ninth Circuit (and the Central District of California in particular) have repeatedly held that the FCA does not apply to internet transmissions: "although the internet has been in wide usage since the mid-1990s, the legislature has not extended the reach of the [FCA] to include transmissions via the internet and it is not the purview of the district court to insert itself and make this determination." *G & G Closed Cir. Events, LLC v. Espinoza* ("*Espinoza*"), No. CV 18-07894 WDK-JC, 2020 WL 7861971, at *4 (C.D. Cal., Oct. 5 2020); *G & G Closed Cir. Events, LLC v. Rojas* ("*Rojas*"), Case No. EDCV1800438WDKJC, 2020 WL 7861979, at *4 (C.D. Cal., Oct. 5, 2020) (same); *J & J Sports Productions, Inc. v. Bigalbal* ("*Bigalbal*"), Case No. CV 16-02676 WDK-PLA, 2016 WL 10651067, *3 (C.D. Cal., Sept. 20, 2016).[11]

---

[10] Further, in the 4/22/21 Podcast, Ethan explicitly states that TEI employees viewed the Broadcast by using a "link" (*i.e.*, from an internet website). RJN, ¶ 8, Ex. H at 1:31:54-1:32:35.

[11] *See also Espinoza*, 2020 WL 7861971, at *4 ("the Court declines to extend the interpretation of the relevant statutes [*i.e.*, 47 U.S.C. Sections 605] to include unauthorized broadcasts via the internet [and] courts within the Ninth Circuit have reached similar conclusions") (*citing Joe Hand Promotions, Inc. v. Spain*, Case No. 2:15-cv-00152-PHX-SMM, 2016 WL 4158802 (D. Ariz., Aug. 5, 2016); *Joe Hand Promotions, Inc. v. Cusi*, Case No. 3:13-cv-935-MMA-BLM, 2014 WL 1921760, *3, n.4 (S.D. Cal., May 14, 2014)); *Rojas*, 2020 WL 7861979, at *4 (same); (continued).

*Zuffa, LLC v. Justin.tv, Inc.*, 838 F.Supp.2d 1102 (D. Nev. 2012) is directly on point. There, the defendant "had no relationship with the original cable or satellite signal" and, therefore, "did not receive or intercept any actual cable or satellite signal or broadcast." *Id.*, 1107. As for defendant's users retransmitting the work via internet transmission, the court explained: "This is not the type of conduct properly addressed by the Communications Act, but by copyright law (and, potentially, trademark law)." *Id.* Further, the court held that Section 605 of the FCA only applies when the defendant "***extended*** the point of distribution of the ***actual broadcast signal*** distributed over a cable (or satellite) system beyond its authorized limits." *Id.* at 1107 fn. 5 (citing H.R. Rep. No. 98-934 at 83 (1984)) (emphasis added). As such the court found "no evidence in the statutory language, other cases, or legislative history that the Communications Act addresses this type of conduct or was meant to bolster or act as a separate type of copyright claim" and, therefore, "refuse[d] to extend the law in this manner." *Id.* at 1107.

Here, Triller's FCA claims fail because the SAC concedes that the Broadcast was transmitted to the public on "online platforms" (*i.e.*, the internet). *See* SAC, ¶¶ 2, 21, 31, 39. Additionally, the SAC concedes that the Reference Video and the 4/22/21 Podcast were shown via YouTube (*i.e.*, the internet) and were uploaded ***after*** the April 17, 2021 transmission of the Broadcast (*i.e.*, they did not extend the point of distribution of the actual broadcast signal). *See* SAC, ¶¶ 5, 24, 32, 41, Ex. A; RJN, ¶¶ 3-4, Exs. C-D.

For these reasons, Triller's FCA claims fail as a matter of law.

---

*Bigalbal*, 2016 WL 10651067, at *3 (same)); *see also J & J Sports Productions, Inc. v. Tamayo*, Case No. 2:14-cv-01997-KJM-CKD, 2016 WL 2855126, *5 (E.D. Cal., May 16, 2016) (denying summary judgment because a material question of fact remained whether the signal source was from a satellite – which is covered by the FCA – or the internet, which is not); *Joe Hand Promotions v. Albright*, Case No. 2:11-cv-2260 (WBS) (CMK), 2013 WL 2449500, *5 (E.D. Cal., June 5, 2013) (noting an FCA claim is defeated "by evidence that the Program was received through some other method, such as over the internet").

