Lincoln D. Bandlow (SBN: 170449)
Lincoln@BandlowLaw.com
Rom Bar-Nissim (SBN: 293356)
Rom@BandlowLaw.com
**Law Offices of Lincoln Bandlow, P.C.**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.556.9680
Facsimile: 310.861.5550

Attorneys for Defendants
Ted Entertainment, Inc., Teddy Fresh, Inc.,
Ethan Klein and Hila Klein

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRILLER FIGHT CLUB II LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> TED ENTERTAINMENT, INC., a California corporation; TEDDY FRESH, INC., a California corporation; ETHAN KLEIN, an individual; HILA KLEIN, an individual; and DOES 1-10 <br><br> Defendants. | Case No.: 2:21-cv-03942-JAK-KS <br><br> **DEFENDANTS' COMPENDIUM OF EXHIBITS IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12(b)(6)** <br><br> [Notice of Motion and Motion; Declarations of Ethan Klein and Lincoln D. Bandlow, Request for Judicial Notice, and Notice of Lodging filed concurrently herewith] <br><br> Assigned to: Hon. John A. Kronstadt <br><br> Date: November 22, 2021 <br> Time: 8:30 a.m. <br> Place: Courtroom 10B |

## <u>INDEX FOR DEFENDANTS' COMPENDIUM OF EXHIBITS</u>

**Exhibit A**: The May 6, 2021 order (the "5/6/21 Order") of the Honorable Percy Anderson that was entered in the United States District Court for Central District of California case entitled *Triller, Inc. v. Filmdaily.com et al.* (Case No. 2:21-cv-03502-PA-RAO) (the "Filmdaily Action");

**Exhibit B**: The audiovisual work of plaintiff Triller Fight Club II, LLC ("Triller"), entitled *Jake Paul vs. Ben Askren* (the "Broadcast");

**Exhibit C**: The webpage for defendant Ted Entertainment, Inc.'s podcast episode entitled *Jake Paul Fight Was A Disaster – H3 Podcast #244* (the "4/22/21 Podcast");

**Exhibit D**: The webpage for the unlisted video entitled *Jake Knockout* that was referred to in the 4/22/21 Podcast (the "Reference Video");

**Exhibit E**: The YouTube Help article entitled "Change video privacy settings" (the "YouTube Video Privacy Article");

**Exhibit F**: The Reference Video;

**Exhibit G**: The YouTube Help article entitled "YouTube Partner Program overview & eligibility" ("YouTube Partner Eligibility Article");

**Exhibit H**: The 4/22/21 Podcast;

**Exhibit I**: Triller, Inc's initial complaint that was filed in the Filmdaily Action ("Initial Filmdaily Complaint");

**Exhibit J**: Judge Anderson's April 28, 2021 order to show cause that was entered in the Filmdaily Action (the "4/28/21 OSC");

**Exhibit K**: Triller's first amended complaint that was filed in the Filmdaily Action (the "Filmdaily FAC");

**Exhibit L**: Triller's response to the 4/28/21 OSC ("Response to the OSC") that was filed in the Filmdaily Action

**Exhibit M**: The June 29, 2021 meet and confer letter of defendants Ted Entertainment, Inc., Teddy Fresh, Inc., Ethan Klein and Hila Klein to Triller;

DEFENDANTS' COMPENDIUM OF EXHIBITS ISO MOTION TO DISMISS

1   **Exhibit N**: The July 12, 2021 proposed second amended complaint of Triller;

2   **Exhibit O**: The complaint of Triller, LLC against Defendants that was filed

3   in Los Angeles Superior Court entitled *Triller, LLC v. Ted Entertainment, Inc.*

4   (Case No. 21SMCV01225) ("Tortious Interference Action");

5   **Exhibit P**: The definition of the word "stream" from Merriam-Webster's

6   online dictionary.

7   Dated:  September 6, 2021                    **Law Offices of Lincoln Bandlow**

8

9                                           By _____

10                                              LINCOLN D. BANDLOW
                                                ROM BAR-NISSIM
11                                              Attorneys for Defendants

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-3502 PA (RAO) | Date | May 6, 2021 |
|---|---|---|---|
| Title | Triller Fight Club II LLC, Inc. v. Filmdaily.com, et al. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Kamilla Sali-Suleyman | None | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**          ORDER TO SHOW CAUSE

Plaintiff Triller Fight Club II LLC ("Plaintiff") commenced this action against defendants Filmdaily.com, Accesstvpro.co, Onlin2livestream.us, Crackstreamslive.com, Sports-today.club, My-sports.club, Bilasport.com, Trendy Clips, Mike, Your Extra, Eclipt Gaming, ItsLilBrandon, H3 Podcast, and H3H3 Productions (collectively "Defendants"). Plaintiff alleges in its First Amended Complaint ("1st AC") that it is the copyright owner and publisher of the broadcast of the "Jake Paul v. Ben Askren" boxing event (the "Broadcast") and that Defendants "unlawfully uploaded], distribute[d], and publicly display[ed], without authorization the Broadcast" to users of websites operated by or affiliated with Defendants. (1st AC ¶ 1.) The Complaint asserts claims against Defendants for: (1) copyright infringement; (2) violation of the Federal Communications Act pursuant to 47 U.S.C. § 605; (3) violation of the Federal Communications Act pursuant to 47 U.S.C. § 553; (4) conversion; (5) breach of contract; (6) conspiracy; (7) violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and (8) vicarious copyright infringement.

The Court ordered Plaintiff to show cause why one or more of the Defendants should not be dropped from this case for improper joinder. In issuing the Order to Show Cause, the Court noted that the Complaint alleges that Plaintiff "is informed and believes, and thereon alleges, that the actions and omissions that serve as the basis for this complaint were undertaken jointly and with the consent, conspiracy, cooperation, and joint participation of all defendants." (Compl. ¶ 21.)[1/] The Complaint also alleges, on information and belief, "that at all times mentioned herein, each defendant was the agent, joint venture, and/or employee of each and every other defendant, and in doing the things alleged in this complaint, each defendant was acting within the course and scope of such agency, joint venture, and/or employment and with the permission and consent of each of the other defendants." (Id. ¶ 22.) As the Court explained in its Order to Show Cause, other than these conclusory allegations, the Complaint and 1st AC

---

[1/]          The 1st AC contains identical allegations as those asserted in the original Complaint.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-3502 PA (RAO) | Date | May 6, 2021 |
|---|---|---|---|
| Title | Triller Fight Club II LLC, Inc. v. Filmdaily.com, et al. | | |

do not contain any well-pleaded facts that plausibly support even an inference that Defendants acted jointly.  See Ashcroft v. Iqbal, 556 U.S. 662, 679, 664 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  Instead, it appears that Plaintiff has improperly joined its claims against multiple different alleged infringers who have no apparent connection to one another, and who each allegedly infringed Plaintiff's intellectual property rights by making the Broadcast available on the separate websites controlled by each of the separate defendants.  The Complaint does not sufficiently allege, identify, or explain any plausible relationship between all of the Defendants.

Plaintiff has filed a Response to the Court's Order to Show Cause ("Response") and an Ex Parte Application for Expedited Discovery ("Ex Parte Application") (Docket No. 24).  As part of its Response, Plaintiff requests leave to file a proposed Second Amended Complaint ("Proposed 2nd AC").  Plaintiff's Ex Parte Application seeks leave to serve subpoenas on third parties to assist Plaintiff in uncovering the true identities and locations of Defendants, which Plaintiff claims it needs prior to filing a Motion for Preliminary Injunction.  Plaintiff additionally contends that the expedited discovery it seeks would assist it in responding to the Court's Order to Show Cause.

Federal Rule of Civil Procedure 20(a)(2), which allows for permissive joinder, provides:

Persons . . . may be joined in one action as defendants if:

(A)     any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B)     any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2) (emphasis added).  "The first prong, the 'same transaction' requirement, refers to similarity in the factual background of a claim."  Coughlin v. Rogers, 130 F.3d 1348, 1350 (9th Cir. 1997).

In addition to the legal conclusions alleged in the original Complaint and the 1st AC, the Proposed 2nd AC adds an allegation that "Plaintiff is further informed and believes, and thereon

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-3502 PA (RAO) | Date | May 6, 2021 |
|---|---|---|---|
| Title | Triller Fight Club II LLC, Inc. v. Filmdaily.com, et al. | | |

alleges, that certain Defendants were aware of and informed their subscribers, viewers, and fans of the existence of other Defendants' illegal uploading and distribution of the Broadcast, thereby demonstrating Defendants' common enterprise." (Proposed 2nd AC ¶ 24.) Nowhere in Plaintiff's Response does it provide examples of how one or more of the unspecified Defendants informed viewers of other unspecified Defendants' distribution of the Broadcast. Instead, as it had previously, Plaintiff relies on the barest legal conclusions to support the joinder of multiple separate entities without any well-pleaded factual allegations supporting an inference of any joint action by Defendants.

In arguing that the Broadcast itself is the common "transaction or occurrence" supporting joinder of Defendants, Plaintiff appears to have shifted the analysis solely to its copyrighted material rather than any common facts concerning Defendants' alleged infringement. Nothing in Plaintiff's Response provides any well-pleaded facts or other indication that Defendants did anything other than operate independently of one another. By attempting to join Defendants in a single action without any facts to support joint action, Plaintiff increases the risk that the conduct of one defendant will be wrongly attributed to another independent defendant. Put simply, the Court provided Plaintiff with an opportunity to provide the Court with some evidentiary basis to support its conclusory allegations supporting joinder of these Defendants. Plaintiff's failure to provide any such evidence and Ex Parte Application for Expedited Discovery indicates that it currently lacks facts to support joinder and calls into question the adequacy of Plaintiff's compliance with its pre-suit investigation obligations under Federal Rule of Civil Procedure 11.

The Court additionally concludes that Plaintiff has failed to establish good cause for the expedited discovery it seeks in its Ex Parte Application. To justify ex parte relief, "the evidence must show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regularly noticed motion procedures." Mission Power Eng'g Co. v. Continental Cas. Co., 883 F. Supp. 488, 492 (C.D. Cal. 1995). Additionally, "it must be established that the moving party is without fault in creating the crisis that requires ex parte relief." Id. "Courts within the Ninth Circuit generally use the 'good cause' standard to determine whether to permit discovery prior to a Rule 26(f) conference." Apple Inc. v. Samsung Elecs. Co., 768 F. Supp. 2d 1040, 1044 (N.D. Cal. 2011). In determining whether good cause justifies expedited discovery, courts commonly consider factors including: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." American LegalNet, Inc. v. Davis, 673 F. Supp.2d 1063, 1067 (C.D. Cal. 2009).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-3502 PA (RAO) | Date | May 6, 2021 |
|---|---|---|---|
| Title | Triller Fight Club II LLC, Inc. v. Filmdaily.com, et al. | | |

Plaintiff asserts that it requires the third-party discovery to identify the Defendants so that it may file an anticipated Motion for Preliminary Injunction. According to Plaintiff, a preliminary injunction is necessary to prevent the irreparable harm of Defendants continuing to offer the Broadcast without authorization. Plaintiff does not, however, explain what irreparable harm it continues to suffer from the availability of copies of a live sporting event that occurred weeks ago, the outcome of which is publicly available, and lasted less than two minutes. Plaintiff therefore fails to establish the emergency necessary to support the consideration of Plaintiff's request to conduct expedited discovery on an ex parte basis. See Mission Power, 883 F. Supp. at 492; see also Manpower Inc. v. Slingshot Connections LLC, No. 2:12-CV-01069 JAM, 2012 WL 3561974, at *2 (E.D. Cal. Aug. 17, 2012) (holding that a plaintiff could not demonstrate good cause for an ex parte application seeking expedited discovery because plaintiff had selected the hearing date for its motion for preliminary injunction). As a result, there is no justification to allow Plaintiff "to go to the head of the line in front of all other litigants and receive special treatment." Id.

For all of the foregoing reasons, the Court therefore denies Plaintiff's Ex Parte Application without prejudice to its being filed as a regularly-noticed motion. The Court additionally concludes that Defendants are misjoined. Because the Proposed 2nd AC does not cure the misjoinder problem identified by the Court, the Court denies Plaintiff's request for leave to file the Proposed 2nd AC without prejudice to any efforts to seek amendment in a manner consistent with Federal Rule of Civil Procedure 15(a). Pursuant to Federal Rule of Civil Procedure 21, misjoinder of parties "is not a ground for dismissing an action." Instead, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Where there is a misjoinder, "the court can generally dismiss all but the first named [defendant] without prejudice to the institution of new, separate lawsuits [against] the dropped [defendants]." Coughlin, 130 F.3d at 1350. Accordingly, the Court thus drops all Defendants except Filmdaily.com. This order does not limit Plaintiff's ability to refile its claims against the remaining Defendants in separate actions.

IT IS SO ORDERED.

# EXHIBIT B

[On external hard drive filed with Notice of Lodging]

# EXHIBIT C

      

SKIP NAVIGATION



## Jake Paul Fight Was A Disaster - H3 Podcast # 244

1,073,167 views • Apr 22, 2021

 28K     2.1K     SHARE    SAVE    

 **H3 Podcast** ✔
2.92M subscribers

JOIN      SUBSCRIBE

Thank you to http://MagicSpoon.com/H3 for sponsoring this episode!
Become a member for access to the episodes a day early with no ads and no cuts:
http://youtube.com/h3podcast/join

TEDDY FRESH...http://teddyfresh.com
H3 MERCH... http://h3h3shop.com

Follow us on Social Media:
https://twitter.com/theh3podcast
https://www.instagram.com/h3_podcast

Follow Teddy Fresh Social Media:
https://teddyfresh.com
https://instagram.com/teddyfresh
https://twitter.com/teddyfresh

SHOW LESS

SKIP NAVIGATION

 

    

SKIP NAVIGATION



**Jake Paul & Triller Are Suing Me - H3 After Dark # 35**
H3 Podcast ✔
1.8M views • Streamed 2 weeks ago

⋮



**James Charles Entire Channel Demonetized by YouTube - Frenemies # 32**
H3 Podcast ✔
4.5M views • 1 month ago

⋮



**Humanity Is Doomed - H3 Podcast # 245**
H3 Podcast ✔
1M views • 3 weeks ago

⋮



**Logan Paul Says Ethan Is Scum Of The Internet - H3 After Dark #21**
H3 Podcast ✔
1.3M views • Streamed 3 months ago

⋮



**Lawyer Reacts | Josh Duggar Released from Custody. Full Hearing Breakdown**
Emily D. Baker ✔
313K views • Streamed 2 weeks ago

⋮



**A Closer Look: Kenneth Copeland - H3 Podcast #232**
H3 Podcast ✔
869K views • 4 months ago

⋮



**Joe Rogan Trashed Hila On His Podcast - H3 After Dark # 37**
H3 Podcast ✔
1.1M views • Streamed 1 day ago
New

⋮



**The Belle Delphine Mystery & Our New Studio - H3 Podcast # 246**
H3 Podcast ✔
879K views • 2 days ago
New

⋮



**Lawyer Reacts | Let's Talk...about the legal side of the Dobrik Cancellation.**
Emily D. Baker ✔
113K views • Streamed 2 months ago

⋮

SKIP NAVIGATION

SKIP NAVIGATION

 

    



1.4M views • 1 month ago



**The American Meltdown - H3 Podcast #230**
H3 Podcast ✔
1M views • Streamed 4 months ago



**Infowars Attacks Ethan - H3 Podcast # 243**
H3 Podcast ✔
948K views • 1 month ago



**Jake Paul Exposed By Bombshell New York Times Article - H3 After Dark # 33**
H3 Podcast ✔
1.8M views • Streamed 4 weeks ago



**GET THIS CRAP OFF UR CAR!! - Cheugy Design 101**
iDubbbzTV ✔
490K views • 1 day ago
New



**Does YouTube Have a Predator Problem? - H3 Podcast #231**
H3 Podcast ✔
885K views • 4 months ago

 

**Case Brief | The Triller v. The H3 Podcast Lawsuit**
Emily D. Baker ✔
40K views • 1 week ago

**Jeff Wittek, David Dobrik, & TRIVIA! - Frenemies # 33**
H3 Podcast ✔
4.1M views • 3 weeks ago

**Corpse Husband, Psycho Twitch Streamers, Joe Rogan Is Tiny Joker - H3 Podcast #233**
H3 Podcast ✔
867K views • 3 months ago

**Twitch Hot Tubs & Bitconnect Carlos Calls In - H3 After Dark # 34**
H3 Podcast ✔

SKIP NAVIGATION



    

SKIP NAVIGATION

**Shane Dawson, Dr DisRespect, Tati Westbrook, Chris D'Elia - H3 Podcast #196**

H3 Podcast ✓
1.6M views • 10 months ago

⋮

| SHOW MORE |
|:---:|

**6,278** Comments        ≡ SORT BY

     Add a public comment...



**bee** 1 month ago
so nice of hila to lend this guy her channel <3

👍 3.1K  👎    REPLY                                                    ⋮

▾ View 47 replies

 **Liquid Richard** 4 weeks ago
Dan's off- mic laugh lowkey cures my depression                        ⋮

👍 1K  👎    REPLY

▾ View 13 replies

**Kylee Haynes** 1 month ago
Ethan: **Looks for compliments**
Ethan: **Receives compliments**
Ethan: I don't wanna hear that Dan.                                    ⋮

👍 781  👎    REPLY

▾ View reply

**Dad** 1 month ago
I always find it odd when Ethan and the crew assume the audience doesn't want to see
behind the scene content? Foot Soldiers are here for it ALL.            ⋮

👍 562  👎    REPLY

▾ View 2 replies

**Mitch Davey** 1 month ago
I love how Ethan is slightly off center of the shot when Hila is gone so we feel her absence.  ⋮

SKIP NAVIGATION
REPLY

SKIP NAVIGATION

     

**Finn Kafka** 1 month ago

Ethan is literally Michael Scott seeking compliments and approval from his employees. Never gets old for me.

👍 10K  👎    REPLY

 View 84 replies

**Fahmida** 4 weeks ago

I dont think it's weird that Zach's parents are like "Stay until you're 50". I promise there are a lot of foreign parents out there who fully expect you to live with them until you get married

👍 327  👎    REPLY

View 17 replies

**c** 1 month ago

Zach kills me with his soundbites, when Ethan and Dan were talking about Frank and the "F word" I was thinking "please play Snoop FUCK, do it play the Snoop" and Zach comes in with the FUCK soundbite hahahaha

👍 478  👎    REPLY

View 5 replies

**SharpieElectricity** 1 month ago

Ethan there's literally no need to feel insecure about anything when you pulled a girl like Hila. It's good that you want to be healthier and drop some weight but you shouldn't be putting yourself down. You have way more to offer than just your looks!

👍 179  👎    REPLY

View 8 replies

**Sara Strohschein** 4 weeks ago (edited)

My grandma lives like 2 miles away from where George Floyd was killed. She says the whole area has felt so dark ever since. But the second they announced the guilty verdict, she felt a huge wave a darkness weight lift and like she could finally breathe again... idk, I just felt like that was so sad yet strangely poetic

👍 124  👎    REPLY

View 4 replies

**Ricky** 1 month ago (edited)

Hey H3,
Could you set up a camera in front of Ethan the next time he sits down to get in costume? A time lapse of  seeing the magic happen would be awesome.

# EXHIBIT D



Jake Knockout

🔒 Private

65 views • Apr 18, 2021                                              👍 1      👎 0      ➤ SHA

 **Zach The Sound Lad**                                                           ANALYT
524 subscribers

Comments are not supported on private videos. Learn more

# EXHIBIT E

# Change video privacy settings

Update the privacy settings of your video to control where your video can appear and who can watch it.

**Computer**     Android     iPhone & iPad

## Change video privacy settings

1. Sign in to YouTube Studio .
2. From the left menu, select **Content**.
3. Point to the video you'd like to update. To see your live uploads, select the **Live** tab.
4. Click the down arrow under "Visibility" and choose **Public**, **Private**, or **Unlisted**.
5. **Save**.

## Watch how to change video privacy settings

Check out the following video from the YouTube Creators channel on how to change video privacy settings.



Edit Video Settings with YouTube Studio



## About privacy settings

### Public videos

**Anyone at YouTube can see public videos**. **They can also be shared with anyone using YouTube**. They're posted on your channel when you upload them and show up in search results and related video lists.

### Private videos

Private videos and playlists can only be **seen by you and whomever you choose**. Your private videos won't appear in the **Videos** tab of your channel homepage. They also won't show up in YouTube's search

results. YouTube systems and human reviewers may review private videos for ad suitability, copyright, and other abuse prevention mechanisms.

To share a private video:

1. Sign in to YouTube Studio    .
2. From the left menu, select **Content**.
3. Click the video you'd like to edit.
4. Click the **Visibility** box and select **Share privately.**
5. Enter the emails you'd like to share your video with, then select **SAVE.**

Comments are not available on private videos. If you want to allow comments on a video that's not publicly available, change the privacy setting to unlisted.

## Unlisted videos

Unlisted videos and playlists can be **seen and shared by anyone with the link**. Your unlisted videos won't appear in the **Videos** tab of your channel homepage. They won't show up in YouTube's search results unless someone adds your unlisted video to a public playlist.

You can share an unlisted video's URL. Those you share the video with don't need a Google Account to see the video. Anyone with the link can also reshare it.

| Feature | Private | Unlisted | Public |
|---|---|---|---|
| Can share URL | No | Yes | Yes |
| Can be added to a channel section | No | Yes | Yes |
| Shows up in search, related videos, and recommendations | No | No | Yes |
| Posted on your channel | No | No | Yes |
| Shows in Subscriber feed | No | No | Yes |
| Can be commented on | No | Yes | Yes |

# EXHIBIT F

[On external hard drive filed with Notice of Lodging]

# EXHIBIT G

# YouTube Partner Program overview & eligibility

**Update November 2020**: The FAQ section has been expanded. We've also provided context around why you may see ads on videos from channels that aren't in the YouTube Partner Program.

The YouTube Partner Program (YPP) gives creators greater access to YouTube resources and features like direct access to our Creator Support team. It also enables revenue sharing from ads being served on your content. In this article, you can review:

- Available features
- Criteria for joining
- The application checklist
- Other miscellaneous FAQs on YPP



## What you get

- Access to our Creator Support teams
- Access to the Copyright Match Tool
- Access to our monetization features

## Minimum eligibility requirements to join

1. Follow all the YouTube monetization policies.
    - The YouTube monetization policies are a collection of policies that allow you to monetize on YouTube. As a YouTube partner, your agreement including the YouTube partner program policies require compliance with these monetization policies to potentially earn money on YouTube.

2. Live in a country/region where the YouTube Partner Program is available.
3. Have more than 4,000 valid public watch hours in the last 12 months.
4. Have more than 1,000 subscribers.
5. Have a linked AdSense account.

# YouTube Partner Program application checklist

Everyone who meets our threshold can apply for YPP, but you do need to meet some of our guidelines to be considered. This checklist is meant to guide you through the application process.

1. **Make sure your channel follows our policies and guidelines**. When you apply, you'll go through a standard review process to check whether your channel meets our policies and guidelines. Channels that meet our policies and guidelines will be accepted into the program. We also constantly check channels in the program to make sure they continue to meet our policies and guidelines.

2. **Enable 2-Step Verification for your Google Account**, which means you'll protect your account with both your password and a second device. Not having 2-Step Verification may cause a delay in your application review, so we highly recommend Enable 2-Step Verification for your Google Account. Go to g.co/2sv to get started.

3. **Have at least 1,000 subscribers and 4,000 valid public watch hours.** When we assess channels for the YouTube Partner Program, we need context. When you reach this threshold, it usually means that you have more content. The threshold helps us make a more informed decision about whether your channel meets our policies and guidelines. You can apply for YPP once you reach this threshold.

4. **Sign YPP terms.** You can ask to be notified when you reach the subscriber and public watch hour threshold. Once your channel meets the threshold, follow these instructions:

   a. Sign in to YouTube.

   b. In the top right, click your profile picture  >  **YouTube Studio**.

   c. In the left menu, click **Monetization**.

   d. If you're under the threshold, click **Notify me when I'm eligible** to get an email. You'll receive an email when you've reached 1,000 subscribers and 4,000 watch hours over the past 12 months. If you meet the threshold, click Start on the "Review Partner Program terms" card.

   e. Once you've signed the term, we'll mark this step with a green "Done" sign on the "Review Partner Program terms" card.

5. **Make sure you only have 1 AdSense account.** As part of the application process, you'll need to connect an AdSense account to get paid.

   a. Click **Start** on the "Sign up for Google AdSense" card.

      • If you already have an AdSense account, use the one that's already approved. You can link as many of your channels as you want to a single AdSense account.

      • If you don't have an AdSense account, you can create one by following the on-screen instructions.

   b. Once you've connected your AdSense, we'll mark this step with a green "Done" sign on the "Sign up for Google AdSense" card.

6. **Get reviewed.** Once you sign the YouTube Partner Program terms and connect an AdSense account, your channel will automatically be put in a review queue. Our automated systems and human reviewers will then review your channel's content to check whether your account has followed all of our guidelines. You can check your application status anytime at https://studio.youtube.com/channel/UC/monetization .

   a. **If you're accepted into YPP:** Congratulations! You can now set up ad preferences and enable monetization on your uploads. Here's a list of FAQs that we get from creators who have just joined YPP.

   b. **If you're rejected from YPP**: Our reviewers found that a significant portion of your channel doesn't meet our policies and guidelines. You can re-apply 30 days after your rejection. Check out our FAQs for tips on how to strengthen your application.

## Review process

Your application will be put into queue once you:

- Meet our subscriber and watch time thresholds
- Sign the YouTube Partner Program terms
- Connect your AdSense account

Our human reviewers will assess your channel as a whole to check whether your account meets our YouTube monetization policies.

We'll get back to you with a decision once your channel is reviewed (**typically about 1 month after you meet the threshold**).

**Note**: Sometimes, you may need to wait more than a month. There can be multiple reasons for delays -- higher-than-usual application volumes, system issues, or we may occasionally need to shift resources. Our policy specialists try to get through applications as fast as possible, but delays can happen because we have a limited number of specialists.

**Can you speed up my application?**

No. Our teams can't speed up your application. All applications are put in a queue, and will be processed in the order they're received. Sometimes channels require multiple reviews, especially when multiple reviewers disagree on your channel's suitability for YPP. In these cases, multiple reviews may be needed, which means it may take more time for a decision to be made.

# Stay active to keep making money

As the YouTube Partner Program continues to grow, it's important to maintain a healthy, active ecosystem of channels. To focus our support for creators who are active and engaged with the community, we may disable monetization on channels that haven't uploaded a video or posted to the Community tab for 6 months or more.

# FAQs around applying and more

What if I don't meet the program threshold?

What does "valid public watch hours" mean?

If I meet the threshold, do I automatically get into YPP?

What happens if my counts drop below the threshold after I apply?

What if I already applied in Creator Studio Classic?

I'm no longer in YPP (or I was never in the program) and I'm seeing ads on my videos. Am I earning revenue from those ads?

New to YPP and unsure where to go next? Take the Welcome to YPP lesson on Creator Academy .

# EXHIBIT H

[On external hard drive filed with Notice of Lodging]

# EXHIBIT I

FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
MICHAEL O'BRIEN (SBN 277244)
mobrien@novianlaw.com
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, California 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222

Attorneys for Plaintiff TRILLER, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRILLER, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FILMDAILY.COM, an unknown business entity; ACCESSTVPRO.CO, an unknown business entity; ONLINE2LIVESTREAM.US, an unknown business entity; CRACKSTREAMSLIVE.COM, an unknown business entity; SPORTS-TODAY.CLUB, an unknown business entity; MY-SPORTS.CLUB, an unknown business entity; BILASPORT.COM, an unknown business entity; TRENDY CLIPS, an unknown business entity; MIKE, an unknown business entity; YOUR EXTRA, an unknown business entity; ECLIPT GAMING, an unknown business entity; ITSLILBRANDON, an unknown business entity; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR:**<br>1. **COPYRIGHT INFRINGEMENT**<br>2. **VIOLATION OF THE FEDERAL COMMUNICATIONS ACT: 47 U.S.C. § 605**<br>3. **VIOLATION OF THE FEDERAL COMMUNICATIONS ACT: 47 U.S.C. § 553**<br>4. **CONVERSION**<br>5. **BREACH OF CONTRACT**<br>6. **CONSPIRACY**<br>7. **VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT: 18 U.S.C. § 1030**<br>8. **VICARIOUS COPYRIGHT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

4820-8923-8759, v. 2

Plaintiff Triller, Inc., a Delaware corporation ("Plaintiff" or "Triller") hereby complains against Defendants FILMDAILY.COM, an unknown business entity ("Filmdaily.com"); ACCESSTVPRO.CO, an unknown business entity ("Accesstvpro.co"); ONLINE2LIVESTREAM.US, an unknown business entity ("Online2livestream.us"); CRACKSTREAMSLIVE.COM, an unknown business entity ("Crackstreamslive.com"); SPORTS-TODAY.CLUB, an unknown business entity ("Sports-today.club"), MY-SPORTS.CLUB, an unknown business entity ("My-sports.club"), BILASPORT.COM, an unknown business entity ("Bilasport.com"), TRENDY CLIPS, an unknown business entity ("Trendy Clips"), MIKE, an unknown business entity ("Mike"), YOUR EXTRA, an unknown business entity ("Your Extra"), ECLIPT GAMING, an unknown business entity ("Eclipt Gaming"), ITSLILBRANDON, an unknown business entity ("ItsLilBrandon"), and DOES 1 through 100, inclusive (collectively, the "Defendants"), and alleges as follows:

## **NATURE OF THIS ACTION**

1.      Through this action, Triller seeks in excess of $100,000,000.00 against Defendants and each of them all of whom are cyber-criminals, for their outright theft and diversion of upwards of 2,000,000 unique viewers by providing them with illegal and unauthorized viewings of the Broadcast of the Jake Paul vs. Ben Askren boxing event.  Plaintiff is the copyright owner and publisher of the Triller Fight Club broadcast of the "Jake Paul vs. Ben Askren" boxing event, including all undercard bouts and the entire television broadcast, exhibited via closed circuit television and via encrypted satellite signal (hereinafter referred to as the "Broadcast"). The Broadcast originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized online platforms. Plaintiff institutes this action to obtain remedy for—and to permanently hinder—the blatantly unlawful infringement and rampant theft of its copyrighted work by the Defendants. Defendants, and each of them, have utilized various torrent and streaming websites

2

COMPLAINT

1  such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co,
2  https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/,
3  https://my-sports.club/, and https://bilasports.com to unlawfully upload, distribute,
4  and publicly display, without authorization, the Broadcast to the users of such
5  websites. Upon information and belief, Defendants, and each of them, acted
6  knowingly, willfully, unlawfully and with blatant disregard to Plaintiff's copyright in
7  the Broadcast by uploading the Broadcast to the aforementioned websites with
8  additional shareable payment links, such as PayPal links, which allow users to remit
9  direct payments to the various Defendants in order to fund and endorse each respective
10  Defendants' infringement of Plaintiff's Broadcast. Defendants' calculated and
11  reprehensible infringement, theft, and other unlawful acts—committed in knowing
12  violation of the law—has resulted in damages suffered by Plaintiff in excess of
13  $100,000,000.00, by stealing and diverting upwards of 2,000,000 unique viewers of
14  the illegal and unauthorized viewings of the Broadcast from Plaintiff.

15      2.    Acting with intentional and knowing disregard of Plaintiff's exclusive
16  rights in the Broadcast, Defendants—who are nothing less than cyber-criminals—
17  employ various user profiles on websites, including those mentioned above, to
18  illegally upload copyrighted programming, including the Broadcast, and to facilitate
19  the unauthorized copying, sharing, downloading, uploading, and distribution of such
20  programming. Through their egregious conduct, Defendants also encourage other
21  online users to copy, share, download, distribute and share the Broadcast on the
22  aforementioned websites. Defendants further unlawfully facilitate, participate, and
23  induce other users to engage in the unauthorized reproduction, adaptation, distribution
24  and public display of Plaintiff's copyrighted Broadcast all to line their own pockets
25  with monies that belong to Plaintiff.

26      3.    Notwithstanding each Defendants' recognition that Plaintiff never
27  authorized their respective copying, downloading, uploading, public display and/or
28  distribution of the Broadcast, Defendants continue to engage—and unjustly benefit—

<div align="center">3</div>
<div align="center">COMPLAINT</div>

from their infringing conduct. Defendants' plain acts of thievery, misappropriation, and infringement, as further described herein, are tantamount to, and no less deplorable than, the acts of a pilferer, poaching on and looting the fruits of another's hard-earned labor.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction pursuant to 17 U.S.C. § 101, *et seq.* and 28 U.S.C. § 1331, which states that district courts shall have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States; and 28 U.S.C. Section § 1338 (a).

5.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.  In the alternative, venue is also proper under 28 U.S.C. § 1391(b)(3), as Defendants, and each of them, are subject to the court's personal jurisdiction with respect to this action.

## PARTIES

6.     Plaintiff is a corporation incorporated under the laws of Delaware and having its principal place of business in the State of California.

7.     Plaintiff is engaged in the business of distributing its copyrighted materials as defined in 17 U.S.C. § 101, and offering such content, including the Broadcast, for purchase on a Pay-Per-View basis to its paying customers over the internet or via cable or satellite TV. Plaintiff invests substantial money, time, and effort in advertising, promoting, selling, and licensing programming such as the Broadcast.

8.     Plaintiff owns the copyrights to the Broadcast. As the exclusive owner of the Copyright in its programing, including but not limited to the Broadcast, Plaintiff possesses the exclusive rights to, *inter alia*, exhibit, distribute, disseminate and perform the Broadcast publicly.

9.     Upon information and belief, Defendant Filmdaily.com is a business entity, the exact nature of which is unknown, registered in Nevada and doing business

4
COMPLAINT

in the State of California. Upon information and belief, Filmdaily.com offers the website https://filmdaily.co for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Filmdaily.com through its illegal uploading and distribution of the Broadcast.

10.    Upon information and belief, Defendant Accesstvpro.co is a business entity, the exact nature of which is unknown, registered in Arizona and doing business in the State of California. Upon information and belief, Accesstvpro.co offers the website https://accesstvpro.co for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Accesstvpro.co through its illegal uploading and distribution of the Broadcast.

11.    Upon information and belief, Defendant Online2livestream.us is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Online2livestream.us offers the website https://online2livestream.us for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Online2livestream.us through its illegal uploading and distribution of the Broadcast.

12.    Upon information and belief, Defendant Crackstreamslive.com is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Crackstreamslive.com offers the website https://crackstreamslive.com for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or

4820-8923-8759, v. 2

1   controlled by Plaintiff, including the Broadcast, which was offered by
2   Crackstreamslive.com through its illegal uploading and distribution of the Broadcast.

3       13.    Upon information and belief, Defendant Sports-today.club is a business
4   entity, the exact nature of which is unknown, doing business in the State of California.
5   Upon information and belief, Sports-today.club offers the website https://sports-
6   today.club/ for the purpose of permitting, encouraging, facilitating, and inducing the
7   sharing of videos and live programing of audiovisual materials between users of the
8   website. Those materials include programming owned and/or controlled by Plaintiff,
9   including the Broadcast, which was offered by Sports-today.club through its illegal
10  uploading and distribution of the Broadcast.

11      14.    Upon information and belief, Defendant My-sports.club is a business
12  entity, the exact nature of which is unknown, doing business in the State of California.
13  Upon information and belief, My-sports.club offers the website https://my-sports.club/
14  for the purpose of permitting, encouraging, facilitating, and inducing the sharing of
15  videos and live programing of audiovisual materials between users of the website.
16  Those materials include programming owned and/or controlled by Plaintiff, including
17  the Broadcast, which was offered by My-sports.club through its illegal uploading and
18  distribution of the Broadcast.

19      15.    Upon information and belief, Defendant Bilasport.com is a business
20  entity, the exact nature of which is unknown, doing business in the State of California.
21  Upon information and belief, Bilasport.com offers the website https://bilasports.com
22  for the purpose of permitting, encouraging, facilitating, and inducing the sharing of
23  videos and live programing of audiovisual materials between users of the website.
24  Those materials include programming owned and/or controlled by Plaintiff, including
25  the Broadcast, which was offered by Bilasport.com through its illegal uploading and
26  distribution of the Broadcast.

27      16.    Upon information and belief, Defendant Trendy Clips is a business
28  entity, the exact nature of which is unknown, doing business in the State of

6
COMPLAINT

California. Upon information and belief, Trendy Clips operates the Youtube channel located at https://www.youtube.com/channel/UCYj6TdieiWvyuQc4s6J88uw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Trendy Clips through its illegal uploading and distribution of the Broadcast.

17.     Upon information and belief, Defendant Mike is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Mike operates the Youtube channel located at https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Mike through its illegal uploading and distribution of the Broadcast.

18.     Upon information and belief, Defendant Your Extra is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Your Extra operates the Youtube channel located at https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Your Extra through its illegal uploading and distribution of the Broadcast.

19.     Upon information and belief, Defendant Eclipt Gaming is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Eclipt Gaming operates the Youtube

COMPLAINT

1   channel located at

2   https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for the

3   purpose of permitting, encouraging, facilitating, and inducing the sharing of videos

4   and live programing of audiovisual materials between users of the website. Those

5   materials include programming owned and/or controlled by Plaintiff, including the

6   Broadcast, which was offered by Eclipt Gaming through its illegal uploading and

7   distribution of the Broadcast.

8        20.    Upon information and belief, Defendant ItsLilBrandon is a business

9   entity, the exact nature of which is unknown, doing business in the State of

10  California. Upon information and belief, ItsLilBrandon operates the Youtube channel

11  located at https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for

12  the purpose of permitting, encouraging, facilitating, and inducing the sharing of

13  videos and live programing of audiovisual materials between users of the website.

14  Those materials include programming owned and/or controlled by Plaintiff,

15  including the Broadcast, which was offered by ItsLilBrandon through its illegal

16  uploading and distribution of the Broadcast.

17       21.    Plaintiff is informed and believes, and thereon alleges, that the actions

18  and omissions that serve as the basis for this complaint were undertaken jointly and

19  with the consent, conspiracy, cooperation, and joint participation of all defendants.

20       22.    Plaintiff is informed and believes, and thereon alleges, that at all times

21  mentioned herein, each defendant was the agent, joint venture, and/or employee of

22  each and every other defendant, and in doing the things alleged in this complaint, each

23  defendant was acting within the course and scope of such agency, joint venture, and/or

24  employment and with the permission and consent of each of the other defendants.

25       23.    The true names and capacities, whether individual, corporate, associate,

26  or otherwise, of Defendants named herein as DOES 1 through 10, inclusive, and each

27  of them, are unknown to Plaintiff at this time.  Plaintiff therefore sues said Defendants,

28  and each of them, by such fictitious names.  Plaintiff will advise the Court and seek

1   leave to amend this Complaint when the true names and capacities of each such
2   Defendant has been ascertained.  Plaintiff is informed and believes, and based thereon
3   alleges, that each such Defendant designated as a DOE is responsible in some manner
4   for the events and happenings referred to herein or as hereinafter specifically alleged.

5   **<u>COUNT ONE:</u>**

6   **(For Copyright Infringement Against All Defendants)**

7       24.    Plaintiff hereby realleges, and by this reference incorporates herein, each
8   and every allegation of preceding and subsequent paragraphs as though fully set forth
9   herein.

10      25.    Plaintiff is the owner of the copyrights to the Broadcast, including all
11  undercard bouts and the entire television Broadcast. Plaintiff's rights include, but are
12  not limited to, all moving images and other audio/video content which were
13  broadcasted via encrypted satellite signal. The Broadcast originated via satellite uplink
14  and were subsequently retransmitted to cable systems and satellite companies via
15  satellite signal and/or retransmitted via satellite signal to licensed content distributors
16  such as Plaintiff's authorized, online platforms.

17      26.    As the copyright holder to the rights of the Broadcast, Plaintiff has the
18  exclusive right to copy, publicly perform and distribute it.

19      27.    Defendants, and each of them, failed to obtain the property authority or
20  license from Plaintiff to copy, publicly perform or distribute the Broadcast.

21      28.    Upon information and belief, Defendants illegally copied, uploaded,
22  publicly performed and distributed the Broadcast via the internet with full knowledge
23  that the Broadcast could only be obtained by purchasing a license from Plaintiff.

24      29.    Defendants, and each of them, have utilized various torrent and
25  streaming websites such as https://filmdaily.co, https://accesstvpro.co,
26  https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/,
27  https://my-sports.club/, https://bilasports.com, and https://youtube.com to upload,
28  distribute, and publicly display the Broadcast to the users of such website in direct

9
COMPLAINT

1   violation of the exclusive rights owned by Plaintiff.

2       30.    Specifically, upon information and belief, the Defendants, and each of

3   them, obtained the Broadcast through internet websites, cable and/or satellite Pay-Per-

4   View purchase intended for private, non-commercial viewing, and subsequently

5   illegally re-transmitted the Broadcast and publicly exhibited the Broadcast by illegally

6   copying and uploading the Broadcast to the aforementioned websites for other users

7   to also illegally view, download, access, share, and distribute.

8       31.    Defendants, and each of them, have infringed on Plaintiff's copyright in

9   the Broadcast by reproducing, adapting distributing, uploading, copying, and publicly

10  displaying the copyrighted works without Plaintiff's authorization in violation of the

11  Copyright Act, 17 U.S.C. § 501, and have recouped profits from the aforementioned

12  websites through users' payments to the Defendants or through advertising revenue

13  generated through the websites.

14      32.    Defendants' acts of infringement were willful, in blatant disregard of, and

15  committed with indifference to Plaintiff's rights.

16      33.    By reason of Defendants' conduct as described herein, Defendants, and

17  each of them, willfully violated 17 U.S.C. § 501.

18      34.    Due to Defendants' acts of copyright infringement as alleged herein,

19  Defendants have obtained direct and indirect profits Defendants would not otherwise

20  have realized but for Defendants' infringement of the Broadcast. As such, Plaintiff is

21  entitled to disgorgement of Defendant's profits directly and indirectly attributable to

22  Defendants' infringement of the Broadcast, in an amount to be established at trial,

23  but in no event less than $100,000,000.00.

24      35.    Plaintiff is further entitled to its attorney's fees and full costs pursuant to

25  17 U.S.C. § 505.

26  ///

27  ///

28  ///

10

COMPLAINT

1

**COUNT TWO:**

2

**(For Violations of the Federal Communications Act: 47 U.S.C. §605 Against All**

3

**Defendants)**

4      36.    Plaintiff hereby realleges, and by this reference incorporates herein, each

5  and every allegation of preceding and subsequent paragraphs as though fully set forth

6  herein.

7      37.    Plaintiff is the owner of the Broadcast, including all undercard matches

8  and the entire television broadcast, aired via closed circuit television and via encrypted

9  satellite signal.

10     38.    The Broadcast was available for non-commercial, private viewing

11  through Plaintiff, its authorized online vendors, as well as through Pay-Per-View

12  purchase through authorized satellite TV providers. Defendants, in a calculated effort

13  to use Plaintiff's Broadcast for their own commercial benefit, obtained access to

14  Plaintiff's Broadcast by purchasing the programming and subsequently copying the

15  Broadcast and uploading it to torrent and streaming websites such as and

16  https://youtube.com,         https://filmdaily.co,         https://accesstvpro.co,

17  https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/,

18  https://my-sports.club/, and https://bilasports.com.

19     39.    In order to purchase and view the Broadcast through a satellite TV

20  provider intended for private, non-commercial viewing, an individual purchaser was

21  subject to the copyright language contained therein which expressly stated that the

22  "unauthorized reproduction or distribution of the copyrighted work is illegal."

23     40.    Upon information and belief, with full knowledge that the Broadcast was

24  not to be received, distributed, reproduced and or publicly exhibited by individuals

25  unauthorized to do so, Defendants, without authorization from Plaintiff, unlawfully

26  intercepted, received and/or de-scrambled Plaintiff's satellite signal for purposes of

27  direct commercial advantage and subsequently divulged the Broadcast to the public

28  by copying and distributing said Broadcast to the users of the aforementioned websites

11

COMPLAINT

1    in exchange for payments to aid, encourage, support, or otherwise endorse Defendants'

2    infringing conduct.

3         41.    Upon information and belief, Plaintiff alleges that Defendants effected

4    unauthorized interception and receipt of Plaintiff's Broadcast via Defendants' satellite

5    TV service by ordering programming for residential use and subsequently copying,

6    uploading, distributing and publicly displaying the Broadcast without authorization,

7    or by such other means which are unknown to Plaintiff and known only to Defendants.

8         42.    47 U.S.C. § 605(a) prohibits the unauthorized reception and publication

9    or use of communications such as the Broadcast for which Plaintiff had the distribution

10   rights thereto.

11        43.    By reason of Defendants' conduct as described herein, Defendants, and

12   each of them, willfully violated 47 U.S.C. § 605(a)

13        44.    As a proximate result of Defendants' willful violations of 47 U.S.C. §

14   605(a), Plaintiff is entitled to damages, in the discretion of this Court, under 47 U.S.C.

15   § 605(a), Plaintiff is entitled to damages, in the discretion of this Court, under 47

16   U.S.C. § 605(e)(3)(C)(i)(II) and (ii) of up to the maximum amount of $110,000.00 as

17   to *each* violation.

18        45.    Pursuant to 47 U.S.C. § 605, Plaintiff is also entitled to an award of full

19   costs, interest and reasonable attorney's fees.

20   <div align="center">**<u>COUNT THREE:</u>**</div>

21   <div align="center">**(For Violations of the Federal Communications Act: 47 U.S.C. §553 Against All**

22   **Defendants)**</div>

23        46.    Plaintiff hereby realleges, and by this reference incorporates herein, each

24   and every allegation of preceding and subsequent paragraphs as though fully set forth

25   herein.

26        47.    Upon information and belief, Defendants willfully and unlawfully

27   accessed, received, and subsequently re-transmitted the Broadcast over a cable TV or

28   internet system while knowing that they were unauthorized to do so.

<div align="center">12

COMPLAINT</div>

48.     47 U.S.C. §553 prohibits the unauthorized reception of any communications service offered over a cable system such as the transmission of the Broadcast for which Plaintiff holds the copyright ownership thereto.

49.     Upon information and belief, the Defendants knowingly, willfully and unlawfully accessed, received and subsequently re-transmitted the Broadcast when it was offered via a cable TV or internet subscription without the authorization from Plaintiff and without paying Plaintiff the appropriate Pay-Per-View fee.

50.     By reason of Defendants' conduct as described herein, Defendants, and each of them, willfully violated 47 U.S.C. §553.

51.     As a proximate result of Defendants' willful violations of 47 U.S.C. §553, Plaintiff is entitled to damages in an amount, in the discretion of this Court, of up to the maximum amount of $60,000.00 as to each violation, plus the recovery of full costs, interest and reasonable attorney's fees, in the discretion of this Court.

## COUNT FOUR:

### (For Conversion Against All Defendants)

52.     Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

53.     Plaintiff, at all relevant times, owned, possessed, and had the right to possess the copyrights to the Broadcast.

54.     By virtue of Defendants' conduct as set forth herein, Defendants, and each of them, knowingly and intentionally substantially interfered with Plaintiff's property by unlawfully converting it for their own commercial use, benefit, and private financial gain.

55.     Defendants' acts of conversion were done without Plaintiff's consent and with the objective of depriving Plaintiff of its copyright ownership for Defendants' direct commercial benefit, advantage and private financial gain.

56.     As a proximate result of Defendants' wrongful conversion of the

COMPLAINT

Broadcast, Plaintiff suffered damages in an amount subject to proof at trial but in no event less than $100,000,000.00.

## COUNT FIVE

### (For Breach of Contract Against All Defendants)

57.     Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

58.     Plaintiff would show that pursuant to Plaintiff's Terms of Use for its programming of the Broadcast, any user of Plaintiff's authorized websites for Pay-Per-View purchase and any purchaser of a residential Pay-Per-View feed from Plaintiff, either via cable or satellite TV, agreed not to reproduce, distribute, or transmit any of Plaintiff's materials, including the Broadcast.

59.     Upon information and belief, Defendants, and each of them, purchased the Broadcast through Plaintiff's authorized websites or via Pay-Per-View purchase for private, residential viewing.

60.     Upon information and belief, with full knowledge that the Broadcast was not to be unlawfully copied and distributed by individuals unauthorized to do so, Defendants willfully and unlawfully copied, uploaded and distributed the Broadcast to users of   torrent and streaming websites such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/,and https://bilasports.com so that the Broadcast could be accessed free of charge.

61.     As a proximate result of Defendants breach of their respective agreements with Plaintiff, Plaintiff has been damaged through the loss of substantial amounts of revenue, loss of business, loss of good-will and loss of customers, the sum value of which will be proven at trial but which is an amount no less than $100,000,000.00

///

///

14

COMPLAINT

## COUNT SIX

### (For Conspiracy Against All Defendants)

62.    Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

63.    Upon information and belief, Defendants, and each of them, had an agreement between two or more persons.

64.    Upon information and belief, pursuant to the respective Defendants' agreements, Defendants set out to intentionally, willfully, and unlawfully access and copy Plaintiff's  Broadcast and subsequently upload the Broadcast for distribution and public display in exchange for direct contributions from the users of the websites known as such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com or for advertisement revenue from such websites.

65.    Upon information and belief, Defendants, and each of them, intentionally, willfully, and unlawfully accessed, copied, uploaded, distributed, and publicly displayed Plaintiff's Broadcast using such websites and did in fact receive direct contributions from users of such websites or advertisement revenue from such websites.

66.    As a proximate result of Defendants respective agreements and subsequent acts as described herein, Plaintiff has been damaged through the loss of substantial amounts of revenue, loss of business, loss of good-will, and loss of customers, the sum value of which will be proven at trial but which is an amount no less than $100,000,000.00

///

///

///

4820-8923-8759, v. 2

## COUNT SEVEN

### (For Violations of the Computer Fraud and Abuse Act: 18 U.S.C. § 1030 Against All Defendants)

67.    Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

68.    Upon information and belief, Defendants, and each of them, without authorization or by exceeding the scope of granted authorization, accessed a protected computer containing Plaintiff's live internet streams of the Broadcast, and knowingly and with the intent to defraud, unlawfully copied, distributed, and publicly displayed the Broadcast.

69.    Upon information and belief, as a proximate result of Defendants' unlawful and fraudulent conduct as set forth herein, Defendants, and each of them, obtained the valuable copyrighted Broadcast and subsequently uploading, distributing, and publicly displaying the Broadcast using such as and https://youtube.com, https://filmdaily.co,          https://accesstvpro.co,          https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com.

## COUNT EIGHT:

### (For Vicarious Copyright Infringement Against All Defendants)

70.    Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

71.    Plaintiff is the owner of the copyrights to the Broadcast, including all undercard bouts and the entire television Broadcast. Plaintiff's rights include, but are not limited to, all moving images and other audio/video content which were broadcasted via encrypted satellite signal. The Broadcast originated via satellite uplink and were subsequently retransmitted to cable systems and satellite companies via

4820-8923-8759, v. 2

satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized, online platforms.

72.    Upon information and belief, Defendants, and each of them, directly infringed on Plaintiff's Broadcast by illegally uploading the Broadcast and/or portions thereof via the internet on the websites such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com in direct violation of Plaintiff's exclusive copyright.

73.    Upon information and belief, Defendants encouraged online users to copy, share, download, distribute, and share content, including the Broadcast, on the aforementioned websites, and defendants facilitated, participated in and induced users to engage in the unauthorized reproduction, adaptation, public display and public performance of programming containing Plaintiff's copyrighted Broadcast.

74.    Defendants had the right and ability to control and prevent the users on such aforementioned websites from directly accessing and infringing on Plaintiff's Broadcast which was copied, uploaded, and distributed by Defendants, and each of them.

75.    Defendants derived a financial benefit from such users' activities on the aforementioned websites by directing such users to external and/or shareable payment links, such as PayPal links, whereby users could remit direct payments to Defendants in order to compensate, fund and endorse each respective Defendants' infringement of Plaintiff's Broadcast.

76.    By reason of Defendants' conduct as described herein, Defendants, and each of them, willfully violated 17 U.S.C. § 501.

77.    Due to Defendants' acts of copyright infringement as alleged herein, Defendants have obtained direct and indirect profits Defendants would not otherwise have realized but for Defendants' infringement of the Broadcast. As such, Plaintiff is entitled to disgorgement of Defendant's profits directly and indirectly attributable to

4820-8923-8759, v. 2

Defendants' infringement of the Broadcast, in an amount to be established at trial but no less than $100,000,000.00.

78.     Plaintiff is further entitled to its attorney's fees and full costs pursuant to 17 U.S.C. § 505.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

AS TO COUNT ONE:

1.     That Defendants, Defendants' employees, representatives, and agents be enjoined from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast;

2.     That Plaintiff be awarded all profits of Defendants plus all losses of Plaintiff, the exact sum to be proven at the time of trial but in no event less than $100,000,000.00; and

3.     That an order be issued requiring Defendants, and each of them, to account to Plaintiff for profits attributable to their use of Plaintiff's copyright, in accordance with proof.

AS TO COUNT TWO:

4.     For statutory penalties in an amount, in the discretion of this Court, of up to the maximum amount of $110,000.00 for each of the Defendants' willful violations of 47 U.S.C. § 605(a).

AS TO COUNT THREE:

5.     For statutory penalties in an amount, in the discretion of this Court, of up to the maximum amount of $60,000.00 for each of the Defendants' willful violations of 47 U.S.C. § 553; and

6.     For Attorney's fees, interest, and costs of suit pursuant to 17 U.S.C. § 505; 47 U.S.C. 605(e)(3)(B)(iii) or §553(c)(2)(c);

///

4820-8923-8759, v. 2

AS TO COUNT FOUR:

7.   For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

8.   For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

AS TO COUNT FIVE:

9.   For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

10.   For consequential damages.

AS TO COUNT SIX:

11.   For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00;

12.   For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

AS TO COUNT SEVEN:

13.   For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

14.   Injunctive relief enjoining from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast.

AS TO COUNT EIGHT:

15.   That Defendants, Defendants' employees, representatives, and agents be enjoined from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast;

16.   That Plaintiff be awarded all profits of Defendants plus all losses of Plaintiff, the exact sum to be proven at the time of trial but in no event less than $100,000,000.00; and

17.   That an order be issued requiring Defendants, and each of them, to account to Plaintiff for profits attributable to their use of Plaintiff's

19

COMPLAINT

1      copyright, in accordance with proof.

2   AS TO ALL COUNTS:

3      18.   For pre-judgment and post-judgment interest on all damages awarded;

4      19.   For attorneys' fees and costs of suit incurred herein according to proof;

5            and

6      20.   For such other and further relief as the Court may deem just and proper.

7

8   Dated:  April 23, 2021                NOVIAN & NOVIAN, LLP
                                          Attorneys at Law
9

10                                  By:   /s/ Farhad Novian
                                          FARHAD NOVIAN, State Bar No. 118129
11                                        MICHAEL O'BRIEN, State Bar No. 277244
                                          Attorneys for Plaintiff TRILLER, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
4820-8923-8759, v. 2

# EXHIBIT J

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-3502 PA (RAO) | Date | April 28, 2021 |
|---|---|---|---|
| Title | Triller, Inc. v. Filmdaily.com, et al. | | |

Present: The Honorable    PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | None | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**        ORDER TO SHOW CAUSE

        The Court has reviewed the Complaint filed by plaintiff Triller, Inc. ("Plaintiff") against defendants Filmdaily.com, Accesstvpro.co, Onlin2livestream.us, Crackstreamslive.com, Sports-today.club, My-sports.club, Bilasport.com, Trendy Clips, Mike, Your Extra, Eclipt Gaming, and ItsLilBrandon (collectively "Defendants").  Plaintiff alleges that it is the copyright owner and publisher of the broadcast of the "Jake Paul v. Ben Askren" boxing event (the "Broadcast") and that Defendants "unlawfully uploaded], distribute[d], and publicly display[ed], without authorization the Broadcast" to users of websites operated by or affiliated with Defendants. (Compl. ¶ 1.)  The Complaint asserts claims against Defendants for:  (1) copyright infringement; (2) violation of the Federal Communications Act pursuant to 47 U.S.C. § 605; (3) violation of the Federal Communications Act pursuant to 47 U.S.C. § 553; (4) conversion; (5) breach of contract; (6) conspiracy; (7) violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and (8) vicarious copyright infringement.

        Federal Rule of Civil Procedure 20(a)(2), which allows for permissive joinder, provides:

        Persons . . . may be joined in one action as defendants if:

        (A)    any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

        (B)    any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2) (emphasis added).  "The first prong, the 'same transaction' requirement, refers to similarity in the factual background of a claim."  Coughlin v. Rogers, 130 F.3d 1348, 1350 (9th Cir. 1997).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-3502 PA (RAO) | Date | April 28, 2021 |
|---|---|---|---|
| Title | Triller, Inc. v. Filmdaily.com, et al. | | |

Plaintiff alleges that it "is informed and believes, and thereon alleges, that the actions and omissions that serve as the basis for this complaint were undertaken jointly and with the consent, conspiracy, cooperation, and joint participation of all defendants." (Compl. ¶ 21.)  The Complaint also alleges, on information and belief, "that at all times mentioned herein, each defendant was the agent, joint venture, and/or employee of each and every other defendant, and in doing the things alleged in this complaint, each defendant was acting within the course and scope of such agency, joint venture, and/or employment and with the permission and consent of each of the other defendants."  (Id. at ¶ 22.)  Other than these conclusory allegations, the Complaint does not contain any well-pleaded facts that plausibly support even an inference that Defendants acted jointly.  See Ashcroft v. Iqbal, 556 U.S. 662, 679, 664 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").[1/]  Instead, it appears that Plaintiff has improperly joined its claims against multiple different alleged infringers who have no apparent connection to one another, and who each allegedly infringed Plaintiff's intellectual property rights by making the Broadcast available on the separate websites controlled by each of the separate defendants.  The Complaint does not sufficiently allege, identify, or explain any plausible relationship between all of the Defendants.

For these reasons, the Court orders Plaintiff to show cause in writing no later than May 10, 2021, why one or more of the Defendants should not be dropped from this case for improper joinder.  See Fed. R. Civ. P. 20, 21; see also Coughlin, 130 F.3d at 1351 (finding misjoinder where "[e]ach claim raises potentially different issues, and must be viewed in a separate and individual light by the Court.").  In response to this Order to Show Cause, Plaintiff may, if it so chooses, limit its claims to one of the Defendants.  Plaintiff may then, if it so chooses, file separate actions against the other Defendants with new complaints and filing fees.  Failure to adequately respond to this Order to Show Cause may result, without further warning, in dismissal of the Complaint without prejudice.

IT IS SO ORDERED.

---

[1/]    The Complaint's allegations concerning the Central District as a proper venue for this action, and in support of the Court's exercise of personal jurisdiction over the Defendants is similarly based only on legal conclusions rather than well-pleaded facts.

# EXHIBIT K

FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
MICHAEL O'BRIEN (SBN 277244)
mobrien@novianlaw.com
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, California 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222

Attorneys for Plaintiff TRILLER FIGHT CLUB II LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRILLER FIGHT CLUB II LLC, a Delaware Limited Liability Company, | CASE NO.: 2:21-cv-03502-PA-RAO |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | 1. **COPYRIGHT INFRINGEMENT** |
| FILMDAILY.COM, an unknown business entity; ACCESSTVPRO.CO, an unknown business entity; ONLINE2LIVESTREAM.US, an unknown business entity; CRACKSTREAMSLIVE.COM, an unknown business entity; SPORTS-TODAY.CLUB, an unknown business entity; MY-SPORTS.CLUB, an unknown business entity; BILASPORT.COM, an unknown business entity; TRENDY CLIPS, an unknown business entity; MIKE, an unknown business entity; YOUR EXTRA, an unknown business entity; ECLIPT GAMING, an unknown business entity; ITSLILBRANDON, an unknown business entity; the H3 PODCAST, an unknown business entity; H3H3 PRODUCTIONS, an unknown | 2. **VIOLATION OF THE FEDERAL COMMUNICATIONS ACT: 47 U.S.C. § 605** <br> 3. **VIOLATION OF THE FEDERAL COMMUNICATIONS ACT: 47 U.S.C. § 553** <br> 4. **CONVERSION** <br> 5. **BREACH OF CONTRACT** <br> 6. **CONSPIRACY** <br> 7. **VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT: 18 U.S.C. § 1030** <br> 8. **VICARIOUS COPYRIGHT INFRINGEMENT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

1

1   business entity; and DOES 1 through 100,
    inclusive,
2

3                   Defendants.

FIRST AMENDED COMPLAINT

4820-8923-8759, v. 2

Plaintiff Triller Fight Club II LLC, a Delaware limited liability company ("Plaintiff" or "Triller") hereby complains against Defendants FILMDAILY.COM, an unknown business entity ("Filmdaily.com"); ACCESSTVPRO.CO, an unknown business entity ("Accesstvpro.co"); ONLINE2LIVESTREAM.US, an unknown business entity ("Online2livestream.us"); CRACKSTREAMSLIVE.COM, an unknown business entity ("Crackstreamslive.com"); SPORTS-TODAY.CLUB, an unknown business entity ("Sports-today.club"), MY-SPORTS.CLUB, an unknown business entity ("My-sports.club"), BILASPORT.COM, an unknown business entity ("Bilasport.com"), TRENDY CLIPS, an unknown business entity ("Trendy Clips"), MIKE, an unknown business entity ("Mike"), YOUR EXTRA, an unknown business entity ("Your Extra"), ECLIPT GAMING, an unknown business entity ("Eclipt Gaming"), ITSLILBRANDON, an unknown business entity ("ItsLilBrandon"), the H3 PODCAST, an unknown business entity ("H3 Podcast"), H3H3 PRODUCTIONS, an unknown business entity ("H3H3"), and DOES 1 through 100, inclusive (collectively, the "Defendants"), and alleges as follows:

## NATURE OF THIS ACTION

1.    Through this action, Triller seeks in excess of $100,000,000.00 against Defendants and each of them all of whom are cyber-criminals, for their outright theft and diversion of upwards of 2,000,000 unique viewers by providing them with illegal and unauthorized viewings of the Broadcast of the Jake Paul vs. Ben Askren boxing event.   Plaintiff is the copyright owner and publisher of the Triller Fight Club broadcast of the "Jake Paul vs. Ben Askren" boxing event, including all undercard bouts and the entire television broadcast, exhibited via closed circuit television and via encrypted satellite signal (hereinafter referred to as the "Broadcast"). The Broadcast originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized online platforms. Plaintiff institutes this action to obtain remedy for—and to permanently hinder—the blatantly

FIRST AMENDED COMPLAINT

unlawful infringement and rampant theft of its copyrighted work by the Defendants. Defendants, and each of them, have utilized various torrent and streaming websites such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com to unlawfully upload, distribute, and publicly display, without authorization, the Broadcast to the users of such websites. Upon information and belief, Defendants, and each of them, acted knowingly, willfully, unlawfully and with blatant disregard to Plaintiff's copyright in the Broadcast by uploading the Broadcast to the aforementioned websites with additional shareable payment links, such as PayPal links, which allow users to remit direct payments to the various Defendants in order to fund and endorse each respective Defendants' infringement of Plaintiff's Broadcast. Defendants' calculated and reprehensible infringement, theft, and other unlawful acts—committed in knowing violation of the law—has resulted in damages suffered by Plaintiff in excess of $100,000,000.00, by stealing and diverting upwards of 2,000,000 unique viewers of the illegal and unauthorized viewings of the Broadcast from Plaintiff.

2.     Acting with intentional and knowing disregard of Plaintiff's exclusive rights in the Broadcast, Defendants—who are nothing less than cyber-criminals—employ various user profiles on websites, including those mentioned above, to illegally upload copyrighted programming, including the Broadcast, and to facilitate the unauthorized copying, sharing, downloading, uploading, and distribution of such programming. Through their egregious conduct, Defendants also encourage other online users to copy, share, download, distribute and share the Broadcast on the aforementioned websites. Defendants further unlawfully facilitate, participate, and induce other users to engage in the unauthorized reproduction, adaptation, distribution and public display of Plaintiff's copyrighted Broadcast all to line their own pockets with monies that belong to Plaintiff.

3.     Notwithstanding each Defendants' recognition that Plaintiff never

FIRST AMENDED COMPLAINT

authorized their respective copying, downloading, uploading, public display and/or distribution of the Broadcast, Defendants continue to engage—and unjustly benefit—from their infringing conduct. Defendants' plain acts of thievery, misappropriation, and infringement, as further described herein, are tantamount to, and no less deplorable than, the acts of a pilferer, poaching on and looting the fruits of another's hard-earned labor.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction pursuant to 17 U.S.C. § 101, *et seq.* and 28 U.S.C. § 1331, which states that district courts shall have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States; and 28 U.S.C. Section § 1338 (a).

5.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.  In the alternative, venue is also proper under 28 U.S.C. § 1391(b)(3), as Defendants, and each of them, are subject to the court's personal jurisdiction with respect to this action.

## PARTIES

6.     Plaintiff is a limited liability company incorporated under the laws of Delaware and having its principal place of business in the State of California.

7.     Plaintiff is engaged in the business of distributing its copyrighted materials as defined in 17 U.S.C. § 101, and offering such content, including the Broadcast, for purchase on a Pay-Per-View basis to its paying customers over the internet or via cable or satellite TV. Plaintiff invests substantial money, time, and effort in advertising, promoting, selling, and licensing programming such as the Broadcast.

8.     Plaintiff owns the copyrights to the Broadcast. As the exclusive owner of the Copyright in its programing, including but not limited to the Broadcast, Plaintiff possesses the exclusive rights to, *inter alia*, exhibit, distribute, disseminate and perform the Broadcast publicly.

4820-8923-8759, v. 2

9.     Upon information and belief, Defendant Filmdaily.com is a business entity, the exact nature of which is unknown, registered in Nevada and doing business in the State of California. Upon information and belief, Filmdaily.com offers the website https://filmdaily.co for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Filmdaily.com through its illegal uploading and distribution of the Broadcast.

10.    Upon information and belief, Defendant Accesstvpro.co is a business entity, the exact nature of which is unknown, registered in Arizona and doing business in the State of California. Upon information and belief, Accesstvpro.co offers the website https://accesstvpro.co for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Accesstvpro.co through its illegal uploading and distribution of the Broadcast.

11.    Upon information and belief, Defendant Online2livestream.us is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Online2livestream.us offers the website https://online2livestream.us  for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Online2livestream.us through its illegal uploading and distribution of the Broadcast.

12.    Upon information and belief, Defendant Crackstreamslive.com is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Crackstreamslive.com offers the website https://crackstreamslive.com  for the purpose of permitting, encouraging, facilitating,

4820-8923-8759, v. 2

and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Crackstreamslive.com through its illegal uploading and distribution of the Broadcast.

13.   Upon information and belief, Defendant Sports-today.club is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Sports-today.club offers the website https://sports-today.club/ for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Sports-today.club through its illegal uploading and distribution of the Broadcast.

14.   Upon information and belief, Defendant My-sports.club is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, My-sports.club offers the website https://my-sports.club/ for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by My-sports.club through its illegal uploading and distribution of the Broadcast.

15.   Upon information and belief, Defendant Bilasport.com is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Bilasport.com offers the website https://bilasports.com for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Bilasport.com through its illegal uploading and distribution of the Broadcast.

FIRST AMENDED COMPLAINT
4820-8923-8759, v. 2

16.     Upon information and belief, Defendant Trendy Clips is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Trendy Clips operates the Youtube channel located at https://www.youtube.com/channel/UCYj6TdieiWvyuQc4s6J88uw  for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Trendy Clips through its illegal uploading and distribution of the Broadcast.

17.     Upon information and belief, Defendant Mike is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Mike operates the Youtube channel located at https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Mike through its illegal uploading and distribution of the Broadcast.

18.     Upon information and belief, Defendant Your Extra is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Your Extra operates the Youtube channel located at https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Your Extra through its illegal uploading and distribution of the Broadcast.

19.     Upon information and belief, Defendant Eclipt Gaming is a business

8

4820-8923-8759, v. 2

1  entity, the exact nature of which is unknown, doing business in the State of

2  California. Upon information and belief, Eclipt Gaming operates the Youtube

3  channel located at

4  https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for the

5  purpose of permitting, encouraging, facilitating, and inducing the sharing of videos

6  and live programing of audiovisual materials between users of the website. Those

7  materials include programming owned and/or controlled by Plaintiff, including the

8  Broadcast, which was offered by Eclipt Gaming through its illegal uploading and

9  distribution of the Broadcast.

10       20.    Upon information and belief, Defendant ItsLilBrandon is a business

11  entity, the exact nature of which is unknown, doing business in the State of

12  California. Upon information and belief, ItsLilBrandon operates the Youtube channel

13  located at https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for

14  the purpose of permitting, encouraging, facilitating, and inducing the sharing of

15  videos and live programing of audiovisual materials between users of the website.

16  Those materials include programming owned and/or controlled by Plaintiff,

17  including the Broadcast, which was offered by ItsLilBrandon through its illegal

18  uploading and distribution of the Broadcast.

19       21.    Upon information and belief, Defendant H3 Podcast is a business entity,

20  the exact nature of which is unknown, doing business in the State of California. Upon

21  information and belief, the H3 Podcast—through its hosts Ethan and Hila Klein—

22  operates          the          Youtube          channel          located          at

23  https://www.youtube.com/channel/UCLtREJY21xRfCuEKvdki1Kw for the purpose

24  of permitting, encouraging, facilitating, and inducing the sharing of videos and live

25  programing of audiovisual materials between users of the website. Those materials

26  include programming owned and/or controlled by Plaintiff, including the Broadcast,

27  which was offered by the H3 Podcast through its illegal uploading and distribution of

28  the Broadcast.

FIRST AMENDED COMPLAINT

4820-8923-8759, v. 2

22.    Upon information and belief, Defendant H3H3 is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, H3H3—through Ethan and Hila Klein—operates the Youtube channel located at https://www.youtube.com/user/h3h3Productions for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by H3H3 through its illegal uploading and distribution of the Broadcast.

23.    Plaintiff is informed and believes, and thereon alleges, that the actions and omissions that serve as the basis for this complaint were undertaken jointly and with the consent, conspiracy, cooperation, and joint participation of all defendants.

24.    Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, each defendant was the agent, joint venture, and/or employee of each and every other defendant, and in doing the things alleged in this complaint, each defendant was acting within the course and scope of such agency, joint venture, and/or employment and with the permission and consent of each of the other defendants.

25.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff at this time.  Plaintiff therefore sues said Defendants, and each of them, by such fictitious names.  Plaintiff will advise the Court and seek leave to amend this Complaint when the true names and capacities of each such Defendant has been ascertained.  Plaintiff is informed and believes, and based thereon alleges, that each such Defendant designated as a DOE is responsible in some manner for the events and happenings referred to herein or as hereinafter specifically alleged.

## COUNT ONE:

### (For Copyright Infringement Against All Defendants)

26.    Plaintiff hereby realleges, and by this reference incorporates herein, each

4820-8923-8759, v. 2

1   and every allegation of preceding and subsequent paragraphs as though fully set forth
2   herein.

3        27.    Plaintiff is the owner of the copyrights to the Broadcast, including all
4   undercard bouts and the entire television Broadcast. Plaintiff's rights include, but are
5   not limited to, all moving images and other audio/video content which were
6   broadcasted via encrypted satellite signal. The Broadcast originated via satellite uplink
7   and were subsequently retransmitted to cable systems and satellite companies via
8   satellite signal and/or retransmitted via satellite signal to licensed content distributors
9   such as Plaintiff's authorized, online platforms.

10        28.    As the copyright holder to the rights of the Broadcast, Plaintiff has the
11   exclusive right to copy, publicly perform and distribute it.

12        29.    Defendants, and each of them, failed to obtain the property authority or
13   license from Plaintiff to copy, publicly perform or distribute the Broadcast.

14        30.    Upon information and belief, Defendants illegally copied, uploaded,
15   publicly performed and distributed the Broadcast via the internet with full knowledge
16   that the Broadcast could only be obtained by purchasing a license from Plaintiff.

17        31.    Defendants, and each of them, have utilized various torrent and
18   streaming websites such as https://filmdaily.co, https://accesstvpro.co,
19   https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/,
20   https://my-sports.club/, https://bilasports.com, and https://youtube.com to upload,
21   distribute, and publicly display the Broadcast to the users of such website in direct
22   violation of the exclusive rights owned by Plaintiff.

23        32.    Specifically, upon information and belief, the Defendants, and each of
24   them, obtained the Broadcast through internet websites, cable and/or satellite Pay-Per-
25   View purchase intended for private, non-commercial viewing, and subsequently
26   illegally re-transmitted the Broadcast and publicly exhibited the Broadcast by illegally
27   copying and uploading the Broadcast to the aforementioned websites for other users
28   to also illegally view, download, access, share, and distribute.

11

FIRST AMENDED COMPLAINT

33.    Defendants, and each of them, have infringed on Plaintiff's copyright in the Broadcast by reproducing, adapting distributing, uploading, copying, and publicly displaying the copyrighted works without Plaintiff's authorization in violation of the Copyright Act, 17 U.S.C. § 501, and have recouped profits from the aforementioned websites through users' payments to the Defendants or through advertising revenue generated through the websites.

34.    Defendants' acts of infringement were willful, in blatant disregard of, and committed with indifference to Plaintiff's rights.

35.    By reason of Defendants' conduct as described herein, Defendants, and each of them, willfully violated 17 U.S.C. § 501.

36.    Due to Defendants' acts of copyright infringement as alleged herein, Defendants have obtained direct and indirect profits Defendants would not otherwise have realized but for Defendants' infringement of the Broadcast. As such, Plaintiff is entitled to disgorgement of Defendant's profits directly and indirectly attributable to Defendants' infringement of the Broadcast, in an amount to be established at trial, but in no event less than $100,000,000.00.

37.    Plaintiff is further entitled to its attorney's fees and full costs pursuant to 17 U.S.C. § 505.

## COUNT TWO:

**(For Violations of the Federal Communications Act: 47 U.S.C. §605 Against All Defendants)**

38.    Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

39.    Plaintiff is the owner of the Broadcast, including all undercard matches and the entire television broadcast, aired via closed circuit television and via encrypted satellite signal.

40.    The Broadcast was available for non-commercial, private viewing

12

4820-8923-8759, v. 2

1  through Plaintiff, its authorized online vendors, as well as through Pay-Per-View

2  purchase through authorized satellite TV providers. Defendants, in a calculated effort

3  to use Plaintiff's Broadcast for their own commercial benefit, obtained access to

4  Plaintiff's Broadcast by purchasing the programming and subsequently copying the

5  Broadcast and uploading it to torrent and streaming websites such as and

6  https://youtube.com,                https://filmdaily.co,                https://accesstvpro.co,

7  https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/,

8  https://my-sports.club/, and https://bilasports.com.

9      41.    In order to purchase and view the Broadcast through a satellite TV

10  provider intended for private, non-commercial viewing, an individual purchaser was

11  subject to the copyright language contained therein which expressly stated that the

12  "unauthorized reproduction or distribution of the copyrighted work is illegal."

13      42.    Upon information and belief, with full knowledge that the Broadcast was

14  not to be received, distributed, reproduced and or publicly exhibited by individuals

15  unauthorized to do so, Defendants, without authorization from Plaintiff, unlawfully

16  intercepted, received and/or de-scrambled Plaintiff's satellite signal for purposes of

17  direct commercial advantage and subsequently divulged the Broadcast to the public

18  by copying and distributing said Broadcast to the users of the aforementioned websites

19  in exchange for payments to aid, encourage, support, or otherwise endorse Defendants'

20  infringing conduct.

21      43.    Upon information and belief, Plaintiff alleges that Defendants effected

22  unauthorized interception and receipt of Plaintiff's Broadcast via Defendants' satellite

23  TV service by ordering programming for residential use and subsequently copying,

24  uploading, distributing and publicly displaying the Broadcast without authorization,

25  or by such other means which are unknown to Plaintiff and known only to Defendants.

26      44.    47 U.S.C. § 605(a) prohibits the unauthorized reception and publication

27  or use of communications such as the Broadcast for which Plaintiff had the distribution

28  rights thereto.

4820-8923-8759, v. 2

45.    By reason of Defendants' conduct as described herein, Defendants, and each of them, willfully violated 47 U.S.C. § 605(a)

46.    As a proximate result of Defendants' willful violations of 47 U.S.C. § 605(a), Plaintiff is entitled to damages, in the discretion of this Court, under 47 U.S.C. § 605(a), Plaintiff is entitled to damages, in the discretion of this Court, under 47 U.S.C. § 605(e)(3)(C)(i)(II) and (ii) of up to the maximum amount of $110,000.00 as to *each* violation.

47.    Pursuant to 47 U.S.C. § 605, Plaintiff is also entitled to an award of full costs, interest and reasonable attorney's fees.

## COUNT THREE:

### (For Violations of the Federal Communications Act: 47 U.S.C. §553 Against All Defendants)

48.    Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

49.    Upon information and belief, Defendants willfully and unlawfully accessed, received, and subsequently re-transmitted the Broadcast over a cable TV or internet system while knowing that they were unauthorized to do so.

50.    47 U.S.C. §553 prohibits the unauthorized reception of any communications service offered over a cable system such as the transmission of the Broadcast for which Plaintiff holds the copyright ownership thereto.

51.    Upon information and belief, the Defendants knowingly, willfully and unlawfully accessed, received and subsequently re-transmitted the Broadcast when it was offered via a cable TV or internet subscription without the authorization from Plaintiff and without paying Plaintiff the appropriate Pay-Per-View fee.

52.    By reason of Defendants' conduct as described herein, Defendants, and each of them, willfully violated 47 U.S.C. §553.

53.    As a proximate result of Defendants' willful violations of 47 U.S.C. §553,

14

4820-8923-8759, v. 2

Plaintiff is entitled to damages in an amount, in the discretion of this Court, of up to the maximum amount of $60,000.00 as to each violation, plus the recovery of full costs, interest and reasonable attorney's fees, in the discretion of this Court.

## COUNT FOUR:

### (For Conversion Against All Defendants)

54.   Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

55.   Plaintiff, at all relevant times, owned, possessed, and had the right to possess the copyrights to the Broadcast.

56.   By virtue of Defendants' conduct as set forth herein, Defendants, and each of them, knowingly and intentionally substantially interfered with Plaintiff's property by unlawfully converting it for their own commercial use, benefit, and private financial gain.

57.   Defendants' acts of conversion were done without Plaintiff's consent and with the objective of depriving Plaintiff of its copyright ownership for Defendants' direct commercial benefit, advantage and private financial gain.

58.   As a proximate result of Defendants' wrongful conversion of the Broadcast, Plaintiff suffered damages in an amount subject to proof at trial but in no event less than $100,000,000.00.

## COUNT FIVE

### (For Breach of Contract Against All Defendants)

59.   Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

60.   Plaintiff would show that pursuant to Plaintiff's Terms of Use for its programming of the Broadcast, any user of Plaintiff's authorized websites for Pay-Per-View purchase and any purchaser of a residential Pay-Per-View feed from

15

4820-8923-8759, v. 2

Plaintiff, either via cable or satellite TV, agreed not to reproduce, distribute, or transmit any of Plaintiff's materials, including the Broadcast.

61.    Upon information and belief, Defendants, and each of them, purchased the Broadcast through Plaintiff's authorized websites or via Pay-Per-View purchase for private, residential viewing.

62.    Upon information and belief, with full knowledge that the Broadcast was not to be unlawfully copied and distributed by individuals unauthorized to do so, Defendants willfully and unlawfully copied, uploaded and distributed the Broadcast to users of   torrent   and   streaming   websites   such   as   https://youtube.com, https://filmdaily.co,        https://accesstvpro.co,        https://online2livestream.us, https://crackstreamslive.com,   https://sports-today.club/,   https://my-sports.club/,and https://bilasports.com so that the Broadcast could be accessed free of charge.

63.    As a proximate result of Defendants breach of their respective agreements with Plaintiff, Plaintiff has been damaged through the loss of substantial amounts of revenue, loss of business, loss of good-will and loss of customers, the sum value of which will be proven at trial but which is an amount no less than $100,000,000.00

## COUNT SIX

### (For Conspiracy Against All Defendants)

64.    Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

65.    Upon information and belief, Defendants, and each of them, had an agreement between two or more persons.

66.    Upon information and belief, pursuant to the respective Defendants' agreements, Defendants set out to intentionally, willfully, and unlawfully access and copy Plaintiff's  Broadcast and subsequently upload the Broadcast for distribution and public display in exchange for direct contributions from the users of the websites known   as   such   as   https://youtube.com,   https://filmdaily.co,   https://accesstvpro.co,

16

4820-8923-8759, v. 2

1  https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/,
2  https://my-sports.club/, and https://bilasports.com or for advertisement revenue from
3  such websites.

4      67.    Upon information and belief, Defendants, and each of them,
5  intentionally, willfully, and unlawfully accessed, copied, uploaded, distributed, and
6  publicly displayed Plaintiff's Broadcast using such websites and did in fact receive
7  direct contributions from users of such websites or advertisement revenue from such
8  websites.

9      68.    As a proximate result of Defendants respective agreements and
10  subsequent acts as described herein, Plaintiff has been damaged through the loss of
11  substantial amounts of revenue, loss of business, loss of good-will, and loss of
12  customers, the sum value of which will be proven at trial but which is an amount no
13  less than $100,000,000.00

14      **COUNT SEVEN**

15  **(For Violations of the Computer Fraud and Abuse Act: 18 U.S.C. § 1030**
16  **Against All Defendants)**

17      69.    Plaintiff hereby realleges, and by this reference incorporates herein, each
18  and every allegation of preceding and subsequent paragraphs as though fully set forth
19  herein.

20      70.    Upon information and belief, Defendants, and each of them, without
21  authorization or by exceeding the scope of granted authorization, accessed a protected
22  computer containing Plaintiff's live internet streams of the Broadcast, and knowingly
23  and with the intent to defraud, unlawfully copied, distributed, and publicly displayed
24  the Broadcast.

25      71.    Upon information and belief, as a proximate result of Defendants'
26  unlawful and fraudulent conduct as set forth herein, Defendants, and each of them,
27  obtained the valuable copyrighted Broadcast and subsequently uploading, distributing,
28  and publicly displaying the Broadcast using such as and https://youtube.com,

1  https://filmdaily.co,          https://accesstvpro.co,          https://online2livestream.us,
2  https://crackstreamslive.com,  https://sports-today.club/,  https://my-sports.club/,  and
3  https://bilasports.com.

**<u>COUNT EIGHT:</u>**

4

**(For Vicarious Copyright Infringement Against All Defendants)**

5

6       72.    Plaintiff hereby realleges, and by this reference incorporates herein, each
7  and every allegation of preceding and subsequent paragraphs as though fully set forth
8  herein.

9       73.    Plaintiff is the owner of the copyrights to the Broadcast, including all
10 undercard bouts and the entire television Broadcast. Plaintiff's rights include, but are
11 not limited to, all moving images and other audio/video content which were
12 broadcasted via encrypted satellite signal. The Broadcast originated via satellite uplink
13 and were subsequently retransmitted to cable systems and satellite companies via
14 satellite signal and/or retransmitted via satellite signal to licensed content distributors
15 such as Plaintiff's authorized, online platforms.

16      74.    Upon information and belief, Defendants, and each of them, directly
17 infringed on Plaintiff's Broadcast by illegally uploading the Broadcast and/or portions
18 thereof via the internet on the websites such as https://youtube.com,
19 https://filmdaily.co,          https://accesstvpro.co,          https://online2livestream.us,
20 https://crackstreamslive.com,  https://sports-today.club/,  https://my-sports.club/,  and
21 https://bilasports.com in direct violation of Plaintiff's exclusive copyright.

22      75.    Upon information and belief, Defendants encouraged online users to
23 copy, share, download, distribute, and share content, including the Broadcast, on the
24 aforementioned websites, and defendants facilitated, participated in and induced users
25 to engage in the unauthorized reproduction, adaptation, public display and public
26 performance of programming containing Plaintiff's copyrighted Broadcast.

27      76.    Defendants had the right and ability to control and prevent the users on
28 such aforementioned websites from directly accessing and infringing on Plaintiff's

Broadcast which was copied, uploaded, and distributed by Defendants, and each of them.

77.     Defendants derived a financial benefit from such users' activities on the aforementioned websites by directing such users to external and/or shareable payment links, such as PayPal links, whereby users could remit direct payments to Defendants in order to compensate, fund and endorse each respective Defendants' infringement of Plaintiff's Broadcast.

78.     By reason of Defendants' conduct as described herein, Defendants, and each of them, willfully violated 17 U.S.C. § 501.

79.     Due to Defendants' acts of copyright infringement as alleged herein, Defendants have obtained direct and indirect profits Defendants would not otherwise have realized but for Defendants' infringement of the Broadcast. As such, Plaintiff is entitled to disgorgement of Defendant's profits directly and indirectly attributable to Defendants' infringement of the Broadcast, in an amount to be established at trial but no less than $100,000,000.00.

80.     Plaintiff is further entitled to its attorney's fees and full costs pursuant to 17 U.S.C. § 505.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

AS TO COUNT ONE:

1.     That Defendants, Defendants' employees, representatives, and agents be enjoined from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast;

2.     That Plaintiff be awarded all profits of Defendants plus all losses of Plaintiff, the exact sum to be proven at the time of trial but in no event less than $100,000,000.00; and

3.     That an order be issued requiring Defendants, and each of them, to

account to Plaintiff for profits attributable to their use of Plaintiff's copyright, in accordance with proof.

AS TO COUNT TWO:

4.      For statutory penalties in an amount, in the discretion of this Court, of up to the maximum amount of $110,000.00 for each of the Defendants' willful violations of 47 U.S.C. § 605(a).

AS TO COUNT THREE:

5.      For statutory penalties in an amount, in the discretion of this Court, of up to the maximum amount of $60,000.00 for each of the Defendants' willful violations of 47 U.S.C. § 553; and

6.      For Attorney's fees, interest, and costs of suit pursuant to 17 U.S.C. § 505; 47 U.S.C. 605(e)(3)(B)(iii) or §553(c)(2)(c);

AS TO COUNT FOUR:

7.      For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

8.      For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

AS TO COUNT FIVE:

9.      For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

10.     For consequential damages.

AS TO COUNT SIX:

11.     For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00;

12.     For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

AS TO COUNT SEVEN:

13.     For damages within this Court's jurisdiction in an amount according to

20

FIRST AMENDED COMPLAINT

1        proof at trial but in no event less than $100,000,000.00; and

2    14.   Injunctive relief enjoining from copying, uploading, distributing, selling,

3          or otherwise infringing on Plaintiff's copyright in the Broadcast.

4  AS TO COUNT EIGHT:

5    15.   That Defendants, Defendants' employees, representatives, and agents be

6          enjoined from copying, uploading, distributing, selling, or otherwise

7          infringing on Plaintiff's copyright in the Broadcast;

8    16.   That Plaintiff be awarded all profits of Defendants plus all losses of

9          Plaintiff, the exact sum to be proven at the time of trial but in no event

10         less than $100,000,000.00; and

11   17.   That an order be issued requiring Defendants, and each of them, to

12         account to Plaintiff for profits attributable to their use of Plaintiff's

13         copyright, in accordance with proof.

14 AS TO ALL COUNTS:

15   18.   For pre-judgment and post-judgment interest on all damages awarded;

16   19.   For attorneys' fees and costs of suit incurred herein according to proof;

17         and

18   20.   For such other and further relief as the Court may deem just and proper.

19

20 Dated:  April 29, 2021          NOVIAN & NOVIAN, LLP
                                   Attorneys at Law
21

22                           By:   /s/ Farhad Novian
                                   FARHAD NOVIAN, State Bar No. 118129
23                                 MICHAEL O'BRIEN, State Bar No. 277244

24
                                   Attorneys for Plaintiff TRILLER FIGHT
25                                 CLUB II LLC

26

27

28

                                    21
4820-8923-8759, v. 2

# EXHIBIT L

FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
MICHAEL O'BRIEN (SBN 277244)
mobrien@novianlaw.com
ALEXANDER BRENDON GURA (SBN 305096)
gura@novianlaw.com
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, California 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222

Attorneys for Plaintiff TRILLER FIGHT CLUB II LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRILLER FIGHT CLUB II LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>FILMDAILY.COM, an unknown business entity; ACCESSTVPRO.CO, an unknown business entity; ONLINE2LIVESTREAM.US, an unknown business entity; CRACKSTREAMSLIVE.COM, an unknown business entity; SPORTS-TODAY.CLUB, an unknown business entity; MY-SPORTS.CLUB, an unknown business entity; BILASPORT.COM, an unknown business entity; TRENDY CLIPS, an unknown business entity; MIKE, an unknown business entity; YOUR EXTRA, an unknown business entity; ECLIPT GAMING, an unknown business entity; ITSLILBRANDON, an unknown business entity; the H3 PODCAST, an unknown business entity; H3H3 PRODUCTIONS, an unknown | CASE NO.: 2:21-cv-03502-PA-RAO<br><br>**PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE DATED APRIL 28, 2021**<br><br>Complaint Filed:  April 23, 2021 |

business entity; and DOES 1 through 100, inclusive,

Defendants.

RESPONSE TO ORDER TO SHOW CAUSE

Plaintiff Triller Fight Club II LLC ("Plaintiff" or "Triller") submits this Memorandum in response to the Court's April 28, 2021 Order to Show Cause the ("OSC").

## I.  STATEMENT OF RELEVANT FACTS

Plaintiff is the copyright owner and publisher of the Triller Fight Club broadcast of the "Jake Paul vs. Ben Askren" boxing event, including all undercard bouts and the entire television broadcast, exhibited via closed circuit television and via encrypted satellite signal (hereinafter referred to as the "Broadcast").  On April 17, 2021, Triller made the Broadcast available to licensed content distributors such as Plaintiff's authorized online platforms.

Triller has since learned that certain individuals and entities utilized various torrent and streaming websites such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com to unlawfully upload, distribute, and publicly display, without authorization, the Broadcast to the users of such websites.  Thus far, Triller has identified as wrongdoers Defendants Filmdaily.com, an unknown business entity ("Filmdaily.com"); Accesstvpro.co, an unknown business entity ("Accesstvpro.co"); Online2livestream.us, an unknown business entity ("Online2livestream.us"); Crackstreamlive.com, an unknown business entity ("Crackstreamslive.com"); Sports-today.club, an unknown business entity ("Sports-today.club"), My-sports.club, an unknown business entity ("My-sports.club"), Bilasport.com, an unknown business entity ("Bilasport.com"), Trendy Clips, an unknown business entity ("Trendy Clips"), Mike, an unknown business entity ("Mike"), Your Extra, an unknown business entity ("Your Extra"), Eclipt Gaming, an unknown business entity ("Eclipt Gaming"), ItsLilBrandon, an unknown business entity ("ItsLilBrandon"), the H3 Podcast, an unknown business entity ("H3 Podcast"), h3h3 Productions, an unknown business entity ("H3H3").

1    Accordingly, on April 23, 2021, Triller filed a complaint (the "Complaint").

2    On April 28, 2021, the Court issued the OSC.  In the OSC, the Court noted that

3    "Plaintiff alleges that it 'is informed and believes, and thereon alleges, that the actions

4    and omissions that serve as the basis for this complaint were undertaken jointly and

5    with the consent, conspiracy, cooperation, and joint participation of all defendants.'"

6    (OSC, at 2 (quoting Compl., at ¶ 21).)  "The Complaint also alleges, on information

7    and belief, "that at all times mentioned herein, each defendant was the agent, joint

8    venture, and/or employee of each and every other defendant, and in doing the things

9    alleged in this complaint, each defendant was acting within the course and scope of

10   such agency, joint venture, and/or employment and with the permission and consent

11   of each of the other defendants."  (*Id*. (quoting Compl., at ¶ 22.)

12   In the OSC, the Court also wrote that "it appears that Plaintiff has improperly

13   joined its claims against multiple different alleged infringers who have no apparent

14   connection to one another, and who each allegedly infringed Plaintiff's intellectual

15   property rights by making the Broadcast available on the separate websites controlled

16   by each of the separate defendants[,]" and that "[t]he Complaint does not sufficiently

17   allege, identify, or explain any plausible relationship between all of the Defendants."

18   (OSC, at 2.)

19   **II. ARGUMENT**

20   Federal Rule of Civil Procedure 20(a)(2), which governs the permissive joinder

21   of parties, explains, in pertinent part:

22   Persons . . . may be joined in one action as defendants if:
         (A) any right to relief is asserted against them
23       jointly, severally, or in the alternative with respect
         to or arising out of the same transaction, occurrence,
24       or series of transactions or occurrences; and
25       (B) any question of law or fact common to all
26       defendants will arise in the action.

27   (Fed. R. Civ. P. 20(a)(2); *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371,

28   1375 (9th Cir. 1980) ("On a threshold level, Rule 20(a) imposes two specific

requirements for the permissive joinder of parties:  (1) a right to relief must be asserted

1  by, or against, each plaintiff or defendant relating to or arising out of the same
2  transaction or occurrence or series of transactions or occurrences; and (2) some
3  question of law or fact common to all parties must arise in the action."). The United
4  States Supreme Court has explained that "[u]nder the Rules, the impulse is toward
5  entertaining the broadest possible scope of action consistent with fairness to the
6  parties; *joinder of claims, parties and remedies is strongly encouraged*." *United Mine*
7  *Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966) (emphasis added); *see also League*
8  *to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 558 F.2d 914, 917 (9th Cir. 1977)
9  ("We start with the premise that Rule 20 . . . regarding permissive joinder is to be
10 construed liberally in order to promote trial convenience and to expedite the final
11 determination of disputes, thereby preventing multiple lawsuits.")

12      Defendants are properly joined in this Action because (i) Defendants' are jointly
13 and severally liable for Triller's claims under the Copyright Act, (ii) Triller's claims
14 against Defendants arise from the same transaction, occurrence, or series of
15 transactions or occurrences, *i.e.*, the Broadcast, and, as such, (iii) there will be many
16 questions of law and fact common to all Defendants arising in this Action.

17           **A. Defendants Are Jointly and Severally Liable.**

18      To satisfy the first prong of the permissive joinder test under Rule 20, a plaintiff
19 may show that "any right to relief is asserted against them jointly [and] severally. . . ."
20 (Fed. R. Civ. P. 20(a)(2)(A).) Triller asserts against Defendants, among other claims,
21 causes of action arising under the Copyright Act. Defendants are jointly and severally
22 liable for any damages arising in connection with those causes of action. (*See* 17
23 U.S.C. § 504; *see also Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1192 (9th
24 Cir. 2016).) Where, as here, Defendants' liability is joint and several, joinder under
25 Rule 20 is permitted.

26      **B. Triller's Claims Against Defendants Arise From the Same**
27          **Transaction or Occurrence—the Broadcast.**

28      As explained above, to satisfy the first prong of the permissive joinder test under

---

Rule 20, a plaintiff may show that the claims asserted "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences. . . ." (Fed. R. Civ. P. 20(a)(2)(A).)  "[T]he mere fact that a case involves independent actors as defendants does not necessarily bring the case outside the scope of Rule 20." *In re EMC Corp.*, 677 F.3d 1351, 1357 (Fed. Cir. 2012).  So long as the claims asserted against those defendants arise from the same transaction or occurrence, joinder is permitted.  As one court has explained:

> Independent defendants satisfy the transaction-or-occurrence test of Rule 20 when there is a logical relationship between the separate causes of action.  The logical relationship test is satisfied if there is substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant.  In other words, the defendants' allegedly infringing acts, which give rise to the individual claims of infringement, must share an aggregate of operative facts.

*In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012).

As noted above, each of the causes of action asserted by Triller arises from the same transaction or occurrence, *i.e.*, the Broadcast.  Where, as here, the causes of action arise from the same transaction or occurrence, joinder under Rule 20 is permitted.  *See, e.g.*, *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980) (explaining that "Plaintiff's petition to add Schulte as a party defendant satisfied these specific requirements of Rule 20" because, among other things, "plaintiff's claims against both of the defendants arose out of the same series of occurrences").

### C. There Will Be Questions of Law and Fact Common to All Defendants.

To satisfy the second prong of the permissive joinder test under Rule 20, a plaintiff must show that questions of law or fact common to all defendants will arise in the action.  (*See* Fed. R. Civ. P. 20(a)(2)(B).)  Not every question of law and fact must be common.  *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974)

1  ("The rule does not require that all questions of law and fact raised by the dispute be

2  common."). Here, *each* cause of action asserted against *each* Defendant arises from

3  the very same set of operative facts. Where, as here, there are questions of law and

4  fact common to all defendants, joinder under Rule 20 is permitted. *See, e.g.*, *Desert*

5  *Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980) (explaining

6  that "Plaintiff's petition to add Schulte as a party defendant satisfied these specific

7  requirements of Rule 20" because, among other things, "[t]here were several material

8  questions that were common both to the claims of plaintiff DEB and to the responses

9  of defendants Schulte and INA").

10  ### D. Triller Can and Will Supplement its Complaint.

11  Triller is eager to learn and plead additional facts concerning the identities of

12  and relationships between Defendants. Indeed, Triller is concurrently filing an *ex*

13  *parte* application seeking leave to seek expedited discovery concerning Defendants'

14  true identifies (the "Application"). Triller anticipates using the information learned

15  through its expedited discovery to further support its claims against Defendants.[1]

16  At present, Triller is aware of certain facts demonstrating Defendants'

17  knowledge of other Defendants' illegal uploading and distribution of the Broadcast.

18  For example, while unlawfully re-distributing the Broadcast, certain Defendants

19  informed their viewers, subscribers, and fans of other Defendants' unlawful re-

20  distributing of the Broadcast. Triller can immediately amend its pleadings to assert

21  these allegations. (*See* Declaration of Alexander Brendon Gura in Support of

22  Plaintiff's Response to Order to Show Cause ("Gura Decl."), ¶ 2 & Ex. A at ¶ 24.)

23  ### III.   CONCLUSION

24  For the foregoing reasons, Triller respectfully requests that the Court permit

25  Triller to obtain the discovery requested in the Application before dismissing any

26  defendant.

27  _____

28  [1] Triller also anticipates using the information learned through its expedited discovery
to further support its allegations that the Central District is the proper venue for this
Action and that the Central District may exercise personal jurisdiction over
Defendants.

1

2    Dated: May 5, 2021                   NOVIAN & NOVIAN, LLP

3                                          Attorneys at Law

4                                          By:     /s/ Farhad Novian

5                                                  FARHAD NOVIAN
                                                   MICHAEL O'BRIEN
6                                                  ALEXANDER BRENDON GURA

7
                                                   Attorneys for Plaintiff TRILLER FIGHT
8                                                  CLUB II LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF ALEXANDER BRENDON GURA

I, Alexander Brendon Gura, declare as follows:

1.  I am an associate with the law firm of Novian & Novian, LLP, counsel to Plaintiff Triller Fight Club II LLC ("Plaintiff" or "Triller") in this action.  I submit this declaration in support of Triller's Response to this Court's Order to Show Cause.  If called as a witness in this action, I could and would testify competently to the matters set forth herein.

2.  Attached hereto as **Exhibit A** is a true and correct copy of Triller's [Proposed] Second Amended Complaint.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 5th day of May 2021, at Los Angeles, California.

*/s/ Alexander Brendon Gura*

Alexander Brendon Gura

# EXHIBIT A

FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
MICHAEL O'BRIEN (SBN 277244)
mobrien@novianlaw.com
ALEXANDER BRENDON GURA (SBN 305096)
gura@novianlaw.com
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, California 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222

Attorneys for Plaintiff TRILLER FIGHT CLUB II LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRILLER FIGHT CLUB II LLC, a Delaware Limited Liability Company, | CASE NO.: 2:21-cv-03502-PA-RAO |
| Plaintiff, | **[PROPOSED] SECOND AMENDED COMPLAINT FOR:** |
| vs. | 1. **COPYRIGHT INFRINGEMENT** |
| FILMDAILY.COM, an unknown business entity; ACCESSTVPRO.CO, an unknown business entity; ONLINE2LIVESTREAM.US, an unknown business entity; CRACKSTREAMSLIVE.COM, an unknown business entity; SPORTS-TODAY.CLUB, an unknown business entity; MY-SPORTS.CLUB, an unknown business entity; BILASPORT.COM, an unknown business entity; TRENDY CLIPS, an unknown business entity; MIKE, an unknown business entity; YOUR EXTRA, an unknown business entity; ECLIPT GAMING, an unknown business entity; ITSLILBRANDON, an unknown business entity; the H3 PODCAST, an unknown business entity; | 2. **VIOLATION OF THE FEDERAL COMMUNICATIONS ACT: 47 U.S.C. § 605** <br> 3. **VIOLATION OF THE FEDERAL COMMUNICATIONS ACT: 47 U.S.C. § 553** <br> 4. **CONVERSION** <br> 5. **BREACH OF CONTRACT** <br> 6. **CONSPIRACY** <br> 7. **VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT: 18 U.S.C. § 1030** <br> 8. **VICARIOUS COPYRIGHT INFRINGEMENT** <br><br> **JURY TRIAL DEMANDED** |

1   H3H3 PRODUCTIONS, an unknown
2   business entity; and DOES 1 through 100,
    inclusive,
3
                    Defendants.
4

Plaintiff Triller Fight Club II LLC, a Delaware limited liability company ("Plaintiff" or "Triller") hereby complains against Defendants FILMDAILY.COM, an unknown business entity ("Filmdaily.com"); ACCESSTVPRO.CO, an unknown business entity ("Accesstvpro.co"); ONLINE2LIVESTREAM.US, an unknown business entity ("Online2livestream.us"); CRACKSTREAMSLIVE.COM, an unknown business entity ("Crackstreamslive.com"); SPORTS-TODAY.CLUB, an unknown business entity ("Sports-today.club"), MY-SPORTS.CLUB, an unknown business entity ("My-sports.club"), BILASPORT.COM, an unknown business entity ("Bilasport.com"), TRENDY CLIPS, an unknown business entity ("Trendy Clips"), MIKE, an unknown business entity ("Mike"), YOUR EXTRA, an unknown business entity ("Your Extra"), ECLIPT GAMING, an unknown business entity ("Eclipt Gaming"), ITSLILBRANDON, an unknown business entity ("ItsLilBrandon"), the H3 PODCAST, an unknown business entity ("H3 Podcast"), H3H3 PRODUCTIONS, an unknown business entity ("H3H3"), and DOES 1 through 100, inclusive (collectively, the "Defendants"), and alleges as follows:

## NATURE OF THIS ACTION

1.      Through this action, Triller seeks in excess of $100,000,000.00 against Defendants and each of them all of whom are cyber-criminals, for their outright theft and diversion of upwards of 2,000,000 unique viewers by providing them with illegal and unauthorized viewings of the Broadcast of the Jake Paul vs. Ben Askren boxing event.   Plaintiff is the copyright owner and publisher of the Triller Fight Club broadcast of the "Jake Paul vs. Ben Askren" boxing event, including all undercard bouts and the entire television broadcast, exhibited via closed circuit television and via encrypted satellite signal (hereinafter referred to as the "Broadcast"). The Broadcast originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized online platforms. Plaintiff institutes this action to obtain remedy for—and to permanently hinder—the blatantly

1    unlawful infringement and rampant theft of its copyrighted work by the Defendants.

2    Defendants, and each of them, have utilized various torrent and streaming websites

3    such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co,

4    https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/,

5    https://my-sports.club/, and https://bilasports.com to unlawfully upload, distribute,

6    and publicly display, without authorization, the Broadcast to the users of such

7    websites. Upon information and belief, Defendants, and each of them, acted

8    knowingly, willfully, unlawfully and with blatant disregard to Plaintiff's copyright in

9    the Broadcast by uploading the Broadcast to the aforementioned websites with

10   additional shareable payment links, such as PayPal links, which allow users to remit

11   direct payments to the various Defendants in order to fund and endorse each respective

12   Defendants' infringement of Plaintiff's Broadcast. Defendants' calculated and

13   reprehensible infringement, theft, and other unlawful acts—committed in knowing

14   violation of the law—has resulted in damages suffered by Plaintiff in excess of

15   $100,000,000.00, by stealing and diverting upwards of 2,000,000 unique viewers of

16   the illegal and unauthorized viewings of the Broadcast from Plaintiff.

17           2.     Acting with intentional and knowing disregard of Plaintiff's exclusive

18   rights in the Broadcast, Defendants—who are nothing less than cyber-criminals—

19   employ various user profiles on websites, including those mentioned above, to

20   illegally upload copyrighted programming, including the Broadcast, and to facilitate

21   the unauthorized copying, sharing, downloading, uploading, and distribution of such

22   programming. Through their egregious conduct, Defendants also encourage other

23   online users to copy, share, download, distribute and share the Broadcast on the

24   aforementioned websites. Defendants further unlawfully facilitate, participate, and

25   induce other users to engage in the unauthorized reproduction, adaptation, distribution

26   and public display of Plaintiff's copyrighted Broadcast all to line their own pockets

27   with monies that belong to Plaintiff.

28           3.     Notwithstanding each Defendants' recognition that Plaintiff never

1   authorized their respective copying, downloading, uploading, public display and/or
2   distribution of the Broadcast, Defendants continue to engage—and unjustly benefit—
3   from their infringing conduct. Defendants' plain acts of thievery, misappropriation,
4   and infringement, as further described herein, are tantamount to, and no less deplorable
5   than, the acts of a pilferer, poaching on and looting the fruits of another's hard-earned
6   labor.

7                              **JURISDICTION AND VENUE**

8       4.      The Court has subject matter jurisdiction pursuant to 17 U.S.C. § 101, *et*
9   *seq.* and 28 U.S.C. § 1331, which states that district courts shall have original
10  jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the
11  United States; and 28 U.S.C. Section § 1338 (a).

12      5.      Upon information and belief, venue is proper in this Court pursuant to 28
13  U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to
14  the claims occurred in this district.  In the alternative, venue is also proper under 28
15  U.S.C. § 1391(b)(3), as Defendants, and each of them, are subject to the court's
16  personal jurisdiction with respect to this action.

17                                  **PARTIES**

18      6.      Plaintiff is a limited liability company incorporated under the laws of
19  Delaware and having its principal place of business in the State of California.

20      7.      Plaintiff is engaged in the business of distributing its copyrighted
21  materials as defined in 17 U.S.C. § 101, and offering such content, including the
22  Broadcast, for purchase on a Pay-Per-View basis to its paying customers over the
23  internet or via cable or satellite TV. Plaintiff invests substantial money, time, and effort
24  in advertising, promoting, selling, and licensing programming such as the Broadcast.

25      8.      Plaintiff owns the copyrights to the Broadcast. As the exclusive owner of
26  the Copyright in its programing, including but not limited to the Broadcast, Plaintiff
27  possesses the exclusive rights to, *inter alia*, exhibit, distribute, disseminate and
28  perform the Broadcast publicly.

9.    Upon information and belief, Defendant Filmdaily.com is a business entity, the exact nature of which is unknown, registered in Nevada and doing business in the State of California. Upon information and belief, Filmdaily.com offers the website https://filmdaily.co for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Filmdaily.com through its illegal uploading and distribution of the Broadcast.

10.    Upon information and belief, Defendant Accesstvpro.co is a business entity, the exact nature of which is unknown, registered in Arizona and doing business in the State of California. Upon information and belief, Accesstvpro.co offers the website https://accesstvpro.co for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Accesstvpro.co through its illegal uploading and distribution of the Broadcast.

11.    Upon information and belief, Defendant Online2livestream.us is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Online2livestream.us offers the website https://online2livestream.us  for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Online2livestream.us through its illegal uploading and distribution of the Broadcast.

12.    Upon information and belief, Defendant Crackstreamslive.com is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Crackstreamslive.com offers the website https://crackstreamslive.com  for the purpose of permitting, encouraging, facilitating,

and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Crackstreamslive.com through its illegal uploading and distribution of the Broadcast.

13.     Upon information and belief, Defendant Sports-today.club is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Sports-today.club offers the website https://sports-today.club/ for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Sports-today.club through its illegal uploading and distribution of the Broadcast.

14.     Upon information and belief, Defendant My-sports.club is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, My-sports.club offers the website https://my-sports.club/ for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by My-sports.club through its illegal uploading and distribution of the Broadcast.

15.     Upon information and belief, Defendant Bilasport.com is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Bilasport.com offers the website https://bilasports.com for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Bilasport.com through its illegal uploading and distribution of the Broadcast.

[PROPOSED] SECOND AMENDED COMPLAINT

16.     Upon information and belief, Defendant Trendy Clips is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Trendy Clips operates the Youtube channel located at https://www.youtube.com/channel/UCYj6TdieiWvyuQc4s6J88uw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Trendy Clips through its illegal uploading and distribution of the Broadcast.

17.     Upon information and belief, Defendant Mike is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Mike operates the Youtube channel located at https://www.youtube.com/channel/UCc6_H_Qrmy_yGUe6M6vOClw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Mike through its illegal uploading and distribution of the Broadcast.

18.     Upon information and belief, Defendant Your Extra is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Your Extra operates the Youtube channel located at https://www.youtube.com/channel/UCArjknvNYidNOoJgOQNby3g for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Your Extra through its illegal uploading and distribution of the Broadcast.

///

19.     Upon information and belief, Defendant Eclipt Gaming is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, Eclipt Gaming operates the Youtube channel located at https://www.youtube.com/channel/UCt1CKTX-ITRNbJ5U1Su6Qcw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by Eclipt Gaming through its illegal uploading and distribution of the Broadcast.

20.     Upon information and belief, Defendant ItsLilBrandon is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, ItsLilBrandon operates the Youtube channel located at https://www.youtube.com/channel/UCRjHeG6mxIFuMaLS3HAt9rg for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by ItsLilBrandon through its illegal uploading and distribution of the Broadcast.

21.     Upon information and belief, Defendant H3 Podcast is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, the H3 Podcast—through its hosts Ethan and Hila Klein— operates          the          Youtube          channel          located          at https://www.youtube.com/channel/UCLtREJY21xRfCuEKvdki1Kw for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by the H3 Podcast through its illegal uploading and distribution of the Broadcast.

22.     Upon information and belief, Defendant H3H3 is a business entity, the exact nature of which is unknown, doing business in the State of California. Upon information and belief, H3H3—through Ethan and Hila Klein—operates the Youtube channel located at https://www.youtube.com/user/h3h3Productions for the purpose of permitting, encouraging, facilitating, and inducing the sharing of videos and live programing of audiovisual materials between users of the website. Those materials include programming owned and/or controlled by Plaintiff, including the Broadcast, which was offered by H3H3 through its illegal uploading and distribution of the Broadcast.

23.     Plaintiff is informed and believes, and thereon alleges, that the actions and omissions that serve as the basis for this complaint were undertaken jointly and with the consent, conspiracy, cooperation, and joint participation of all defendants.

24.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, each Defendant was the agent, joint venture, and/or employee of each and every other defendant, and in doing the things alleged in this complaint, each defendant was acting within the course and scope of such agency, joint venture, and/or employment and with the permission and consent of each of the other defendants. Plaintiff is further informed and believes, and thereon alleges, that certain Defendants were aware of and informed their subscribers, viewers, and fans of the existence of other Defendants' illegal uploading and distribution of the Broadcast, thereby demonstrating Defendants' common enterprise.

25.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff at this time.  Plaintiff therefore sues said Defendants, and each of them, by such fictitious names.  Plaintiff will advise the Court and seek leave to amend this Complaint when the true names and capacities of each such Defendant has been ascertained.  Plaintiff is informed and believes, and based thereon alleges, that each such Defendant designated as a DOE is responsible in some manner

for the events and happenings referred to herein or as hereinafter specifically alleged.

## COUNT ONE:

### (For Copyright Infringement Against All Defendants)

26.     Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

27.     Plaintiff is the owner of the copyrights to the Broadcast, including all undercard bouts and the entire television Broadcast. Plaintiff's rights include, but are not limited to, all moving images and other audio/video content which were broadcasted via encrypted satellite signal. The Broadcast originated via satellite uplink and were subsequently retransmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized, online platforms.

28.     As the copyright holder to the rights of the Broadcast, Plaintiff has the exclusive right to copy, publicly perform and distribute it.

29.     Defendants, and each of them, failed to obtain the property authority or license from Plaintiff to copy, publicly perform or distribute the Broadcast.

30.     Upon information and belief, Defendants illegally copied, uploaded, publicly performed and distributed the Broadcast via the internet with full knowledge that the Broadcast could only be obtained by purchasing a license from Plaintiff.

31.     Defendants, and each of them, have utilized various torrent and streaming websites        such        as        https://filmdaily.co,        https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, https://bilasports.com, and https://youtube.com to upload, distribute, and publicly display the Broadcast to the users of such website in direct violation of the exclusive rights owned by Plaintiff.

32.     Specifically, upon information and belief, the Defendants, and each of them, obtained the Broadcast through internet websites, cable and/or satellite Pay-Per-

1   View purchase intended for private, non-commercial viewing, and subsequently
2   illegally re-transmitted the Broadcast and publicly exhibited the Broadcast by illegally
3   copying and uploading the Broadcast to the aforementioned websites for other users
4   to also illegally view, download, access, share, and distribute.

5       33.     Defendants, and each of them, have infringed on Plaintiff's copyright in
6   the Broadcast by reproducing, adapting distributing, uploading, copying, and publicly
7   displaying the copyrighted works without Plaintiff's authorization in violation of the
8   Copyright Act, 17 U.S.C. § 501, and have recouped profits from the aforementioned
9   websites through users' payments to the Defendants or through advertising revenue
10  generated through the websites.

11      34.     Defendants' acts of infringement were willful, in blatant disregard of, and
12  committed with indifference to Plaintiff's rights.

13      35.     By reason of Defendants' conduct as described herein, Defendants, and
14  each of them, willfully violated 17 U.S.C. § 501.

15      36.     Due to Defendants' acts of copyright infringement as alleged herein,
16  Defendants have obtained direct and indirect profits Defendants would not otherwise
17  have realized but for Defendants' infringement of the Broadcast. As such, Plaintiff is
18  entitled to disgorgement of Defendant's profits directly and indirectly attributable to
19  Defendants' infringement of the Broadcast, in an amount to be established at trial,
20  but in no event less than $100,000,000.00.

21      37.     Plaintiff is further entitled to its attorney's fees and full costs pursuant to
22  17 U.S.C. § 505.

23                          **COUNT TWO:**

24  **(For Violations of the Federal Communications Act: 47 U.S.C. §605 Against All**
25                          **Defendants)**

26      38.     Plaintiff hereby realleges, and by this reference incorporates herein, each
27  and every allegation of preceding and subsequent paragraphs as though fully set forth
28  herein.

---

39.     Plaintiff is the owner of the Broadcast, including all undercard matches and the entire television broadcast, aired via closed circuit television and via encrypted satellite signal.

40.     The Broadcast was available for non-commercial, private viewing through Plaintiff, its authorized online vendors, as well as through Pay-Per-View purchase through authorized satellite TV providers. Defendants, in a calculated effort to use Plaintiff's Broadcast for their own commercial benefit, obtained access to Plaintiff's Broadcast by purchasing the programming and subsequently copying the Broadcast and uploading it to torrent and streaming websites such as and https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com.

41.     In order to purchase and view the Broadcast through a satellite TV provider intended for private, non-commercial viewing, an individual purchaser was subject to the copyright language contained therein which expressly stated that the "unauthorized reproduction or distribution of the copyrighted work is illegal."

42.     Upon information and belief, with full knowledge that the Broadcast was not to be received, distributed, reproduced and or publicly exhibited by individuals unauthorized to do so, Defendants, without authorization from Plaintiff, unlawfully intercepted, received and/or de-scrambled Plaintiff's satellite signal for purposes of direct commercial advantage and subsequently divulged the Broadcast to the public by copying and distributing said Broadcast to the users of the aforementioned websites in exchange for payments to aid, encourage, support, or otherwise endorse Defendants' infringing conduct.

43.     Upon information and belief, Plaintiff alleges that Defendants effected unauthorized interception and receipt of Plaintiff's Broadcast via Defendants' satellite TV service by ordering programming for residential use and subsequently copying, uploading, distributing and publicly displaying the Broadcast without authorization,

1    or by such other means which are unknown to Plaintiff and known only to Defendants.

2    44.    47 U.S.C. § 605(a) prohibits the unauthorized reception and publication

3    or use of communications such as the Broadcast for which Plaintiff had the distribution

4    rights thereto.

5    45.    By reason of Defendants' conduct as described herein, Defendants, and

6    each of them, willfully violated 47 U.S.C. § 605(a)

7    46.    As a proximate result of Defendants' willful violations of 47 U.S.C. §

8    605(a), Plaintiff is entitled to damages, in the discretion of this Court, under 47 U.S.C.

9    § 605(a), Plaintiff is entitled to damages, in the discretion of this Court, under 47

10   U.S.C. § 605(e)(3)(C)(i)(II) and (ii) of up to the maximum amount of $110,000.00 as

11   to *each* violation.

12   47.    Pursuant to 47 U.S.C. § 605, Plaintiff is also entitled to an award of full

13   costs, interest and reasonable attorney's fees.

14                          **COUNT THREE:**

15   **(For Violations of the Federal Communications Act: 47 U.S.C. §553 Against All**

16                          **Defendants)**

17   48.    Plaintiff hereby realleges, and by this reference incorporates herein, each

18   and every allegation of preceding and subsequent paragraphs as though fully set forth

19   herein.

20   49.    Upon information and belief, Defendants willfully and unlawfully

21   accessed, received, and subsequently re-transmitted the Broadcast over a cable TV or

22   internet system while knowing that they were unauthorized to do so.

23   50.    47 U.S.C. §553 prohibits the unauthorized reception of any

24   communications service offered over a cable system such as the transmission of the

25   Broadcast for which Plaintiff holds the copyright ownership thereto.

26   51.    Upon information and belief, the Defendants knowingly, willfully and

27   unlawfully accessed, received and subsequently re-transmitted the Broadcast when it

28   was offered via a cable TV or internet subscription without the authorization from

1   Plaintiff and without paying Plaintiff the appropriate Pay-Per-View fee.

2       52.    By reason of Defendants' conduct as described herein, Defendants, and

3   each of them, willfully violated 47 U.S.C. §553.

4       53.    As a proximate result of Defendants' willful violations of 47 U.S.C. §553,

5   Plaintiff is entitled to damages in an amount, in the discretion of this Court, of up to

6   the maximum amount of $60,000.00 as to each violation, plus the recovery of full

7   costs, interest and reasonable attorney's fees, in the discretion of this Court.

8   <div align="center">**COUNT FOUR:**</div>

9   <div align="center">**(For Conversion Against All Defendants)**</div>

10      54.    Plaintiff hereby realleges, and by this reference incorporates herein, each

11  and every allegation of preceding and subsequent paragraphs as though fully set forth

12  herein.

13      55.    Plaintiff, at all relevant times, owned, possessed, and had the right to

14  possess the copyrights to the Broadcast.

15      56.    By virtue of Defendants' conduct as set forth herein, Defendants, and

16  each of them, knowingly and intentionally substantially interfered with Plaintiff's

17  property by unlawfully converting it for their own commercial use, benefit, and private

18  financial gain.

19      57.    Defendants' acts of conversion were done without Plaintiff's consent and

20  with the objective of depriving Plaintiff of its copyright ownership for Defendants'

21  direct commercial benefit, advantage and private financial gain.

22      58.    As a proximate result of Defendants' wrongful conversion of the

23  Broadcast, Plaintiff suffered damages in an amount subject to proof at trial but in no

24  event less than $100,000,000.00.

25  <div align="center">**COUNT FIVE**</div>

26  <div align="center">**(For Breach of Contract Against All Defendants)**</div>

27      59.    Plaintiff hereby realleges, and by this reference incorporates herein, each

28  and every allegation of preceding and subsequent paragraphs as though fully set forth

1    herein.

2        60.    Plaintiff would show that pursuant to Plaintiff's Terms of Use for its

3    programming of the Broadcast, any user of Plaintiff's authorized websites for Pay-

4    Per-View purchase and any purchaser of a residential Pay-Per-View feed from

5    Plaintiff, either via cable or satellite TV, agreed not to reproduce, distribute, or

6    transmit any of Plaintiff's materials, including the Broadcast.

7        61.    Upon information and belief, Defendants, and each of them, purchased

8    the Broadcast through Plaintiff's authorized websites or via Pay-Per-View purchase

9    for private, residential viewing.

10       62.    Upon information and belief, with full knowledge that the Broadcast was

11   not to be unlawfully copied and distributed by individuals unauthorized to do so,

12   Defendants willfully and unlawfully copied, uploaded and distributed the Broadcast

13   to   users   of    torrent   and   streaming   websites   such   as   https://youtube.com,

14   https://filmdaily.co,          https://accesstvpro.co,          https://online2livestream.us,

15   https://crackstreamslive.com,   https://sports-today.club/,   https://my-sports.club/,and

16   https://bilasports.com so that the Broadcast could be accessed free of charge.

17       63.    As a proximate result of Defendants breach of their respective agreements

18   with Plaintiff, Plaintiff has been damaged through the loss of substantial amounts of

19   revenue, loss of business, loss of good-will and loss of customers, the sum value of

20   which will be proven at trial but which is an amount no less than $100,000,000.00

21                                       **COUNT SIX**

22                       **(For Conspiracy Against All Defendants)**

23       64.    Plaintiff hereby realleges, and by this reference incorporates herein, each

24   and every allegation of preceding and subsequent paragraphs as though fully set forth

25   herein.

26       65.    Upon information and belief, Defendants, and each of them, had an

27   agreement between two or more persons.

28       66.    Upon information and belief, pursuant to the respective Defendants'

agreements, Defendants set out to intentionally, willfully, and unlawfully access and copy Plaintiff's Broadcast and subsequently upload the Broadcast for distribution and public display in exchange for direct contributions from the users of the websites known as such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com or for advertisement revenue from such websites.

67. Upon information and belief, Defendants, and each of them, intentionally, willfully, and unlawfully accessed, copied, uploaded, distributed, and publicly displayed Plaintiff's Broadcast using such websites and did in fact receive direct contributions from users of such websites or advertisement revenue from such websites.

68. As a proximate result of Defendants respective agreements and subsequent acts as described herein, Plaintiff has been damaged through the loss of substantial amounts of revenue, loss of business, loss of good-will, and loss of customers, the sum value of which will be proven at trial but which is an amount no less than $100,000,000.00

### COUNT SEVEN

### (For Violations of the Computer Fraud and Abuse Act: 18 U.S.C. § 1030 Against All Defendants)

69. Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

70. Upon information and belief, Defendants, and each of them, without authorization or by exceeding the scope of granted authorization, accessed a protected computer containing Plaintiff's live internet streams of the Broadcast, and knowingly and with the intent to defraud, unlawfully copied, distributed, and publicly displayed the Broadcast.

71.     Upon information and belief, as a proximate result of Defendants' unlawful and fraudulent conduct as set forth herein, Defendants, and each of them, obtained the valuable copyrighted Broadcast and subsequently uploading, distributing, and publicly displaying the Broadcast using such as and https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com.

## COUNT EIGHT:

### (For Vicarious Copyright Infringement Against All Defendants)

72.     Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

73.     Plaintiff is the owner of the copyrights to the Broadcast, including all undercard bouts and the entire television Broadcast. Plaintiff's rights include, but are not limited to, all moving images and other audio/video content which were broadcasted via encrypted satellite signal. The Broadcast originated via satellite uplink and were subsequently retransmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized, online platforms.

74.     Upon information and belief, Defendants, and each of them, directly infringed on Plaintiff's Broadcast by illegally uploading the Broadcast and/or portions thereof via the internet on the websites such as https://youtube.com, https://filmdaily.co, https://accesstvpro.co, https://online2livestream.us, https://crackstreamslive.com, https://sports-today.club/, https://my-sports.club/, and https://bilasports.com in direct violation of Plaintiff's exclusive copyright.

75.     Upon information and belief, Defendants encouraged online users to copy, share, download, distribute, and share content, including the Broadcast, on the aforementioned websites, and defendants facilitated, participated in and induced users

1  to engage in the unauthorized reproduction, adaptation, public display and public
2  performance of programming containing Plaintiff's copyrighted Broadcast.

3      76.    Defendants had the right and ability to control and prevent the users on
4  such aforementioned websites from directly accessing and infringing on Plaintiff's
5  Broadcast which was copied, uploaded, and distributed by Defendants, and each of
6  them.

7      77.    Defendants derived a financial benefit from such users' activities on the
8  aforementioned websites by directing such users to external and/or shareable payment
9  links, such as PayPal links, whereby users could remit direct payments to Defendants
10 in order to compensate, fund and endorse each respective Defendants' infringement of
11 Plaintiff's Broadcast.

12     78.    By reason of Defendants' conduct as described herein, Defendants, and
13 each of them, willfully violated 17 U.S.C. § 501.

14     79.    Due to Defendants' acts of copyright infringement as alleged herein,
15 Defendants have obtained direct and indirect profits Defendants would not otherwise
16 have realized but for Defendants' infringement of the Broadcast. As such, Plaintiff is
17 entitled to disgorgement of Defendant's profits directly and indirectly attributable to
18 Defendants' infringement of the Broadcast, in an amount to be established at trial but
19 no less than $100,000,000.00.

20     80.    Plaintiff is further entitled to its attorney's fees and full costs pursuant to
21 17 U.S.C. § 505.

22                          **PRAYER FOR RELIEF**

23     WHEREFORE, Plaintiff prays for judgment against Defendants, and each of
24 them, as follows:

25 AS TO COUNT ONE:

26     1.    That Defendants, Defendants' employees, representatives, and agents be
27        enjoined from copying, uploading, distributing, selling, or otherwise
28        infringing on Plaintiff's copyright in the Broadcast;

[PROPOSED] SECOND AMENDED COMPLAINT

2. That Plaintiff be awarded all profits of Defendants plus all losses of Plaintiff, the exact sum to be proven at the time of trial but in no event less than $100,000,000.00; and

3. That an order be issued requiring Defendants, and each of them, to account to Plaintiff for profits attributable to their use of Plaintiff's copyright, in accordance with proof.

AS TO COUNT TWO:

4. For statutory penalties in an amount, in the discretion of this Court, of up to the maximum amount of $110,000.00 for each of the Defendants' willful violations of 47 U.S.C. § 605(a).

AS TO COUNT THREE:

5. For statutory penalties in an amount, in the discretion of this Court, of up to the maximum amount of $60,000.00 for each of the Defendants' willful violations of 47 U.S.C. § 553; and

6. For Attorney's fees, interest, and costs of suit pursuant to 17 U.S.C. § 505; 47 U.S.C. 605(e)(3)(B)(iii) or §553(c)(2)(c);

AS TO COUNT FOUR:

7. For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

8. For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

AS TO COUNT FIVE:

9. For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

10. For consequential damages.

AS TO COUNT SIX:

11. For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00;

12. For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

AS TO COUNT SEVEN:

13. For damages within this Court's jurisdiction in an amount according to proof at trial but in no event less than $100,000,000.00; and

14. Injunctive relief enjoining from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast.

AS TO COUNT EIGHT:

15. That Defendants, Defendants' employees, representatives, and agents be enjoined from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast;

16. That Plaintiff be awarded all profits of Defendants plus all losses of Plaintiff, the exact sum to be proven at the time of trial but in no event less than $100,000,000.00; and

17. That an order be issued requiring Defendants, and each of them, to account to Plaintiff for profits attributable to their use of Plaintiff's copyright, in accordance with proof.

AS TO ALL COUNTS:

18. For pre-judgment and post-judgment interest on all damages awarded;

19. For attorneys' fees and costs of suit incurred herein according to proof; and

20. For such other and further relief as the Court may deem just and proper.

///
///
///
///
///
///

[PROPOSED] SECOND AMENDED COMPLAINT

Dated:  May 5, 2021                NOVIAN & NOVIAN, LLP
                                             Attorneys at Law

                                   By:     /s/ Farhad Novian
                                           FARHAD NOVIAN
                                           MICHAEL O'BRIEN
                                           ALEXANDER BRENDON GURA

                                           Attorneys for Plaintiff TRILLER FIGHT
                                           CLUB II LLC

[PROPOSED] SECOND AMENDED COMPLAINT

# EXHIBIT M



Lincoln@BandlowLaw.com

June 29, 2021

<u>**VIA EMAIL**</u>

Farhad Novian
farhad@novianlaw.com
Michael O'Brien
michaelo@novianlaw.com
Alexander Brendon Gura
gura@novianlaw.com
Novian & Novian, LLP
1801 Century Park East, Suite 1201
Los Angeles, CA 90067

RE:     *Triller Fight Club II LLC v. The H3 Podcast* (Case No. 2:21-cv-03942)

Dear Counsel:

      As you know, we are counsel for Ted Entertainment, Inc. ("TEI"), Ethan Klein ("Ethan")
and Hila Klein ("Hila") (collectively, "Our Clients"). Pursuant to Local Rule 7-3, we are writing
to you to schedule a meet and confer regarding two motions Our Clients intend to file in
response to the First Amended Complaint ("FAC") filed by Triller Fight Club II, LLC
("Triller"): (1) a motion to dismiss pursuant to Federal Rule of Civil Procedure ("F.R.C.P.")
12(b)(6) (the "Motion to Dismiss"); and (2) a special motion to strike pursuant to California
Code of Civil Procedure ("C.C.P.") Section 425.16 (the "Anti-SLAPP Motion").

      In our June 1, 2021 letter (the "6/1/21 Letter"), we explained in extensive detail why the
Honorable Percy Anderson was completely correct in expressing serious concerns regarding "the
adequacy of [Triller's] compliance with its pre-suit investigation obligations under Federal Rule
of Civil Procedure 11."[1] Our 6/1/21 Letter unequivocally demonstrated that Triller did violate its
obligations under F.R.C.P. Rule 11 because each and every claim in the FAC was fatally
defective as a matter of law. Additionally, we provided you with an extensive amount of facts
that further demonstrated that each and every claim in the FAC was devoid of merit and that the
FAC contained demonstrably false allegations that Triller could have discovered if it complied
with its F.R.C.P. Rule 11 obligations. We also warned you to cease engaging in F.R.C.P. Rule
11 violations or you would leave Our Clients no choice but to seek sanctions.

      In your June 8, 2021 Letter (the "6/8/21 Letter"), Triller did not head our warning and

---

[1] *See Triller Fight Club II, LLC v. Filmdaily.com*, Case No. 2:21-cv-03502-PA-RAO (the
"Filmdaily Action"), Dkt. No. 26, p. 3 (the "5/6/21 Order").



continued to demonstrate its bad faith. The 6/8/21 Letter advanced a series of untethered and untenable arguments that were either completely inapposite or divorced from the law and facts. Even more shocking was that Triller failed to address – let alone refute – the vast majority of points raised in our 6/1/21 Letter. Most egregious, Triller even had the *chutzpa* to claim that we were in violation of our ethical responsibilities – despite Triller itself making completely frivolous arguments and intentionally misrepresenting the record and the law.

The time has come for Triller to decide: will it continue to engage in bad faith by making demonstrably false statements of law and fact or will it come to terms with reality and concede it does not and cannot allege a viable claim against Our Clients. Our Clients are no longer inclined to play whack-a-mole to refute each and every one of Triller's desperate, deceptive and even delusional arguments. Nor will we point out each and every one of the countless instances where Triller effectively conceded that its FAC lacks merit by failing to address – let alone refute – the majority of points raised in our 6/1/21 Letter (as that would require a completely separate letter). We will, however, demonstrate how the 6/8/21 Letter – like Triller's prior pleadings and statements – was rife with materially false statements of law and fact.

We strongly advise Triller to read this letter closely, including the authorities cited in this letter. In their generosity, Our Clients are providing Triller two options to avoid continuing to violate F.R.C.P. Rule 11 and California Rule of Professional Conduct 3.3. First, Triller can submit to us a proposed second amended complaint that properly pleads viable claims (assuming that is possible, which we believe it is not). Second, Triller can dismiss the FAC with prejudice.

Be advised: Our Clients will not tolerate any further bad faith arguments. Nor will they stipulate to another abusive and harassing complaint that persists in failing to adequately plead viable claims. If Triller does not head this final warning, Our Clients will have no choice by to file their Motion to Dismiss and Anti-SLAPP Motion and seek their attorneys' fees. The grounds for both motions are set forth in detail below.

## I.     Legal Standard Under F.R.C.P. Rule 12(b)(6)

To draft a complaint that can survive dismissal under F.R.C.P. Rule 12(b)(6), Triller was required to "allege '***enough facts*** to state a claim to relief that is plausible on its face.'" *Benavidez v. County of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (emphasis added) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility standard is ***not*** akin to a 'probability requirement'" and, instead, "asks for ***more than a sheer possibility*** that a defendant has acted unlawfully." *Dent v. National Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020) (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 556)). Additionally, this requires Triller "to include ***enough facts*** to raise a right to relief ***above a speculative level.***" *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (emphasis added) (quoting *Twombly*, 550 U.S. at 555).



Farhad Novian, Michael O'Brien and Alexander Brendon Gura
June 29, 2021
Page 3

In stark contrast to Triller's fatally defective FAC, a well-pleaded complaint must contain sufficient "factual content that allows the court to draw the ***reasonable inference*** that the defendant is liable for the misconduct alleged." *Benavidez*, 993 F.3d at 1144 (emphasis added) (quoting *Iqbal*, 556 U.S. at 678; *United States v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011)). Instead, Triller's fatally defective FAC relies merely on "labels and conclusions," "formulaic recitation of the elements," and "conclusory allegations of law and unwarranted inferences" which simply "will not do." *Benavidez*, 993 F.3d at 1145 (quoting *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004)). Further, Triller's "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are woefully inadequate. *Whitaker*, 985 F.3d at 1176 (quoting *Iqbal*, 556 U.S. at 678-679).

Triller cannot, as here, "rely on ***anticipated discovery*** to satisfy" its pleading requirements; "rather, pleadings ***must assert well-pleaded factual allegations to advance to discovery***." *Whitaker*, 985 F.3d at 1177 (emphasis added) (citing *Iqbal*, 556 U.S. at 678-79). Triller was required to plead sufficient facts to demonstrate that "it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Whitaker*, 986 F.3d at 1177 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

The Ninth Circuit has repeatedly held that, on a motion to dismiss, a court can review "unattached evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Beverly Oaks Physicians Surgical Center, LLC v. Blue Cross and Blue Shield of Illinois*, 983 F.3d 435, 439 (9th Cir. 2020) (quoting *United States v. Corinthian Colleges*, 655 F.3d 984, 998-99 (9th Cir. 2011)). Sometimes known as the "incorporation by reference doctrine," it is frequently applied to copyright infringement claims that result in dismissal. *See e.g., Rearden LLC v. Walt Disney Company*, 293 F.Supp.3d 963, 969 (N.D. Cal. 2018) (incorporating various items referred to copyright infringement complaint, including various motion pictures); *Marcus v. ABC Signature Studios, Inc.*, 279 F.Supp.3d 1056, 1062-63 (C.D. Cal. 2017) (incorporating script and DVD of television show referred to in complaint); *Shame on You Productions, Inc. v. Elizabeth Banks*, 120 F.Supp.3d 1123, 1144-45 (C.D. Cal. 2015) (same).

Additionally, the Ninth Circuit authorizes courts to consider "matters of which the court may take judicial notice." *Ceder Point Nursery v. Shiroma*, 923 F.3d 524, 530 (9th Cir. 2019) (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008)).

Our Clients shall submit the following items to the Court for their Motion to Dismiss:

- The audiovisual work entitled *Jake Paul vs. Ben Askren* (the "Broadcast"), which is incorporated by reference in Paragraphs 1-5, 9-11, 17-23, 26, 29-33, 39-40, 44, 47, 49-50, 52-56 and 58 of the FAC;

- The audiovisual work entitled *Jake Paul Fight Was A Disaster – H3 Podcast # 244*" (the "4/22/21 Podcast"), which is incorporated by reference in Paragraphs 2 and 12-13 of the FAC;



- The unlisted video entitled *Jake Knockout* (the "Reference Video"), which is incorporated by reference in Paragraphs 2, 12-13, 22 and 30 of the FAC;

- A printout of the webpage for the "H3 Podcast" (the "Podcast") channel, which is incorporated by reference in Paragraphs 2-3, 11-13, 23 and 56 of the FAC;

- A printout of the webpage for the 4/22/21 Podcast, which is incorporated by reference in Paragraphs 2, 12-13 and 56 of the FAC;

- A printout of the webpage for the Reference Video, which is incorporated by reference in Paragraphs 2, 12-13, 22, 30 and 56 of the FAC;

- The initial complaint in the Filmdaily Action (the "Filmdaily Initial Complaint"), which is subject to judicial notice as a matter of public record (*see United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008));

- The first amended complaint in the Filmdaily Action (the "Filmdaily FAC"), which is subject to judicial notice as a matter of public record;

- The 5/6/21 Order, which is subject to judicial notice as a matter of public record;

- The Copyright Office's online record for the Broadcast, which is subject to judicial notice as a matter of public record;

- The dictionary definitions of "Stream" in Merriam-Webster Dictionary,[2] which is subject to judicial notice as a dictionary definition (*see Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F.Supp.2d 139, 146 (N.D. Cal. 2020)); and

- Google's definitions of "Public Videos," "Private Videos," and "Unlisted Videos" which is made available on its public website[3] (*see Terraza v. Safeway Inc.*, 241 F.Supp.3d 1057, 1067 (N.D. Cal. 2017)).

## II.     Triller's Alter-Ego Theory Fails as a Matter of Law

In our 6/1/21 Letter, we explained how the FAC is fatally defective in pleading that TEI is the alter-ego of Ethan and Hila.  Triller's FAC spews a word salad of "conclusory allegation[s], unsupported by facts" that do "not adequately plead" alter-ego theory because these allegations are "mere speculation that [are] insufficient to defeat a motion to dismiss."  *See Gerritsen v. Warner Brothers Entertainment, Inc.*, 116 F.Supp.3d 1104, 1142 (C.D. Cal. 2015) (citing *NetApp, Inc. v. Nimble Storage, Inc.*, Case No. 5:13-cv-05059 (LHK) (HRL), 2015 WL 400251, * 7 (N.D. Cal. 2015); *Hoang v. Vinh Phat Supermarkets, Inc.*, Case No. 2:13-cv-00725 (WBS) (GGH), 2013 WL 4095042, *14 (E.D. Cal. 2013); *Dollar Tree Stores, Inc. v. Toyama Partners, LLC,* Case No. C 10-0325 (SI) 2011 WL 872724, *2 (N.D. Cal. 2011)).

---

[2] Merriam-Webster, "Stream," *available at*: https://www.merriam-webster.com/dictionary/stream.

[3] YouTube Help, "Change Video Privacy Settings", *available at*: https://support.google.com/youtube/answer/157177?co=GENIE.Platform%3DDesktop&hl=en#zippy=%2Cunlisted-videos%2Cprivate-videos%2Cpublic-videos.



"Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specific facts supporting ***both*** of the necessary elements." *Gerritsen*, 116 F.Supp.3d at 1136-37 (emphasis added) (citing *In re Currency Conversion Fee Antitrust Litigation*, 265 F.Supp.2d 385, 426 (S.D.N.Y. 2003); *Wady v. Provident Live and Accident Insurance Co. of America*, 216 F.Supp.2d 1060, 1067 (C.D. Cal. 2002); *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, Case No. 01 Civ. 02946(AGS), 2002 WL 432390, *12 (S.D.N.Y. Mar. 20, 2002); *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 647 (C.D. Cal. 1983)).

To properly plead that TEI was the alter-ego of Ethan and Hila, Triller was required to allege ***facts*** that demonstrate: (1) "a unity of interest and ownership between the corporation and its equitable owner[s] that the separate personalities of the corporation and the shareholder[s] do not in reality exist"; and (2) "an inequitable result if the acts in question are treated as those of the corporation alone." *Gerritsen*, 116 F.Supp.3d at 1136 (quoting *Sonora Diamond Corp. v. Sup. Ct.*, 83 Cal.App.4th 523, 526 (2000)).

As to the unity of interest element, Triller's FAC merely asserts conclusory and threadbare allegations that repackage the alter-ego factors first articulated in *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 838-840 (1962). The allegations of Paragraph 14(a) of the FAC regurgitate the *Associated Vendors* factor that TEI is allegedly "a mere shell, instrumentality or conduit for" Ethan and Hila and they purportedly have "the domination and control" of TEI. *Compare* FAC, ¶ 14(a) *with Associated Vendors*, 210 Cal.App.2d at 839. The allegations of Paragraph 14(b) of the FAC regurgitate the *Associated Vendors* factors that there is a purported "failure to adequately capitalize [TEI]; the total absence of corporate assets, and undercapitalization" and "use of a corporate entity as a shield against personal liability." *Compare* FAC, ¶ 14(b) *with Associated Vendors*, 210 Cal.App.2d at 839-40. The allegations in Paragraph 14(c) of the FAC regurgitate the *Associated Vendors* factors that there is an alleged "unauthorized diversion of corporate funds or assets to other than corporate uses" and "the treatment by [Ethan and Hila] of the corporation as [their] own." *Compare* FAC, ¶ 14(c) *with Associated Vendors*, 210 Cal.App.2d at 838. The allegations of Paragraph 14(d) regurgitate the *Associated Vendors* factors of Ethan and Hila's purported "failure to maintain minutes or adequate corporate records" and the "domination and control" of the entity by the shareholders. *Compare* FAC, ¶ 14(d) *with Associated Vendors*, 210 Cal.App.2d at 838-39. None of these conclusory allegations will survive Our Clients' Motion to Dismiss.

Triller's FAC also fails to properly plead an inequitable result. Paragraph 15 of Triller's FAC relies "merely [on] allegations [for] the lack of separation" between TEI and Ethan and Hila "and nowhere discuss[es] any reason why continuing to recognize each company's distinct corporate form would sanction a fraud or promote an injustice." *See In re Packaged Seafood Products Antitrust Litigation*, 277 F.Supp.3d 1167, 1189 (S.D. Cal. 2017). Such woefully deficient allegations are insufficient to "plausibly allege the inequitable result required for a finding of alter ego liability." *Id.*



In our 6/1/21 Letter, we explained that – not only does the FAC fail to plead facts sufficient to state an alter-ego theory – we also explained that the alter-ego allegations violate F.R.C.P. Rule 11(b). This violation is apparent because Triller did not even know about TEI ***until we informed you of its existence when we sought to resolve service issues regarding the initial complaint in the present action ("Initial Complaint") when we spoke on Tuesday, May 18, 2021 at 5:00 p.m.*** To claim Triller was able to investigate TEI's financials, how it is operated and its records within three days – particularly in light of Triller's complete and total failure to investigate its other allegations as articulate above – is a brazen and unabashed lie.

Further, your 6/8/21 Letter compounds Triller's bad faith by misrepresenting the record. In that letter, you claimed that – on May 18, 2021 – we admitted TEI does not have insurance. Not only is this statement ***false***, Triller ***failed*** to allege this false statement in the FAC. In our May 18, 2021 call, Mr. Novian asked if ***this matter*** was covered by insurance. In response, we informed Mr. Novian that we did not believe there was insurance that would cover this particular matter. Mr. Novian did ***not*** ask whether TEI had insurance ***as a general matter***. In fact, TEI does have General Liability and Production Package insurance, but they do not cover this particular dispute as would a standard Errors & Omissions policy. Furthermore, your 6/8/21 Letter still fails to explain how Triller has (or could) adequately plead the second necessary element of alter-ego liability.

Therefore, not only are Triller's alter-ego allegations woefully deficient, Triller will not be granted leave to amend because of its "undue delay," "bad faith," "dilatory motive," "repeated failure to cure deficiencies by amendments previously allowed," "undue prejudice" to Our Clients and the "futility of amendment." *See Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. Triller's Copyright Infringement Claim Fails as a Matter of Law[4]

### A. Triller's Theory of Copyright Infringement via Torrent Websites Fails as a Matter of Law

In our 6/1/21 Letter, we explained that Triller's allegation that Our Clients shared the Broadcast via torrent websites failed as a matter of law and constituted as a F.R.C.P. Rule 11

---

[4] As a side note, we find your 6/8/21 Letter's assertion that Triller "filed the certificate of registration with the Court" to be – not only false – but comical. On June 3, 2021, Triller filed a Report on the Filing or Determination of an Action or Appeal Regarding a Copyright" (the "Report"). Dkt. No. 21. Triller filed the Report ***after*** we pointed out this defect in our 6/1/21 Letter. Further, the Report does ***not*** include the certificate of registration, but only the registration number. *Id.* Moreover, your 6/8/21 Letter fails to dispute that Triller improperly filed the Filmdaily Initial Complaint and Filmdaily FAC because Triller only secured copyright registration ***after*** those pleadings were filed. Our Clients, however, will not move to dismiss for failure to plead registration as a gesture of good faith.



violation.  To properly plead a defendant engaged in infringement via a torrent website, Triller was required to plead that it used "a combination of forensic and geolocation technology to tie a single IP address, registered to a user in the [jurisdiction] to … acts of infringement on specified dates."  *See Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1211 (D.C. Cir. 2020); *see also Strike 3 Holdings, LLC v. Doe*, 370 F.Supp.3d 478, 483 & fn. 4 (E.D. Penn. 2019) ("Exhibit A of the complaint provides the 'file hash' for each motion picture and the website from which each motion picture was allegedly downloaded, as well as the copyright registration for each").  Only then could Triller plausibly allege that Our Clients "actually did the infringement."  *Strike 3 Holdings*, 964 F.3d at 1211.

Our 6/1/21 Letter called out Triller's failure to conduct any pre-lawsuit investigation – let alone properly plead torrent copyright infringement.  We further pointed out that the torrent allegations in the FAC were regurgitated allegations that were cut and pasted from the Filmdaily Initial Complaint, Filmdaily FAC and Initial Complaint.  *See e.g.*, Filmdaily Initial Complaint, ¶¶ 1, 29, 38, 60; Filmdaily FAC, ¶¶ 1, 31, 40, 62; Initial Complaint, ¶¶ 18, 27; FAC, ¶¶ 21-22, 30.  Indeed, your 6/8/21 Letter fails to dispute – and therefore concedes – that the torrent allegations were a result of Triller's indolence.

Further, in a desperate attempt to cover up this error, your 6/8/21 Letter materially misrepresents the FAC by claiming it alleges infringement via "torrent [and/or] streaming" websites.  6/8/21 Letter, p. 2 (original brackets) (citing FAC, ¶¶ 21-22, 30).  ***This is another demonstrable falsehood illustrating Triller's bad faith.***  In Paragraphs 21-22 and 30 of the FAC, Triller specifically alleges "torrent ***and*** streaming websites." (emphasis added).  In other words, the FAC uses the conjunctive "and," not disjunctive the disjunctive "or."  Triller's attempt to rewrite the FAC to cover this error is disingenuous in the extreme.

In sum, Triller's indolent pleadings alleging that Our Clients engaged in copyright infringement by downloading and/or uploading the Broadcast via torrent websites is ***false*** and the lack of factual allegations prove it.  Triller's pathetic attempt to cover up this egregious error is but another of numerous examples of its bad faith.

**B.**      **The FAC Does Not and Cannot Allege that Viewing a Streaming Video Constitutes Copyright Infringement**

In your 6/8/21 Letter, Triller attempts to make much hay about Ethan's admission that he watched an unauthorized stream of the Broadcast.  6/8/21 Letter, p. 1.  While your letter attempts to cast this a copyright infringement, it is not.

As a threshold matter, the FAC fails to plead any facts pertaining to Ethan's viewing of the Broadcast.  Further, Triller's FAC spews another word salad of conclusory allegations that regurgitate the rights set forth in 17 U.S.C. Section 106.  These allegations are woefully inadequate and insufficient to survive Our Clients' Motion to Dismiss.  *See e.g.*, FAC, ¶¶ 18-19.



Additionally, any amendment would be futile because watching a copyrighted work via internet stream does not implicate any of the exclusive rights set forth in 17 U.S.C. Section 106. Watching a stream (authorized or unauthorized) is not a public performance or public display because the viewer is not performing or displaying the work – let alone in a "place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gather." *See* 17 U.S.C. § 101 (definitions of "display" "perform," "transmit" and "publicly") and 17 U.S.C. § 106(4-5). The viewing does not constitute as a derivative work because there is no new work. *See Id.* § 101 (definition of "derivative work") and § 106(2). There is no distribution because merely viewing a work is not offering a copy of the work "to the public by sale or other transfer of ownership, or by rental, lease, or lending." *See Id.* § 106(3).

This only leaves the reproduction right of 17 U.S.C. Section 106(1). The reproduction right grants copyright owners the exclusive right to "reproduce the copyrighted work in *copies.*" 17 U.S.C. § 106(1) (emphasis added). To constitute a copy, the copy must be "fixed." *Id.* § 101 (definition of "copies"). A work is "fixed" when "its embodiment in a copy … is sufficiently *permanent or stable* to permit it to be perceived, reproduced, or otherwise communicated for *a period of more than transitory duration*." *Id.* (definition of "fixed") (emphasis added).

Your 6/8/21 Letter concedes that streamed content does not result in a copy being fixed for a period more than transitory duration. In your 6/8/21 Letter, Triller admits that the word "stream" is defined as "to transfer (digital data, such as audio or video material) in a *continuous stream especially for immediate processing or playback*". 6/8/21 Letter, p. 2 (emphasis added) (quoting Merriam-Webster, Stream (2021), *available at:* https://www.merriam-webster.com/dictionary/stream). This is nearly identical to the Supreme Court's definition of streaming, which is "the process of providing a steady flow of audio or video data so that an internet user is able to access it *as it is transmitted*." *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 437 (2014) (brackets omitted; emphasis added) (quoting A Dictionary of Computing (6th ed. 2008)). As the Second Circuit explained, streaming involves "only a minuscule portion of a work" that does not result in "'a work' [being] embodied" – *i.e.*, the data is "*rapidly and automatically overwritten as soon as it is processed*". *Cartoon Network LP, LLLP v. CSC Holdings, Inc.* 536 F.3d 121, 129-130 (2d Cir. 2008) (emphasis added).

In enacting the Copyright Act, Congress explicitly stated that transitory copies on a computer – like streaming – do not constitute as a copy because they are not fixed. The "definition of 'fixation' would exclude from the concept *purely evanescent or transient reproductions* such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or *captured momentarily in the 'memory' of a computer*." H.R. REP. 94-1476, 53, 1976 U.S.C.C.A.N. 5659, 5666 (emphasis added).

Therefore, not only does Triller fail to plead facts demonstrating Our Clients (or anyone else for that matter) engaged in copyright infringement by watching a stream of the Broadcast,



Triller cannot do so as a matter of law. This further emphasizes that Triller engages in bad faith arguments because – not only is the FAC bereft of factual allegations supporting this theory – it failed to properly research whether viewing a stream implicates copyright law at all.

### C. Triller's Copyright Infringement Claim is Barred as a Matter of Law under the Doctrine of Fair Use

In our 6/1/21 Letter, we explained in painstaking detail that TEI made a fair use of the Reference Video and the Broadcast. Your 6/8/21 Letter failed to address the vast majority of these arguments and, instead, argued bad law.

Under Section 107 of the Copyright Act, "the fair use of a copyrighted work … ***for purposes*** such as ***criticism [and] comment*** … is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). As the Supreme Court explained on numerous occasions: the fair use doctrine is "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, ***it would stifle the very creativity which that law is designed to foster***." *Google, LLC v. Oracle America, Inc.*, 141 S.Ct. 1183, 1196 (2021) (emphasis added) (quoting *Steward v. Abend*, 495 U.S. 2017, 236 (1990)). The statute contains four factors that courts consider when analyzing fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted works.

17 U.S.C. § 107.

These factors are "not exhaustive" and "set forth general principles, the application of which requires judicial balancing, depending on the circumstances." *Google*, 141 S.Ct. at 1197 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994); *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984)). Fair use is "***not to be simplified with bright-line rules***, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577 (emphasis added). "***Nor may the four statutory factors be treated in isolation***, one from another. All are to be explored, and the results weighed together, ***in light of the purpose of copyright***." *Id.* at 578 (emphasis added) (citing Level, *Towards a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110-1111 ("1990") ("Leval"); Patry & Perlmutter, *Fair Use*



*Misconstrued: Profit, Presumptions, and Parody*, 11 Cardozo Arts & Ent. L. J. 667, 685-87 (1993)). Rather, "courts must apply [Section 107] in light of the sometimes conflicting aims of copyright law, and that is application may vary depending on the ***context***." *Google*, 141 S.Ct. at 1197.

        1.      <u>Triller's Attempt to Isolate the Reference Video from the 4/22/21 Podcast is Precluded as a Matter of Law</u>

In our 6/1/21 Letter, we explained that, as a threshold matter, Triller's FAC myopically seeks to examine the Reference Video in isolation from its use in the 4/22/21 Podcast. *See* FAC, ¶ 2. This approach has been rejected by the Supreme Court, the Ninth Circuit and the Second Circuit. In *Google*, the Supreme Court cited with approval two Ninth Circuit decisions that found fair use for "intermediate copying" or copying as a "preliminary step" in the creation of a fair use work. 141 S.Ct. 1183, 1198-99 (2021) (citing *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 603-608 (9th Cir. 2000); *Sega Enterprises Ltd. v. Accolate, Inc.*, 977 F.2d 1510, 1521-1527 (9th Cir. 1992)); *see also American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 921 (2d Cir. 1994); *DSC Communications Corp v. DGI Technologies, Inc.*, 898 F.Supp. 1183, 1189 (N.D. Tex. 1995) ("Like the situation in *Sega*, the copy at issue in this case was an intermediate one and any commercial exploitation of the dissembled copy was indirect or derivative").

Indeed, 17 U.S.C. Section 107 itself supports this interpretation. As the language of the statute makes clear, "the fair use of a copyrighted work, including ***use*** by ***reproduction in copies ... or by any other means specified [in 17 U.S.C. 106],*** for ***purposes*** such as criticism, comment [or] news reporting ... is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). The emphasis on words like "use" and "purposes" throughout the statute demonstrates that the focus is ***not*** on the individual act of alleged infringement but whether the "use" was to serve a "purpose" protected by fair use.

The Second Circuit's decision in *American Geophysical Union* is particularly instructive and illustrates this precise point. 60 F.3d 913 (2d Cir. 1994). At issue in that case was Texaco making copies of individual articles from science journals for its research scientists. *Id.* at 918-19. The Second Circuit found that "Texaco's photocopying served, at most to facilitate [the scientist's] research, which in turn might have led to the development of new products and technology that could have improved Texaco's commercial performance. Texaco's photocopying is more appropriately labeled as 'intermediate use.'" *Id.* at 921 (citing *Sega Enterprises,* 977 F.2d at 1522-23). The Second Circuit, however, rejected Texaco's argument that the articles were intermediate use for research because the scientist did not use "portions of articles ... in his ***own published piece of research, nor has he had to duplicate some portion of the copyrighted material directly in the course of conducting an experiment investigation.*** Rather, entire articles were copied as an ***intermediate step*** that ***might abet*** [the scientist's] research." *American Geophysical Union*, 60 F.3d at 920 & fn. 7. Thus, the "primary purpose,"



"primary aspect" and "primary objective" of Texaco's copying was "to provide [the scientist] within his own, **additional,** readily accessible copy of the original article."[5]  *Id.* at 919 & fn. 6 (original emphasis).

Here, the FAC explicitly alleges that the Reference Video was: (1) unlisted; and (2) cited in the 4/22/21 Podcast.  FAC, ¶ 2.  The FAC does ***not*** allege that the 4/22/21 Podcast did not make a fair use of the Reference Video – which contained footage of the Broadcast.  Additionally, when the Court will see the 4/22/21 Podcast as part of Our Client's Motion to Dismiss, there will be no doubt that the primary purpose of the Reference Video was for commentary and critique.  The 4/22/21 Podcast did not focus on the URL for the Reference Video – as demonstrated by Triller's screenshot in the FAC where the URL is illegible.  No one in the 4/22/21 Podcast said to view the Reference Video and there was no hyperlink was provided for the Reference Video.

In your 6/8/21 Letter, Triller, once again, demonstrates its bad faith by advancing a completely unsupported interpretation of *Sega* and, ironically, chastising us for the potentially violating Model Rule 3.3(a)(2) when Triller has ***actually*** violated California Rule of Professional Conduct 3.3.[6]  Clearly, Triller did not read *Sega* because it does not stand for the proposition that intermediate use can be viewed in isolation and, therefore, we request that you not make any further knowingly false statements of fact and law to the Court.

*Sega* stands for the proposition that intermediate use ***must*** be examined in light of the overall purpose of the use.  In examining the first fair use factor, the Ninth Circuit stated: "We must consider other aspects of the 'purpose and character of the use' as well.  As we have noted, ***the use at issue was an intermediate one only and thus any commercial 'exploitation' was indirect or derivative.***"  *Sega*, 977 F.2d at 1522 (emphasis added).  The Ninth Circuit examined "the video game programs contained in Accolade's game cartridges"  and that Accolade "wrote its own procedures" for the games "***based on what it had learned through disassembly***."  *Id.*

---

[5] One of the most obsurd (and hypocritical) parts of your 6/8/21 Letter is to argue that *American Geophysical Union* is not persuasive authority because it was decided by the Second Circuit and that we are in the Ninth Circuit.  6/8/21 Letter, p. 5.  First, this argument is completely hypocritical given that Triller itself ***relies on out of circuit authority that has been explicitly rejected in the Ninth Circuit***.  *See* Section III.C.2.b., *infra* (discussing how the Ninth Circuit refused to follow the holding in *Atari Games Corp. v. Nintendo of America Inc.*, 975 F.2d 832 (Fed. Cir. 1992) in *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1166 (9th Cir. 2007)).  Further, as we shall discuss below, Triller's reliance on *Sega* for the proposition that intermediate use should be viewed in isolation demonstrates Triller failed to read *Sega* and the Ninth Circuit's subsequent decision in *Sony Computer Entertainment.*

[6] We are confused by Triller's cite to *Walker v. University Books, Inc.*, 602 F.2d 859, 864 (9th Cir. 1979).  6/8/21 Letter, p. 6.  *Walker* is not a fair use case and makes clear that the defendant copied a preliminary version of the plaintiff's I Ching card designs in the blueprints for the defendant's I Ching cards (*i.e.*, unadulterated reproduction).  *Walker*, 602 F.2d at 862.



(emphasis added).  The Ninth Circuit concluded:

> Taken together, these facts indicate that although Accolade's ***ultimate purpose*** was the release of Genesis-compatible games for sale, its ***direct purpose*** in copying Sega's code, and thus its ***direct use*** of the copyrighted material, was simply to study the functional requirements for Genesis compatibility ***so that it could modify existing games and make them usable with the Genesis console***. … On these facts, we conclude that Accolade copied Sega's code for a ***legitimate, essentially non-exploitative purpose, and that the commercial aspect of its use can best be described as of minimal significance.***

*Sega*, 977 F.2d at 1522 (emphasis added).[7]

In other words, the Ninth Circuit did not examine the intermediate copying in isolation; rather, the Ninth Circuit examined whether the purpose of the intermediate copying was to facilitate a non-infringing purpose – just like *American Geophysical Union.*[8]

Furthermore, your 6/8/21 Letter completely fails to address the Ninth Circuit's subsequent decision in *Sony Computer Entertainment*.  In that case, the Ninth Circuit made it crystal clear that intermediate copying should not be viewed in isolation:

> The intermediate copies made and used by Connectix during the course of its reverse engineering of the Sony BIOS were protected fair use, ***necessary to permit Connectix to make its non-infringing Virtual Game Station function***

---

[7] Additionally, the Ninth Circuit held that courts are "free to consider the ***public benefit*** resulting from a particular use ***notwithstanding*** the fact that the alleged infringer may gain commercially." *Sega*, 977 F.2d at 1523.  The Ninth Circuit found Accolade's use served the public interest because the use "led to an increase in the number of independently designed video game programs offered for use with the Genesis console."  *Id.*  As the Supreme Court recently explained, the "public benefit" consideration should be analyzed under the fourth fair use factor – and we shall do the same in this letter.  *See Google*, 141 S.Ct. at 1206.

[8] Further emphasizing that you did not read the cases cited in your 6/8/21 Letter is Triller's citation to *Fox Broadcasting Co. v. Dish Network LLC*, 905 F.Supp.2d 1088, 1106 (C.D. Cal. 2012).  6/8/21 Letter., p. 6.  In *Fox Broadcasting*, the court noted that, in *Sega*, Accolade's intermediate use was "for the purpose of gaining information to ***create a new, competing product rather than to supplant the original work***" which was "a ***significant factor*** in finding fair use."  905 F.Supp.2d at 1103 (emphasis added).  In contrast, the court noted that "Dish makes the QA copies for purpose ***fundamentally different*** than did the plaintiff in *Sega***.**  Dish makes copies of protected works and it does ***not*** do so in order to ***create unique, transformative works that compete with the Fox Programs***."  *Id.* (emphasis added).  Therefore, *Fox Broadcasting* makes clear that an intermediate copy can constitute fair use where, like here, it is used in the creation of a new transformative work.



> *with PlayStation games. Any other intermediate copies made by Connectix do not support injunctive relief, even if those copies were infringing.*

*Sony Computer Entertainment*, 203 F.3d at 599 (emphasis added).

In sum, the authority cited in your 6/8/21 Letter explicitly supports the arguments raised in our 6/1/21 Letter – *i.e.*, that intermediate uses should not be viewed in insolation. Further, these authorities make clear that it is you – not us – that must be mindful not to continue violating your ethical responsibilities by making knowingly false statements of law and fact to a tribunal under California Rule of Professional Conduct 3.3(a).

## 2.    The First Fair Use Factor Weighs Heavily in Favor Fair Use

### a.    It is Undisputed that TEI Made a Transformative Use of the Reference Video and, therefore, the Broadcast

Our 6/1/21 Letter dispelled any doubt that the first fair use factor heavily favors fair use. The "'***central purpose***' of the first fair use factor is to see 'whether and to what extent the new work is ***transformative***.'"  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) (emphasis added) (quoting *Campbell*, 510 U.S. at 579).  A use is transformative when it "adds something new, with a further purpose or different character, altering the copyrighted work with new expression, meaning or message."  *Google*, 141 S.Ct. at 1202 (internal quotes omitted) (quoting *Campbell*, 510 U.S. at 579).  Further, the Supreme Court has recently recognized that the transformative use inquiry asks "whether the copier's use 'fulfills the objective of copyright law ***to stimulate creativity for public illumination***.'"  *Google*, 141 S.Ct. at 1202-03 (emphasis added) (quoting Leval at 1111).  The Ninth Circuit has also explained that "if the quoted matter is ***used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings***—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  *Seltzer*, 725 F.3d at 1176 (emphasis added) (quoting Leval, at 1111).

Critically, "the ***more*** transformative the new work, the ***less*** will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use."  *Campbell*, 510 U.S. at 579 (emphasis added); *Tresona Multimedia v. Burbank High School Vocal Music Association*,  953 F.3d 638, 649 (9th Cir. 2020) (same); *Seltzer*, 725 F.3d at 1176 (same); *Perfect 10,* 508 F.3d at 1166 (same).

As eloquently stated by the court in *Hosseinzadeh v. Klein*: "It is well established that 'among the best recognized justifications for copying from another's work is to ***provide comment on it or criticism of it.***'"  276 F.Supp.3d 34, 42 (S.D.N.Y. 2017) (emphasis added; internal brackets omitted) (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214-15 (2d Cir. 2015)).  The Supreme Court has held likewise.  *See Google*, 141 S.Ct. at 1203 (a subsequent



work is "transformative because it ***comments on the original or criticizes it***") (emphasis added); *Campbell*, 510 U.S. at 583 ("***comment and criticism*** … traditionally have had a claim to fair use protection as transformative works.") (emphasis added).

Indeed, as further aptly stated by the *Hosseinzadeh* court: "there is a ***strong presumption*** that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107, including ***criticism and comment***." 276 F.Supp.3d at 42 (emphasis added; internal quotes omitted) (quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991); citing *TCA Television Corp v. McCollum*, 839 F.3d 168, 179 (2d Cir. 2016) (the "uses identified by Congress in the preamble to § 107 – *criticism, comment*, news reporting, teaching, scholarship, and research – might be deemed '***most appropriate***' for a purpose or character finding indicative of fair use") (emphasis added); *NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 477 (2d Cir. 2004) ("Where the defendants' use is ***for purposes of criticism or comment*** factor one will normally tilt in the defendants' favor") (emphasis added; internal brackets, ellipses and quotes omitted); *Id.* at 482 (affirming district court denial of preliminary injunction after finding that defendants' allegedly infringing writings were "***undoubtedly transformative*** secondary uses intended as a form of ***criticism***") (emphasis added); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F.Supp.3d 425, 444-45 (S.D.N.Y. 2016) ("***comment or criticism*** [have] an obvious claim to transformative value") (emphasis added); *Adjmi v. DLT Entertainment, Ltd.*, 97 F.Supp.3d 512, 531 (S.D.N.Y. 2015) (play was transformative because it "***criticizes and comments*** upon Three's Company by reimagining a familiar setting in a darker, exceedingly vulgar manner") (emphasis added).[9]

In *Hosseinzadeh*, the court found that Ethan and Hila's use of another YouTuber's video was "quintessential criticism and comment … [i]rrespective of whether one finds it necessary, accurate, or well-executed." 276 F.Supp.3d at 45-46. This case is no different. Below are illustrative examples of how the 4/22/21 Podcast used the Reference Video to criticize and comment on the Broadcast while showing the Reference Video.

- **Critiquing Askren's Performance in his Boxing Match with Jake Paul (the "Fight")**: It is evident that the cast of the 4/22/21 Podcast commented on and critiqued Ben Askren's performance in the Fight by showing the Reference Video to, among other things, point out Askren's physical fitness (or lack thereof), commenting on his ability (or lack thereof) to box and how he was knocked out.
- **Critiquing the Fight in General**: It is equally evident the cast of the 4/22/21 Podcast, while showing the Reference Video, commented on and critiqued the mismatch of Jake

---

[9] *See, also Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 800 (9th Cir. 2003) ("works that ***comment and criticize*** are by their nature often sufficiently transformative to fit clearly under the fair use exception") (emphasis added; internal comma omitted); *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1153 (9th Cir. 1986) ("Section 107 expressly permits fair use for the purposes of ***criticism and comment***") (emphasis added).



Paul and Ben Askren, the Fight's brevity and the referee's decision to end the Fight.

Further, the commentary and critique surrounding the 4/22/21 Podcast's use of the Reference Video further emphasizes TEI's transformative use of the Broadcast. *See Swatch Group Management Services, Ltd. v. Bloomberg L.P. ("Swatch")*, 756 F.3d 73, 84 (2d Cir. 2014) ("the altered purpose or context of the work [is] evidenced by ***surrounding commentary or criticism***") (emphasis added) (citing *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 609-610 (2d Cir. 2006)).

- **Critiquing the Broadcast in General**:  Prior to showing the clip from the Reference Video, the 4/22/21 Podcast made overarching critiques of the Broadcast, including the quality (or lack thereof) of the Broadcast and its decision to include mainstream musical acts in a fight between a YouTuber and an United Fighting Championship ("UFC") fighter.
- **Critiquing Ben Askren's Fitness for the Fight and the Matchup with Jake Paul**: Prior to showing the clip from the Reference Video, the 4/22/21 Podcast made critiques about Ben Askren's physical fitness and ability to participate in the Fight, comparing his previous physical fitness to his current physical fitness and his lopsided matchup with Jake Paul.
- **Critiquing the Referee's Decision and Whether the Fight was Staged**: After showing the clip from the Reference Video, the 4/22/21 Podcast made additional critiques and commentary about the referee's premature decision to call the Fight and discussed whether the Fight was staged.
- **Miscellaneous Critique of the Fight and Jake Paul**: After showing the clip from the Reference Video, the 4/22/21 Podcast made additional critiques and commentary on the poor quality of the Fight and of Jake Paul himself, such as Ethan saying that, unless Jake Paul  "fights a real f*cking boxer in the prime of his career next time, I am not watching. I don't want any more bullshit fights from Jake" and that Jake Paul "literally just knocked out a 40-year-old man who hasn't fought in like two, several years" and has "no experience boxing."
- **Critiquing the Broadcast's and Jake Paul's Potential Earning**:  After showing the clip from the Reference Video, the 4/22/21 Podcast made a number of critiques about the number of viewers of the Broadcast, how much revenue the Broadcast generated and the amount of money Jake Paul was paid for the Fight (with the implicit if not explicit criticism that his take may not have been sufficiently earned).

Therefore, it is self-evident that the statements made by the cast of the 4/22/21 Podcast about the Reference Video (and, therefore, the Broadcast) are "quintessential criticism and comment … [i]rresective of whether one finds it necessary, accurate, or well-executed." *Hosseinzadeh*, 276 F.Supp.3d at 45-46.



Furthermore, the title of the 4/22/21 Podcast and the channel for the Podcast transforms the Broadcast. *See Hughes v. Benjamin*, 437 F.Supp.3d 382 (S.D.N.Y. 2020). In *Hughes*, a conservative YouTube commentator, Sargon of Akkad, uploaded a video to his YouTube channel entitled *SJW Levels of Awareness* that was an edit of the 2016 election night video of a liberal YouTube commentator, Akilah Hughes. *Id.* at 387-88. Sargon did not provide any commentary over the video; he did, however, make an edit of 20% of Hughes' video that highlighted her realization that Hillary Clinton had lost the 2016 presidential election and moments illustrating lack of self-awareness. *Id.* at 391. On a motion to dismiss, the court found Sargon made a fair use of Hughes' video. *Id.* at 394. For the first fair use factor, the court found that Sargon's use was transformative because: (1) the title of Sargon's video – namely the pejorative term "SJW" (which means "Social Justice Warrior" and often used derisively) – critiqued Hughes' video; and (2) Sargon's video was uploaded to his channel, which catered to viewers seeking conservative commentary about liberal values. *Id.* at 390-91.

*Hughes* is directly on point. The title of the 4/22/21 Podcast was "Jake Paul Fight Was A Disaster" and people watched because they wanted to hear Ethan and the cast of the Podcast ruthlessly critique Jake Paul, the Fight and Broadcast and explain why it was – as perceived by a substantial swath of the general public – to be a steaming pile of garbage. This is further evidenced by the Podcast consistently criticizing Jake Paul since the inception of the Podcast in 2017.[10] Therefore, like in *Hughes*, "a reasonable observer who came across the video would quickly grasp its critical purpose." *Hughes*, 437 F.Supp.3d at 392.

Simply put, it is self-evident to everyone – except apparently Triller – that the sole purpose of the Reference Video was to serve as commentary and criticism of the Broadcast in the 4/22/21 Podcast. The Reference Video served as the "raw materials" by which the cast of the Podcast provided their fair use commentary and criticism of the Broadcast in the 4/22/21 Podcast. The 4/22/21 Podcast did not: (1) zoom in on the link for the Reference Video; (2) tell

---

[10] H3 Podcast, YouTube, "Jake Paul, Wendy Williams, Bhad Bhabie & Dr. Phil – H3 After Dark # 31" (April 9, 2021), *available at*: https://youtu.be/BbFYG-tyk48; H3 Podcast, YouTube, "Jake Paul Arrested For Looting & The Karen Invasion – H3 Podcast #193" (June 13, 2020), *available at*: https://youtu.be/MJVM5bWcbgk; H3 Podcast, YouTube, "Gigi Hadid Bodyslams Jake Paul 0 H3 Podcast #178" (February 26, 2020), *available at*: https://youtu.be/BTDNJe8UiJE; H3 Podcast, YouTube, "Jake Paul's New Scam – H3 Podcast #176" (February 19, 2020), *available at*: https://youtu.be/X9bdbCGiSJ8; H3 Podcast, YouTube, "Logan Paul Rips Off Shane Dawson & New Jake Paul Song is Awful – H3 Podcast #108" (March 15, 2019), *available at:* https://youtu.be/qejmBpzCXOE; H3 Podcast, YouTube, "H3 Podcast #86 – Shane Dawson vs Jake Paul & Drake + Millie Bobby Brown" (September 28, 2018), *available at*: https://youtu.be/ExiLfQ_RyAA; H3 Podcast, YouTube, "H3 Podcast #45 – Jake & Logan Paul's Predatory Merch Machine" (December 30, 2017), *available at*: https://youtu.be/hOLCEvGO-SU; H3 Podcast, YouTube, "H3 Podcast #22 – Jake Paul & KTLA Reporter Chris Wolfe" (August 19, 2017), *available at*: https://youtu.be/q_fAWNnWhcw; H3 Podcast, YouTube, "H3 Podcast #10 – Talking About Jake Paul, Lance Stewart, Jerry Seinfeld (Top Of The Month)" (June 13, 2017), *available at*: https://youtu.be/Z9U9TJ4W26k.



Farhad Novian, Michael O'Brien and Alexander Brendon Gura
June 29, 2021
Page 17

people to watch the Reference Video or where to find it; or (3) provide a link for the Reference Video in the description box for the 4/22/21 Podcast.

The screenshot of the 4/22/21 Podcast further evidences that the predominant purpose of the Reference Video was to serve as the "raw materials" for the 4/22/21 Podcast's commentary and criticism of the Broadcast because ***the URL for the Reference Video is illegible***.  FAC, ¶ 2.  Further, as conceded in the FAC, the Reference Video was "unlisted" – which by definition means it cannot be viewed on a channel's homepage or through YouTube search results.[11]  Even assuming *arguendo* that the URL was legible, a viewer would have to: (1) pause the 4/22/21 Podcast with the URL for the Reference Video showing; (2) enlarge the 4/22/21 Podcast or zoom into the URL for the Reference Video in order to decipher the URL; (3) write down the URL for the Reference Video; and (4) manually type in the URL for the Reference Video into the viewer's browser.

The notion that anyone would go through all this trouble to watch the Reference Video after the 4/22/21 Podcast trashed the Broadcast is patently absurd – particularly when clips of the Fight from the Broadcast are ***still*** readily available on YouTube with simple search terms, such as "Jake Paul v. Ben Askren," "Jake Paul v. Ben Askren Fight," "Paul Askren Fight" and countless other simple permutations.  Moreover, as referenced above, viewers of the 4/22/21 Podcast were clearly not interested in simply watching the Fight *sans* commentary, they tuned in to hear about what a "disaster" it was and to see the portions of the Fight that evidenced said disaster.

In sum, the most important consideration in the fair use analysis weighs heavily in favor of Fair Use.

**b.      Triller's Sole Reliance on Purported Bad Faith is not Dispositive of Fair Use or the First Fair Use Factor**

Tellingly, Triller does ***not*** (because it cannot) refute that the 4/22/21 Podcast made a transformative use of the Reference Video.  Instead, Triller repeatedly advances the completely misguided and legally unsupported argument that purported bad faith is dispositive of fair use.

In your 6/8/21 Letter, Triller relies on *Atari* for the proposition that, "to invoke the fair use exception, an individual must possess an authorized copy of a literary work."  6/8/21 Letter, p. 5 (quoting *Atari*, 975 F.2d at 843).

The Ninth Circuit has explicitly rejected this reading of *Atari*.  *Perfect 10*, 508 F.3d at

---

[11] YouTube Help, "Change video privacy settings", *available at*: https://support.google.com/youtube/answer/157177?co=GENIE.Platform%3DDesktop&hl=en#zippy=%2Cunlisted-videos.



1164 fn. 8. Like Triller, the plaintiff in *Perfect 10* argued that *Atari* stood for the proposition that the fair use defense is barred when the secondary user utilizes an unauthorized copy. *Id.* ("We reject at the outset Perfect 10's argument that providing access to infringing websites cannot be deemed transformative and is inherently not fair use"). The Ninth Circuit read *Atari* far more narrowly because, in that case, the defendant's sole purpose was to "***replicate a competitor's computer game***" (*i.e.*, non-transformative copying). *Id.* (emphasis added). In contrast to *Atari*, the defendant in *Perfect 10* made a transformative use by creating a "comprehensive search engine." *Id.* In light of its rejection of *Atari's* holding that obtaining an authorized copy is a prerequisite for fair use, the Ninth Circuit stated: "we conclude that Google's inclusion of thumbnail images ***derived from infringing websites*** in its Internet-wide search engine activities does ***not preclude*** Google from raising a fair use defense." *Id.* (emphasis added).

In Triller's May 14, 2021 letter ("5/14/21 Letter") and its 6/8/21 Letter, Triller argues that fair use is precluded when the defendant "obtained the allegedly infringing material via unlawful means." 5/14/21 Letter, p. 2 (citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985)); 6/8/21 Letter, p. 6 (same). In the section from *Harper & Row* cited in those letters, the Supreme Court stated that this is a good faith/bad faith argument:

> Also relevant to the character of the use is the ***propriety of the defendant's conduct***. [Citation]. Fair use presupposes ***good faith and fair dealing***. [Citation] The trial court found The Nation knowingly exploited a purloined manuscript. [Citation] Unlike the typical claim of fair use, The Nation cannot offer up even the fiction of consent as justification. Like its competitor news-weekly, it was free to bid for the right of abstracting excerpts from "A Time to Heal."

*Harper & Row*, 471 U.S. at 562-63 (emphasis added; internal citations and quotations marks omitted).[12]

---

[12] Further, the most important issue in *Harper & Row* was ***not*** that the manuscript was unlawfully obtained, but that defendant had stolen plaintiff's "first publication" privilege. Thus, the Supreme Court in *Harper & Row* focused on how the lower court "overlook[ed] the unpublished nature of the work and the resulting impact on the potential market for ***first*** serial rights of permitting unauthorized republication." 471 U.S. at 569 (emphasis added). As described further below, "the author's right to control the ***first public appearance of his expression*** weighs against such use of the work ***before its release***" because the "***right of first publication*** encompasses not only the choice whether to publish at all, but also the choices of when, where, and in what form ***first to publish the work***." *Id.* at 564 (emphasis added). Moreover, in discussing market harm, the Supreme Court stated that "a fair use doctrine that permits extensive prepublication quotations from an ***unreleased*** manuscript without the copyright owner's consent poses substantial potential for damage to the marketability of ***first serialization rights*** in general." *Id.* at 569 (emphasis added). Indeed, even Congress recognized that *Harper & Row* focused exclusively on the ***previously unpublished*** nature of the work when, in 1992, Congress responded to *Harper & Row* and its progeny by amending 17 U.S.C. Section



Subsequent decisions by the Supreme Court have repeatedly cast serious doubt on the role that bad faith plays in the fair use analysis. "As for bad faith, our decision in *Campbell* expressed some ***skepticism about whether bad faith has any role in a fair use analysis.*** [Citation] We find this ***skepticism justifiable***, as 'copyright is ***not a privilege reserved for the well-behaved***." *Google*, 141 S.Ct. at 1204 (emphasis added) (quoting Leval at 1126; citing *Campbell*, 510 U.S. at 585 fn. 18 ("being denied permission to use a work does ***not*** weigh against a finding of fair use") (emphasis added).

In your 6/8/21 Letter, Triller effectively buries its head in the sand by arguing that *Google* and *Campbell* did not affect the role that bad faith plays in the fair use analysis. 6/8/21 Letter, pp. 6-7. These arguments are disingenuous in the extreme because they in no way dispute the explicit "skepticism" the Supreme Court repeatedly expressed about the role of bad faith in the fair use analysis. Further, contrary to your assertion in the 6/8/21 Letter, *Campbell* cited *Fisher v. Dees* for the exact ***opposite*** proposition – *i.e.*, that "being denied permission to use a work does ***not*** weigh against a finding of fair use." *Campbell*, 510 U.S. at 585 fn. 18 (emphasis added) (citing *Fisher v. Dees*, 794 F.2d 432, 437 (9th Cir. 1986)).

Further, it is apparent that – despite citing the case in your 6/8/21 Letter – Triller did not actually read *Religious Technology Center v. Netcom On-Line Communication Services* ("*Netcom*"), 923 F.Supp. 1231 (N.D. Cal. 1995). 6/8/21 Letter, p. 6. The court in *Netcom* explicitly rejected the proposition that obtaining an authorized copy is dispositive – or even probative – of fair use.

> ***Nothing in Harper & Row indicates that the defendant's bad faith was itself conclusive of the fair use question, or even of the first factor***. After *Campbell,* it is clear that a finding of bad faith, or a finding on any one of the four factors, ***cannot be considered dispositive***. [Citation] *Campbell* cited *Harper & Row's* good faith discussion without comment, but noted that the defendants use of the plaintiff's work, despite the plaintiff's explicit denial of permission*, **would not, in any case, constitute bad faith***. [Citation] *Campbell,* the Supreme Court's most recent pronouncement on fair use, thus ***hardly endorses the good faith requirement***.

*Netcom* 923 F.Supp. at 1244 fn. 14 (emphasis added) (citing *Campbell*, 510 U.S. at 585 fn. 18; 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (1995) § 13.05[B], at 13-205 fn. 298).

---

107 to state: the "fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." *See* P.L. 102-492; H.R. Report No. 102-836. For the reasons discussed in the section below, TEI did not usurp Triller's right to first publication and thus *Harper & Row*, even if it were still good law, is not relevant here.



Farhad Novian, Michael O'Brien and Alexander Brendon Gura
June 29, 2021
Page 20

Further evidencing Triller's bad faith is its characterization of *NXIVM* – which we cited in our 6/1/21 Letter. *See* 6/8/21 Letter, p. 7. In *NXIVM*, the Second Circuit "assume[d] defendants' copy of the NXIVM was unauthorized." 367 F.3d at 478. Just like Triller, NXIVM attempted to cite *Harper & Row* for the proposition that unauthorized access precludes fair use. The Second Circuit was not persuaded and read *Harper & Row's* holding more narrowly because in that case "the defendants acquired a 'purloined manuscript' for the ***very purpose of preempting the plaintiff's first publication rights***, rights already sold by the copyright owner for which the defendants had an opportunity to bid." *NXIVM*, 364 F.3d at 478-79 (emphasis added). Despite the unauthorized access, the Second Circuit found that "the first factor ***still favors defendants*** in light of the transformative nature of the secondary use as ***criticism***." *Id.* at 479 (emphasis added).

In your 6/8/21 Letter, Triller quotes *NXIVM* for the proposition that "to the extent [the defendant] knew his access to the manuscript was unauthorized or was derived from a violation of law or breach of duty, this consideration weighs in favor of plaintiffs." 6/8/21 Letter, p. 7 (quoting *NXIVM,* 364 F.3d at 478). Triller clearly did not read *NXIVM*. Had it done so, it would have discovered that the Second Circuit stated "we find that even if the bad faith subfactor weighs in plaintiffs' favor, ***the first factor still favors defendants in light of the transformative nature of the secondary use as criticism***." *NXIVM*, 364 F.3d at 479 (emphasis added).

In sum, it is well-settled law that any purported bad faith is not dispositive of fair use and its role in the fair use analysis, if any, is highly suspect. Far more glaring is Triller's bad faith arguments and misrepresentations of law to argue otherwise.

### c. Triller's "Commercial Use" Argument Materially Misrepresents Our 6/8/21 Letter

One of the most grotesque material misrepresentations in your 6/8/21 Letter is that: "Triller alleges, and you do not deny, that Defendants monetized their unlawful actions in connection with the Broadcast" and gave an example of "generating advertising revenue." 6/8/21 Letter, p. 3.

***This is patently false***. In our 6/1/21 Letter, we specifically stated that the Reference Video was not (and could not) be monetized. We explained that the Reference Video was uploaded to a separate YouTube channel called "Zach the Sound Lad" and that the sole purpose of this channel – including the videos uploaded to this channel – is to facilitate TEI's preparation and creation of the critical commentary to be presented on the Podcast. We also explained that the "Zach the Sound Lad" channel is ***not eligible for monetization***. Had Triller taken one second to examine the channel, it would have noticed that the channel does not meet YouTube's criteria to affirmatively apply for monetizing videos. To be eligible to apply for monetization, a YouTube channel must have: (1) 4,000 hours of public view time in the past 12 months; and



(2) over 1,000 subscribers.[13]  The Zach the Sound Lad channel does not have 1,000 subscribers. Further, had Triller taken another second to check Socialblade.com (a website that compiles social media statistics), Triller would have realized that there are no public views for the channel.[14]  As such, the Reference Video – or any other video on the Zach the Sound Lad channel – is ineligible for monetization and, therefore, not a commercial use.[15]

We also remind you that "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use."  *Campbell*, 510 U.S. at 579; *Tresona Multimedia*,  953 F.3d at 649 (same); *Seltzer*, 725 F.3d at 1176 (same); *Perfect 10,* 508 F.3d at 1166 (same).

As the Supreme Court has repeatedly stated: "a finding that copying was not commercial in nature tips the scales in favor of fair use.  But the inverse is ***not*** necessarily true, as many common fair uses are ***indisputably commercial***."  *Google*, 141, S.Ct. at 1204 (emphasis added); *see also Campbell*, 510 U.S. at 585 ("the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness [because] the illustrative uses listed in the preamble paragraph of § 107, including news reporting, ***comment, criticism***, teaching, scholarship, and research … '***are generally conducted for profit in this country***'") (emphasis added).

Furthermore, once again, *Hughes* is directly on point.  In *Hughes*, the court explicitly stated that "the commercial nature of an allegedly infringing work is ***not necessarily a significant factor***."  437 F.Supp.3d at 392 (emphasis added) (citing *Cariou v. Prince*, 714 F.3d 694, 708 (2d Cir. 2013)).  Exactly like Triller, the plaintiff tried to argue that "Defendants have unfairly derived profits from [plaintiff's video] in the form of advertising revenues generated from its upload to and availability on YouTube".  *Id.*  The court rejected this argument and stated: "insofar as there is a commercial aspect to [defendant's video], it ***pales in significance to the considerations discussed above***" – *i.e.*, the transformative criticism of defendant's use of the plaintiff's video.  *Id.* (citing *Cariou*, 714 F.3d at 708).

In sum, Triller's argument is foreclosed as a matter of law, made in bad faith and materially misrepresents the record.  While we cannot stop Triller from repeatedly making false statements of law and fact, we can ensure that Triller faces the consequences for doing so.

---

[13] YouTube Help, "YouTube Partner Program overview & eligibility," *available at*: https://support.google.com/youtube/answer/72851?hl=en.

[14] Social Blade, "Zach The Sound Lad's YouTube Stats (Summary Profile) – Social Blade Stats, *available at*: https://socialblade.com/youtube/channel/UCNH7rgSCaLsKq3nwyczjN8Q

[15] Additionally, even if the "Zach the Sound Lad" channel could be monetized, it would require affirmatively applying for monetization – which TEI has no interest in doing because the channel's sole purpose is to facilitate reviewing clips for potential inclusion in the Podcast and making those video easily accessible for criticism and commentary during the Podcast.



> ### 3.    The Second Fair Use Factor Weighs in Favor of Fair Use

In our 6/1/21 Letter, we exposed another instance of Triller making patently false assertions of fact and law by arguing that the Broadcast was unpublished.  We explained that the Supreme Court and the Ninth Circuit have both stated that this factor concerns "the author's right to control the ***first public appearance of his undisseminated expression.***"  *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1178 (9th Cir. 2012) (emphasis added) (quoting *Harper & Row*, 471 U.S. at 555); *see also Swatch Group Management Services, Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 87 (2d Cir. 2014) ("Thus, even though the sound recording remains statutorily unpublished, it is clear that Swatch was ***not deprived of the ability to 'control the first public appearance of its expression*,**' including 'when, where, and in what form' it appeared") (emphasis added) (quoting *Harper & Row*, 471 U.S. at 564); *Seltzer*, 725 F.3d at 1178 ("Here, as in *Kelly*, *Scream Icon* was widely disseminated, both on the internet and on the streets of Los Angeles before Green Day used it in its concerts.  Accordingly***, Seltzer controlled the 'first public appearance'*** of his work [which] tends to weigh in favor of the fair use of that work") (emphasis added) (citing *Kelly v. Arriba Soft, Corp.* 336 F.3d 811, 820 (9th Cir. 2003)).

It is simply absurd for Triller to argue that the Broadcast is unpublished.  Triller made the Broadcast publicly available on April 17, 2021.  Further, news reports state that the Broadcast had anywhere from 1.2-1.6 million paid viewers.[16]  Not only is Triller's position patently absurd, it is a fraud upon the Court.  According to the records of the Copyright Office, the Broadcast had a "Date of Publication: 2021-04-17."

Further, the Broadcast is not particularly creative.  At its core, it consists of simply showing two men fighting.  *See Hughes*, 437 F.Supp.3d at 393 (plaintiff's video of the events of her experience witnessing the 2016 presidential election results was "factual or informational in that it provides a first-hand account of a newsworthy event").  Even assuming that the Broadcast is creative, this "factor typically has ***not*** been terribly significant in the overall fair use balancing."  *Mattel,* 353 F.3d at 803 (emphasis added); *Equals Three, LLC v. Jukin Media, Inc.*, 139 F.Supp.3d 1094, 1106 (C.D. Cal. 2015) ("the copied work's creative nature is not particularly important where the new work is highly transformative"); *Author's Guild*, 804 F.3d

---

[16] Michael Woods, Bad Left Hook (SB Nation), "Sources: Jake Paul vs Ben Askren did at least 1.45 million buys on PPV, could top 2 million" (April 18, 2021), *available at*: https://www.badlefthook.com/2021/4/18/22391025/jake-paul-vs-ben-askren-ppv-buys-at-least-1-45-million-could-top-2-boxing-news-2021-triller; Damon Martin, MMAFighting, "Jake Paul vs. Ben Askren event sells over 1 million pay-per-views with final numbers still being calculated" (April 19, 2021), *available at*: https://www.mmafighting.com/2021/4/19/22392558/jake-paul-vs-ben-askren-event-sells-over-1-million-pay-per-views-final-numbers-being-calculated; Ryan Harkness, MMAMania (SB Nation), "Report: Triller's Jake Paul vs Ben Askren event sells over 1.4 million PPV units" (April 18, 2021), *available at*: https://www.mmamania.com/2021/4/18/22391204/report-trillers-jake-paul-vs-ben-askren-event-sells-over-1-4-million-pay-per-views.



at 220 (Level, J.) ("The second factor has rarely played a significant role in the determination of a fair use dispute") (citing William F. Patry, *Patry on Fair Use* § 4.1 (2015); *Cariou*, 714 F.3d at 710 (the creative nature of a work is of "limited usefulness where, as here, the creative work of art is being used for a transformative purpose") (quoting *Bill Graham*, 448 F.3d at 612); *Hosseinzadeh*, 276 F.Supp.3d at 42 (holding the "second factor [is] rarely found to be determinative"); *Hughes*, 437 F.Supp.3d at 393 (holding the second fair use factor to be of "limited usefulness where the creative work of art is being used for a transformative purpose").

Tellingly, your 6/8/21 Letter does address (let alone dispute) that Triller misrepresented the Broadcast as being unpublished – *i.e.*, effectively conceding that it lied about the Broadcast's unpublished status. Nor does Triller make any attempt to dispute the argument made in our 6/1/21 Letter that the Broadcast was not creative. In light of the 4/22/21 Podcast's highly transformative criticism and commentary of the Broadcast, this factor – if it is given any weight at all – weighs in favor of fair use as a matter of law.

### 4. The Third Fair Use Factor Weighs Heavily in Favor of Fair Use

In our 6/1/21 Letter, we demonstrated how the third fair use factor undeniably weighs heavily in favor of fair use. Notably, in your 6/8/21 Letter, Triller does not address (let alone dispute) the arguments from our 6/1/21 Letter that this factor weighs heavily in favor of fair use.

As the Supreme Court explained, the third fair use factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are ***reasonable*** in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (emphasis added); *Mattel,* 353 F.3d at 803 (same). Courts are tasked with examining the "justification for the particular copying done" and recognize the "extent of permissible copying varies with the purpose and character of the use." *Mattel*, 353 F.3d at 803 (quoting *Campbell*, 510 U.S. at 586-87). Thus, even "entire verbatim reproductions are justifiable where the purpose of the work differs enough from the original." *Mattel*, 353 F.3d 792 fn. 8.

 "The law does not require that the secondary artist may take no more than is necessary." *Cariou*, 714 F.3d at 710 (citing *Campbell*, 510 U.S. at 588; *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998); *see also Mattel*, 343 F.3d at 805 ("Mattel's argument that [the defendant] could have used a lesser portion of the Barbie doll is completely without merit and would lead to absurd results"); *Hosseinzadeh*, 276 F.Supp.3d at 46 ("The law is clear, however, that quantity alone is not determinative"). "[W]here an evaluation or description is being made, copying the exact words may be the only valid way [to] precisely … report the evaluation." *Swatch*, 756 F.3d at 85.

The Supreme Court recently clarified both the quantitative and qualitative analysis for this fair use factor. As to the quantitative analysis, the Supreme Court explained, "copying a larger amount of material can fall within the scope of fair use where the material copied … is



*central to a copier's valid purpose*." *Google*, 141 S.Ct. at 1205 (emphasis added). This also requires taking into account the amount of the allegedly infringed work that TEI "did ***not*** copy." *Id.* (emphasis added) ("the better way to look at the numbers is to take into account the several million lines that Google did not copy"). As to the qualitative analysis, the Supreme Court explained that, even when the secondary user takes the "heart" of the work, the "substantiality factor will generally weigh in ***favor*** of fair use where, as here, the amount of copying was ***tethered to a valid, and transformative, purpose***." *Id.* (emphasis added).

The facts of this case stand on even firmer ground than in *Hosseinzadeh*. In that case, Ethan and Hila used "three minutes and fifteen seconds of [a] five minute, twenty-four second long" video in their "almost fourteen minutes long" critique video. *Hosseinzadeh*, 276 F.Supp.3d at 40. In other words, Ethan and Hila used 60% of the original. Here, the 4/22/21 Podcast used 5 seconds of pure audio from the Broadcast, 9 seconds of both audio and video from the Broadcast and 28 seconds of just video from the Broadcast (*i.e.*, a total of 42 seconds). The Broadcast was 3 hours, 57 minutes and 4 seconds long. In other words, the 4/22/21 Podcast only used less than .3% of the Broadcast.[17] Therefore, the quantity of the Broadcast used was minimal and nascent compared to *Hosseinzadeh* and favors fair use. *See Seltzer*, 725 F.3d at 1178 ("This factor captures the fact that an allegedly infringing work that copies little of the original is likely to be fair use") (citing *SOFA Entertainment, Inc. v. Dodger Productions, Inc.*, 709 F.3d 1273, 1279 (9th Cir. 2013)).

Further, the fact that the 4/22/21 Podcast used the Reference Video to show Jake Paul knocking out Ben Askren does not affect the analysis because the use was tethered to the preparation and creation of the 4/22/21's critique and commentary of the Fight. This is no different from *Hosseinzadeh* where Ethan and Hila took the heart of the work for purposes of critique and commentary. Without question, the Court's analysis in *Hosseinzadeh* applies:

> It is ***evident*** that to comment on and critique a work, clips of the original may be used. [Citation] Without using actual clips, the commentary and critique here would ***lose context and utility***. Here, the 'extent' and 'quality and importance' of the video clips used by the defendants were ***reasonable to accomplish the transformative purpose of critical commentary*** [Citation]. … [A] great deal of plaintiff's work was copied, but such copying was ***plainly necessary to the commentary and critique***.

*Hosseinzadeh*, 276 F.Supp.3d at 46 (emphasis added) (citing *Campbell*, 510 U.S. at 588; *Abilene Music, Inc. v. Sony Music Entertainment, Inc.*, 320 F.Supp.2d 84, 89 (S.D.N.Y. 2003); *McCollum*, 839 F.3d at 185).

---

[17] Even if we were to factor the duration of the Reference Video (which we should not because it only served as raw materials for the 4/22/21 Podcast), the percentage is still small. The Reference Video was 13 minutes and 56 seconds, which was less than 5.9% of the Broadcast.



Here, one of the chief criticisms of the Fight (both in the public and in the 4/22/21 Podcast) was that it was "staged," that it was not a legitimate fight and that perhaps one of the contestants "took a dive" in this farce. It is impossible to criticize the Fight on these grounds without showing the potential "dive" itself – the purported knockout – and the referee making that decision. Therefore, as a matter of law, this factor weighs in favor of fair use.

### 5.  The Fourth Fair Use Factor Weighs Heavily in Favor of Fair Use

In our 6/1/21 Letter, we explained that – both as a matter of law and of undisputed fact – Triller did not suffer and could not have suffered market harm. As the Supreme Court explained, the "fourth statutory factor focuses upon the 'effect' of the copying in the 'market for or value of the copyrighted work.'" *Google*, 141 S.Ct. at 1206 (quoting 17 U.S.C. § 107(4)); *see also Campbell*, 510 U.S. at 590. The Supreme Court has also repeatedly emphasized that courts "must consider not just the ***amount*** but also ***the source of the loss***." *Google*, 141 S.Ct. at 1206 (emphasis added). This requires "distinguish[ing] between 'biting criticism that merely ***suppresses demand*** and copyright infringement which ***usurps it***." *Campbell,* 510 U.S. at 592 (emphasis added; internal brackets omitted) (quoting *Fisher*, 794 F.2d at 438).

It is axiomatic that market harm from criticism, "even if directly translated into foregone dollars, is '***not cognizable under the Copyright Act***.'" *Google*, 141 S.Ct. at 1206 (emphasis added) (quoting *Campbell*, 510 at 592). This is because "the law recognizes ***no derivative market for critical works***." *Campbell*, 510 U.S. at 592 (emphasis added). Criticism that "may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market." *Id.* at 593; *see also Google*, 141 S.Ct. at 1206 (a 'lethal parody, like a scathing theater review,' may 'kill demand for the original'") (quoting *Campbell*, 510 at 591-92).

> This ***distinction*** between potentially ***remediable displacement and unremediable disparagement*** is reflected in the rule that there is ***no protectible derivative market for criticism***. The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the ***unlikelihood*** that creators of imaginative works will ***license critical reviews*** or lampoons of their own productions removes such sues from the very notion of a potential licensing market.

*Campbell*, 510 U.S. at 592 (emphasis added).

Here, the 4/22/21 Podcast provided scathing criticism of the Broadcast and the Reference Video served that purpose. The words of the *Hosseinzadeh* court are directly on point:

> Here, it is clear to the Court that the [4/22/21 Podcast] does ***not*** serve as a market substitute for the [Broadcast]; anyone seeking to enjoy [the Broadcast]



> on its own will have a ***very different experience*** watching the [4/22/21 Podcast], which responds to and transforms the [Broadcast] into ***fodder for caustic, moment-by-moment commentary and mockery***.  Because the [4/22/21 Podcast] does not offer a substitute for the original, ***it does not (and indeed, cannot) usurp a market that properly belongs to the copyright-holder***.

*Hosseinzadeh*, 276 F.Supp.3d at 47 (internal quotes and brackets omitted).

     *Hughes* is also instructive.  In *Hughes*, the court found the fourth fair use factor favored fair use because: "there is no danger that [defendant's video] will usurp the market of progressive commentaries such as [plaintiff's] video."  437 F.Supp.3d at 394.  This was because the defendant's "***target audience*** (generally political conservatives and libertarians) is obviously ***not the same*** as [plaintiff's] target audience (generally political liberals)."  *Id.* (emphasis added).  Consequently, there was "***no reason*** to think [plaintiff's] audience will abandon her progressive YouTube channel to watch the derisively-titled *SJW Levels of Awareness* on a conservative YouTube channel simply because it contains parts of her work."  *Id.* (emphasis added).

     Here, it is apparent to everyone – except for Triller – that the Podcast, in general, and the 4/22/21 Podcast, in particular, targets a fundamentally different audience than the Broadcast.  Like in *Hughes*, the 4/22/21 Podcast was "derisively titled" *Jake Paul Fight Was A Disaster*.  It is equally apparent that the audience for the H3 Podcast is fundamentally different than those interested in the Broadcast – particularly in light of the numerous Podcast videos excoriating Jake Paul.  *See* Fn. 10.  To think that that any viewer of the 4/22/21 Podcast – which thoroughly trashed the Broadcast – watched the 4/22/21 Podcast to identify and subsequently watch the Reference Video is simply comical.  Therefore, as a matter of law, Triller did not and could not have suffered market harm.

     The Supreme Court has also recently stated that the market harm factor "must take into account the public benefits the copying will likely produce" such as "copyright's concern for the creative production of new expression."  *Google*, 141 S.Ct. at 1206.  The 4/22/21 Podcast is a work of humorous and biting criticism of the Broadcast, which serves the public policy of the Copyright Act to stimulate the creation of new works.  Indeed, as the Supreme Court stated: "humorous forms of criticism … ***provide social benefit***, by shedding light on an earlier work, and in the process, ***creating a new one***."  *Campbell*, 510 U.S. at 579 (emphasis added).  Therefore, under absolutely no circumstance can Triller demonstrate market harm.

     In our 6/1/21 Letter, we also provided you with the YouTube analytics for the Reference Video that dispelled any doubt whether the Reference Video served as a market substitute for the Broadcast. The beauty of YouTube analytics is that it can be determined with absolute precision: (1) when and how many views the Reference Video received; and (2) how many unique viewers watched the Reference Video.


The screenshot that we previously provided to you undeniably demonstrated that: (1) the Reference Video had only *51 unique viewers* for a total of *65 views*; and (2) had an average watch time of *57 seconds*. In other words, the Reference Video received less than *.0065%* of the of the views of the 4/22/21 Podcast.[18] Additionally, if we were to calculate the purported lost revenue of $49.99 for each unique viewer of the Reference Video (which is – in it of itself – ridiculous), the total amount of speculative lost revenue would be *$2,549.49 – i.e., .003% of the reported $75,000,000* in revenue Triller received from the Broadcast.[19]

Most notable, *45 of those views came on May 3, 2021 and hardly any occurred from when the 4/22/21 Podcast aired until that date*. The reason why May 3, 2021 is important is because this was the *same day* that Triller's so-called "head of piracy," Mr. Matt St. Claire, made statements to *Reuters* for a May 3, 2021 article entitled "EXCLUSIVE Triller offers clemency to boxing fans who pirated Jake Paul bout if they pay up."[20] Specifically, Mr. St. Claire stated: "The fines are calculated at $150,000 *per instance*, so for H3 and other sites who rebroadcast the event to *many people*, the (potential) damages are large." (Emphasis added). Mr. St. Claire went on to say that it will "pursue the full $150,000 penalty *per person per instance* for anyone who doesn't do the right thing and pay before the deadline."[21] (Emphasis added).

---

[18] Further, for Triller to argue that playing a 42 second clip (the majority of which was without sound or video) with two individuals – who hardly look like athletes or boxing aficionados – talking over it usurps the market for the original speaks less about the use of the Reference Video in the 4/22/21 Podcast and more about the poor quality of entertainment produced by Triller.

[19] Anwesha Nag, Sportskeeda, "Jake Paul reveals PPV sales and revenue figures for the Triller Fight Club event" (April 19, 2021), *available at*: https://www.sportskeeda.com/mma/news-jake-paul-ppv-buys-the-problem-child-reveals-pay-per-view-sales-revenue-figures-triller-fight-club-event; Bill Shea, The Athletic, "The new boxing spectacle? Triller's Jake Paul fight crammed with celebs pulls in up to $75 million in PPV sales" (April 21, 2021), *available at*: https://theathletic.com/2534883/2021/04/21/jake-paul-fight-triller-snoop-dogg/; Nasir Jabbar, Sport Bible, "Jake Paul Vs. Ben Askren Did 1.5 Million Pay-Per-View Buys And Generated $75 Million" (April 19, 2021), *available at*: https://www.sportbible.com/boxing/news-paul-vs-askren-did-15-million-pay-per-view-buys-and-generated-75m-20210419.

[20] Rory Carroll, Reuters, "EXCLUSIVE Triller offers clemency to boxing fans who pirated Jake Paul bout if they pay up" (May 3, 2021) *available at*: https://www.reuters.com/lifestyle/sports/exclusive-triller-offers-clemency-boxing-fans-who-pirated-jake-paul-bout-if-they-2021-05-03/.

[21] Additionally, our 6/1/21 Letter explained why Mr. St. Claire's statement was completely divorced from the law and illustrates Triller's bad faith to coerce individuals who were not named in any lawsuit to participate in Triller's settlement scheme. It is well-established that the Copyright Act does *not* authorize statutory damages *per instance of infringement, but per work infringed.* "Section 504(c)(1) permits an owner to recover 'an award of statutory damages for *all infringements* involved in the action, with respect to *any one work*, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally.'" *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1264 (9th Cir. 2021) (emphasis



On May 3, 2021, online commentators began discussing that the Podcast was sued by Triller and even focused on where the Reference Video appeared in the 4/22/21 Podcast.[22]  Until that point, there was little if any discussion online about the Filmdaily FAC and its allegations against the Podcast.  When TEI became aware of the fact that the online community was discussing Mr. St. Claire's statements, it checked the analytics of the Reference Video and saw a bump in views.  As such, on May 3, 2021, TEI changed the Reference's Video's status from unlisted to private to prevent further viewers from watching.  The YouTube analytics are below.



added) (quoting 17 U.S.C. § 501(c)).  Thus, the "number of awards available under this provision depends **not on the number of separate infringements**, but rather on (1) the number of **individual 'works' infringed** and (2) the number of **separate infringers**."  *Desire*, 986 F.3d at 1264 (emphasis added) (quoting *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1189-90 (9th Cir. 2016)).  We also pointed out in our 6/1/21 Letter that – what makes this statement particularly absurd – was that not a single complaint filed by Triller contained a request for statutory damages for copyright infringement.  *See* Filmdaily Initial Complaint, pp. 18:8-17 & 19:20-20:1; Filmdaily FAC, pp. 19:21-20:2 & 21:4-13; Initial Complaint, pp. 9:24-10:5 & 10:26-11:7; FAC, pp. 12:19-28 & 13:21-14:2. In response, Triller's 6/8/21 Letter *falsely* stated Triller did plead statutory damages – but the letter only cited requests for statutory damages for the claims under the Federal Communications Act.  6/8/21 Letter, p. 2, fn. 5 (citing FAC at Prayer for Relief ¶¶ 4, 5).  This is but another of the multiple examples of Triller engaging in bad faith arguments divorced from law or fact.

[22] Keemstar, Twitter (May 3, 2021 at 3:49 P.M), *available at*: https://twitter.com/KEEMSTAR/status/1389351335183671304; Keemstar, Twitter (March 3, 2021 at 4:04 P.M.), *available at*: https://twitter.com/KEEMSTAR/status/1389355273857421327; Keemstar, Twitter (May 3, 2021 at 4:36 P.M.), *available at*: https://twitter.com/KEEMSTAR/status/1389363354238607364.



Thus, if anyone is to blame for driving viewers and views to the Reference Video, *it is Triller and its entirely inept "head of piracy," Mr. St. Claire*. Due to their completely baseless, reprehensible and irresponsible public statements, Triller and Mr. St. Claire created a Streisand Effect where people suddenly became curious about the Reference Video. Until that point, virtually no one was interested in seeing the Reference Video. What emphasizes that people came for mere curiosity is that the average viewer only watched 57 seconds of the Reference Video, which consisted solely of the ring announcer, Michael Buffer, making introductions.

Simply put, Triller's argument that the 4/22/21 Podcast did not make a fair use of the Broadcast through the Reference Video is patently meritless. Our Clients have absolutely no apprehension about stridently defending fair use in general and their fair use of the Broadcast in particular.

### D.     Triller will Pay Our Clients' Attorneys' Fees

This lawsuit provides a quintessential example of when attorneys' fees should be awarded to a prevailing defendant. As the Supreme Court has repeatedly stated, courts should examine "several nonexclusive factors to inform a court's fee-shifting decisions: frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S.Ct. 1979, 1985 (2016) (internal quotations and brackets omitted) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 fn. 19 (1994)).

As explained above, Triller's claim of copyright infringement against our client is – to put it in extremely delicate terms – objectively unreasonable. A more accurate description is that Triller's theory of copyright infringement is delusional. In addition, and explained in detail above, the record is rife with examples of Triller's bad faith and the need to deter bad actors, like Triller, from making such claims in the future. Therefore, an award of attorneys' fees against Triller is not only warranted, it is inevitable.

### IV.     Triller's Federal Communication Act Claims Fail as a Matter of Law

In our 6/1/21 Letter, we spelled out how Triller violated F.R.C.P. Rule 11 with its bizarre claims that Our Clients violated 47 U.S.C. Sections 553 ("Section 553") and 605 ("Section 605") of the Federal Communications Act ("FCA").

We explained to you that, as a threshold matter, Triller's FCA claims – like its other claims – fail to properly allege a violation of Section 553 and Section 605. Instead, Triller spews a word salad of legal conclusions and threadbare recitals that Our Clients purportedly violated


those sections.[23]  FAC, ¶¶ 32, 40.  This is insufficient to survive Our Clients' Motion to Dismiss.

We also explained to you that, had Triller taken the time to conduct a prelitigation investigation and ***actually watched the 4/22/21 Podcast (which the FAC incorporates by reference)***, it would have been clear to Triller that the Broadcast was initially watched via a "link" (*i.e.*, over the internet and ***not*** from a satellite or cable signal).  Additionally, from its own pleadings, Triller (falsely) alleges that Our Clients uploaded the Broadcast to the internet.  FAC, ¶¶ 20, 50, 53.

The Central District of California and other courts within the Ninth Circuit have repeatedly held that FCA (and Section 553 and Section 605 in particular) does not apply to purported unauthorized access to internet broadcasts or re-transmissions over the internet.  *See G & G Closed Cir. Events, LLC v. Espinoza* ("*Espinoza*"), No. CV 18-07894 WDK-JC, 2020 WL 7861971, at *4 (C.D. Cal. 2020) ("the Court declines to extend the interpretation of the relevant statutes [*i.e.*, 47 U.S.C. Sections 553 and 605] to include unauthorized broadcasts via the internet [and] courts within the Ninth Circuit have reached similar conclusions.") (citing *Joe Hand Promotions, Inc. v. Spain*, Case No. 2:15-cv-00152-PHX-SMM, 2016 WL 4158802 (D. Ariz. 2016); *Joe Hand Promotions, Inc. v. Cusi*, Case No. 3:13-cv-935-MMA-BLM, 2014 WL 1921760, *3, n.4 (S.D. Cal. 2014)); *G & G Closed Cir. Events, LLC v. Rojas* ("*Rojas*"), Case No. EDCV1800438WDKJC, 2020 WL 7861979, at *4 (C.D. Cal. 2020) (same); *J & J Sports Prods., Inc. v. Bigalbal* ("*Bigalbal*"), Case No. CV 15-02676 WDK-PLA, 2016 WL 10651067, at *3 (C.D. Cal. 2016) (same)); *see also J & J Sports Productions, Inc. v. Tamayo* ("*Tamayo*"), Case No. 2:14-cv-01997-KJM-CKD, 2016 WL 2855126, *5 (E.D. Cal. 2016) (denying summary judgment because a material question of fact remained whether signal source with from a satellite – which is covered by the Federal Communications Act – or the internet, which is not); *Joe Hand Promotions v. Albright*, Case No. 2:11-cv-2260 (WBS) (CMK), 2013 WL 2449500, *5 (E.D. Cal. 2013) (noting that defendant could have defeated plaintiff's motion for summary judgment "by evidence that the Program was received through some other method, such as over the internet").

The holding in *Zuffa, LLC v. Justin.tv, Inc.*, 838 F.Supp.2d 1102 (D. Nev. 2012), is directly on point.  There, the defendant did not retransmit the actual broadcast of a UFC event; rather, its users subsequently "sent a digital copy of that broadcast by internet video stream to [defendant] for general public availability."  *Id.* at 1107.  As the District Court explained: "This

---

[23] *See* FAC, ¶ 32 ("Upon information and belief, with full knowledge that the Broadcast was not to be received, distributed, reproduced and or publicly exhibited by individuals unauthorized to do so, Defendants, without authorization from Plaintiff, unlawfully intercepted, received and/or de-scrambled Plaintiff's satellite signal"); *Id.*, ¶ 40 ("Upon information an belief, Defendants knowingly, willfully and unlawfully accessed, received and subsequently re-transmitted the Broadcast when it was offered via a cable TV or internet subscription without the authorization from Plaintiff").



is not the type of conduct properly addressed by the Communications Act, but by copyright law (and, potentially, trademark law)." *Id.* Further, the District Court held that Sections 553 and 605 of the FCA only apply when the defendant "extended the point of distribution ***of the actual broadcast signal*** distributed over a cable (or satellite) system beyond its authorized limits." *Id.* at 1107 fn. 5 (citing H.R. Rep. No. 98-934 at 83 (1984)) (emphasis added). As such the District Court found "no evidence in the statutory language, other cases, or legislative history that the Communications Act addresses this type of conduct or was meant to bolster or act as a separate type of copyright claim" and, therefore, "refuse[d] to extend the law in this manner." *Id.* at 1107.

Numerous Central District of California cases have come to the same conclusion: "although the internet has been in wide usage since the mid-1990s, the legislature has not extended the reach of the statutes to include transmissions via the internet and it is not the purview of the district court to insert itself and make this determination." *Espinoza*, 2020 WL 7861971, at *4; *Rojas*, 2020 WL 7861979, at *4 (same); *Bigalbal*, 2016 WL 10651067, at *3 (same)).

In your 6/8/21 Letter, Triller ***failed*** to refute that: (1) in the 4/22/21 Podcast (which the FAC incorporates by reference), Ethan states the Broadcast was viewed by a "link" (*i.e.*, over the internet); (2) the FCA does not apply to transmissions received or disseminated over the Internet; (3) the Reference Video was uploaded to YouTube on April 18, 2021 – which was ***after*** the transmission of the Broadcast on April 17, 2021; and (4) the Reference Video was shown ***five days*** after the Broadcast for purposes of commentary and critique in the 4/22/21 Podcast.

Instead, Triller argues that the FCA claims are well pled merely because the FAC alleges that the "the Broadcast was 'exhibited via ***closed circuit television*** and via ***encrypted satellite signal***." 6/8/21 Letter, p. 7 (original emphasis) (quoting FAC, ¶ 1).

This allegation does ***not*** demonstrate that the FCA claims are well pled. First, the allegations of Paragraph 1 only pertain to how the Broadcast was purportedly disseminated – ***not how Our Clients allegedly intercepted the Broadcast***. Second, the allegations of Paragraph 1 of the FAC in no way refute that Triller relies on threadbare recitals and insufficient factual allegations regarding Our Clients' alleged interception of the Broadcast (let alone how the Broadcast was transmitted to the public). Third, the FAC also explicitly states that the Broadcast was re-transmitted by authorized third-parties over the ***internet and Our Clients viewed the Broadcast over the Internet***. *See* FAC, ¶¶ 9, 12, 17, 22, 49.

In sum, Triller has completely failed to demonstrate it has (or could) properly allege a violation of Section 553 or Section 605 by Our Clients. Indeed, continuing to rely inapposite and frivolous arguments, Triller has dispelled any doubt that its Section 553 or Section 605 claims are bereft of merit and Triller violated its F.R.C.P. Rule 11 obligations.



## V.     Triller's Conversion Claim is Subject to California's Anti-SLAPP Statute and Fails as a Matter of Law

In our 6/1/21 Letter, we exposed Triller's lawsuit against Our Clients as a paradigmatic strategic lawsuit against public participation (*i.e.*, a SLAPP) and how Triller's conversion claim is subject to immediate dismissal under California's Anti-SLAPP statute and under F.R.C.P. Rule 12(b)(6).

Your 6/8/21 Letter effectively concedes that this lawsuit is a SLAPP and the conversion claim is subject to immediate dismissal by ***completely failing to address*** that: (1) this lawsuit, in general, and the conversion claim, in particular, targets protected expression under C.C.P. Section 425.16(e); (2) Triller's conversion claim has absolutely no possibility of prevailing on the merits; and (3) Our Clients will be awarded their attorneys' fees for the Anti-SLAPP Motion – which would likely eclipse any amount of potential recovery by Triller.

Anti-SLAPP motions involve a two-step process:  First, under prong one, "the defendant must establish that the challenged claim arises from activity protected by section 425.16." *Taus v. Loftus*, 40 Cal.4th 683, 712 (2007).  Under prong two, if the defendant makes the required showing under prong one, "the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." *Baral v. Schnitt*, 1 Cal.5th 376, 384 (2016).  The Anti-SLAPP Statute is to be "construed broadly" (C.C.P. §§ 425.16(a)) and it is designed to encourage participation in matters of public interest by targeting "lawsuits brought primarily to chill the valid exercise of the constitutional right of freedom of speech." *Equilon Enterprises, LLC v. Consumer Cause Inc*., 29 Cal.4th 53, 59-60 (2002).

### A.     Prong One: Triller's Conversion Claim Arises from Protected Activity as Defined by the Anti-SLAPP Statute

Under prong one of the Anti-SLAPP Statute, a "claim arises from protected activity when that activity underlies or forms the basis for the claim." *Park v. Board of Trustees of California State University,* 2 Cal.5th 1057, 1062 (2017).  This requires "evaluating the context and content of the asserted activity." *Wilson v. Cable News Network, Inc.*, 7 Cal.5th 871, 884-885 (2019).

Section 425.16(e)(3) defines protected activity as "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest[.]"  Under this provision, "[w]eb sites accessible to the public", like YouTube, "are 'public forums' for purposes of the anti-slapp statute." *Barret v. Rosenthal,* 40 Cal.4th 33, 41 fn. 4 (2006).

In addition, Section 425.16(e)(4) defines protected activity as "any other conduct in furtherance of the exercise of … the constitutional right of free speech in connection with a public issue or an issue of public interest."



Farhad Novian, Michael O'Brien and Alexander Brendon Gura
June 29, 2021
Page 33

The California Supreme Court stated that there are "three nonexclusive and sometimes overlapping categories of statements within the ambit of subdivision (e)(4)": (1) "statements or conduct concern[ing] 'a person in the public eye'"; (2) "conduct that could directly affect a large number of people beyond the direct participants"; or (3) statements or conduct that involve "'a topic of widespread, public interest.'" *Rand Resources, LLC v. City of Carson*, 6 Cal.5th 610, 621 (2019) (quoting *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO*, 105 Cal.App.4th 913, 924 (2003)).

Here, Triller's conversion claim arises from its allegations that Our Clients "knowingly and intentionally [and] substantially interfered" with Triller's "copyrights to the Broadcast." FAC, ¶¶ 44-45. Triller's FAC concedes that the Broadcast and the Reference Video were used in connection with the 4/22/21 Podcast. *Id.*, ¶ 2.

Courts have routinely found that "acts that 'advance or assist' the creation and performance of artistic works are acts in furtherance of the right of free speech for anti-SLAPP purposes." *Symmonds v. Mahoney*, 31 Cal.App.5th 1096, 1106 (2019) (wrongful termination claim by drummer against a band leader's selection of musicians for live musical performances arose from protected activity subject to the Anti-SLAPP Statute) (*citing Tamkin v. CBS Broadcasting, Inc.*, 193 Cal.App.4th 133, 143-144 (2011) (claims that arose from the "writing, casting and broadcasting" of a television show arose from protected activity subject to the Anti-SLAPP Statute); *Hunter v. CBS Broadcasting, Inc.*, 221 Cal.App.4th 1510, 1521 (2013) (employment discrimination claim by weather anchor applicant for a new program arose from protected activity subject to the Anti-SLAPP Statute).[24]

---

[24] *See also Brodeur v. Atlas Entertainment, Inc.*, 248 Cal.App.4th 665, 675 (2016) (claims arising from a movie satirizing the Abscam investigation arose from protected activity subject to the Anti-SLAPP Statute); *Ojjeh v. Brown*, 43 Cal.App.5th 1027, 1037-1038 (2019) (claims arising from statements made while fundraising for a documentary arose from protected activity subject to the Anti-SLAPP Statute); *Daniel v. Wayans*, 8 Cal.App.5th 367, 386 (2017) (claims arising from statements made by writer-performer during the creation of a comedy arose from protected activity subject to the Anti-SLAPP Statute); *Seelig v. Infinity Broadcasting Corp.*, 97 Cal.App.4th 798, 807-808 (2002) (claims arising from statements in a radio show discussing a reality show participant arose from protected activity subject to the Anti-SLAPP Statute); *Serova v. Sony Music Entertainment,* 44 Cal.App.5th 103, 119 (2020) (claims arising from advertisements about the identity of the singer on a music recording arose from protected activity subject to the Anti-SLAPP Statute); *No Doubt v. Activision Publishing, Inc.*, 192 Cal.App.4th 1018, 1027 (2011) (claims arising from videogame distributor's depiction of a band in a videogame arose from protected activity subject to the Anti-SLAPP Statute); *Hall v. Time Warner, Inc.*, 153 Cal.App.4th 1337, 1347 (2007) (claims arising from statements in a documentary about the distribution of dead actor's assets arose from protected activity subject to the Anti-SLAPP Statute); *M.G. v. Time Warner, Inc.*, 89 Cal.App.4th 623, 629 (2001) (claims arising from use of photograph in television program about child abuse arose from protected


Here, it is self-evident that the Reference Video to assist and advance the preparation and creation of an expressive work of widespread public interest (*i.e.*, the 4/22/21 Podcast). Triller's FAC concedes this point, noting that the Reference Video was used in connection with 4/22/21 Podcast which had over 1,000,000 views on a publicly accessible website (*i.e.*, YouTube"). FAC, ¶¶ 2, 4.

On this ground alone, Our Clients will be able to meet their burden under the first prong of the Anti-SLAPP statute. What further bolsters that the 4/22/21 Podcast involved speech protected by the Anti-SLAPP statute is that the use of the Reference Video in the 4/22/21 Podcast was to discuss three separate matters of public interest: (1) the Broadcast and Fight itself; (2) Jake Paul; and (3) Ben Askren.

The Broadcast, which included the Fight, was a matter of widespread public interest. First, according to various news reports, the Broadcast received anywhere from 1.2-1.6 million pay-per-view buys.[25] A public controversy ensued when UFC President, Dana White, repeatedly called out Triller (including its majority owner, Ryan Kavanaugh) by claiming – amongst several

---

activity subject to the Anti-SLAPP Statute); *Doe v. Gangland Productions, Inc.*, 730 F.3d 946, 953-955 (9th Cir. 2013) (claims based on pre-broadcast interviews for a documentary television series arose from protected activity subject to the Anti-SLAPP Statute); *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 423 (9th Cir. 2014) (claims arising from the decision not to include closed captions for online news videos arose from protected activity subject to the Anti-SLAPP Statute); *Sarver v. Chartier*, 813 F.3d 891, 902 (9th Cir. 2016) (claims arising from a film about an Iraq War veteran arose from protected activity subject to the Anti-SLAPP Statute); *Friedman v. DirectTV*, 262 F.Supp.3d 1000, 1004 (C.D. Cal. 2015) (claims arising from use of plaintiff's idea in a television show arose from protected activity subject to the Anti-SLAPP Statute); *Wilder v. CBS Corp.*, 2016 WL 693070, at *11 (C.D. Cal. Feb. 13, 2016) (claims arising from statements made in television show that discussed motherhood, pop culture, current events, and celebrity news arose from protected activity subject to the Anti-SLAPP Statute); *PowerTV Media, LLC v. Street Racing DigNight, LLC*, 2017 WL. 5665013, at *12 (C.D. Cal. March 10, 2017) (claims arising from contracts that were integral to the filming, production and broadcast of television show arose from protected activity subject to the Anti-SLAPP Statute).

[25] Michael Woods, Bad Left Hook (SB Nation), "Sources: Jake Paul vs Ben Askren did at least 1.45 million buys on PPV, could top 2 million" (April 18, 2021), *available at*: https://www.badlefthook.com/2021/4/18/22391025/jake-paul-vs-ben-askren-ppv-buys-at-least-1-45-million-could-top-2-boxing-news-2021-triller; Damon Martin, MMAFighting, "Jake Paul vs. Ben Askren event sells over 1 million pay-per-views with final numbers still being calculated" (April 19, 2021), *available at*: https://www.mmafighting.com/2021/4/19/22392558/jake-paul-vs-ben-askren-event-sells-over-1-million-pay-per-views-final-numbers-being-calculated; Ryan Harkness, MMAMania (SB Nation), "Report: Triller's Jake Paul vs Ben Askren event sells over 1.4 million PPV units" (April 18, 2021), *available at*: https://www.mmamania.com/2021/4/18/22391204/report-trillers-jake-paul-vs-ben-askren-event-sells-over-1-4-million-pay-per-views.



other unflattering things – that Triller's statements regarding the reported number of pay-per-view buys for the Broadcast were false.[26]  Further, several UFC fighters publicly commented and criticized the Broadcast and the Fight.[27]  Additionally, numerous media outlets reported on the Fight, including *The Washington Post, The New York Times* and CBS Sports.[28]

       Equally important, the participants of the Fight, Jake Paul and Ben Askren, are both individuals in the public eye.  Jake Paul is famous for being infamous.  *The New York Times* alone has published several articles on Jake Paul, including allegations about him committing sexual assault, allegations about his exploitation of fellow YouTubers, calling COVID-19 a "hoax," charges of trespassing and unlawful assembly during last year's civil unrest, the FBI executing a search warrant on his home, Disney firing him from the television show *Bizaardvark*, a potential lawsuit brought by Jake Paul's former neighbors for creating a public nuisance, and his confrontation with KTLA news reporter Chris Wolfe.[29]  Ben Askren is a

[26] Connor Bennet, Dexerto.com, "Dana White claims Jake Paul is lying about PPV numbers for Ben Askren fight" (April 25, 2021), *available at*: https://www.dexerto.com/entertainment/dana-white-claims-jake-paul-is-lying-about-ppv-numbers-for-ben-askren-fight-1560466/; UFC – Ultimate Fighting Championship, YouTube, "UFC 261: Dana White Post-fight Reaction" (April 24, 2021), *available at*: https://youtu.be/h3ZvOVxpYeQ; UFC – Ultimate Fighting Championship, YouTube, "UFC 262: Dana White Post-fight Reaction" (May 15, 2021), *available at*: https://youtu.be/CEs_8LSAWpM; UFC – Ultimate Fighting Championship, YouTube, "UFC 263: Dana White Post-fight Reaction" (June 13, 2021), *available at*: https://youtu.be/4jNzXFQDF7Q.

[27] MMA Crazy, YouTube, "UFC Fighters slam Jake Paul's actions" (April 22, 2021), *available at*: https://youtu.be/8-S2ARXzf0k.

[28] Cindy Boren, *The Washington Post*, "YouTube star Jake Paul wins his third pro fight, knocking out a former UFC fighter" (April 18, 2021), *available at*: https://www.washingtonpost.com/sports/2021/04/18/jake-paul-ben-askren-knockout/; Brent Brookhouse, CBS Sports, "Jake Paul vs. Ben Askren fight results, highlights: Paul crushes Askren for first-round TKO" (April 18, 2021), *available at*: https://www.cbssports.com/boxing/news/jake-paul-vs-ben-askren-fight-results-highlights-paul-crushes-askren-for-first-round-tko/live/; Taylor Lorenz, *The New York Times*, "Jake Paul Promised Them Fame.  Was It Worth the Price?" (April 22, 2021), *available at*: https://www.nytimes.com/2021/04/22/style/jake-paul-team-10.html.

[29] Taylor Lorenz, *The New York Times*, "Jake Paul Promised Them Fame.  Was It Worth the Price?" (April 22, 2021), *available at*: https://www.nytimes.com/2021/04/22/style/jake-paul-team-10.html; Derrick Bryson Taylor and Taylor Lorenz, *The New York Times*, "F.B.I. Searches Jake Paul's California Home" (August 5, 2020), *available at*: https://www.nytimes.com/2020/08/05/us/jake-paul-fbi-raid.html?searchResultPosition=2; Jonah Engel Bromwich, *The New York Times*, "Disney Splits With the YouTube Star Jake Paul" (July 25, 2017), *available at*: https://www.nytimes.com/2017/07/24/arts/television/disney-jake-paul.html?searchResultPosition=3; Jonah E. Bromwich, *The New York Times*, "Jake Paul, a Reality Villain for the YouTube Generation" (July 21, 2017), *available at*: https://www.nytimes.com/2017/07/20/arts/who-is-jake-paul.html?searchResultPosition=4;


former Olympic wrestler, NCAA champion wrestler, former MMA welterweight champion for Bellator and One and fought in twenty-two UFC fights with a record of nineteen wins, two loses and one no-contest.[30]

Therefore, there can be no doubt that Triller's conversion claim arises from activity protected by the Anti-SLAPP Statement because: (1) the Reference Video assisted and advanced the preparation and creation of the 4/22/21 Podcast (which itself was a matter of public interest); and (2) the 4/22/21 Podcast used the Reference Video to comment on and critique matters of substantial public interest, including the Broadcast, the Fight, Jake Paul and Ben Askren.

> **B.**      <u>Prong Two: Triller Cannot Show a Probability of Prevailing on the Merits of its Conversion Claim</u>

Under prong two, Triller bears the burden to "establish[] that there is a probability that [it] will prevail on the claim." C.C.P. § 425.16(b)(1). When, as here, an anti-SLAPP motion is based on "deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fees provision of § 425.16(c) applies." *Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, 890 F.3d 828, 834 (9th Cir. 2018) (quoting *Rogers v. Home Shopping Network, Inc.*, 57 F.Supp.2d 973, 983 (C.D. Cal. 1999)).

Here, Triller's conversion claim fails as a matter of law because it is preempted by the Copyright Act. Section 301(a) of the Copyright Act preempts all state law claims that meet the following two-prong test: (1) the claims "come within the subject matter of copyright" and (2) the claims seek to enforce rights "equivalent to any of the exclusive rights within the general scope of copyright[.]" 17 U.S.C. § 301(a). Under Section 301(a), courts uniformly find that state law claims are preempted when the claims arise from allegations that the defendant exploited a copyrighted work. *See Fleet v. CBS, Inc.* 50 Cal.App.4th 1911, 1924 (1996) ("A claim asserted to prevent nothing more than the reproduction, performance, distribution or display of a dramatic

---

Taylor Lorenz, *The New York Times*, "Jake Paul Charged With Misdemeanor Trespassing After Mall Looting" (July 4, 2020), *available at*: https://www.nytimes.com/2020/06/04/style/jake-paul-charged-protests.html?searchResultPosition=5; Alex Williams, *The New York Times*, "How Jake Paul Set the Internet Ablaze" (September 8, 2017), *available at*: https://www.nytimes.com/2017/09/08/fashion/jake-paul-team-10-youtube.html?searchResultPosition=6.

[30] Team USA, "Olympic Wrester Ben Askren Heads To The Boxing Ring Against Jake Paul On April 17" (April 13, 2021), *available at*: https://www.teamusa.org/USA-Wrestling/Features/2021/April/13/Ben-Askren-fight-vs-Jake-Paul; UFC Stats, "Ben Askren", *available at*: http://ufcstats.com/fighter-details/0b31f87be71ebbb1#:~:text=Weight%3A%20170%20lbs.



performance captured on film is subsumed by copyright law and preempted").[31]

As a threshold matter, Triller's conversion claim is comprised solely of threadbare recitals and legal conclusions that fail as a matter of law. Further, Triller's FAC concedes that its conversion claim is preempted by the Copyright Act.

As to the first element of copyright preemption, Triller's FAC explicitly concedes that the Broadcast comes within the subject matter of copyright. In the conversion claim itself, Triller specifically refers to: (1) its "right to possess the copyrights to the Broadcast"; (2) that Our Clients' alleged "conduct as set forth herein … substantially interfered with Plaintiff's property"; and (3) Our Clients' alleged "objective" was "depriving [Triller] of its copyright ownership". FAC, ¶¶ 44-46. Moreover, Triller's FAC describes the Broadcast as a "television broadcast" and "audio/visual" work. *Id.*, ¶¶ 1, 17 (incorporated by reference into the conversion claim by Paragraph 43 of the FAC). Indeed, Triller registered the Broadcast as a "motion picture" with the Copyright Office, according to the Copyright Office's website. Finally, the FAC consistently uses terms, like "copyright owner" to describe Triller, and "copyrighted work" to refer to the Broadcast. *Id.*, ¶¶ 1, 3, 5-6, 9-10, 17-18, 23, 26, 31, 39, 44, 46, 50, 52-54, 58.

The Copyright Act explicitly states that "motion pictures and other audiovisual works" are copyrightable subject matter."[32] 17 U.S.C. § 102(a)(6). Therefore, there can be no doubt that Triller's conversion claim involves property that comes within the subject matter of copyright.

As to the second element of copyright preemption, Triller's FAC explicitly concedes that its conversion claim seeks to enforce rights equivalent to the exclusive rights within the general scope of copyright. In its conversion claim, Triller does not allege any specific acts constituting

---

[31] *See also Laws v. Sony Music Entertainment, Inc.,* 448 F.3d 1134, 1137-38 (9th Cir. 2006) (holding Right of Publicity Claims arising from use of a sound recording in a music video were preempted); *Motown Record Corp. v. George A. Hormel & Co.,* 657 F. Supp. 1236, 1238-40 (C.D. Cal. 1987) (holding Right of Publicity claims based on the use of look-a-like performers singing the musical group's signature musical composition were preempted because the claims arose from the "use of a copyrighted work"); *Fleet,* 50 Cal.App.4th at 1919-20 (holding actors' Right of Publicity claims for unpaid use of their performances in a film were preempted); *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 674 (7th Cir. 1986) (holding baseball players' Right of Publicity Claims based on baseball game broadcasts were preempted); *Ahn v. Midway Manufacturing Co.,* 965 F. Supp. 1134, 1138 (N.D. Ill. 1997) (holding that videos taped for purposes of creating videogame came were preempted).

[32] The Copyright Act defines "motion pictures" as "audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any." 17 U.S.C. § 101 (definition of "motion picture"). The Copyright Act defines "audiovisual works" as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied." *Id.* (definition of "audiovisual works").



conversion; instead, it alleges that by "virtue of [Our Clients' alleged] conduct as set forth herein," Our Clients purported objective was "depriving Plaintiff of its copyright ownership" in the Broadcast. *See* FAC, ¶¶ 45-46. The conduct Triller appears to be referring to is that Our Clients' allegedly "uploaded, distributed and publicly displayed, without authorization, the Broadcast to the users of the [Podcast's] YouTube channel." *Id.*, ¶¶ 2; *see also Id.*, ¶¶ 3, 5, 11-13, 19-23. In other words, Triller is alleging that Our Clients violated the reproduction right, public distribution right and public performance right of Section 106 of the Copyright Act. *See* 17 U.S.C. §§ 106(1) & 106(3-4).

Thus, Our Clients will, unquestionably, prevail on their Anti-SLAPP Motion. Consequently, as the prevailing defendant, Triller will be ordered to pay Our Clients' attorneys' fees. *See* C.C.P. § 425.16(c) ("a prevailing defendant on a special motion to strike ***shall*** be entitled to recover his or her attorney's fees and costs.") (emphasis added). When Our Clients both move and prevail on their Anti-SLAPP motion, they will expose Triller's lawsuit as a direct attack on the First Amendment and that its bellicose and fallacious public statements were an attempt to punish and silence Our Clients for lawfully criticizing Triller.

## VI. <u>Triller's Computer Fraud and Abuse Act Claim Fails as a Matter of Law</u>

In our 6/1/21 Letter, we provided a detailed explanation why Triller's claim that Our Clients violated the Computer Fraud and Abuse Act ("CFAA") is devoid of merit and preposterous as every other claim in the FAC. Stunningly, Triller effectively ***concedes this point*** because your 6/8/21 Letter ***completely fails*** to address the CFAA claim whatsoever – let alone a single argument raised in our 6/1/21 Letter.

It is clear that Triller's CFAA claim is made under 18 U.S.C. Section 1030(a)(4) because Triller's FAC merely regurgitates a series of legal conclusions that parrots the statute.[33]

Not only are these allegations insufficient to plead a claim under 18 U.S.C. Section 1030(a)(4), they also completely fail to satisfy the particularity requirement for the fraud element of this claim. *See Synopsys, Inc. v. Ubiquity Networks, Inc.*, 313 F.Supp.3d 1056, 1072 (N.D. Cal. 2018) ("For the § 1030(a)(4) claim, [a plaintiff] must also allege facts supporting a knowing intent to defraud [the plaintiff] with particularity under [F.R.C.P.] Rule 9.") (citing *Oracle*

---

[33] *Compare* 18 U.S.C. § 1030(a)(4) (making it a crime to "Knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct further the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.") *with* FAC, ¶ 49 ("Upon information and belief, Defendants, without authorization or by exceeding the scope of granted authorization, accessed a protected computer containing Plaintiff's live internet streams of the Broadcast, and knowingly and with intent to defraud, unlawfully copied, distributed and publicly displayed the Broadcast.").



*America, Inc. v. Service Key, LLC*, 2012 WL 6019580, at *6 (N.D. Cal. 2012) ("Rule 9(b) plainly applies to section 1030(a)(4)'s requirement that the defendant's acts further intended fraud").

Moreover, Triller makes absolutely no attempt to plead the $5,000 damages requirement. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service." 18 U.S.C. § 1030(e)(11).

The Supreme Court recently stated that the "statutory definitions of 'damage' and 'loss' thus focus on ***technological harms-such as corruption of files–of the type unauthorized users cause to computer systems and data***" and are "***ill fitted***" to "remediating '***misuse***'" of information. *Van Buren v. United States*, 141 S.Ct. 1648, 1660 (2021) (emphasis added)

This distinction between remediable "***technological harms***" versus non-remediable "***misuse***" has been repeatedly reiterated by the Ninth Circuit. "As explained by the Ninth Circuit, 'the plain language of the CFAA targets the unauthorized procurement or alternation of information, ***not its misuse or misappropriation***." *Synopsys*, 313 F.Supp.3d at 1070 (emphasis added; internal quotes and brackets omitted) (quoting *U.S. v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012)); *In re General Capacitor*, 325 F.Supp.3d 1029, 1040 (N.D. Cal. 2018) (same); *Brodsky v. Apple, Inc.*, 445 F.Supp.3d 110, 128-29 (N.D. Cal. 2020) (same). As the Ninth Circuit further explained: this is because the "CFAA is best understood as an anti-intrusion statute and ***not as a 'misappropriation statute.'***" *hiQLabs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1000 (9th Cir. 2019) (emphasis added) (quoting *Nosal*, 676 F.3d at 857-858).

Consequently, both the Supreme Court and the Ninth Circuit have held that the CFAA has a "narrow conception of loss" due to the CFAA's "references to damage assessments, data restoration, and interruption of service", which "clearly limits its focus to harms caused by computer intrusions, not general injuries unrelated to the hacking itself." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262-63 (9th Cir. 2019); *Van Buren*, 141 S.Ct. at 1660 ("Limiting 'damage' and 'loss' in this way makes sense in a scheme 'aimed at preventing the typical consequences of hacking.'") (*quoting Royal Truck & Trailer Sales and Service, Inc. v. Kraft*, 974 F.3d 756, 760 (6th Cir. 2020)).

*Andrews* is directly on point. There, the plaintiff's "theory of loss was that he and his fellow class members were denied profits they might have received from commodifying the personal information that the defendant allegedly obtained through unlawful means." 932 F.3d at 1262 (internal brackets omitted). The plaintiff argued that, since the defendant "allegedly stole the personal information without compensating him, he lost the value of that information



and the opportunity to sell it." *Id.* The Ninth Circuit rejected this theory of loss because the CFAA's "narrow conception of 'loss' does not include a provision that aligns with plaintiff's theory." *Id.*; *see also Brodsky*, 445 F.Supp.3d at 130-131 (same).

Here, Triller makes the exact same fatal error as the plaintiffs in *Andrews* and *Brodsky*. Triller fails to allege any damages or loss as a result of any purported intrusion. Rather, Triller's damages theory is that the purported intrusion resulted in an alleged misappropriation and exploitation of the Broadcast. *See* FAC, ¶ 49. This is emphasized by the "$50,000,000" in damages that Triller requests for this claim, which is identical to its request for damages for its copyright infringement claims. FAC, pp. 12:23-25, 13:16-18, 13:25-27. As the Ninth Circuit has repeatedly explained, Triller cannot use the CFAA to recover damages from this purported misappropriation.

Furthermore, as discussed above, Our Clients did not unlawfully access any of Triller's computer system or of its affiliates. Rather, the Reference Video was copied the day *after* the fight on April 18, 2021 from an existing YouTube video. Consequently, because the Reference Video was taken from a third-party with no relationship to Triller, it cannot possibly prove any damage or loss from an intrusion *because it never happened.*

In sum, Triller's CFAA claim fails as a matter of law and will not survive Our Clients' Motion to Dismiss. Further, Triller's highly deficient pleadings and complete failure to address the arguments raised in our 6/1/21 Letter unequivocally demonstrate that Triller failed to investigate the facts and law for Triller's CFAA claim in violation of F.R.C.P. Rule 11.

## VII.   Triller's Vicarious Copyright Infringement Claim Fails as a Matter of Law

In our 6/1/21 Letter, we demonstrated that Triller's vicarious copyright infringement claim epitomizes its complete failure to understand copyright law and is a violation of F.R.C.P. Rule 11 by failing to conduct a prelitigation investigation into the law or facts.

First, aside from mere legal conclusions, Triller does not allege facts demonstrating copyright infringement by third parties. As the Ninth Circuit repeatedly explained, vicarious copyright infringement requires pleading and proving "direct infringement by third parties." *Oracle America, Inc. v. Hewlett Packard Enterprise Company*, 971 F.3d 1042, 1050 (9th Cir. 2020) (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007); citing *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1071 (9th Cir. 2013)). Once again, Triller mere regurgitates language from 17 U.S.C. Section 106 by alleging that Our Clients allowed "users to engage in the unauthorized reproduction, adaptation, public display and public performance of programming containing Plaintiff's copyrighted Broadcast." FAC, ¶ 54. Further, as we explained in Section III.B. above, viewing a streaming a video over the internet does not constitute copyright infringement because it does not implicate any of the rights set forth in 17 U.S.C. Section 106.



Second, as demonstrated above, the YouTube analytics for the Reference Video demonstrate that – aside from Our Clients (and perhaps Triller and Triller's attorneys) no one viewed the Reference Video until May 3, 2021. On May 3, 2021, the Reference Video received a spike in views due to online commentators responding to Mr. St. Claire's statements in the May 3, 2021 *Reuters* article. *See* Fns. 20 & 22. Therefore, Triller itself is directly responsible for driving viewers to the Reference Video.

Third, as explained in Section III.C.5. above, Triller makes the ***verifiably false*** allegation that "Defendants derived a financial benefit from such users' activities on the aforementioned websites by directing such users to external and/or shareable payment links, such as PayPal links, whereby users could remit direct payments to Defendants in order to compensate, fund and endorse each respective Defendants' infringement of Plaintiff's Broadcast." FAC, ¶ 56.

Shockingly, in your 6/8/21 Letter, Triller argues that pointing out this ***demonstrably false allegation*** "misses the point." 6/8/21 Letter, p. 3. ***But that is exactly the point: Triller has repeatedly made false allegations about Our Clients in its pleadings to the court in violation of F.R.C.P. Rule 11(b) and California Rule of Professional Conduct 3.3***. Further, contrary to Triller's preposterous assertion, our 6/1/21 Letter explicitly denied Our Clients "monetized their [purported] unlawful actions" such as "generating advertising revenue." 6/8/21 Letter, p. 3. Our 6/1/21 Letter explicitly told you that the Reference Video was ***not monetized because: (1) the "Zach the Sound Lad" channel is not eligible for monetization; and (2) TEI would not monetize the channel even if it was eligible***. Either Triller is materially misrepresenting the contents of our 6/1/21 Letter or failed to read it altogether.

These facts unequivocally demonstrate that Triller cannot prove the necessary element for its vicarious copyright infringement claim that Our Clients had a "direct financial interest in the infringing activity". *See Erickson Productions, Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) (quoting *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 745 (9th Cir. 2019)). To satisfy this requirement, Triller must plead and prove "a ***causal relationship between the infringing activity and any financial benefit a defendant reaps***." *Erickson Productions*, 921 F.3d at 829 (emphasis added) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)). A causal relationship exists "where the availability of infringing material acts as a draw for customers" and ***not*** "just an added benefit." *Erickson Productions*, 921 F.3d at 829 (quoting *Ellison*, 357 F.3d at 1078-79). Theories based on mere claims that the allegedly infringing material "enhanced the general attractiveness" of a website or that the benefit was "avoiding license fees [a defendant] would have otherwise been required to pay" are completely inadequate. *Erickson Productions*, 921 F.3d at 829-831.

Under no circumstances can Triller meet the "direct financial interest" requirement. The Reference Video was not and could not be monetized and, therefore, there was no financial benefit received from the Reference Video by Our Clients. Any argument to the contrary is either based on rank and unsupported speculation or made in bad faith.



In sum, Triller's vicarious copyright infringement claim is equally bizarre and meritless as each and every other claim in Triller's FAC.

## VIII.   Meet and Confer

We are utterly appalled by Triller repeatedly making false statements of law and fact in its pleadings and correspondence.  Triller has effectively made it Our Clients' responsibility to educate Triller – not only on the law and facts concerning each of its claims – but how to draft a well-pled complaint in the first instance.  Instead of recognizing Our Clients' generosity and gracefully exiting stage left, Triller continues to demonstrate its bad faith by responding with even more demonstrably false statements of law and fact.   ***There is absolutely no excuse for this and we demand it end immediately.***

At this stage, it is nearly impossible for us to conceive how a second amended complaint – which would be Triller's ***fifth*** opportunity to draft a complaint regarding the Broadcast and ***fourth*** against Our Clients – could possibly cure the fatal defects to each and every claim in the FAC as we have explained above.  The proposals set forth in your 6/8/21 Letter do ***not*** cure the fatal defects as to each and every claim set forth in the FAC whatsoever.[34]

 In a gesture of good faith, Our Clients are willing to review any proposed second amended complaint to see if Triller can actually plead a single viable claim – particularly one that does not make ***demonstrably false allegations***.  While Our Clients are not hopeful that Triller could cure such defects, they are willing to provide Triller that opportunity.  If Triller is somehow able to cure these fatal defects (which we do not believe it can), Our Clients would be willing to stipulate to the filing of a second amended complaint.

If, however, Triller is unable to cure the fatal defects as to each and every claim in the FAC, Our Clients position is that ***Triller must dismiss its abusive and harassing FAC with prejudice***.  Our Clients will even incentivize Triller dismissing the FAC with prejudice by not pursuing attorneys' fee for the copyright claims.  *See Nutrivita Laboratories, Inc. v. VBS Distribution Inc.*, 160 F.Supp.3d 1184, 1189-90 (C.D. Cal. 2016) (holding plaintiff's dismissal of copyright infringement case with prejudice results in the defendant being the prevailing party).

***Please provide us with Triller's proposed second amended complaint by July 8, 2021 so that we may schedule a time to meet and confer telephonically by July 15, 2021.***

Be advised: if Triller continues to make false statements of law and fact in its pleadings

---

[34] In your 6/8/21 Letter, you asked us to stipulate to a second amended complaint that would: (1) properly plead copyright registration; (2) removing the demonstrably false allegations of Paragraph 56 to include language of "generating advertising revenue"; and (3) drop the conversion and Section 553 claims.



and correspondence or propose another fatally defective complaint, Our Clients position is that Triller has refused to meet and confer in good faith and will file their Motion to Dismiss and Anti-SLAPP Motion.  If Triller insists on using the judicial process and the press for intimidation, Our Clients will use them for vindication.

Govern yourselves and client accordingly or face the consequences.

This letter does not constitute a complete statement of all of Our Clients' rights, defenses, contentions, legal theories or the facts in support thereof.  Nothing stated herein is intended, nor shall it constitute, a waiver or relinquishment of any of Our Clients' rights, defenses, or remedies, whether legal or equitable, all of which are hereby expressly reserved.

Very truly yours,

Lincoln D. Bandlow

# EXHIBIT A



SKIP NAVIGATION

     



## Jake Paul Fight Was A Disaster - H3 Podcast # 244

1,073,167 views • Apr 22, 2021

 28K  2.1K  SHARE  SAVE •••



**H3 Podcast** ✔
2.92M subscribers

JOIN   SUBSCRIBE

Thank you to http://MagicSpoon.com/H3 for sponsoring this episode!
Become a member for access to the episodes a day early with no ads and no cuts:
http://youtube.com/h3podcast/join

TEDDY FRESH...http://teddyfresh.com
H3 MERCH... http://h3h3shop.com

Follow us on Social Media:
https://twitter.com/theh3podcast
https://www.instagram.com/h3_podcast

Follow Teddy Fresh Social Media:
https://teddyfresh.com
https://instagram.com/teddyfresh
https://twitter.com/teddyfresh

SHOW LESS

SKIP NAVIGATION

 　　　　　　　　　　　    

SKIP NAVIGATION


### Jake Paul & Triller Are Suing Me - H3 After Dark # 35
H3 Podcast ✔
1.8M views • Streamed 2 weeks ago


### James Charles Entire Channel Demonetized by YouTube - Frenemies # 32
H3 Podcast ✔
4.5M views • 1 month ago


### Humanity Is Doomed - H3 Podcast # 245
H3 Podcast ✔
1M views • 3 weeks ago


### Logan Paul Says Ethan Is Scum Of The Internet - H3 After Dark #21
H3 Podcast ✔
1.3M views • Streamed 3 months ago


### Lawyer Reacts | Josh Duggar Released from Custody. Full Hearing Breakdown
Emily D. Baker ✔
313K views • Streamed 2 weeks ago


### A Closer Look: Kenneth Copeland - H3 Podcast #232
H3 Podcast ✔
869K views • 4 months ago


### Joe Rogan Trashed Hila On His Podcast - H3 After Dark # 37
H3 Podcast ✔
1.1M views • Streamed 1 day ago
New


### The Belle Delphine Mystery & Our New Studio - H3 Podcast # 246
H3 Podcast ✔
879K views • 2 days ago
New

### Lawyer Reacts | Let's Talk...about the legal side of the Dobrik Cancellation.
Emily D. Baker ✔
113K views • Streamed 2 months ago


SKIP NAVIGATION

SKIP NAVIGATION

 

    


1.4M views • 1 month ago


### The American Meltdown - H3 Podcast #230
H3 Podcast ✓
1M views • Streamed 4 months ago


### Infowars Attacks Ethan - H3 Podcast # 243
H3 Podcast ✓
948K views • 1 month ago


### Jake Paul Exposed By Bombshell New York Times Article - H3 After Dark # 33
H3 Podcast ✓
1.8M views • Streamed 4 weeks ago


### GET THIS CRAP OFF UR CAR!! - Cheugy Design 101
iDubbbzTV ✓
490K views • 1 day ago
New


### Does YouTube Have a Predator Problem? - H3 Podcast #231
H3 Podcast ✓
885K views • 4 months ago

 
### Case Brief | The Triller v. The H3 Podcast Lawsuit
Emily D. Baker ✓
40K views • 1 week ago

### Jeff Wittek, David Dobrik, & TRIVIA! - Frenemies # 33
H3 Podcast ✓
4.1M views • 3 weeks ago

### Corpse Husband, Psycho Twitch Streamers, Joe Rogan Is Tiny Joker - H3 Podcast #233
H3 Podcast ✓
867K views • 3 months ago

### Twitch Hot Tubs & Bitconnect Carlos Calls In - H3 After Dark # 34
H3 Podcast ✓

SKIP NAVIGATION

 ≡ ▶ YouTube         

## Shane Dawson, Dr DisRespect, Tati Westbrook, Chris D'Elia - H3 Podcast #196

H3 Podcast ✔

1.6M views • 10 months ago

⋮

---

SHOW MORE

---

**6,278** Comments     ☰ SORT BY

 Add a public comment...

---

**bee** 1 month ago

so nice of hila to lend this guy her channel <3

👍 3.1K 👎   REPLY      ⋮

▾ View 47 replies

 **Liquid Richard** 4 weeks ago

Dan's off- mic laugh lowkey cures my depression

👍 1K 👎   REPLY      ⋮

▾ View 13 replies

 **Kylee Haynes** 1 month ago

Ethan: **Looks for compliments**
Ethan: **Receives compliments**
Ethan: I don't wanna hear that Dan.

👍 781 👎   REPLY      ⋮

▾ View reply

**Dad** 1 month ago

I always find it odd when Ethan and the crew assume the audience doesn't want to see behind the scene content? Foot Soldiers are here for it ALL.

👍 562 👎   REPLY      ⋮

▾ View 2 replies

**Mitch Davey** 1 month ago

I love how Ethan is slightly off center of the shot when Hila is gone so we feel her absence.

⋮

REPLY

     

**Finn Kafka** 1 month ago

Ethan is literally Michael Scott seeking compliments and approval from his employees. Never gets old for me.

👍 10K   👎   REPLY

 View 84 replies

**Fahmida** 4 weeks ago

I dont think it's weird that Zach's parents are like "Stay until you're 50". I promise there are a lot of foreign parents out there who fully expect you to live with them until you get married

👍 327   👎   REPLY

View 17 replies

**c** 1 month ago

Zach kills me with his soundbites, when Ethan and Dan were talking about Frank and the "F word" I was thinking "please play Snoop FUCK, do it play the Snoop" and Zach comes in with the FUCK soundbite hahahaha

👍 478   👎   REPLY

View 5 replies

**SharpieElectricity** 1 month ago

Ethan there's literally no need to feel insecure about anything when you pulled a girl like Hila. It's good that you want to be healthier and drop some weight but you shouldn't be putting yourself down. You have way more to offer than just your looks!

👍 179   👎   REPLY

View 8 replies

**Sara Strohschein** 4 weeks ago (edited)

My grandma lives like 2 miles away from where George Floyd was killed. She says the whole area has felt so dark ever since. But the second they announced the guilty verdict, she felt a huge wave a darkness weight lift and like she could finally breathe again... idk, I just felt like that was so sad yet strangely poetic

👍 124   👎   REPLY

View 4 replies

**Ricky** 1 month ago (edited)

Hey H3,
Could you set up a camera in front of Ethan the next time he sits down to get in costume? A time lapse of seeing the magic happen would be awesome.

# EXHIBIT B

SKIP NAVIGATION

 YouTube

     

 Home

 Explore

Subscriptions

 Library

 Merch Store  

## H3 Podcast 
2.92M subscribers

[ JOIN ]   SUBSCRIBE

__HOME__　　　VIDEOS　　　PLAYLISTS　　　COMMUNITY　　　CH　❯

▶ PLAY ALL

    

| ...shed Hila On H3 After Dar... | The Belle Delphine Mystery & Our New Studio - H3... | Trisha & Ethan Got Bullied & Are Fighting Back -... | James Charles Is B... Sued & Bill Gates ( |
|---|---|---|---|
| 2:14:31 | 1:38:42 | 2:03:37 | |
| ...ago | 879K views • 2 days ago | 3M views • 5 days ago | 1.8M views • Streamed 1 week ago |

VE! ▶ PLAY ALL

    

| ...s Is Being ...es Calls In -... | Jake Paul & Triller Are Suing Me - H3 After Dark # 35 | Twitch Hot Tubs & Bitconnect Carlos Calls In ... | Jake Paul Exposed Bombshell New Yo |
|---|---|---|---|
| 3:20:45 | 3:05:16 | 2:46:51 | |
| ...k ago | H3 Podcast • 1.8M views • Streamed 2 weeks ago | H3 Podcast • 1.4M views • Streamed 3 weeks ago | H3 Podcast • 1.8M views • Streamed 4 weeks ago |

SKIP NAVIGATION




Home


Explore

Subscriptions


Library

 Merch Store   

## H3 Podcast 
2.92M subscribers

**JOIN**     SUBSCRIBE

HOME     VIDEOS     PLAYLISTS     COMMUNITY     CH ›

▶ PLAY ALL






| | | | |
|---|---|---|---|
| 1:27:53 | 1:16:25 | 1:45:26 | |

**Kenneth ...Podcast...**
...months ago

**Content Court: Jared Leto**
H3 Podcast
860K views • 5 months ago

**Content Court: The ACE Family**
H3 Podcast
1.3M views • 6 months ago

**Content Court: TheQuartering:**
H3 Podcast
1M views • 7 months

▶ PLAY ALL
...ests






| | | | |
|---|---|---|---|
| 1:31:43 | 1:17:24 | 2:01:14 | |

**...lphine - H3 Podcast**
...months ago

**Tim Dillon - H3 Podcast #224**
H3 Podcast
404K views • 7 months ago

**Whitney Cummings - H3 Podcast #223**
H3 Podcast
484K views • 7 months ago

**Tom Segura & Chri... H3 Podcast #221**
H3 Podcast
422K views • 7 month...

▶ PLAY ALL
...ly videos

...le to members of this channel. Automatically updated.





    

**Home**

**Explore**

**Subscriptions**

**Library**

 Merch Store  

## H3 Podcast 
2.92M subscribers

JOIN    SUBSCRIBE

HOME    VIDEOS    PLAYLISTS    COMMUNITY    CH >

    

| | 2:12:06 | | 1:57:50 | | 2:05:05 | |
|---|---|---|---|---|---|---|

(Defending ne Wicked...          Someone On The Crew Is A Psychopath & Papa John...          The Fate Of Frenemies With Dr. Drew - Frenemies #14          H3 After Dark (Tall About The Trisha T

ths ago          H3 Podcast ✓          H3 Podcast ✓          H3 Podcast ✓
989K views • 5 months ago          2.8M views • 5 months ago          1.5M views •
Streamed 5 months a

▶ PLAY ALL

   

| | 1:53:41 | | 1:53:19 | | 1:27:07 | |
|---|---|---|---|---|---|---|

el Stevens) - 01          A Lot Happened While We Were Gone... - H3 Podcast...          Chris D'Elia - H3 Podcast #103          Shane Dawson vs ( Cheese Pizza Lies

s ago          H3 Podcast ✓          H3 Podcast ✓          H3 Podcast ✓
898K views •          860K views •          1.4M views •
Streamed 2 years ago          Streamed 2 years ago          Streamed 2 years ago

▶ PLAY ALL





☰  **YouTube**                        🎤  🔍  📹  ⠿  🔔  

🏠
Home

🧭
Explore

🗂
Subscriptions

▶
Library

≋ Merch Store   🐦  📷

## H3 Podcast ✓                    [ JOIN ]    SUBSCRIBE
2.92M subscribers

**HOME**        VIDEOS        PLAYLISTS        COMMUNITY        CH  ›

   

2:04:58 | 2:10:05 | 2:38:18

…2 - Shane | H3 Podcast #7 - Post Malone & Joji | H3 Podcast #39 - Post Malone | H3 Podcast #10 - T About Jake Paul, L

…ears ago | 9.2M views • 4 years ago | 7.9M views • 3 years ago | 7.1M views • 3 years

CC

---

CHANNELS



roductions                The H3 PODCAST HIGHLIGHTS                Ethan and Hila

subscribers                1.6M subscribers                2.09M subscribers

SCRIBE                     SUBSCRIBE                        SUBSCRIBE

# EXHIBIT C



## Jake Knockout

🔒 Private

65 views • Apr 18, 2021

 1   0   SHA

 **Zach The Sound Lad**
524 subscribers

ANALYT

Comments are not supported on private videos. Learn more

# EXHIBIT N

FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
MICHAEL O'BRIEN (SBN 277244)
michaelo@novianlaw.com
ALEXANDER BRENDON GURA (SBN 305096)
gura@novianlaw.com
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, California 90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222

*Attorneys for Plaintiff TRILLER FIGHT CLUB II LLC*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRILLER FIGHT CLUB II LLC, a Delaware limited liability company, | CASE NO.: 2:21-cv-03502-PA-RAO |
| Plaintiff, | **[PROPOSED] SECOND AMENDED COMPLAINT FOR:** |
| vs. | 1. COPYRIGHT INFRINGEMENT |
| | 2. VICARIOUS COPYRIGHT INFRINGEMENT |
| TED ENTERTAINMENT, INC. a California corporation; TEDDY FRESH, INC, a California corporation; ETHAN KLEIN, an individual; HILA KLEIN, an individual; and Does 1-10, | 3. VIOLATION OF THE FEDERAL COMMUNICATIONS ACT: 47 U.S.C. § 605 |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Triller Fight Club II LLC, a Delaware limited liability company ("Plaintiff" or "Triller"), hereby complains against Defendants Ted Entertainment, Inc. ("TEI"), Teddy Fresh, Inc. ("Teddy Fresh"), Ethan Klein ("Mr. Klein"), Hila Klein ("Mrs. Klein"), and Does 1-10 (collectively, "Defendants"), alleging as follows:

## NATURE OF THIS ACTION

1. Plaintiff is the copyright owner and publisher of the Triller Fight Club broadcast of the "Jake Paul vs. Ben Askren" boxing event, including all undercard bouts and the entire television broadcast, exhibited via closed circuit television and via encrypted satellite signal (the "Broadcast"). Plaintiff's copyright in the Broadcast bears Registration Number PA 2-290-040, became effective on April 30, 2021, and was decided on May 4, 2021. A true and correct copy of Plaintiff's certificate of registration is attached hereto **Exhibit A**.

2. The Broadcast originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized online platforms. The Broadcast was then made available to consumers for purchase on a pay-per-view basis. Plaintiff's certificate of registration reflects this limited publication.

3. Upon information and belief, Defendants own and operate the YouTube channel located at https://www.youtube.com/channel/UCLtREJY21xRfCuEKvdki1Kw (the "YouTube Channel"). Upon information and belief, the H3 Podcast and YouTube Channel earn profits, including via (i) the YouTube Partner Program, (ii) sponsorships from unaffiliated third-party individuals and entities, and (iii) the sale of merchandise through businesses affiliated with Defendants, including, but not limited to, Teddy Fresh. Upon information and belief, Defendants' profits from their ownership and operation of the YouTube Channel are tied to the number of views the YouTube Channel receives.

[PROPOSED] SECOND AMENDED COMPLAINT

1      4.      Upon information and belief, Defendants did not purchase the Broadcast,

2    but rather publicly admitted to having unlawfully "bootlegged" or "pirated" the

3    Broadcast.[1]

4      5.      Upon information and belief, on or about April 22, 2021, without

5    requesting or receiving authorization, Defendants uploaded all or a substantial portion

6    of the Broadcast, in unaltered form, as an "Unlisted" video on YouTube (the "Unlisted

7    Video"), and publicly displayed the URL for the Unlisted Video on the YouTube

8    Channel in Defendants' video entitled "Jake Paul Fight Was A Disaster – H3 Podcast

9    # 244," available at https://youtu.be/bfKPts4BJkA (the "Distribution Video").  As

10   shown in the screenshot below, the URL for the Unlisted Video first appeared in the

11   Distribution Video at approximately 1:29:29 and remained visible through at least

12   approximately 1:30:58.

13



[1]  See DJ Screwdriver Media Posts (@MediaPostsDJ), Twitter (May 3, 2021, 5:13
     p.m.), https://twitter.com/MediaPostsDJ/status/1389372495749390337?s=20.

[PROPOSED] SECOND AMENDED COMPLAINT

6.     Upon information and belief, the Distribution Video has been viewed at least 1,000,000 times, and continues to receive additional views with each passing day.

7.     Upon information and belief, through its egregious conduct, Defendants unlawfully facilitated, participated, and induced other users to engage in the unauthorized reproduction, adaptation, distribution and public display of Plaintiff's copyrighted Broadcast.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction pursuant to 17 U.S.C. § 101, *et seq.* and 28 U.S.C. § 1331, which states that district courts shall have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a), which states that district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks.

9.     Venue is proper in this Court pursuant to 28 U.S.C § 1391(b)(2) because Defendants reside in this judicial district.  Alternatively, venue is also proper in this Court pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and because Defendants' unlawful actions were directed at this District.

## PARTIES

10.     Plaintiff is a limited liability company incorporated under the laws of Delaware and having its principal place of business in the State of California.

11.     Plaintiff is engaged in the business of distributing its copyrighted materials as defined in 17 U.S.C. § 101, and offering such content, including the Broadcast, for purchase on a pay-per-view basis to its paying customers over the internet or via cable or satellite TV.  Plaintiff invests substantial money, time, and effort in advertising, promoting, selling, and licensing programming such as the

[PROPOSED] SECOND AMENDED COMPLAINT

Broadcast.

12.     Plaintiff owns the copyrights to the Broadcast.  As the exclusive owner of the Copyright in its programing, including but not limited to the Broadcast, Plaintiff possesses the exclusive rights to, *inter alia*, exhibit, distribute, disseminate and perform the Broadcast publicly.

13.     TEI is a corporation registered to conduct business in the State of California.  Upon information and belief, TEI owns and operates, among other things, the so-called H3 Podcast (the "H3 Podcast") and the YouTube channel located at https://www.youtube.com/channel/UCLtREJY21xRfCuEKvdki1Kw (the "YouTube Channel").  Upon information and belief, TEI, through the H3 Podcast and YouTube Channel, earns profits, including via (i) the YouTube Partner Program, (ii) sponsorships from unaffiliated third-party individuals and entities, and (iii) the sale of merchandise through businesses affiliated with Defendants, including, but not limited to, Teddy Fresh.

14.     Teddy Fresh is a corporation registered to conduct business in the State of California.  Upon information and belief, Teddy Fresh is a clothing retailer.  The YouTube Channel and/or videos posted to the YouTube Channel contain links to a website owned and/or operated by Teddy Fresh and through which consumers can purchase Teddy Fresh merchandise.

15.     Mr. Klein is an individual residing in the State of California.  Mr. Klein is the Chief Executive Officer of TEI and the Secretary of Teddy Fresh.

16.     Mrs. Klein is an individual residing in the State of California.  Mrs. Klein is the Secretary of TEI, and the Chief Executive Officer, Chief Financial Officers, and sole director of Teddy Fresh.

## ALTER EGO ALLEGATIONS

17.     Upon information and belief, at all relevant times, there existed a unity of interest between Defendants such that any individuality or separateness between them has ceased.  TEI and Teddy Fresh are the alter egos of Mr. Klein and Mrs. Klein in

that:

    a. TEI and Teddy Fresh are, and at all relevant times were, mere shells, instrumentalities, and conduits through which Mr. Klein and Mrs. Klein carried on business in the name of TEI and Teddy Fresh, while exercising complete control and dominance over TEI and Teddy Fresh, their business and assets, to such an extent that any individuality or separateness between TEI and Teddy Fresh, on the one hand, and Mr. Klein and Mrs. Klein, on the other, did not exist. TEI and Teddy Fresh share, *inter alia*, corporate officers and directors, as well as corporate offices.

    b. TEI and Teddy Fresh were conceived, intended, and used by Mr. Klein and Mrs. Klein as a device to avoid liability and for the purpose of substituting an undercapitalized entity—namely, TEI and Teddy Fresh—in the place of Mr. Klein and Mrs. Klein. TEI and Teddy Fresh are, and at all times herein mentioned were, so inadequately capitalized that, compared with the business done by Mr. Klein and Mrs. Klein and the risks of loss, their capitalization was illusory and trifling. In addition, many assets of TEI and Teddy Fresh were transferred without adequate consideration to Mr. Klein and Mrs. Klein. Upon information and belief, neither TEI nor Teddy Fresh are insured.

    c. Mr. Klein and Mrs. Klein diverted assets from TEI and Teddy Fresh to themselves to suit their own convenience in carrying out business matters which were and should have been the domain of TEI and Teddy Fresh.

    d. TEI and Teddy Fresh are, and at all times herein mentioned were, controlled, dominated, and operated by Mr. Klein and Mrs. Klein as their alter ego, in that the activities and business of TEI and Teddy

Fresh were carried out without annual meetings, and without keeping records or minutes of any proceedings, or maintaining written resolutions.

18. Adherence to the fiction of the separate existence of TEI and Teddy Fresh, on the one hand, and Mr. Klein and Mrs. Klein, on the other, would permit an abuse of the corporate privilege and would sanction fraud, promote injustice, and otherwise aid in the commission of unlawful conduct. This is true because, as Plaintiff is informed and believes, at all relevant times, Defendants were commingling assets in a manner that allowed Defendants to utilize and freely transfer those assets amongst themselves. The commingling of assets and unlawful business conduct, as alleged more fully herein, by Defendants was intended, among other things, to allow Mr. Klein and Mrs. Klein to avoid liability to Plaintiff and others.

## COUNT ONE
### (Copyright Infringement)

19. Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

20. Plaintiff is the copyright owner and publisher of the Broadcast. As the copyright owner and publisher of the Broadcast, Plaintiff has the exclusive right to copy, publicly perform and distribute the Broadcast. Plaintiff's rights include, but are not limited to, all moving images and other audio/video content which were broadcasted via encrypted satellite signal.

21. The Broadcast originated via satellite uplink and was subsequently retransmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized, online platforms. The Broadcast was then made available to consumers for purchase on a pay-per-view basis.

22. Upon information and belief, Defendants did not purchase the Broadcast,

but rather publicly admitted to having unlawfully "bootlegged" or "pirated" the Broadcast.[2]

23.  Upon inspecting records of customers who lawfully purchased access to the Broadcast, there was no record of Ethan Klein, Hila Klein, the H3 Podcast, or TED Entertainment making a purchase of a license to view the Broadcast.

24.  Upon information and belief, on or about April 22, 2021, without requesting or receiving authorization, Defendants uploaded to YouTube all or a substantial portion of Broadcast, in unaltered form, as the Unlisted Video, and publicly displayed the URL for the Unlisted Video on the YouTube Channel in the Distribution Video.  The URL for the Unlisted Video first appeared in the Distribution Video at approximately 1:29:29 and remained visible through at least approximately 1:30:58.

25.  Upon information and belief, the Distribution Video has been viewed at least 1,000,000 times, and continues to receive additional views with each passing day.

26.  Upon information and belief, numerous individuals who had not purchased and did not purchase the Broadcast on a pay-per-view basis were able to, and did, freely view all or a substantial portion of the Broadcast, in unaltered form, via the Unlisted Video.

27.  Defendants infringed on Plaintiff's rights by adapting, copying, reproducing, uploading, publicly displaying, and distributing the Broadcast without Plaintiff's authorization in violation of the Copyright Act, 17 U.S.C. § 501. Defendants' acts of infringement were willful, in blatant disregard of, and committed with indifference to Plaintiff's rights.

28.  Upon information and belief, the H3 Podcast and YouTube Channel have profited from their unlawful conduct alleged herein, including via (i) the YouTube Partner Program, (ii) sponsorships from unaffiliated third-party individuals and entities, and (iii) the sale of merchandise through businesses affiliated with

_____

[2] *See* DJ Screwdriver Media Posts (@MediaPostsDJ), Twitter (May 3, 2021, 5:13 p.m.), https://twitter.com/MediaPostsDJ/status/1389372495749390337?s=20.

[PROPOSED] SECOND AMENDED COMPLAINT

Defendants, including, but not limited to, Teddy Fresh. Upon information and belief, Defendants would not have realized such profits but for their infringement on Plaintiff's rights. As such, Plaintiff is entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of the Broadcast, in an amount to be established at trial.

## COUNT TWO

### (Vicarious Copyright Infringement)

29. Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

30. Plaintiff is the copyright owner and publisher of the Broadcast. As the copyright owner and publisher of the Broadcast, Plaintiff has the exclusive right to copy, publicly perform and distribute the Broadcast. Plaintiff's rights include, but are not limited to, all moving images and other audio/video content which were broadcasted via encrypted satellite signal.

31. The Broadcast originated via satellite uplink and were subsequently retransmitted to cable systems and satellite companies via satellite signal and/or retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized, online platforms. The Broadcast was then made available to consumers for purchase on a pay-per-view basis.

32. Upon information and belief, on or about April 22, 2021, without requesting or receiving authorization, Defendants uploaded to YouTube all or a substantial portion of Broadcast, in unaltered form, as the Unlisted Video, and publicly displayed the URL for the Unlisted Video on the YouTube Channel in the Distribution Video. The URL for the Unlisted Video first appeared in the Distribution Video at approximately 1:29:29 and remained visible through at least approximately 1:30:58.

33. Upon information and belief, the Distribution Video has been viewed at least 1,000,000 times, and continues to receive additional views with each passing day.

34.     Upon information and belief, numerous individuals who had not purchased and did not purchase the Broadcast on a pay-per-view basis were able to, and did, freely view all or a substantial portion of the Broadcast, in unaltered form, via the Unlisted Video.

35.     Upon information and belief, Defendants created the Unlisted Video and had the exclusive right and ability to prevent consumers from accessing and viewing the Unlisted Video and thereby infringing on Plaintiff's rights.

36.     Upon information and belief, the H3 Podcast and YouTube Channel have profited from their unlawful conduct alleged herein, including via (i) the YouTube Partner Program, (ii) sponsorships from unaffiliated third-party individuals and entities, and (iii) the sale of merchandise through businesses affiliated with Defendants, including, but not limited to, Teddy Fresh.  Upon information and belief, Defendants would not have realized such profits but for their infringement on Plaintiff's rights.  As such, Plaintiff is entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of the Broadcast, in an amount to be established at trial.

## COUNT THREE

### (Violation of the Federal Communications Act, 47 U.S.C. § 605)

37.     Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

38.     Plaintiff is the copyright owner and publisher of the Broadcast.  As the copyright owner and publisher of the Broadcast, Plaintiff has the exclusive right to copy, publicly perform and distribute the Broadcast.  Plaintiff's rights include, but are not limited to, all moving images and other audio/video content which were broadcasted via encrypted satellite signal.

39.     The Broadcast originated via satellite uplink and were subsequently retransmitted to cable systems and satellite companies via satellite signal and/or

retransmitted via satellite signal to licensed content distributors such as Plaintiff's authorized, online platforms. The Broadcast was then made available to consumers for purchase on a pay-per-view basis.

40. Consumers who purchased the Broadcast on a pay-per-view basis were expressly and unequivocally advised that the "unauthorized reproduction or distribution of the copyrighted work is illegal."

41. Upon information and belief, with full knowledge that the Broadcast was not to be received, distributed, reproduced and or publicly exhibited by individuals unauthorized to do so, Defendants, without authorization from Plaintiff, unlawfully intercepted, received and/or de-scrambled Plaintiff's satellite signal for purposes of direct commercial advantage. Specifically, Defendants unlawfully obtained access to the Broadcast[3], and on or about April 22, 2021, without requesting or receiving authorization, Defendants uploaded to YouTube all or a substantial portion of Broadcast, in unaltered form, as the Unlisted Video. Defendants subsequently publicly displayed the URL for the Unlisted Video on the YouTube Channel in the Distribution Video.

42. Upon information and belief, the Distribution Video has been viewed at least 1,000,000 times, and continues to receive additional views with each passing day.

43. Upon information and belief, numerous individuals who had not purchased and did not purchase the Broadcast on a pay-per-view basis were able to, and did, freely view all or a substantial portion of the Broadcast, in unaltered form, via the Unlisted Video.

44. Upon information and belief, the H3 Podcast and YouTube Channel have profited from their unlawful conduct alleged herein, including via (i) the YouTube Partner Program, (ii) sponsorships from unaffiliated third-party individuals and entities, and (iii) the sale of merchandise through businesses affiliated with

---

[3] *See* DJ Screwdriver Media Posts (@MediaPostsDJ), Twitter (May 3, 2021, 5:13 p.m.), https://twitter.com/MediaPostsDJ/status/1389372495749390337?s=20.

[PROPOSED] SECOND AMENDED COMPLAINT

Defendants, including, but not limited to, Teddy Fresh. Upon information and belief, Defendants would not have realized such profits but for their infringement on Plaintiff's rights. As such, Plaintiff is entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of the Broadcast, in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

AS TO COUNT ONE:

45. That Defendants and Defendants' employees, representatives, and agents be enjoined from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast;

46. That Plaintiff be awarded all profits of Defendants plus all losses of Plaintiff, the exact sum to be proven at the time of trial, or statutory damages in the amount of $150,000 per violation; and

47. That an order be issued requiring Defendants to account to Plaintiff for profits attributable to their use of Plaintiff's copyright, in accordance with proof.

AS TO COUNT TWO:

48. That Defendants and Defendants' employees, representatives, and agents be enjoined from copying, uploading, distributing, selling, or otherwise infringing on Plaintiff's copyright in the Broadcast;

49. That Plaintiff be awarded all profits of Defendants plus all losses of Plaintiff, the exact sum to be proven at the time of trial, or statutory damages in the amount of $150,000 per violation; and

50. That an order be issued requiring Defendants to account to Plaintiff for profits attributable to their use of Plaintiff's copyright, in accordance with proof.

AS TO COUNT THREE:

51. For statutory penalties in an amount, in the discretion of this Court, of up to the maximum amount of $110,000.00, for Defendants' willful violations of 47

U.S.C. § 605(a).

AS TO ALL COUNTS:

52.     For pre-judgment and post-judgment interest on all damages awarded;

53.     For attorneys' fees and costs of suit incurred herein according to proof; and

54.     For such other and further relief as the Court may deem just and proper.

Dated:  July 12, 2021                 NOVIAN & NOVIAN, LLP
                                      Attorneys at Law

                              By:     /s/ **DRAFT**_____
                                      FARHAD NOVIAN
                                      MICHAEL O'BRIEN
                                      ALEXANDER BRENDON GURA

                                      *Attorneys for Plaintiff TRILLER FIGHT*
                                      *CLUB II LLC*

# EXHIBIT O

Electronically FILED by Superior Court of California, County of Los Angeles on 07/19/2021 03:48 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariscal,Deputy Clerk

21SMCV01225

Assigned for all purposes to: Santa Monica Courthouse, Judicial Officer: Mark Epstein

FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
MICHAEL O'BRIEN (SBN 277244)
michaelo@novianlaw.com
LAUREN WOODLAND (SBN 283052)
laurenw@novianlaw.com
ALEXANDER BRENDON GURA (SBN 305096)
gura@novianlaw.com
NOVIAN & NOVIAN, LLP
1801 Century Park East, Suite 1201
Los Angeles, California 90067
Telephone:   (310) 553-1222
Facsimile:    (310) 553-0222

*Attorneys for Plaintiff Triller, LLC*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TRILLER, LLC, a Delaware limited liability company, | CASE NO: |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| TED ENTERTAINMENT, INC., a California corporation; TEDDY FRESH, INC., a California corporation; ETHAN KLEIN, an individual; HILA KLEIN, an individual; and DOES 1-500, inclusive, | |
| Defendants. | |

## **NATURE OF THE ACTION**



1.     In April 2021, Defendant Ethan Klein ("Defendant" or "Mr. Klein") publicly admitted that he "bootlegged" or "pirated" certain copyrighted materials belonging to Triller Fight Club II LLC ("Fight Club").[1]  In response, and to protect its valuable copyright rights and other business interests, Fight Club filed a lawsuit against Mr. Klein, Hila Klein ("Mrs. Klein"), Ted Entertainment, Inc. ("TEI"), and others, in the United Stated District

---

[1] DJ Screwdriver Media Posts (@MediaPostsDJ), TWITTER (May 3, 2021, 5:13 p.m.), https://twitter.com/MediaPostsDJ/status/1389372495749390337?s=20.

Court for the Central District of California (the "Copyright Action").[2]

2.     To detract attention from the Copyright Action, and in a deeply misguided attempt to exact revenge for the Copyright Action, and to gain an unfair advantage in the highly competitive entertainment industry, Defendants Mr. Klein, Mrs. Klein, TEI, Teddy Fresh, Inc. ("Teddy Fresh"), and Does 1-500 (together with Mr. Klein, Mrs. Klein, TEI, and Teddy Fresh, "Defendants") announced that they were "going to war"[3] with certain affiliates of Fight Club, including Triller, LLC ("Triller" or "Plaintiff") and Ryan Kavanaugh.   In furtherance of that war, Defendants specifically instructed their rabid fans—known as "foot soldiers"—to leave thousands of negative, so-called "troll"[4] reviews for Triller's eponymous app (the "App") on the Apple App Store and Google Play Store, among other places.

3.     As part of their unlawful conspiracy, Defendants recorded and published to their YouTube channel and millions of subscribers at least four videos which contained false, misleading, and malicious allegations concerning Triller and Mr. Kavanaugh, and encouraged their foot soldiers to leave one-star reviews of the App.   Defendants' foot soldiers heeded Defendants' call, as they have before,[5] and in the weeks since Defendants kicked off their unlawful campaign, the App has received *thousands* of one-star reviews on the Apple App Store and Google Play Store.   These reviews are notable and clearly

---

[2] *See Triller Fight Club II LLC v. Ted Entertainment, Inc., et al.*, United States District Court for the Central District of California, Case No. 2:21-cv-03502-PA-RAO.

[3] *See And The Number Of Babies Is… -- H3 After Dark # 40*, H3 Podcast, YOUTUBE (Jun. 11, 2021), *available at*   https://youtu.be/uvc-dX0fG3s, at 4:40-4:45 (stating "***this is the guy I'm going to war with now***" while showing results of Google search for "Ryan Kavanaugh").

[4] To "troll" something or someone is "to write false or offensive messages on the internet in order to make other people angry."  (*Troll*, OXFORD LEARNER'S DICTIONARIES (Jul. 19, 2021), *available at* https://www.oxfordlearnersdictionaries.com/us/definition/english/troll_2.)

[5] *YouTubers are reporting that Old Spice dropped its sponsorship of h3h3's Ethan Klein amid a brewing troll war with Keemstar*, Kat Tenbarge, BUSINESS INSIDER (May 22, 2020), *available at* https://www.businessinsider.com/ethan-klein-h3h3-keemstar-old-spice-sponsorship-productions-feud-2020-5.

traceabale to Defendants because they are completely at odds with the reviews the App received for more than five years, and each of them explicitly parrots and implicitly references Defendants and Defendants' false, misleading, and malicious allegations concerning Triller and Mr. Kavanaugh.

4. Defendants have advanced their scheme via various social media platforms, including, but not limited to, Defendants' dedicated forum on Reddit.com, a popular social news aggregator (the "H3 Subreddit"). Upon information and belief, Defendants and/or Defendants' employees "moderate," and thereby control the posts to and content of, the H3 Subreddit.

5. For example, in May 2021, Reddit user "u/ConversationActual77" posted to the H3 Subreddit: "***Take down Triller*** . . . ***Let's all rate triller a 1 on the App Store*** for being greedy little fucks."[6] On or about July 2, 2021, Reddit user "u/2POKUS2" posted to the H3 Subreddit: "FOOTSOLDIERS***, TIME TO BANK DOWN TRILLER APP***. ***Called by the king himself***!"[7] On or about July 8, 2021, Reddit user "u/dontblameme_13" posted to the H3 Subreddit: "FOOT 🤙 SOLDIERS ⬛ ASSEMBLE 🔪🚀 ***TANK THE TRILLER APP***!! WE CAN DO BETTER THAN THIS!!!!"[8] On or about July 11, 2021, Reddit user "u/Necessary_Yak_3918" posted to the H3 Subreddit the following image[9]:

---

[6] *Take down Triller*, u/ConversationActual77, REDDIT (May 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/n4roow/take_down_triller/?utm_source=share&utm_medium=web2x&context=3.

[7] *FOOTSOLDIERS, TIME TO BANK DOWN TRILLER APP. Called by the king himself!*, u/2POKUS2, REDDIT (Jul. 2, 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/obfd2g/footsoldiers_time_to_bank_down_triller_app_called/?utm_source=share&utm_medium=web2x&context=3.

[8] *FOOT 🤙 SOLDIERS □ ASSEMBLE 🔪🚀 TANK THE TRILLER APP!! WE CAN DO BETTER THAN THIS!!!!*, u/dontblameme, REDDIT (Jul. 8, 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/ofy8rh/foot_soldiers_assemble_tank_the_triller_app_we/?utm_source=share&utm_medium=web2x&context=3.

[9] *In these trying times, we must do what needs to be done!*, u/Necessary Yak3918, REDDIT (Jul. 11, 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/ohwds9/in_these_trying_times_we_must_do_what_needs_to_be/?utm_source=share&utm_medium=web2x&context=3.



6.      The scare quotes surrounding the word "honest" utterly belie any defense that this post encouraged legitimate users of the App to leave good faith reviews based upon their actual exerpiences using the App.  Defendants' social media activity establishes an overwhelming record to the contrary.

7.      To date, Defendants have succeeded in artificially lowering the App's rating—not based on actual user experiences, but based entirely on Defendants' unlawful conduct.  Indeed, on or about July 11, 2021, Reddit user "u/MrsRodrickHeffley" posted to the H3 Subreddit:  "***TRILLER WENT DOWN .1 STARS IN THE APP STORE keep up***

*the honest reviews footsoldiers*[.]"[10]

8.    Defendants' unlawful conduct described herein has caused and will continue to cause Triller tremendous general and special harm. Triller institutes this action to put a halt to and seek redress for Defendants' unlawful conduct.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over Defendants because Defendants are citizens of the State of California.

10.    Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this county, and because Defendants' unlawful actions were directed at this county.

## PARTIES

11.    Triller is a limited liability company incorporated under the laws of Delaware and having its principal place of business in the State of California. Triller owns and operates the App.

12.    TEI is a corporation registered to conduct business in the State of California. Upon information and belief, TEI owns and operates, among other things, the so-called H3 Podcast (the "H3 Podcast") and the YouTube channel located at https://www.youtube.com/channel/UCLtREJY21xRfCuEKvdki1Kw (the "YouTube Channel"). Upon information and belief, the H3 Podcast and YouTube Channel earn profits, including via (i) the YouTube Partner Program, (ii) sponsorships from unaffiliated third-party individuals and entities, and (iii) the sale of merchandise through businesses affiliated with Defendants, including, but not limited to, Teddy Fresh.

13.    Defendants use The H3 Podcast to generate controversy, including by intentionally making incendiary and malicious comments about others, thereby driving

---

[10] *TRILLER WENT DOWN .1 STARS IN THE APP STORE keep up the honest reviews footsoldiers*, u/MrsRodrickHeffley, REDDIT (Jul. 11, 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/ohxlu3/triller_went_down_1_stars _in_the_app_store_keep/?utm_source=share&utm_medium=web2x&context=3.

views to Defendants' monetized websites and social media accounts. For example, in a 2017 profile by Vice News, Mr. Klein argued that it was acceptable to use the N-word, stating "[i]t's all about intent" and reasoning that "[w]hen iDubbbz comes on, he says '[n-word][11] [f-word]'[12], but he's using it contextually."[13] Later, in 2019, Mr. Klein announced on The H3 Podcast: "I'm just going to say it right now, I don't like K-pop. I hate K-pop. I don't get BTS. How did this become a thing in Western culture, where all these grown men and little girls are jerking off to K-pop boys? It's like a little fetish. It's like a little twink, gay fetish about these K-pop boys."[14] The same late 2019 article reporting on Mr. Klein's homophobic and racist remarks noted that Mr. Klein had previously posted on Twitter: "I love that I can just say [n-word] [f-word], though ... Like how could—I couldn't really say that, [n-word] [f-word]. So wonderful."[15]

14.     Teddy Fresh is a corporation registered to conduct business in the State of California. Upon information and belief, Teddy Fresh is a clothing retailer. The YouTube Channel and/or videos posted to the YouTube Channel contain links to a website owned and/or operated by Teddy Fresh and through which consumers can purchase Teddy Fresh merchandise all for the benefit of the Mr. and Mrs. Klein.

15.     Mr. Klein is an individual residing in the State of California. Mr. Klein is the Chief Executive Officer of TEI, the Secretary of Teddy Fresh, and a host of the H3 Podcast.

16.     Mrs. Klein is an individual residing in the State of California. Mrs. Klein is the Secretary of TEI, the Chief Executive Officer, Chief Financial Officer, and sole director

---

[11] A derogatory slur for African-Americans.
[12] A derogatory slur for gay men.
[13] *H3H3 Productions Are the Married Couple Calling Bullshit on YouTube*, Joe Bish, Vice (Feb. 28, 2017
[14] *Ethan Klein Accused of Racism and Homophobia after Calling K-pop a "Little Twink, Gay Fetish"*, Cory Roy, ROGUE ROCKET (Dec. 9, 2019), *available at* https://roguerocket.com/2019/12/09/ethan-klein-bts/.
[15] *Ethan Klein Accused of Racism and Homophobia after Calling K-pop a "Little Twink, Gay Fetish"*, Cory Roy, ROGUE ROCKET (Dec. 9, 2019), *available at* https://roguerocket.com/2019/12/09/ethan-klein-bts/.

of Teddy Fresh, and a host of the H3 Podcast.

## **<u>ALTER EGO ALLEGATIONS</u>**

17.     Upon information and belief, at all relevant times, there existed a unity of interest between Defendants such that any individuality or separateness between them has ceased.  TEI and Teddy Fresh are the alter egos of Mr. Klein and Mrs. Klein in that:

    a.  TEI and Teddy Fresh are, and at all relevant times were, mere shells, instrumentalities, and conduits through which Mr. Klein and Mrs. Klein carried on business in the name of TEI and Teddy Fresh, while exercising complete control and dominance over TEI and Teddy Fresh, their business and assets, to such an extent that any individuality or separateness between TEI and Teddy Fresh, on the one hand, and Mr. Klein and Mrs. Klein, on the other, did not exist.

    b.  TEI and Teddy Fresh were conceived, intended, and used by Mr. Klein and Mrs. Klein as a device to avoid liability and for the purpose of substituting an undercapitalized entity—namely, TEI and Teddy Fresh—in the place of Mr. Klein and Mrs. Klein.  TEI and Teddy Fresh are, and at all times herein mentioned were, so inadequately capitalized that, compared with the business done by Mr. Klein and Mrs. Klein and the risks of loss, their capitalization was illusory and trifling.  In addition, many assets of TEI and Teddy Fresh were transferred without adequate consideration to Mr. Klein and Mrs. Klein.

    c.  Mr. Klein and Mrs. Klein diverted assets from TEI and Teddy Fresh to themselves to suit their own convenience in carrying out business matters which were and should have been the domain of TEI and Teddy Fresh.

    d.  TEI and Teddy Fresh are, and at all times herein mentioned were, controlled, dominated, and operated by Mr. Klein and Mrs. Klein as their alter ego, in that the activities and business of TEI and Teddy Fresh were carried out without annual meetings, and without keeping records or

minutes of any proceedings, or maintaining written resolutions.

18.     Adherence to the fiction of the separate existence of TEI and Teddy Fresh, on the one hand, and Mr. Klein and Mrs. Klein, on the other, would permit an abuse of the corporate privilege and would sanction fraud, promote injustice, and otherwise aid in the commission of unlawful conduct.  This is true because, as Plaintiff is informed and believes, at all relevant times, Defendants were commingling assets in a manner that allowed Defendants to utilize and freely transfer those assets amongst themselves.  The commingling of assets and unlawful business conduct, as alleged more fully herein, by Defendants was intended, among other things, to allow Mr. Klein and Mrs. Klein to avoid liability to Plaintiff and others.

## FACTUAL ALLEGATIONS

19.     Triller is a provider of various entertainment and social-media products and services.  Among other things, Triller owns and operates the App, a popular mobile application that allows users to share information and communicate with each other regarding music.

20.     Fight Club, an affiliate of Triller, is the copyright owner and publisher of the Triller Fight Club broadcast of the "Jake Paul vs. Ben Askren" boxing event, including all undercard bouts and the entire television broadcast, exhibited via closed circuit television and via encrypted satellite signal (the "Broadcast").  As a result of, *inter alia*, Defendants' public admission that they unlawfully "bootlegged" or "pirated" the Broadcast[16] and encouragement and facilitation of similar unlawful conduct, Fight Club initiated the Copyright Action.

21.     In response to and retaliation for the Copyright Action, on or about June 11, 2021, Defendants recorded and published to the YouTube Channel, which Defendants own, operate, and control, a series of videos (the "Videos"), including:

a.     *And The Number Of Babies Is… -- H3 After Dark # 40*, H3 Podcast,

---

[16] DJ Screwdriver Media Posts (@MediaPostsDJ), TWITTER (May 3, 2021, 5:13 p.m.), https://twitter.com/MediaPostsDJ/status/1389372495749390337?s=20.

YOUTUBE (Jun. 11, 2021), *available at* https://youtu.be/uvc-dX0fG3s.

   b. *Trisha's Apology & Ace Family Scam – Off The Rails # 3*, H3 Podcast, YOUTUBE (Jul. 1, 2021), *available at* https://youtu.be/6kNZujESbNI).

   c. *James Charles Returns & Baby Update – H3 After Dark # 43*, H3 Podcast, YOUTUBE (Jul. 2, 2021), *available at* https://youtu.be/lw8E6x_tiQE.

   d. *The Biggest Scam In YouTube History – Off The Rails # 4*, H3 Podcast, YOUTUBE (Jul. 8, 2021), *available at* https://youtu.be/iBXtS72EGcM.

22.    In the Videos, Defendants make false, misleading, and malicious statements concerning Triller and Mr. Kavanaugh, including: (i) that Triller is, and Mr. Kavanaugh runs, a Ponzi scheme; (ii) that Triller falsely represented that comedian Kevin Hart uses the App; (iii) that the App is "flipped"; and (iv) that Mr. Kavanaugh bears a physical resemblance to Harvey Weinstein, a notorious, convicted sexual predator.  Defendants also state that Mr. Kavanaugh is suing them.  Mr. Kavanaugh has never sued Defendants.

23.    In the Videos, Defendants misrepresent a June 7, 2019, article in Variety magazine (the "Variety Article"), and claim that the Variety Article supports their statements that Triller is, and Mr. Kavanaugh runs, a Ponzi scheme.  Defendants' statements that Triller is, and Mr. Kavanaugh runs, a Ponzi scheme, are false, misleading, and malicious, as Defendants know.  Indeed, the Variety Article Defendants purportedly base their false, misleading, and malicious statements upon neither mentions nor references Triller, and expressly and unambiguously disavows any claims regarding a Ponzi scheme (the "Retraction").  The Retraction, which is contained within the Variety Article itself, states, in pertinent part:

> ***Spar apparently has some regrets as well, saying that Kavanaugh is not really running a Ponzi scheme***, as he alleged in his suit, which is also posted below.
>
> "Ryan has been funding the ESX operation himself," Spar said.
> "***To my knowledge based on information provided to me, Ryan has and is investing heavily in this business and any reference***

**to ESX or any related business as a 'Ponzi Scheme' is not accurate**.  He is a visionary thinker and I wish him the best of luck in his future endeavors.  He and I have no remaining disputes."

24.  In the Videos, Defendants encourage viewers and fans of the H3 Podcast— aka "foot soldiers"—to leave one-star ratings for the App *en masse*.  For example, in one Video, Mr. Klein states: "So, I've been having fun looking up Triller.  ***Like if you go to the app store, I gave them one star by the way just because I didn't have a positive experience***.  Yeah, but people should judge for themselves.  ***Go download the app and leave a review***."  Thereafter, Defendants show on the screen and read to viewers purported reviews of the App, some of which they themselves wrote.  Nearly all of these reviews parrot Defendants' false, misleading, and malicious statements concerning Triller and Mr. Kavanaugh.

25.  During the July 8, 2021 Video, Mr. Klein appears before a background that contains, among other things, a review for the App left by "Ethan K.", i.e., Mr. Klein (the "Ethan K. Review").  The Ethan K. Review states:

> Using Triller has been one of the worst experiences of my life.
> I would rather get a colonoscopy from a chain link fence over having to use this software one more time.  I would rather get e. coli from a dirty sanchez on a scorching day in Death Valley instead of trying to operate this TikTok knockoff ever again.  I would rather listen to David Dobrik's Luciferian demon laughter play on a loop as my ears bleed in some sort of Hellish vlog night terror I can't wake up from instead of logging into the Triller app.
> Also, I heard that Ryan was involved in a Ponzi scheme according to his former business partner (allegedly).  1 star app

26.  Defendants go on to incite their foot soldiers, exorting them by stating "***I'll be checking in on the Triller reviews***," and asking that foot soldiers "***try the App, see how it***

*goes, and give it one star*.  Or more.  [Laughter.]  One, or more, stars.  Some amount of stars between one star and up to maybe five stars.  ***Download Triller and rate it one star***. Or more.  [Laughter.]  That's what I did."

27.     Although Defendants state that "we do not condone and we do not encourage troll reviews like this one,"  Defendants' visible and audible laughter while making the aforementioned statement, coupled with Defendants' promotion of various supposed "troll reviews" and promise to continue "***checking in on the Triller reviews***" and "***be back . . . every episode . . . to review the reviews***," reveals Defendants true motivation:  to inspire foot soldiers to leave troll reviews.  Indeed, just seconds after purporting to disavow troll reviews, Defendants joked that their "'foot soldiers' would never brigade[17] such a website on command of their, uh…  There's no precedent for that.  How did we get that name again?"

28.     Upon information and belief, there is substantial precedent for Defendants' foot soldiers brigading websites on Defendants' command.  Indeed, approximately one year ago, Business Insider reported that "Old Spice dropped its sponsorship of h3h3's Ethan Klein amid a brewing troll war with Keemstar."[18]  As Business Insider reported, following a spat between Mr. Klein and Keemstar, another YouTube content creator,

---

[17]  As one article notes:  "'Brigading' is a term that originated on Reddit for a coordinated attack by a group of users of an antagonistic subreddit (forum dedicated to a particular topic).  The brigade would privately agree to "downvote" comments, either on a random or targeted basis, to deprioritise them in users' feeds and effectively censor them.  The meaning of the term expanded to cover all coordinated voting behaviour to make something or someone seem more or less popular than they actually are, and now it means all coordinated abusive engagement behaviour online.  This engagement can come in the form of retweets, comments, quote retweets, email campaigns and more."  *Social Media Futures:  What Is Brigading?*, Phoenix CS Andrews, TONY BLAIR INSTITUTE FOR GLOBAL CHANGE (Mar. 10, 2021), *available at* https://institute.global/policy/social-media-futures-what-brigading.

[18]  *YouTubers are reporting that Old Spice dropped its sponsorship of h3h3's Ethan Klein amid a brewing troll war with Keemstar*, Kat Tenbarge, BUSINESS INSIDER (May 22, 2020), *available at* https://www.businessinsider.com/ethan-klein-h3h3-keemstar-old-spice-sponsorship-productions-feud-2020-5.

"Klein went on to produce a video about Keem titled 'Content Nuke' that accused Keem of lying about Klein committing fraud, and additionally compiled examples of Keem's offensive past behavior, including a controversial interview with a YouTuber who would later die by suicide, where Keem appeared to suggest jumping off a bridge." Business Insider further reported that "[a]fter 'Content Nuke' debuted, G Fuel's [(a longtime sponsor of Keemstar)] social media profiles were spammed with comments asking for the energy drink company to end its sponsorship of Keem."[19]

29.    Defendants plainly sought to lead by example, including by posting their false, misleading, and malicious allegations on various social media outlets, including Twitter, Instagram, and the H3 Subreddit.

     a.  In May 2021, Reddit user "u/ConversationActual77" posted to the H3 Subreddit:  "Take down Triller . . . ***Let's all rate triller a 1 on the App*** Store for being greedy little fucks."[20]

     b.  On or about July 2, 2021, Reddit user "u/2POKUS2" posted to the H3 Subreddit:  "FOOTSOLDIERS, ***TIME TO BANK DOWN TRILLER APP. Called by the king himself***!"[21]

     c.  On or about July 8, 2021, Reddit user "u/dontblameme_13" posted to the H3 Subreddit: "FOOT 🧦 SOLDIERS ⬛ ASSEMBLE ✏️🖍️ ***TANK THE***

---

[19] *YouTubers are reporting that Old Spice dropped its sponsorship of h3h3's Ethan Klein amid a brewing troll war with Keemstar*, Kat Tenbarge, Business Insider (May 22, 2020), *available at* https://www.businessinsider.com/ethan-klein-h3h3-keemstar-old-spice-sponsorship-productions-feud-2020-5.

[20] *Take down Triller*, u/ConversationActual77, Reddit (May 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/n4roow/take_down_triller/?utm_source=share&utm_medium=web2x&context=3.

[21] *FOOTSOLDIERS, TIME TO BANK DOWN TRILLER APP. Called by the king himself!*, u/2POKUS2, Reddit (Jul. 2, 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/obfd2g/footsoldiers_time_to_bank_down_triller_app_called/?utm_source=share&utm_medium=web2x&context=3.

*TRILLER APP*!! WE CAN DO BETTER THAN THIS!!!!"[22]

    d. On or about July 11, 2021, Reddit user "u/MrsRodrickHeffley" posted to the H3 Subreddit:  "*TRILLER WENT DOWN .1 STARS IN THE APP STORE keep up the honest reviews footsoldiers*[.]"[23]

30.    Defendants' foot soldiers listened to and followed Defendants' instructions. In the weeks since Defendants published the Videos, thousands of new reviews have been left for the App on the Apple App Store and Google Play Store—far more than the number of reviews left during the entire month of June, all of which were positive.  Moreover, nearly all of these new reviews explicitly and implicitly reference Defendants and parrot the same false, misleading, and malicious claims about Triller and Mr. Kavanaugh asserted by Defendants in the Videos.  Upon information and belief, these purported reviews of the App were authored by Defendants themselves and/or individuals who were following Defendants' instructions, and were not based on actual good faith experiences with the App.

31.    As a result of Defendants' false, misleading and malicious statements and other unlawful conduct described herein, Triller has suffered damages, including, but not limited to, lost opportunities and revenues.

32.    Reasonable persons would look down upon Defendants' contemptible, despicable, and malicious conduct alleged herein.  Defendants' contemptible, despicable, and malicious conduct alleged herein was undertaken with knowledge of, wilful and wanton disregard for, the probable and dangerous consequences thereof.  Consequently, Plaintiffs pray for an award of punitive damages.

---

[22] *FOOT 🟡 SOLDIERS □ ASSEMBLE 🔪🧨 TANK THE TRILLER APP!! WE CAN DO BETTER THAN THIS!!!!*, u/dontblameme, REDDIT (Jul. 8, 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/ofy8rh/foot_soldiers_assemble_tank_the_triller_app_we/?utm_source=share&utm_medium=web2x&context=3.

[23] *TRILLER WENT DOWN .1 STARS IN THE APP STORE keep up the honest reviews footsoldiers*, u/MrsRodrickHeffley, REDDIT (Jul. 11, 2021), *available at* https://www.reddit.com/r/h3h3productions/comments/ohxlu3/triller_went_down_1_stars_in_the_app_store_keep/?utm_source=share&utm_medium=web2x&context=3.

## FIRST CAUSE OF ACTION

### Intentional Interference with Existing Economic Relationships

### (Against All Defendants)

33.     Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

34.     Triller is a popular video-sharing social networking service app and has numerous existing economic relationships and business opportunities within the industry, including with users of the App.

35.     Defendants, at all relevant times, were aware of Triller's status as a popular video-sharing social networking service app and its existing economic relationships and business opportunities within the industry.

36.     Defendants engaged in the conduct described herein with the intent to interfere with Plaintiff's existing economic relationships and business opportunities within the industry.

37.     As a result of Defendants' actions, Plaintiff has lost certain existing economic relationships and business opportunities within the industry, including with users of the App.

38.     As a result of Defendants' actions, Plaintiff has suffered actual damages estimated to be in the tens of millions of dollars, and in an amount to be proven at trial.

39.     Defendants intended to injure Plaintiff, were motivated by spite or ill will, acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure Plaintiff, and consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff.

## SECOND CAUSE OF ACTION

### Intentional Interference with Prospective Economic Relationships

### (Against All Defendants)

40.     Plaintiff hereby realleges, and by this reference incorporates herein, each and

every allegation of preceding and subsequent paragraphs as though fully set forth herein.

41.    Triller is a popular video-sharing social networking service app and has numerous prospective economic relationships and business opportunities within the industry, including with potential users of the App.

42.    Defendants, at all relevant times, were aware of Triller's status as a popular video-sharing social networking service app and its prospective economic relationships and business opportunities within the industry.

43.    Defendants engaged in the conduct described herein with the intent to interfere with Plaintiff's prospective economic relationships and business opportunities within the industry.

44.    As a result of Defendants' actions, Plaintiff has lost certain prospective economic relationships and business opportunities within the industry, including with potential users of the App.

45.    As a result of Defendants' actions, Plaintiff has suffered actual damages estimated to be in the tens of millions of dollars, and in an amount to be proven at trial.

46.    Defendants intended to injure Plaintiff, were motivated by spite or ill will, acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure Plaintiff, and consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff.

## THIRD CAUSE OF ACTION

### Negligent Interference with Existing Economic Relationships

### (Against All Defendants)

47.    Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

48.    Triller is a popular video-sharing social networking service app and has numerous existing economic relationships and business opportunities within the industry, including with users of the App.

49.     Defendants, at all relevant times, were aware of Triller's status as a popular video-sharing social networking service app and its existing economic relationships and business opportunities within the industry.

50.     Defendants knew or should have known that their actions would disrupt Plaintiff's numerous existing economic relationships and business opportunities within the industry.

51.     Defendants failed to exercise reasonable care when engaging in the actions described herein.

52.     Defendants' actions have disrupted Plaintiff's numerous existing economic relationships and business opportunities within the industry, including with users of the App.

53.     As a result of Defendants' actions, Plaintiff has suffered actual damages estimated to be in the tens of millions of dollars, and in an amount to be proven at trial.

54.     Defendants intended to injure Plaintiff, were motivated by spite or ill will, acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure Plaintiff, and consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff.

## FOURTH CAUSE OF ACTION

### Negligent Interference with Prospective Economic Relationships

### (Against All Defendants)

55.     Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

56.     Triller is a popular video-sharing social networking service app and has numerous prospective economic relationships and business opportunities within the industry, including with potential users of the App.

57.     Defendants, at all relevant times, were aware of Triller's status as a popular video-sharing social networking service app and its prospective economic relationships and

business opportunities within the industry.

58. Defendants knew or should have known that their actions would disrupt Plaintiff's numerous prospective economic relationships and business opportunities within the industry.

59. Defendants failed to exercise reasonable care when engaging in the actions described herein.

60. Defendants' actions have disrupted Plaintiff's numerous prospective economic relationships and business opportunities within the industry, including with potential users of the App.

61. As a result of Defendants' actions, Plaintiff has suffered actual damages estimated to be in the tens of millions of dollars, and in an amount to be proven at trial.

62. Defendants intended to injure Plaintiff, were motivated by spite or ill will, acted to serve their own interests, having reason to know and consciously disregarding a substantial risk that their conduct might significantly injure Plaintiff, and consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Plaintiff.

## FIFTH CAUSE OF ACTION

### Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

### (Against All Defendants)

63. Plaintiff hereby realleges, and by this reference incorporates herein, each and every allegation of preceding and subsequent paragraphs as though fully set forth herein.

64. Business and Professions Code section 17200 *et seq.* (the "Unfair Competition Law" or "UCL") prohibits any unlawful, unfair, or fraudulent business act or practice, any unfair, deceptive, untrue, or misleading advertising, and any violation of Business and Professions Code section 17500 *et seq.*

65. Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices by, among other things, making and/or disseminating false, misleading, and deceptive statements concerning Plaintiff to the public.

66.     Defendants' conduct has caused, and absent immediate injunctive relief will continue to cause, significant irreparable harm as a result of Defendants' willful and malicious efforts to artificially lower the App's rating on the Apple App Store and Google Play Store.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

   a.  For actual damages according to proof including general and special damages;

   b.  For punitive damages;

   c.  For injunctive relief pursuant to Business and Professions Code § 17203;

   d.  For attorneys' fees and costs of suit; and

   e.  For such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


Dated:  July 19, 2021              NOVIAN & NOVIAN, LLP
                                   Attorneys at Law

                                   By:   /s/ Farhad Novian
                                         FARHAD NOVIAN
                                         MICHAEL O'BRIEN
                                         LAUREN WOODLAND
                                         ALEXANDER BRENDON GURA

                                         *Attorneys for Plaintiff Triller, LLC*

# EXHIBIT P



SINCE 1828



GAMES & QUIZZES THESAURUS WORD OF THE DAY FEATURES
- SHOP

Buying Guide ⧉ M-W Books ⧉

- LOG IN
- REGISTER

  settings log out
- MY WORDSMY WORDS

stream

dictionary
thesaurus

view recents

Log in Sign Up

Hello,
Games & Quizzes   Thesaurus   Word of the Day   Features   Buying Guide ⧉   M-W Books ⧉

- 🔖 My WordsMy Words
-   ▢ View Recents
-   ▢ Account

Log Out

# stream

noun

🔖 Save Word

To save this word, you'll need to log in.

Log In ⏺

\ ˈstrēm 🔊 \

## Definition of *stream*

(Entry 1 of 2)

1 : a body of running water (such as a river or creek) flowing on the earth also : any body of flowing fluid (such as water or gas)
2a : a steady succession (as of words or events) kept up an endless stream of chatter
b : a constantly renewed or steady supply a stream of revenue
c : a continuous moving procession a stream of traffic
d : digital data (such as audio or video material) that is continuously delivered one packet at a time and is usually intended for immediate processing or playback Having proved their popularity with American couch potatoes, digital video recorders (DVRs) are about to get a boost in features that will allow them to zap several video streams throughout networked homes.— Ed Frauenheim
3 : an unbroken flow (as of gas or particles of matter)
4 : a ray of light
5a : a prevailing attitude or group has always run against the stream of current fashion
b : a dominant influence or line of development the influence of two streams of inheritance: genetic and cultural— P. B. Baltes
6 British : track sense 5c

stream

verb

streamed; streaming; streams

Definition of *stream* (Entry 2 of 2)

intransitive verb

1a : to flow in or as if in a stream
b : to leave a bright trail a meteor streamed through the sky
2a : to exude a bodily fluid profusely her eyes were streaming
b : to become wet with a discharge of bodily fluid streaming with perspiration
3 : to trail out at full length her hair streaming back as she ran
4 : to pour in large numbers complaints came streaming in

transitive verb

1 : to emit freely or in a stream his eyes streamed tears
2 : to display (something, such as a flag) by waving
3 : to transfer (digital data, such as audio or video material) in a continuous stream especially for immediate processing or playback: such as
a : to watch a video on a streaming service … passed the time watching the same shows as he would have streamed at home.— Greg Egan
b : to broadcast a video for others to watch on a stream I went live, but there was no one in my room. Just me. Streaming myself live. Shirtless. To no one.— Will Dennis

⬇ Synonyms  ⬇ More Example Sentences  ⬇ Learn More About *stream*

Keep scrolling for more

## Synonyms for *stream*

Synonyms: Verb

- pour

Visit the Thesaurus for More ⊗

## Examples of *stream* in a Sentence

Noun A *stream* flows through the field. Verb Tears *streamed* down his cheeks.

See More ⊕⊖
Recent Examples on the Web: Noun With mixer on low speed, add olive oil in a slow, steady *stream*. — Kim Sunée, *Anchorage Daily News*, 2 Sep. 2021 As e-commerce grows, recovering the cardboard shipping boxes is critical to keeping the fiber in the recycling *stream*. — *Rolling Stone*, 1 Sep. 2021

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'stream.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors.
Send us feedback.

See More ⊕⊖

## First Known Use of *stream*

Noun

before the 12th century, in the meaning defined at sense 1

Verb

13th century, in the meaning defined at intransitive sense 1a



### History and Etymology for *stream*

Noun

Middle English *streme*, from Old English *strēam*; akin to Old High German *stroum* stream, Greek *rhein* to flow

Keep scrolling for more

### Learn More About *stream*

Share *stream*

Post the Definition of stream to Facebook          Share the Definition of stream on Twitter

Time Traveler for *stream*

### The first known use of *stream* was before the 12th century

See more words from the same century

From the Editors at Merriam-Webster

Live Stream

**Live Stream**

To stream digital data that is delivered continuously

### Dictionary Entries Near *stream*

streaky

stream

stream anchor

See More Nearby Entries

### Statistics for *stream*

Last Updated

5 Sep 2021

Look-up Popularity

Top 2% of words

Cite this Entry

"Stream." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/stream. Accessed 6 Sep. 2021.

**Style:** MLA
MLA ✓ Chicago ✓ APA ✓ Merriam-Webster ✓
Seen & Heard
People are talking about

AdChoices ▷          Sponsored



### What made you look up this word?

Please tell us where you read or heard it (including the quote, if possible).

🔔 Log In

Tell us here

Sort by **Best** ⌄

**RobertChristenbury** · 17 September, 2012                                                              ⋮

I wish to know how many ways streams can be used in writing poems.

Reply   👍  👎



ادانجمد · 21 July, 2013
What about this, I really don't know the meaning and here the dictionary tells nothing: "In
reality, a school system that streams pupils from a young age and only teaches for half the
day...."

Reply  👍  👎

**AngelaRiley** · 24 December, 2011

I am reading Rivers of Praise by Rachel L Moore, and found it necessary to see the
definition.

Reply  👍  👎

Show More Comments

Powered by ○ OpenWeb                                    Terms  |  Privacy  |  Feedback

Keep scrolling for more

More Definitions for *stream*

stream

noun


# English Language Learners Definition of *stream*

(Entry 1 of 2)

: a natural flow of water that is smaller than a river
: any flow of liquid or gas
: a continuous flow of people or things

stream

verb

English Language Learners Definition of *stream* (Entry 2 of 2)

: to move in a steady flow
: to produce a liquid continuously and often in large amounts
: to be or become wet *with* a liquid

See the full definition for *stream* in the English Language Learners Dictionary

stream

noun
\ ˈstrēm  \

# Kids Definition of *stream*

(Entry 1 of 2)

1 : a body of water (as a brook or river) flowing on the earth
2 : a flow of liquid or gas a *stream* of tears
3 : a steady series (as of words or events) following one another There was an endless *stream* of traffic.

stream

verb
streamed; streaming

Kids Definition of *stream* (Entry 2 of 2)

1 : to flow in or as if in a stream Rain was *streaming* down the windows.
2 : to give out a bodily fluid in large amounts His face *streamed* sweat.
3 : to become wet with flowing liquid The windows are *streaming* with rain.
4 : to trail out at full length Her hair *streamed* in the wind.
5 : to pour, enter, or arrive in large numbers The people *streamed* into the hall. Complaints were *streaming* in.
6 : to transfer (data, as music or videos) in a continuous stream especially to be played immediately

stream

noun
\ ˈstrēm 🔊 \

# Medical Definition of *stream*

: an unbroken current or flow (as of water, a bodily fluid, or a gas) — see bloodstream, midstream

More from Merriam-Webster on *stream*

Nglish: Translation of *stream* for Spanish Speakers

Britannica English: Translation of *stream* for Arabic Speakers

Britannica.com: Encyclopedia article about *stream*

Comments on *stream*

What made you want to look up *stream*? Please tell us where you read or heard it (including the quote, if possible).



**WORD OF THE DAY**

———

## coiffure 

See Definitions and Examples »

Get Word of the Day daily email!

Your email address        SUBSCRIBE

**Test Your Vocabulary**

Difficult Spelling Words Quiz

- 
  Spell the correct HELP?!

| accomodate | acommdate |
|---|---|
| acommodate | accommodate |

 Test your knowledge - and maybe learn something along the way.

TAKE THE QUIZ


Anagram puzzles meet word search.

### Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED

---

WORDS AT PLAY

**"In Vino Veritas" and Other Latin Phrases to Live By**

Top 10 Latin Phrases

**10 Words for Uncommon Colors**

Color names taken from paintings, flowers, fleas …

**Word Well Used: 'Recontextualize'**

Vocab + Margaritas

**A Thoughtful Guide to Words About Nonsense**

Buffoonery, Codswallop & More

---

ASK THE EDITORS

**'Everyday' vs. 'Every Day'**

A simple trick to keep them separate …

**What Is 'Semantic Bleaching'?**

How 'literally' can mean "figuratively" …

**Literally**

How to use a word that (literally) drives some pe…

**Is Singular 'They' a Better Choice?**

The awkward case of 'his or her'

---

WORD GAMES

**Name that Thing: Summery Foods**

**August 2021 Words of the Day Quiz**

**True or False?**

**SCRABBLE® Sprint**

A seasonal quiz of hot weather eats

How many do you remember?

Test your knowledge - and m
learn something a...

`

SCRABBLE® fans, sharpen
skills!

...

**TAKE THE QUIZ**

**TAKE THE QUIZ**

**TAKE THE QUIZ**

**PLAY THE GAME**



Learn a new word every day.
Delivered to your inbox!

Your email address

SUBSCRI   >

OTHER MERRIAM-WEBSTER DICTIONARIES

- LEARNER'S ESL DICTIONARY
- VISUAL DICTIONARY
- SCRABBLE® WORD FINDER

- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
- BRITANNICA ENGLISH - ARABIC TRANSLATION
- NGLISH - SPANISH-ENGLISH TRANSLATION

FOLLOW US

Browse the Dictionary:  A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  Q  R  S  T  U  V  W  X  Y  Z  0-9

Home  I  Help  I  Apps  I  About Us  I  Shop  I  Advertising Info  I  Dictionary API  I  Contact Us  I  Join MWU  I  Videos  I
Word of the Year  I  Puku  I  Vocabulary Resources  I  Law Dictionary  I  Medical Dictionary  I  Privacy Policy  I  Terms of Use  I
Do Not Sell My Info

Browse the Thesaurus  I   Browse the Medical Dictionary  I   Browse the Legal Dictionary

© 2021 Merriam-Webster, Incorporated