UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| T. Jackson-Terrell | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE DEFENDANTS' MOTION TO DISMISS CASE PURSUANT TO FED. R. CIV. P. 12(B)(6) (DKT. 26)**

## I. Introduction

On May 10, 2021, Triller Fight Club II LLC ("Plaintiff") brought this action alleging an unlawful YouTube broadcast of a boxing event hosted by Plaintiff. Dkt. 1. On July 23, 2021, Plaintiff filed a Second Amended Complaint ("SAC"), which is the operative one, against Hila Klein ("H. Klein"), Ethan Klein ("E. Klein"), Ted Entertainment, Inc. ("TEI"), Teddy Fresh Inc. ("Teddy Fresh") and Does 1-10 (collectively "Defendants"). Dkt. 24. The SAC advances three causes of action: (1) copyright infringement; (2) vicarious copyright infringement; and (3) violation of the Federal Communications Act, 47 U.S.C. § 605 (the "FCA"). Dkt. 24.

On September 6, 2021, Defendants filed a motion to dismiss the case pursuant to F.R.C.P. 12(b)(6). Dkt. 26 (the "Motion"). On October 6, 2021, Plaintiff filed an opposition to the Motion. Dkt. 27 (the "Opposition"). On October 20, 2021, Defendants filed a reply to the Motion. Dkt. 29 (the "Reply").

Based on a review of the matters presented by the Motion, and pursuant to L.R. 7-15, a determination was made that the Motion may be decided without oral argument. Dkt. 31. For the reasons stated in this Order, the Motion is **DENIED IN PART** as to the copyright-infringement claim against TEI and the FCA claim against TEI and **GRANTED IN PART WITHOUT PREJUDICE**, i.e., with leave to amend, as to the vicarious-copyright-infringement claim against TEI and as to all claims against Teddy Fresh, E. Klein and H. Klein.

## II. Factual Background

### A. The Parties

The SAC alleges that Plaintiff is a Delaware limited liability company whose principal place of business is in California. Dkt. 24 ¶ 10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
|---|---|---|---|
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

The SAC alleges that TEI is a corporation registered to conduct business in California. *Id.* ¶ 13. It is alleged on information and belief that TEI owns and operates a podcast (the "H3 Podcast") and a YouTube Channel located at https://www.youtube.com/channel/UCLtREJY21xRfCuEKvdki1Kw (the "YouTube Channel"). *Id.*

The SAC alleges Teddy Fresh is a clothing retailer and a corporation registered to conduct business in California. *Id.* ¶ 14. It is alleged that the YouTube Channel contains links to a website owned and/or operated by Teddy Fresh, through which consumers can purchase Teddy Fresh merchandise. *Id.*

The SAC alleges that E. Klein is a resident of California, and that he is the chief executive officer of TEI and the secretary of Teddy Fresh. *Id.* ¶ 15. The SAC alleges that H. Klein is a resident of California who is the secretary of TEI and the chief executive officer, chief financial officer and sole director of Teddy Fresh. *Id.* ¶ 16.

      B.     Allegations in the SAC

It is alleged E. Klein is the Chief Executive Officer of TEI and Secretary of Teddy Fresh. *Id.* ¶ 15. It is further alleged H. Klein is the Secretary of TEI, and the Chief Executive Officer, Chief Financial Officer and sole director of Teddy Fresh. *Id.* ¶ 16. TEI and Teddy Fresh allegedly share corporate officers and directors -- Mr. and Mrs. Klein -- share corporate offices, and do not regularly hold meetings, keep written records or maintain written resolutions. *Id.* ¶ 17. It is alleged the YouTube Channel contains links to a website owned by Teddy Fresh where consumers can purchase Teddy Fresh merchandise. *Id.* ¶ 14. It is further alleged Defendants were commingling assets in a manner that allowed Defendants to utilize and freely transfer those assets among themselves. *Id.* ¶ 18.

Plaintiff is allegedly the copyright owner and publisher of the Triller Fight Club broadcast of the April 17, 2021 "Jake Paul vs. Ben Askren" boxing event, including the entire television broadcast which was exhibited by closed circuit television and encrypted satellite (the "Broadcast"). *Id.* ¶ 1, Ex. A. It is alleged the copyright became effective on April 30, 2021, and was issued on May 4, 2021. *Id.* ¶ 1, Ex. A. The Broadcast allegedly originated by a satellite uplink and was subsequently retransmitted to cable systems and satellite companies by satellite signal or retransmitted by satellite to licensed content distributors such as authorized online platforms. *Id.* ¶ 21. From there, the Broadcast was allegedly made available to consumers on a pay-per-view basis. *Id.*

It is alleged that Defendants did not purchase the Broadcast and unlawfully received, intercepted and/or descrambled Plaintiff's satellite signal to watch the Broadcast. *Id.* ¶ 41. It is further alleged Defendants publicly admitted to having unlawfully "bootlegged" the Broadcast. *Id.* ¶ 22. It is further alleged that there is no record of either Mr. Klein, Mrs. Klein, the H3 Podcast or TEI purchasing a license to view the Broadcast. *Id.* ¶ 23.