DEFENDANTS' MEMORANDUM OF POINTS AND AUTORITIES ISO ANTI-SLAPP MOTION

## F.    Triller's Alter-Ego Allegations Fail as a Matter of Law

In Paragraphs 17-18 of the SAC, Triller sets forth an alter-ego theory based solely on "conclusory allegation[s], unsupported by facts" and "mere speculation" that does "not adequately plead" alter-ego theory and is "insufficient to defeat a motion to dismiss." *See Gerritsen v. Warner Brothers Entertainment, Inc.*, 116 F.Supp.3d 1104, 1142 (C.D. Cal. 2015).[12] "Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specific facts supporting both of the necessary elements." *Id.* at 1136-37.[13]

To properly plead that TEI was the alter-ego of Teddy Fresh, Ethan and Hila, Triller was required to allege ***facts*** that demonstrate: (1) "a unity of interest and ownership between the corporation and its equitable owner[s] that the separate personalities of the corporation and the shareholder[s] do not in reality exist"; and (2) "an inequitable result if the acts in question are treated as those of the corporation alone." *Gerritsen*, 116 F.Supp.3d at 1136 (*quoting Sonora Diamond Corp. v. Sup. Ct.*, 83 Cal.App.4th 523, 526 (2000)).

As to the unity of interest element, Triller's SAC merely asserts conclusory and threadbare allegations that repackage the alter-ego factors first articulated in *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 838-840 (1962). *Compare Id. with* SAC, ¶ 17. None of these conclusory allegations are sufficient to plead an alter-ego theory. *See Gerritsen*, 116 F.Supp.3d at 1142 (plaintiff's conclusory alter-ego allegations that regurgitated the *Associated Vendor*

---

[12] Citing *NetApp, Inc. v. Nimble Storage, Inc.,* Case No. 5:13-cv-05059 (LHK) (HRL), 2015 WL 400251, * 7 (N.D. Cal. 2015); *Hoang v. Vinh Phat Supermarkets, Inc.,* Case No. 2:13-cv-00725 (WBS) (GGH), 2013 WL 4095042, *14 (E.D. Cal. 2013); *Dollar Tree Stores, Inc. v. Toyama Partners, LLC,* Case No. C 10-0325 (SI) 2011 WL 872724, *2 (N.D. Cal. 2011).

[13] Citing *In re Currency Conversion Fee Antitrust Litigation*, 265 F.Supp.2d 385, 426 (S.D.N.Y. 2003); *Wady v. Provident Live and Accident Insurance Co. of America*, 216 F.Supp.2d 1060, 1067 (C.D. Cal. 2002); *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, Case No. 01 Civ. 02946(AGS), 2002 WL 432390, *12 (S.D.N.Y. Mar. 20, 2002); *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 647 (C.D. Cal. 1983).

factors were insufficient to survive a motion to dismiss).

Further, Triller's SAC also fails to properly plead an inequitable result. Paragraph 18 of Triller's SAC relies "merely [on] allegations [for] the lack of separation" between TEI and Teddy Fresh, Ethan and Hila "and nowhere discuss[es] any reason why continuing to recognize each company's distinct corporate form would sanction a fraud or promote an injustice." *See In re Packaged Seafood Products Antitrust Litigation*, 277 F.Supp.3d 1167, 1189 (S.D. Cal. 2017). Such woefully deficient allegations are insufficient to "plausibly allege the inequitable result required for a finding of alter ego liability." *Id.*; *see also Gerritsen*, 116 F.Supp.3d at 1143-46 (failure to plead facts showing inequitable result required dismissal under F.R.C.P. Rule 12(b)(6)).

Therefore, Triller's alter-ego theory fails as a matter of law and, thus, Teddy Fresh, Ethan and Hila must be dismissed from this action.

## IV.    CONCLUSION

Triller's abuse of the judicial process to punish and silence lawful speech can no longer be countenanced. Triller's lawsuit is retribution for the 4/22/21 Podcast lambasting the Broadcast as a "disaster." Ironically, despite Judge Anderson's public chastisement and Triller's numerous opportunities to file a well-pled complaint, Triller persists in filing "disastrous" and fatally defective complaints – and the SAC is no exception. Since Triller consistently refuses to cease its abuse of the judicial process and Defendants, it is up to this Court to make Triller stop.

Therefore, for the reasons stated above, Defendants respectfully request that this Court grant its motion and dismiss the SAC with prejudice.

Dated: September 6, 2021                    **Law Offices of Lincoln Bandlow**

By _____
LINCOLN D. BANDLOW
ROM BAR-NISSIM
Attorneys for Defendants

DEFENDANTS' MEMORANDUM OF POINTS AND AUTORITIES ISO ANTI-SLAPP MOTION