It is alleged that, on April 22, 2021, Defendants uploaded to YouTube all or a substantial portion of the Broadcast in unaltered form, as the Unlisted Video (or, equivalently, the "Reference Video"), and then publicly displayed the URL for the Unlisted Video in a video entitled "Jake Paul Fight Was A Disaster – H3 Podcast # 244" (the "Distribution Video" or the "4/22/21 Podcast"). *Id.* ¶ 24. It is alleged the Distribution Video has been viewed at least 1 million times, and that individuals who did not purchase the Broadcast on pay-per-view were able to, and did view all or a substantial portion of the Broadcast

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

through the Unlisted Video. *Id.* ¶¶ 25–26. It is alleged the H3 Podcast and YouTube Channel have profited from their allegedly unlawful conduct, including through the YouTube Partner Program, sponsorships from unaffiliated third parties and the sale of merchandise through businesses affiliated with Defendants including Teddy Fresh. *Id.* ¶ 28.

### III. Request for Judicial Notice

Defendants seek judicial notice of 14 documents. Dkt. 26-2. Plaintiff objects to judicial notice of six of the documents. Dkt. 28 at 2. Among those six are five documents from *Triller, Inc. v. Filmdaily.com, et al.*, Case No. 2:21-cv-3502-PA-RAO (the "FilmDaily Action"). *Id.* These documents include Plaintiff's initial and first amended complaint, Judge Anderson's Order to Show Cause and Triller's subsequent response and an Order entered in the action. Dkt. 26-2 ¶¶ 1, 9–12; Dkt. 28 at 2. The sixth document is Triller's complaint in *Triller, Inc. v. Ted Entertainment, Inc. et al.*, Case No. 21SMCV01225 (the "State Court Action"). Dkt. 26-2 ¶ 13; *Id.* Ex. O. Defendants argue judicial notice for each of the documents is proper because they are public records. Dkt 26-2 at 6. Plaintiff argues that the documents are irrelevant and prejudicial because they concern separate and distinct actions. Dkt. 28 at 3.

Defendants only seek to use these materials to argue that Plaintiff should not be granted leave to amend. Defendants contend that leave to amend would be futile and Plaintiff's claims are brought in bad faith and with dilatory motive. Because the FilmDaily Action and the State Court Action both concerned the same Broadcast at issue here, Plaintiff's prior filings are relevant to determine whether Plaintiff's current positions are reasonable. Similarly, because all of these cases concern the same Broadcast, Plaintiff's prior filings are relevant to determine whether any deficiencies in Plaintiff's SAC can be corrected in an amended complaint.

There is no showing that this material is likely to "invit[e] the jury to ignore the facts in favor of an emotional appeal," as Plaintiff contends. Dkt. 28 at 3. There is no jury in place in connection with this Motion. Plaintiff has not identified the "emotional response" that this evidence would allegedly elicit. Although there has been no present showing that the probative value of this evidence is substantially outweighed by any prejudice to Plaintiff, this is not a determination as to whether this evidence could be used in later proceedings in this action, including at any trial.

For the foregoing reasons, Defendants' Request is **GRANTED**.

### IV. Motion to Dismiss

    A.    Legal Standards

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
|---|---|---|---|
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

A party may move to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citation omitted), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

    B.    Application

        1.    <u>Copyright Infringement</u>

            a)    Copying

Defendants argue that Plaintiff's claims fail because viewing a transmission does not constitute infringement unless the viewer "fixes" a copy of the work simultaneously with the transmission and streaming a video over the Internet does not "fix" a copy of that video. Defendant argues that the Unlisted Video was fixed after the Broadcast was transmitted and Plaintiff has not alleged that third parties "fixed" the Unlisted Video when they streamed the Unlisted Video.

The Copyright Act provides "the owner of [a] copyright . . . the exclusive rights . . . to reproduce the copyrighted work in copies . . . to distribute copies . . . of the copyrighted work to the public . . . to perform the copyrighted work publicly . . . [and] to display the copyrighted work publicly . . . ." 17 U.S.C. § 106. "'Copies' are material objects . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Id.* § 101. "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.* However, "[a] work consisting of sounds, images, or both, that are being transmitted, is 'fixed' . . . if a fixation of the work is being made simultaneously with its transmission." *Id.*

For similar reasons, a work cannot be "displayed" without a copy. "To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially." *Id.*

Although a copyrighted work can be "performed" even without a copy, the SAC does not allege that Defendants publicly performed the work. "To 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." *Id.* However, according to the SAC, "Defendants infringed on Plaintiff's rights by adapting, copying, reproducing, uploading, publicly displaying, and distributing the Broadcast without Plaintiff's authorization . . . ." SAC ¶ 27.

Defendants argue that the allegations of the SAC effectively concede that Defendants did not simultaneously fix the Broadcast with its transmission on April 17, 2021. Plaintiff's copyright registration states that the Broadcast was first published on April 17, 2021. SAC at Ex. A. It is alleged that the Unlisted Video and Distribution Video were uploaded on April 22, 2021. SAC ¶¶ 24, 32.[1] Defendants argue that the Unlisted Video and Distribution Video cannot infringe Plaintiff's copyright because they were not uploaded at the same time as the Broadcast.

Defendants' position is not persuasive. *First*, although the Broadcast was first published on April 17, 2021, that does not establish that the Broadcast was not also transmitted on April 18 and April 22, 2021. *Second*, even if Defendants did not upload their copies on YouTube until April 18 or April 22, 2021, it does not necessarily follow that Defendants did not obtain access to the Broadcast on April 17, 2021. Plaintiff need not plead with particularity precisely how Defendants obtained a copy of the Broadcast. By alleging that Defendants had a copy of the video and by alleging that no Defendant was on the list of those authorized to obtain the Broadcast, Plaintiff has plausibly alleged that Defendants fixed a copy of the Broadcast by downloading it as it was transmitted, or that they obtained a copy from someone who did. These allegations are sufficient.

        b)    Fair Use

Defendant argues that Plaintiff's copyright infringement claims are barred by the fair-use doctrine. "[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. "In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include— (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

"The determination of fair use is a 'mixed question of fact and law,' which necessitates 'an open-ended and context-sensitive inquiry[.]" *Graham v. Prince*, 265 F. Supp. 3d 366, 376 (S.D.N.Y. 2017) (quoting *Cariou v. Prince*, 714 F.3d 694, 704–05 (2d Cir. 2013)). "A court cannot engage in the fair use inquiry until it has been presented with facts relevant to evaluating the fair use factors." *Id.* at 377. "Due to the

---

[1] It appears that the Unlisted Video was actually uploaded on April 18, 2021. Dkt. 26-6 at Exs. C–D.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

fact-sensitive nature of the inquiry, courts generally do not address the fair use defense until the summary judgment phase." *Id.* However, "it is possible to resolve the fair use inquiry on a motion to dismiss under certain circumstances . . . ." *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015); *see, e.g.*, *Marano v. Metropolitan Museum of Art*, 472 F. Supp. 3d 76 (S.D.N.Y. 2020) (dismissing copyright-infringement claim with prejudice on fair-use grounds).

(1)   The Intermediate-Use Doctrine

Under certain circumstances, "intermediate copying" and "copying . . . as a preliminary step" may be fair use. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1198–99 (2021). In general, "the Copyright Act does not distinguish between unauthorized copies of a copyrighted work on the basis of what stage of the alleged infringer's work the unauthorized copies represent." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992), *as amended* (Jan. 6, 1993). However, "authority for [intermediate] copying [may] be found in one of the statutory provisions to which the rights granted in section 106 are subject." *Id.* at 1519.

"[W]here disassembly is the only way to gain access to the ideas and functional elements embodied in a copyrighted computer program and where there is a legitimate reason for seeking such access, disassembly is a fair use of the copyrighted work, as a matter of law." *Id.* at 1527–28; *accord Sony Computer Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000). Although a defendant can establish fair use by showing that disassembly is the only way to access functional elements, that condition does not appear to be necessary: "[w]here there is good reason for studying or examining the unprotected aspects of a copyrighted computer program, disassembly for purposes of such study or examination constitutes a fair use." *Sega*, 977 F.2d at 1520.

Defendants argue that intermediate copying must be examined in light of the overall purpose of the final use. This position is not persuasive. Neither *Sega* nor *Sony* adopted such a broad rule. Indeed, *Sega* held that, in general, there is no distinction between "intermediate" copying and "final" copying. Defendants rely on a statement from *Sega* that "[t]he intermediate copies made and used by Connectix during the course of its reverse engineering of the Sony BIOS were protected fair use" and "[a]ny other intermediate copies made by Connectix do not support injunctive relief, even if those copies were infringing." 203 F.3d at 599. Although it may be appropriate to consider the end result of intermediate copying in some cases, it does not follow that the distinction between intermediate and final copying is always relevant.

Plaintiff argues that the intermediate-use doctrine only applies to a defendant who could not have engaged in the final use without engaging in the intermediate copying. Although *Sega* determined that the defendant's alleged infringement was the only way to prepare its fair-use work, *Sega* also adopted a broader rule that required only "good reason" to justify disassembly.

Plaintiff next argues that the intermediate-use doctrine does not apply if the copyrighted material is used in the end product. Neither party has identified any case in which a court applied the intermediate-use doctrine where the copyrighted material had been used in the end product and thereby made accessible to the public. *Cf. Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 921 (2d Cir. 1994) ("Texaco's photocopying served, at most, to facilitate Chickering's research, which in turn might have led to the development of new products and technology that could have improved Texaco's commercial

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

performance."); *Fox Broad. Co. Inc. v. Dish Network, L.C.C.*, 905 F. Supp. 2d 1088, 1103 (C.D. Cal. 2012), *aff'd sub nom. Fox Broad. Co. v. Dish Network L.L.C.*, 723 F.3d 1067 (9th Cir. 2013), and *aff'd sub nom. Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060 (9th Cir. 2014) ("Like the QA copies here, the disassembly copies were not used in the end product or for any purpose beyond ascertaining the object code, which was not entitled to copyright protection."). Ultimately, the fair use inquiry is a flexible, "equitable rule of reason." *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984).

Here, however, the intermediate-use doctrine does not apply because Plaintiff's claims are based on allegations as to Defendants conduct with respect to the Unlisted Video, not the Distribution Video, Dkt. 27 at 22, and the Unlisted Video is more than a mere intermediate copy. Defendants made the Unlisted Video independently accessible by displaying its URL in the Distribution Video. SAC ¶ 41. Anyone with that URL was able to access the Unlisted Video. At the time of the briefing of the Motion, it appears that the Unlisted Video had been viewed 65 times. Dkt. 26-6 at Exs. C–D. Although the Distribution Video displayed the URL in small font, and although no one spoke on the Distribution Video urging viewers to watch the Unlisted Video or read the URL, the URL was visible. *Id.* at Ex. H. The Distribution Video was viewed more than one million times, far more times than the Unlisted Video. *Id.* at Exs. C–D. However, drawing every reasonable inference in Plaintiff's favor, and recognizing that evidence of Defendants' claimed intent is not to be considered in considering a motion to dismiss, the allegations of the SAC are sufficient to present the inference that Defendants created the Unlisted Video and made it publicly accessible for reasons unrelated to the critical commentary in the Distribution Video.

(2)     Purpose and Character of the Use

"The central purpose of this investigation is to see . . . whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal quotations and citations omitted). Transformative "works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* (internal quotations and citations omitted).

The Distribution Video was transformative. Those speaking in the Distribution Video discussed Ben Askren's overall physical fitness and his ability to box, criticized the alleged mismatch between Jake Paul and Ben Askren and criticized the referee's decision to call the fight for Jake Paul after only a few minutes. Dkt. 26-6, at Ex. H. The speakers also discussed whether the match had been staged. *Id.* The speakers spent much of their time critiquing the allegedly poor quality of the fight and criticizing Paul and other YouTubers who have become boxers. *Id.* The excerpts from the Unlisted Video were short and were employed only to illustrate the points made by E. Klein and the other speakers. *Id.* The Distribution Video, therefore, added a new meaning to the Broadcast. The Broadcast simply showed the fight between Jake Paul and Ben Askren, while the Distribution Video provided social commentary and criticism regarding that fight.[2]

---

[2] Defendants also argue that the Distribution Video was transformative because its title criticized the fight, calling it a "[d]isaster." SAC ¶ 5. Defendants have cited out-of-circuit authority that a YouTube video's title may be sufficient to establish that the video is transformative. *See Hughes v. Benjamin*, 437 F. Supp. 3d 382, 390–91

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
|---|---|---|---|
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

Notwithstanding the foregoing, for the reasons already stated, it is the transformativeness of the Unlisted Video that matters. The Unlisted Video did not contain any criticism or commentary. Dkt. 26-6, at Ex. D. It only included a portion of the Broadcast. *Id.* Defendants did not add any material to the Unlisted Video. *Id.* The title of the Unlisted Video was simply descriptive: "Jake Knockout." *Id.* Nor is there any suggestion that Defendants' decisions regarding which portions of the Broadcast to include had any transformative effect. *Id.* It has also been alleged that the Unlisted Video was created for "commercial advantage." SAC ¶ 41. Defendants have not sought to contest this assertion. Accordingly, this factor weighs against a finding of fair use.

### (3)  Nature of the Copyrighted Work

"The second factor in the fair use analysis 'recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works.'" *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (quoting *Dr. Seuss Enters. L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997)). This factor also considers "whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou v. Prince*, 714 F.3d 694, 709–10 (2d Cir. 2013), *holding modified by Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99 (2d Cir. 2021), and *holding modified by Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021) (quoting *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006)).

Because the Broadcast was published, the scope of fair use in this case is not narrower than in the norm. However, based on the present information, the Broadcast appears to have been more informational than creative. It is simply a video recording a fight. It reflects a newsworthy event, and it does not incorporate significant artistic features. "[T]his . . . factor typically has not been terribly significant in the overall fair use balancing . . . ." *Mattel*, 353 F.3d at 803 (quoting *Dr. Seuss*, 109 F.3d at 1402). Overall, this factor weighs slightly against a finding of fair use.

### (4)  Amount and Substantiality of the Portion Used

In evaluating this factor, courts ask "whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole, is reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586.

The Distribution Video uses a reasonable amount of the Broadcast. The Broadcast is nearly four hours long, and the Distribution Video only contains 42 seconds of that material. *Compare* Dkt. 26-6, at Ex. B *with* Dkt. 26-6, at Ex. H. However, the portion of the Broadcast used in the Distribution Video included the final moments of the fight between Jake Paul and Ben Askren. Dkt. 26-6, at Ex. H. That fight was the main event of the Broadcast, which was entitled "Jake Paul vs. Ben Askren." Dkt. 24 at 16. This material was necessary to the commentary and critique advanced by E. Klein and it was no greater than necessary for Defendants' commentary and criticism. If only the portion of the Broadcast contained in the Distribution Video were at issue, this factor would weigh slightly in favor of fair use.

---

(S.D.N.Y. 2020) (granting motion to dismiss because the title of the defendant's YouTube video served to comment on, and critique, the plaintiff's YouTube video). It is unnecessary to reach this issue in connection with the Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

However, the Unlisted Video is the one at issue. It contains the prologue to the fight, the fight itself and the aftermath. Dkt. 26-6, at Ex. F. Again, that fight was the main event of the Broadcast. The Unlisted Video, which was 14 minutes long, contained significantly more material from the Broadcast than the Distribution Video did. *Id.* Although the vast majority of the Broadcast was not included in the Unlisted Video, the key section was.

Defendants have not argued that the material contained in the Unlisted Video, but not the Distribution Video, was necessary for their commentary and criticism. As such, this factor weighs against a finding of fair use.

(5)     Effect of the Use on the Potential Market for or Value of the Copyrighted Work

"The fourth fair use factor is 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Campbell*, 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). "It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Id.* (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4] (1993)). "The enquiry 'must take account not only of harm to the original but also of harm to the market for derivative works.'" *Id.* (quoting *Harper & Row, Publishers v. Nation Enter.*, 471 U.S. 539, 568 (1985)). Courts may also consider "the source of the loss" and "the public benefits the copying will likely produce." *Google*, 141 S. Ct. at 1206 (observing that a "lethal parody" and "a scathing theatre review" may reduce demand for the original but that neither would weigh against a finding of fair use).

Defendants argue that the derisive title of the Distribution Video makes it clear that the Distribution Video did not cater to an audience that wanted to sit back and enjoy the event, but rather to an audience that wanted to hear why the Broadcast was a "[d]isaster." Plaintiff points out that the Unlisted Video did not have a derisive title and did not provide any commentary or critique. Instead, the Unlisted Video permitted viewers to see the entire fight between Jake Paul and Ben Askren without any supplemental editing or commentary. Plaintiff concludes that the Unlisted Video was a market substitute for the Broadcast. Defendants respond by arguing that the Unlisted Video could only be accessed through the Distribution Video and virtually nobody accessed the Unlisted Video.

Defendants' arguments are not entirely persuasive. *First*, by making the URL to the Unlisted Video available in the Distribution Video, Defendants created a risk that the URL would be disseminated through channels other than the Distribution Video. The magnitude of this risk cannot be determined at this time. *Second*, at least a few dozen people accessed the Unlisted Video, and at present it appears plausible that at least some of them used the Unlisted Video as a substitute for the Broadcast. Although the Distribution Video was derisive in tone, it may have led viewers to access the Unlisted Video to evaluate the fight on their own. *Third*, Defendants have cited cases where courts found that this factor weighed in favor of fair use where the defendant's target audience was not the same as plaintiff's. *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 47 (S.D.N.Y. 2017); *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 394 (S.D.N.Y. 2020). This case is different: by showing that some people accessed the Unlisted Video, Plaintiff has presented some evidence that some people accessed the allegedly infringing work not to hear Defendants' commentary, but to see Plaintiff's work. This factor weighs against a finding of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

fair use.

(6) <u>Bad Faith</u>

Plaintiff argues that Defendants' bad faith weighs against a finding of fair use. Some circuits hold that, "[t]o invoke the fair use exception, an individual [had to] possess an authorized copy of a literary work." *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 843 (Fed. Cir. 1992) (citing *Harper & Row*, 471 U.S. at 562–63). Other circuits "read *Harper & Row* 's holding more narrowly than the broad proposition suggested by *Atari*." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004). However, the Ninth Circuit has not required a defendant to have an authorized copy to invoke fair use. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 n.8 (9th Cir. 2007) (rejecting argument that providing access to infringing websites could not be fair use because defendant was "operating a comprehensive search engine that only incidentally indexes infringing websites" and "[t]his incidental impact does not amount to an abuse of the good faith and fair dealing underpinnings of the fair use doctrine"). Further, *Perfect 10* accepted the "general rule" from *Atari* that "a party claiming fair use must act in a manner generally compatible with principles of good faith and fair dealing." *Id.*

Defendants argue that "bad faith" is no longer a valid consideration in determining whether there is "fair use." The Supreme Court's "decision in *Campbell* expressed some skepticism about whether bad faith has any role in a fair use analysis." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021). Further, later cases have found "this skepticism justifiable, as [c]opyright is not a privilege reserved for the well-behaved." *Id.* (internal quotations and citation omitted). However, the Supreme Court has had "no occasion . . . to say whether good faith is as a general matter a helpful inquiry." *Id.* Until and unless the Supreme Court rules that the defendants' good faith—or lack thereof—is not a relevant consideration, this Court is bound by the holdings of the Ninth Circuit.

It is alleged that Defendants publicly admitted to having "bootlegged" or "pirated" the Broadcast. SAC ¶ 22. In the Distribution Video, E. Klein stated that he "f****** pirated that s***" and "didn't pay for that s*** . . . ." Dkt. 26-6, at Ex. H. As a result, Plaintiff has adequately alleged that "Defendants' acts of infringement were willful, in blatant disregard of, and committed with indifference to Plaintiff's rights." SAC ¶ 27.

(7) <u>Balancing the Factors</u>

With respect to the consideration of the Motion, all of the factors weigh at least somewhat against a finding of fair use. As a result, for purposes of considering the Motion, Plaintiff has adequately alleged that its copyright was infringed by TEI. Defendants' fair-use defense may be considered again later in the case based on a more complete factual record.

2. <u>Vicarious Copyright Infringement</u>

Defendants first argue that this claim fails for the same reasons as the one for copyright-infringement. Because it has been determined that the copyright-infringement claim has been adequately alleged, the same analysis applies to vicarious infringement.

Defendants next argue that, even if copyright infringement has been adequately alleged, vicarious

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

copyright infringement has not. The gravamen of this claim is that "numerous individuals who had not purchased and did not purchase the Broadcast on a pay-per-view basis were able to, and did, freely view all or a substantial portion of the Broadcast, in unaltered form, via the Unlisted Video." SAC ¶ 34. In essence, Plaintiff argues that the individuals who watched the Unlisted Video engaged in copyright infringement for which Defendants are vicariously liable.

"To prevail on a vicarious liability claim, [Plaintiff] must prove [Defendants] ha[d] (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) (quoting *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019)). "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . ." *Id.* (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)).

Defendants argue that this claim has not been adequately alleged because there is no allegation that Defendants had any "direct financial interest" in the allegedly infringing activity by the customers. Specifically, the Unlisted Video did not contain any sponsorships or offer for sale any merchandise. Dkt. 26-6 at Exs. D, F. Nor did Defendants receive revenue for advertisements on that video because the Unlisted Video was not eligible for "monetization" under the YouTube Partner Program. The video was not eligible because it was not uploaded to H3 Podcast's YouTube account; instead, it was uploaded to a separate channel with less than one thousand subscribers. Dkt. 26-6 at Exs. D, G. Plaintiff does not dispute these facts, but argues that the Distribution Video was monetized and that each of the individuals who viewed the Unlisted Video necessarily viewed the monetized Distribution Video.

The SAC has not adequately alleged any "direct financial interest" in the infringing activity. The alleged infringing activity is only as to the Unlisted Video, not the Distribution Video. SAC ¶ 34. Further, because Plaintiff argues that its vicarious-copyright-infringement claim is premised only on the Unlisted Video to avoid Defendants' "fair use" defense, it is inconsistent to argue that its claim is premised on the Distribution Video for purposes of the "direct financial interest" element. *See* Opposition at 22 ("Plaintiff is not suing Defendants as a result of the Distribution Video; rather, Plaintiff is suing Defendants as a result of the Unlisted Video . . . ."). It has not been alleged that watching the Unlisted Video made viewers more likely to re-watch the Distribution Video, to make purchases from the sponsors of the Distribution Video, or to purchase any of the merchandise offered in the Distribution Video. For these reasons, the vicarious-copyright-infringement claim has not been adequately alleged.

      3.    <u>The Federal Communications Act</u>

Under the FCA, "[n]o person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 17 U.S.C. § 605(a).

Defendants argue that the FCA does not prohibit intercepting transmissions sent over the Internet. Defendants then argue that, according to the SAC, the Broadcast was transmitted to the public over the Internet and that, in the Distribution Video, E. Klein states that he obtained the Broadcast via "link." Dkt. 26-6, Ex. H. Based on the foregoing, Defendants contend that the FCA claim has not been adequately alleged. Plaintiff responds that it alleged that "Defendants . . . intercepted, received and/or de- scrambled Plaintiff's satellite signal . . . ." SAC ¶ 41. Defendants assert that this allegation is merely

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
|---|---|---|---|
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

conclusory.

Defendants are correct that the FCA does not apply to Internet transmissions. *See, e.g.*, *G & G Closed Cir. Events, LLC v. Espinoza*, No. CV 18-07894 WDK-JC, 2020 WL 7861971, at *4 (C.D. Cal. Oct. 5, 2020) ("[A]lthough the internet has been in wide usage since the mid-1990s, the legislature has not extended the reach of the statutes to include transmissions via the internet and it is not the purview of the district court to insert itself and make this determination."). However, the scope of the FCA includes "satellite television signals." *DirecTV, Inc. v. Webb*, 545 F.3d 837, 844 (9th Cir. 2008).

The allegation in paragraph 41 of the SAC is a statement of fact, not a legal conclusion. This allegation does not simply repeat the language of the statute. Further, it alleges a specific event that may have occurred in the past. This allegation that must be accepted as true at the pleadings stage. Although E. Klein stated that he obtained the Broadcast by using a "link," the meaning of the term "link" is not clear. Further, such questions of fact cannot be decided on a motion to dismiss. Although the Broadcast was transmitted by Internet, it was also transmitted by satellite. Plaintiff need not detail the technique or techniques allegedly used to intercept the Broadcast.

For the foregoing reasons, the SAC adequately alleges that TEI violated the FCA.

        4.      <u>The Alter-Ego Allegations</u>

It is alleged that TEI "owns and operates" the H3 Podcast and the accompanying YouTube channel. SAC ¶ 13. To the extent that the SAC adequately alleges claims arising out of these operations, they have been adequately stated against TEI. Although E. Klein "is the Chief Executive Officer of TEI and the Secretary of Teddy Fresh," SAC ¶ 15, the SAC does not contain further allegations about his role in the alleged copyright infringement and the alleged violation of the FCA. E. Klein commented on the Broadcast in the Distribution Video, but it has not been alleged that he played a particular role with the Unlisted Video that forms the basis for the claims. Although H. Klein "is the Secretary of TEI, and the Chief Executive Officer, Chief Financial Officer[], and sole director of Teddy Fresh," is not accused of playing any role in the alleged conduct at issue. Similarly, although TEI's videos advertise Teddy Fresh's merchandise, it is not alleged that Teddy Fresh played any role in the challenged conduct.

The basis for the alleged liability of Teddy Fresh, E. Klein, and H. Klein liable for TEI's activities is solely that "TEI and Teddy Fresh are the alter egos of [E.] Klein and [H.] Klein . . . ." SAC ¶ 17. These conclusory allegations are not sufficient to state such a claim. "In California, two conditions must be met before the alter ego doctrine will be invoked." *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538, 99 Cal. Rptr. 2d 824 (2000). "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist." *Id.* "Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Id.*

As to the first requirement, "[a]mong the factors to be considered in applying the doctrine are commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Id.* at 538–39 (quoting *Roman Catholic Archbishop v. Superior Ct.*, 15 Cal. App. 3d 405, 406, 411 (1971)). "Other factors

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

which have been described in the case law include inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Id.* at 539. "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Id.*

As to the second requirement, the alter ego doctrine applies only in a narrow set of circumstances:

> Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. A corporate identity may be disregarded—the "corporate veil" pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners. The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds.

*Id.* at 538 (internal citations omitted). Accordingly, "[a]lter ego is an extreme remedy, sparingly used." *Id.* at 539.

As noted, the SAC alleges that E. Klein and H. Klein are officers and directors of TEI and Teddy Fresh, and that TEI and Teddy Fresh do not have any other officers or directors. SAC ¶¶ 13–16. It is also alleged that TEI and Teddy Fresh share the same corporate offices. SAC ¶ 17(a). These facts are not sufficient to allege alter ego liability. Many closely held corporations share officers, directors, and offices. Although these facts are relevant to alter ego, because it is an "extreme remedy," they are not sufficient.

The other allegations in the SAC are entirely conclusory. They repeat elements from California law on alter ego, rather identifying alleged facts. For example, the SAC alleges that "TEI and Teddy Fresh are . . . mere shells, instrumentalities, and conduits . . . ." SAC ¶ 17(a). It alleges that "TEI and Teddy Fresh are . . . so inadequately capitalized that . . . their capitalization was illusory and trifling." *Id.* ¶ 17(b). It is alleged that "[E.] Klein and [H.] Klein diverted assets from TEI and Teddy Fresh to themselves to suit their own convenience . . . ." *Id.* ¶ 17(c). It is also alleged that "TEI and Teddy Fresh are . . . controlled, dominated, and operated by [E.] Klein and [H.] Klein as their alter ego . . . ." *Id.* ¶ 17(d). Finally, it is alleged that "[a]dherence to the fiction of the separate existence of TEI and Teddy Fresh, on the one hand, and [E.] Klein and [H.] Klein, on the other, would permit an abuse of the corporate privilege and would sanction fraud, promote injustice, and otherwise aid in the commission of unlawful conduct. *Id.* ¶ 18. These statements are not sufficient to state the claim.

There are other statements in the Opposition as to alter ego. For example, the Opposition describes how all Defendants use the H3 Podcast and YouTube Channel to advertise and promote Teddy Fresh's business. It also describes how Defendants do not distinguish themselves and their businesses on social media. It then describes the financial relationships between or among the various Defendants. Because none of these matters is alleged in the SAC, they cannot provide a basis to show that it is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

adequate.

Finally, even if there was a unity of interest among the Defendants, the SAC has not alleged any fraud perpetrated, or statute circumvented, by the alleged misuse of the corporate form. Nor has the SAC alleged any other facts to show that there would be an inequitable result if the corporate veil were not pierced.

For these reasons, the SAC has not adequately alleged any claim against Teddy Fresh, E. Klein or H. Klein.

 5. Leave to Amend

Plaintiff requests leave to amend. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This "policy of favoring amendments to pleadings should be applied with 'extreme liberality.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)). As such, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (quoting *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990)); *accord Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (holding that "dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment"). There has not yet been any showing that Plaintiff's claims could not be saved by the pleading of additional facts or that granting leave to amend would be futile.

Defendants argue that leave to amend should be denied. Defendants first argue that Plaintiff has had five opportunities to draft a well-pleaded complaint. Specifically, Plaintiff named Defendants in its First Amended Complaint and Second Amended Complaint in the FilmDaily Action. An amended complaint would be the fourth one in this action. Although the history of the FilmDaily Action has some relevance, those claims were dismissed for improper joinder, which does not support futility here. Although Plaintiff has filed three complaints in this action, this is the first time one was dismissed by the Court.

Further, there has been no prior ruling that Plaintiff needed to link any alleged "direct financial interest" to the alleged infringement. As to the alter-ego allegations, as noted, the Opposition presents certain arguments about alleged facts.

For all of these reasons, there is not a sufficient showing that leave to amend would be futile.

**V. Conclusion**

For the reasons stated in this Order, the Motion is **DENIED IN PART** as to the copyright-infringement claim against TEI and the FCA claim against TEI and **GRANTED IN PART WITHOUT PREJUDICE**, that is, with leave to amend, as to the vicarious-copyright-infringement claim against TEI and all claims against Teddy Fresh, E. Klein, and H. Klein. Any amended complaint shall be filed within 21 days of the issuance of this Order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-03942 JAK (KSx) | Date | September 15, 2023 |
| Title | Triller Fight Club II LLC v. The H3 Podcast | | |

**IT IS SO ORDERED.**

                                                  _____ : _____

Initials of Preparer    tj