Exhibit Z



**LINCOLN**

**BANDLOW LAW**

Lincoln@BandlowLaw.com

October 2, 2023

**VIA EMAIL**

Farhad Novian
Michael O'Brien
Lauren Woodland
Alexander Kandel
Novian & Novian, LLP
1801 Century Park East, Suite 1201
Los Angeles, CA 90067
Email: farhad@novianlaw.com; michaelo@novianlaw.com; laurenw@novianlaw.com; alexanderk@novianlaw.com

RE:   *Triller Fight Club II LLC v. Ted Entertainment, inc. et al.* **(Case No. 2:21-cv-03942-JAK-KS)**

Dear Counsel:

As you know, we are counsel for Ted Entertainment, Inc. ("TEI"), Teddy Fresh, Inc. ("Teddy Fresh") Ethan Klein ("Ethan") and Hila Klein ("Hila") (collectively, "Defendants"). Pursuant to Local Rule 7-3, we are writing to you to schedule a meet and confer regarding the motion to dismiss the alter ego and vicarious copyright infringement claims of the Third Amended Complaint ("TAC") of Plaintiff Triller Fight Club II, LLC ("Triller").

**I.     Legal Standard Under F.R.C.P. Rule 12(b)(6)**

To draft a complaint that can survive dismissal under Federal Rule of Civil Procedure ("F.R.C.P.") Rule 12(b)(6), Triller was required to "allege '***enough facts*** to state a claim to relief that is plausible on its face.'"  *Benavidez v. County of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (emphasis added) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility standard is ***not*** akin to a 'probability requirement'" and, instead, "asks for ***more than a sheer possibility*** that a defendant has acted unlawfully."  *Dent v. National Football League*, 968 F.3d 1126, 1130 (9th Cir. 2020) (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 556)).  Additionally, this requires Triller "to include ***enough facts*** to raise a right to relief ***above a speculative level.***"  *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (emphasis added) (quoting *Twombly*, 550 U.S. at 555).

In stark contrast to Triller's fatally defective alter ego and vicarious copyright infringement claims alleged in the TAC, a well-pleaded complaint must contain sufficient



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 2

"factual content that allows the court to draw the ***reasonable inference*** that the defendant is liable for the misconduct alleged." *Benavidez*, 993 F.3d at 1144 (emphasis added) (quoting *Iqbal*, 556 U.S. at 678; *United States v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011)). Instead, Triller's fatally defective alter ego and vicarious copyright infringement claims alleged in the TAC rely merely on "labels and conclusions," "formulaic recitation of the elements," and "conclusory allegations of law and unwarranted inferences" which simply "will not do." *Benavidez*, 993 F.3d at 1145 (quoting *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Further, Triller's "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are woefully inadequate. *Whitaker*, 985 F.3d at 1176 (quoting *Iqbal*, 556 U.S. at 678-679).

Triller cannot, as here, "rely on ***anticipated discovery*** to satisfy" its pleading requirements; "rather, pleadings ***must assert well-pleaded factual allegations to advance to discovery***." *Whitaker*, 985 F.3d at 1177 (emphasis added) (citing *Iqbal*, 556 U.S. at 678-79). Triller was required to plead sufficient facts to demonstrate that "it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Whitaker*, 986 F.3d at 1177 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

The Ninth Circuit has repeatedly held that, on a motion to dismiss, a court can review "unattached evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Beverly Oaks Physicians Surgical Center, LLC v. Blue Cross and Blue Shield of Illinois*, 983 F.3d 435, 439 (9th Cir. 2020) (quoting *United States v. Corinthian Colleges*, 655 F.3d 984, 998-99 (9th Cir. 2011)). Sometimes known as the "incorporation by reference doctrine," it is frequently applied to copyright infringement claims that result in dismissal. *See e.g., Rearden LLC v. Walt Disney Company*, 293 F.Supp.3d 963, 969 (N.D. Cal. 2018) (incorporating various items referred to copyright infringement complaint, including various motion pictures); *Marcus v. ABC Signature Studios, Inc.*, 279 F.Supp.3d 1056, 1062-63 (C.D. Cal. 2017) (incorporating script and DVD of television show referred to in complaint); *Shame on You Productions, Inc. v. Elizabeth Banks*, 120 F.Supp.3d 1123, 1144-45 (C.D. Cal. 2015) (same).

Additionally, the Ninth Circuit authorizes courts to consider "matters of which the court may take judicial notice" on a motion to dismiss. *Ceder Point Nursery v. Shiroma*, 923 F.3d 524, 530 (9th Cir. 2019) (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008)). Our Clients shall submit the following items to the Court for their motion to dismiss:

- The materials subject to Defendants' Request for Judicial Notice in support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to F.R.C.P. 12(b)(6) (Dkt. No. 26-2) and the Court granted in its September 15, 2023 order (the "9/25/23 Order"), including

  o The May 6, 2021 Order (the "5/6/21 Order") of the Honorable Percy Anderson that was entered in the United States District Court for the Central District of California case entitled *Triller, Inc. v. Filmdaily.com*



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 3

> *et al* (Case No. 2:21-cv-03502-PA-RAO) (the "Filmdaily Action") (Dkt. No 26-6, Ex. A), which is subject to judicial notice as a public record (*see United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008));

- o The audiovisual work entitled *Jake Paul vs. Ben Askren* (the "Broadcast") (Dkt. No. 26-5, Ex. B), which is incorporated by reference in Paragraphs 1-2, 4-5, 7, 11-12, 20-28, 30-34, 36, 43-46, 48-49, 50 and 53 of the TAC;

- o A printout for the webpage of the TEI podcast episode entitled *Jake Paul Fight Was A Disaster – H3 Podcast # 244*" (the "Broadcast Video") (Dkt. No. 26-6, Ex. C), which is incorporated by reference in Paragraph 5 of the TAC;

- o A printout for the webpage for the unlisted video entitled *Jake Knockout* (the "Unlisted Video") (Dkt. No. 26-6, Ex. D), which is incorporated by reference in Paragraphs 5, 24, 32 and 46 of the TAC;

- o A printout of Google's definitions of "Public Videos," "Private Videos," and "Unlisted Videos" (Dkt. No. 26-6, Ex. E), which is made available on its public website[1] (*see Terraza v. Safeway Inc.*, 241 F.Supp.3d 1057, 1067 (N.D. Cal. 2017));

- o The Unlisted Video (Dkt. No. 26-5, Ex. F), which is incorporated by reference in Paragraphs 5, 24, 26, 32, 34-35, 37-38, 40, 46, 48 of the TAC;

- o A printout of YouTube's requirements for participation in the YouTube Partner Program from the YouTube Help article entitled "YouTube Partner Program overview & eligibility" (Dkt. No. 26-6, Ex. G), which is made available on its public website;[2]

- o The Distribution Video (Dkt. No. 26-6, Ex. H), which is incorporated by reference in Paragraphs 5-6, 24, 32, 37-38, 40-41, 46-47 of the TAC;

- o Triller, Inc's initial complaint that was filed in the Filmdaily Action (Dkt. No. 26-5, Ex. I);

- o Judge Anderson's Aprils 28, 2021 Order to Show Cause that was entered in the Filmdaily Action (the "4/28/21 OSC") (Dkt. No. 26-6, Ex. J);

- o Triller, Inc.'s first amended complaint that was filed in the Filmdaily Action (Dkt. No. 26-6, Ex. K);

---

[1] YouTube Help, "Change Video Privacy Settings", *available at*:
https://support.google.com/youtube/answer/157177?co=GENIE.Platform%3DDesktop&hl=en#zippy=%2Cunlisted-videos%2Cprivate-videos%2Cpublic-videos.

[2] YouTube Help, "YouTube Partner Program overview & availability," *available at*
https://support.google.com/youtube/answer/72851h1=en



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 4

> o   Triller, Inc.'s response to the 4/28/21 OSC in the Filmdaily Action (Dkt. No. 26-6, Ex. L);
>
> o   The complaint of Triller, LLC against Defendants that was filed in the Los Angeles Superior Court entitled *Triller, LLC v. Ted Entertainment, Inc.* (Case No. 21SMCV01225) (the "Tortious Interference Action") (Dkt. No. 26-6, Ex. O);
>
> o   A printout of the webpage containing the definition of the word "stream" from Merriam-Webster's online dictionary[3]  (Dkt. No. 26-6, Ex. P) (*see Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F.Supp.2d 139, 146 (N.D. Cal. 2020));

- A printout of the webpage for TEI's channel, the "H3 Podcast," which is incorporated by reference in Paragraphs 3, 5, 13-14, 17(a)(iii-v), 17(a)(vii-viii), 24, 28, 32, 36, 38-40, 46 and 49;

- A copy of the video *Teddy Fresh Summer Collection* from the H3 Podcast Highlights channel, which is incorporated by reference in Paragraph 17(a)(v) of the TAC;

- A printout of the webpage for the video *Teddy Fresh Summer Collection* from the H3 Podcast Highlights channel, which is incorporated by reference in Paragraph 17(a)(v) of the TAC;

- A copy of the video *Twitch Double Standard & Analyzing Belle Delphine's Spit – H3 Podcast #129*, from which the *Teddy Fresh Summer Collection* video was derived and incorporated by reference in Paragraph 17(a)(v) of the TAC;

- A printout of the webpage for the video *Twich Double Standard & Analyzing Belle Delphine's Spit – H3 Podcast #129*, from which the *Teddy Fresh Summer Collection* video was derived and incorporated by reference in Paragraph 17(a)(v) of the TAC;

- A printout of the article from Fashionista entitled "How Hila Klein Went From YouTube Star to Fashion Designer And CEO Of Teddy Fresh" by Morgan Whipple (the "Fashionista Article"), which is incorporated by reference in Paragraphs 17(vi-vii) of the TAC;

- A printout of the webpage for Hila's TikTok page, which is incorporated by reference in Paragraph 17(ix) of the TAC; and

- The January 12, 2022 order granting Defendants' anti-SLAPP motion and dismissing the Tortious Interference Action.

## II.   <u>The TAC Fails to Properly Plead Alter-Ego as a Matter of Law</u>

As the Court correctly held in its 9/15/23 Order, "alter ego is an ***extreme remedy, sparingly used***." Dkt. No. 32, p. 13 (brackets omitted) (*quoting Sonora Diamond Corp. v. Sup.*

---

[3] Merriam-Webster, "Stream," *available at*: https://www.merriam-webster.com/dictionary/stream.



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 5

*Ct.*, 83 Cal.App.4th 523, 539 (2000)) (emphasis added). Indeed, "the corporate form will be disregarded only in ***narrowly defined circumstances*** and only when the ends of justice so require." *In re L. Scott Apparel, Inc.*, 615 B.R. 881, 891 (C.D. Cal. 2020) (emphasis added) (*quoting Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 301 (1985)).

As the Court also correctly held in the 9/15/23 Order that under California law, "two conditions must be met before the alter ego doctrine will be invoked": (1) "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist"; and (2) "there must be an inequitable result if the acts in question are treated as those of the corporation alone." Dkt. No. 32, p. 12 (*quoting Sonora Diamond*, 83 Cal.App.4th at 538).

The "standards for application of alter ego principles are ***high***, and the imposition of alter ego liability is to be exercised ***reluctantly and cautiously***." *JPV I L.P. v. Koetting*, 88 Cal.App.5th 172, 189 (2023) (emphasis added) (*quoting Highland Springs Conference & Training Center v. City of Banning*, 244 Cal.App.4th 267, 281 (2016)). As the Court properly held in the 9/15/23 Order, allegations that are "entirely conclusory" and merely "repeat elements from California law on alter ego, rather [than] identifying alleged facts" are insufficient. Dkt. No. 32, p. 13; *see also Riot Games, Inc. v. Suga PTE, Ltd.*, 638 F.Supp.3d 1102, 1120 (C.D. Cal. 2022) ("Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each.") (*quoting Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1116 (C.D. Cal. 2003)).

### A.    The TAC Fails to Properly Allege a Unity of Interest

As to the first requirement, the 9/15/23 Order held that the "factors to be considered in applying" the alter ego doctrine were: (1) "commingling of funds and other assets of the two entities"; (2) "the holding out by one entity that is liable for the debts of the other"; (3) "identical equitable ownership in the two entities"; (4) "use of the same offices and employees"; (5) "use of one as a mere shell or conduit for the affairs of the other"; (6) "inadequate capitalization"; (7) "disregard of corporate formalities"; (8) lack of segregation of corporate records"; and (9) "identical directors and officers." Dkt. No. 32, pp. 12-13 (*quoting Sonora Diamond*, 83 Cal.App.4th at 538-39; *Roman Catholic Archbishop v. Sup. Ct.*, 15 Cal.App.3d 405, 406, 411 (1971)).

In the 9/15/23 Order, the Court held that the following allegations from Triller's Second Amended Complaint ("SAC") were "not sufficient" to properly plead an alter ego theory: (1) that Hila and Ethan (collectively, the "Kleins") "are officers and directors of TEI and Teddy Fresh"; (2) that "TEI and Teddy Fresh do not have any other officers and directors; and (3) "TEI and Teddy Fresh share the same corporate offices." Dkt. No. 32, p. 13 (*citing* Dkt. No. 24, ¶¶ 13-16, 17(a)). As the 9/15/23 Order explained, "[m]any closely held corporations share officers, directors, and offices" and, therefore, such allegations "are ***not sufficient***" to allege an alter ego

LINCOLN
BANDLOW LAW

Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 6

theory. Dkt. No. 32, p. 13 (emphasis added). The Court's finding was correct because "total ownership and shared management personnel are alone insufficient to establish the requisite level of control to meet the first prong for Alter Ego liability." *Riot Games*, 638 F.Supp.3d at 1121 (*quoting Ranza v. Nike*, 793 F.3d 1059, 1073 (9th Cir. 2015); *citing Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 327 F.3d 1122, 1135 (9th Cir. 2003)).

Here, the TAC relies on allegations that are **identical** to those in Triller's SAC. *Compare* Dkt. No. 36, ¶¶ 13-16, 17(a), 17(d) *with* Dkt. No. 24, ¶¶ 13-16, 17(a), 17(d).[4] Therefore, just as the 9/15/23 Order found with the allegations contained in the SAC were insufficient, the allegations contained the TAC (which are identical to those of the SAC) are insufficient to allege an alter-ego theory.

In addition, the 9/15/23 Order found the following allegations from the SAC "entirely conclusory" and merely "repeat[ed] elements from California law on alter ego, rather [than] identifying alleged facts" and, therefore, these allegations were "not sufficient" to plead alter ego liability: (1) "TEI and Teddy Fresh are mere shells, instrumentalities, and conduits"; (2) "TEI and Teddy Fresh are so inadequately capitalized that their capitalization was illusory and trifling"; (3) that the Kleins "diverted assets from TEI and Teddy Fresh to themselves to suit their own convenience"; and (4) "TEI and Teddy Fresh are controlled, dominated, and operated by" the Kleins "as their alter ego." Dkt. No. 32, p 13 (internal ellipses omitted) (*quoting* Dkt. No. 24, ¶¶ 17(a-d)).

Once again, the TAC relies on allegations that are **identical** to those in the SAC. *Compare* Dkt. No. 36, ¶¶ 17(a-d) *with* Dkt. No. 24, ¶¶ 17(a-d). Therefore, just as the 9/15/23 Order found with the allegations contained in the SAC to be insufficient, the allegations contained in the TAC are entirely conclusory and fail to allege an alter ego theory.

The new allegations contained in Paragraphs 17(a)(i-x) of the TAC fail to allege a "unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist." Dkt. No. 32, p. 12 (*quoting Sonora Diamond*, 83 Cal.App.4th at 538).

A "plaintiff who makes allegations on information and belief must state the factual basis for the belief" to support an alter ego theory. *Wimbledon Fund, SPC v. Graybox, LLC*, 2016 WL 7444709, *7 (C.D. Cal. Aug. 31, 2016); *see also Sandoval v. Ali*, 34 F.Supp.3d 1031, 1040 (conclusory allegations made on information and belief are insufficient to plead an alter ego theory); *Oakley, Inc. v. Trimera Military Technology, Inc.*, 2016 WL 8794459, *8-9 (C.D. Cal. Jan. 22, 2016) (same). Two of the new allegations contained in the TAC are made "[u]pon

---

[4] The only additional difference was to the last sentence of Paragraph 17(b). In the SAC, Triller alleged: "Upon information and belief, neither TEI nor Teddy Fresh are insured." Dkt. No. 24, ¶ 17(b). In the TAC, Triller alleged: "Upon information and belief, TEI is not insured" – *i.e.*, the TAC omits reference to TEI. Dkt. No. 36, ¶ 17(b).



# LINCOLN
### BANDLOW LAW

Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 7

information and belief": (1) "TEI, unlike Teddy Fresh, fails to maintain adequate liability insurance to pay claims against TEI"; and (2) "in an effort to intentionally make TEI judgment proof, TEI has few assets and those assets have limited value." Dkt. No. 36, ¶¶ 17(a)(i-ii).

Here, the TAC fails to disclose the factual basis for the aforementioned allegations that were made on information and belief. To the contrary, the TAC makes the conclusory assertion that: (1) TEI lacks insurance, while Teddy Fresh is insured; and (2) TEI has few assets of limited value to intentionally make TEI judgment proof. *See* Dkt. No. 36, ¶¶ 17(a)(i-ii). Further, as to the first allegation (*i.e.*, lack of insurance), there is "***no case law*** considering the lack of liability insurance in alter ego analysis." *Vacless Systems, Inc. v. Vac-Alert IP Holdings, LLC*, 2011 WL 13217924, *6 (C.D. Cal. Jun. 24, 2011) (emphasis added). Moreover, as to the second allegation, it is contradicted by subsequent allegations in the TAC – *i.e.*, that Hila: (1) "uses equipment purchased by TEI to film personal videos for her personal Tik Tok account"; and (2) "uses multiple pieces of equipment, including but not limited to lights, microphones, and cameras, as well as camera audio and other crew members from TEI to film videos." Dkt. No. 36, ¶¶ 17(a)(ix-x).

Next, the TAC makes a series of allegations purportedly derived from the Fashionista Article, namely: (1) the "value" of TEI's "YouTube Channel plummeted in 2017 after YouTube changed how it compensates content creators"; (2) TEI's YouTube Channel is "used to actively market Teddy Fresh because the audience of" TEI's "YouTube Channel is the same as the customer base for Teddy Fresh"; (3) Hila "readily admits to the above comingling of assets in a recent Fashionista article by Morgan Whipple"; (4) "[a]ccording to the Fashionista article," TEI's "YouTube Channel became less profitable after a recalculation of advertising Revenue in 2017, resulting in an 80% drop in revenue" and Hila "diverted over $100,000 from TEI to Teddy Fresh in order to remove assets from TEI" as to not put all their "eggs in one basket"; and (5) the "business goal of Teddy Fresh is to 'trickle down' from the YouTube Channel to create revenue for Teddy Fresh." Dkt. No. 36, ¶¶ 17(a)(iii-iv, vi-viii).

The actual text of the Fashionista Article, however, unequivocally demonstrates that the TAC misrepresents the contents of the Fashionista Article. First, the Fashionista Article makes absolutely no reference to comingling of assets or TEI diverting $100,000 to Teddy Fresh whatsoever. *See* Dkt. No. 36, ¶¶ 17(a)(vi-vii); Ex. A (the Fashionista Article). Indeed, as stated in the Fashionista Article:

> [I]n 2017 a phenomenon known as the "Adpocaly[p]se" resulted in an 80% reduction in their channel revenue: "That was a little bit of a wake-up call for us, like, 'Well, people always say you don't want to have all your eggs in one basket.' ***You need to diversify***."

> The Kleins started the H3 Podcast, and Hila founded Teddy Fresh.

Ex A, p. 2 (emphasis added).



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 8

What the actual text of the Fashionista Article actually demonstrates is that **both** the H3 Podcast and Teddy Fresh were established **after** the "Adpocalypse" in order to "**diversify**" – not to divert assets from TEI to Teddy Fresh or comingle the assets of the two entities.

Second, Hila does not state that the "business goal of Teddy Fresh is to 'trickle down' from the YouTube Channel to create revenue for Teddy Fresh." *See* Dkt. No. 36, ¶ 17(a)(viii). In response to the question, "What's your approach to social media more broadly?," Hila responded with:

> I wanted to start establishing myself more as a person in the fashion world. I'd love to start getting invited to fashion shows and get to know and work with other brands, because we've just been in our own bubble.
>
> In the beginning, I was just **taking selfies for our Friday podcast**, which was my moment to dress up and do something more elevated for my Instagram. **Then I started to bring a photographer to take the pictures**. Then I was like, "I want to do another photoshoot." Now, I'm having so much fun. I'm basically taking the approach of creating what I want to see happen for myself and seeing where it goes.
>
> **One of my big goals is that ultimately it will trickle down to Teddy Fresh – if I'm more a part of the fashion conversation, Teddy Fresh will be as well**.

Ex. A, pp. 2-3 (emphasis added).

In other words, Hila was promoting **herself** as a player in the fashion industry with the goal of benefiting Teddy Fresh – not for TEI's YouTube Channel to "trickle down" to create revenue for Teddy Fresh. Additionally, this section demonstrates that Hila and Teddy Fresh did **not** use TEI assets to take photographs of herself for social media – but that Hila took the photos herself and subsequently retained her own photographer to take photographs – which refutes the allegations in the TAC that Hila used TEI equipment for her social media. *See* Dkt. No. 36, ¶¶ 17(a)(ix-x).

Third, the mere fact that TEI provides marketing for Teddy Fresh is insufficient to demonstrate an alter ego theory. *See* Dkt. No. 36, ¶¶ 17(a)(iv-v).[5] The "Ninth Circuit has stated 'where a parent corporation uses its subsidiary '**as a marketing conduit' and attempts to shield itself from liability based on its subsidiaries' activities**, the alter-ego test is satisfied." *NetApp, Inc. v. Nimble Storage, Inc.*, 2015 WL 4000251, *7 (N.D. Cal. Jan. 29, 2015) (emphasis added;

---

[5] It is also worth noting that the TAC falsely alleges that the video identified in Paragraph 17(a)(v) "shows boxes in the background storing Teddy Fresh garments at what is ostensibly TEI's office space." None of the boxes in the background of the video demonstrate they contain Teddy Fresh merchandise whatsoever.



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 9

ellipses omitted) (*quoting Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) *overruled on other grounds in Burri Law PA v. Skurla*, 25 F.4th 1207 (9th Cir. 2022). Further, "a plaintiff must allege facts 'as to the subsidiary's role as a marketing conduit for the parent were ***specific to the subsidiary's marketing function***" – *i.e.*, "***day-to-day control***." *Gardner v. Starkist Co.*, 418 F.Supp.3d 443, 464 (N.D. Cal. 2019) (emphasis added) (*quoting NetApp*, 2015 WL 400251, *7; *Moody v. Charming Shoppes of Delaware, Inc.*, 2008 WL 2128955, *7 (N.D. Cal. May 20, 2008)).

Here, the TAC's "marketing conduit" theory fails because: (1) TEI is not a subsidiary of Teddy Fresh; (2) Teddy Fresh is not using TEI to shield Teddy Fresh from its activities – rather the TAC seeks to hold Teddy Fresh responsible for TEI's activities; or (3) the mere fact that TEI markets Teddy Fresh products does not demonstrate that Teddy Fresh controls the day-to-day operations of TEI or that TEI's specific purpose is to just promote Teddy Fresh products. The Distribution Video further emphasizes that TEI is not a mere "marketing conduit" for Teddy Fresh. Not only does it contain hours of content unrelated to Teddy Fresh, within the first 12 seconds of the Distribution Video, Ethan announces: "Today's episode is sponsored by Magic Spoon and Adam & Eve." Distribution Video at 0:00:00-0:00:12; *see also Id.* at 0:29:45-0:32:55. Therefore, the specific purpose of TEI is not to merely serve as a marketing conduit for Teddy Fresh to shield Teddy Fresh from liability.

For these various reasons, the allegations of the TAC are insufficient to plead a unity of interest for purposes of alter ego liability.

### B.     The TAC Fails to Properly Allege an Inequitable Result

As to the second requirement for an alter-ego theory, the Court correctly held in the 9/15/23 Order that the "corporate form [must be] used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose" and the "alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud and other misdeeds." Dkt. No. 32, p. 13 (*quoting Sonara Diamond*, 83 Cal.App.4th at 538). The Court held that the SAC failed to allege "any fraud perpetrated, or statute circumvented by the alleged misuse of the corporate form" or "that there would be an inequitable result if the corporate veil were not pierced." Dkt. No. 32, p. 14.

Once again, the allegations contained in the TAC are ***identical*** to the deficient allegations contained in the SAC. *Compare* Dkt. No. 36, ¶ 18 *with* Dkt. No. 24, ¶ 18. This alone demonstrates that the TAC fails to adequately allege the second requirement of alter-ego theory.

Further, the mere "difficulty in enforcing a judgment or collecting a debt does ***not***, by itself, constitute an inequitable result for purposes of the alter ego doctrine." *JPV I*, 88 Cal.App.5th at 200 (emphasis added) (*citing Sonora*, 83 Cal.App.4th at 539); *see also Gerritsen v. Warner Bros. Entertainment, Inc.*, 116 F.Supp.3d 1104, 1144 ("California courts routinely '***reject*** the view that the potential difficulty a plaintiff faces collecting a judgment is an



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 10

inequitable result that warrants application of the alter ego doctrine.'") (brackets omitted; emphasis added)) (*quoting Neilson*, 290 F.Supp.2d at 1117; *citing VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal.App.4th 228, 245; *Mid-Century Ins. Co. v. Gardner*, 9 Cal.App.4th 1205, 1213 (1992); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 842 (1962)).

Here, the only purported inequitable result alleged by Triller is: "The commingling of assets and unlawful business conduct, as alleged more fully herein, by Defendants was intended, among other things, ***to allow Mr. Klein and Mrs. Klein to avoid liability to [Triller] and others***."[6] TAC, ¶ 18 (emphasis added). Not only is this a completely conclusory assertion that this Court rejected in the 9/15/23 Order, but this allegation also fails as a matter of law to demonstrate an inequitable result under the second alter ego requirement.

Nor has Triller identified any purported fraud to support an alter ego theory. Consonant with the heightened standard articulated in California state court,[7] the "majority of courts in this Circuit have found that plaintiffs must satisfy Rule 9(b)'s particularity standard as to the fraud element of plaintiff's alter ego theory." *Wimbledon Fund*, 2016 WL 7444709, *5 (*citing Neilson*, 290 F.Supp.2d at 1116; *Sandoval*, 34 F.Supp.3d at 1040; *TransFresh Corp v. Ganzerla & Assoc., Inc.*, 862 F.Supp.2d 1009, 1020 (N.D. Cal. 2012); *FDIC v. Freestand Fin. Holding Corp*, 2011 WL 166362, at *1 (C.D. Cal. Jan. 12, 2011)); *see also Riot Games*, 638 F.Supp.3d at 1120 ("a plaintiff must allege ***specifically*** both of the elements of alter ego liability, as well as facts supporting each.") (emphasis added) (*quoting Neilson*, 290 F.Supp.2d at 1116).

Under the heightened standard, the "allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (*quoting Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001); *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993)). Therefore, to satisfy the heightened pleading standard, the "complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Glazer Capital Management*, 63 F.4th at 765 (*quoting Neubronner*, 6 F.3d at 672).

Here, the TAC fails to identify any fraudulent statement or conduct – let alone specify facts as to the time, date, place, benefits received and other details of any purported fraud. Indeed, the only reference to "fraud" is the conclusory assertion that: "Adherence to the fiction of the separate existence of TEI and Teddy Fresh, on the one hand, and Mr. Klein and Mrs.

---

[6] Nowhere in the TAC does Triller identify the "the other things" or "others" to which it is referring.

[7] *See JPV I*, 88 Cal.App.5th at 189 (the "standards for application of alter ego principles are high, and the imposition of alter ego liability is to be exercised reluctantly and cautiously." (*quoting Highland Springs Conference & Training Center*, 244 Cal.App.4th at 281).



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 11

Klein, on the other, would permit an abuse of the corporate privilege and would sanction fraud." Dkt. No. 36, ¶ 18. This is woefully deficient to properly plead fraud – even without the heightened pleading standard.

Finally, the TAC does not allege how the purported facts alleged for unity of interest result or are otherwise connected to any fraud, violation of statute or inequitable result in the **present case**. California law is clear: "The issue is not so much whether, for all purposes, the corporation is the 'alter ego' of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether *in the particular case presented and for the purposes of such case* justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." *JPV I*, 88 Cal.App.5th at 195 (original emphasis) (*quoting Kohn v. Kohn*, 95 Cal.App.2d 708, 718 (1950)).

Therefore, for these various reasons, Triller has failed to properly allege any fraud, violation of statute or inequitable result to support its alter ego theory.

## III.   The Vicarious Copyright Infringement Claim Fails as a Matter of Law

### A.   The TAC Fails to Allege Third-Party Direct Infringement

As the Ninth Circuit has made clear, a "defendant may be held vicariously and contributorily liable for copyright infringement *carried out by another*." *Oracle America, Inc. v. Hewlett Packard Enterprise Co.*, 971 F.3d 1042, 1051 (9th Cir. 2020) (emphasis added) (*citing Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1071 (9th Cir. 2013)). Consequently, "as a threshold matter" there must be "direct infringement *by third parties*." *Oracle America*, 971 F.3d at 1050 (*quoting Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007)).

As the 9/15/23 Order held, Defendants argued that "Plaintiff has not alleged that third parties 'fixed' the Unlisted Video when they streamed the Unlisted Video." Dkt. No. 32, p. 4. However, the 9/15/23 Order did not find that third parties "fixed" the Unlisted Video when watching it on YouTube – nor any other form of infringement by third parties. *Id.*, p. 5. Rather, the Court's findings in the 9/15/23 Order focused solely on whether the Broadcast and Unlisted Video were fixed.

The TAC does not allege any infringement by third-parties, nor could it. When third-parties viewed the Unlisted Video on YouTube, they did not publicly perform or publicly display the Unlisted Video – let alone in a "place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gather." *See* 17 U.S.C. § 101 (definitions of "display" "perform," "transmit" and "publicly") and 17 U.S.C. § 106(4-5). Further, when third-parties viewed the Unlisted Video on YouTube they did not create a derivative work "based on" the Broadcast or otherwise "recasted, transformed, or



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 12

adapted" the Broadcast. *See Id.* § 101 (definition of "derivative work") and § 106(2). Nor did third-parties who viewed the Unlisted Video publicly distribute the Broadcast because merely viewing the Unlisted Video on YouTube is not offering a copy of it "to the public by sale or other transfer of ownership, or by rental, lease, or lending." *See Id.* § 106(3).

Nor did third-parties reproduce the Unlisted Video when they viewed it on YouTube. The reproduction right grants a copyright owner the exclusive right to "reproduce the copyrighted work in ***copies.***" 17 U.S.C. § 106(1) (emphasis added). To constitute a copy, the copy must be "***fixed***." *Id.* § 101 (definition of "copies") (emphasis added). A work is "fixed" when "its embodiment in a copy … is sufficiently ***permanent or stable*** to permit it to be perceived, reproduced, or otherwise communicated for ***a period of more than transitory duration***." *Id.* (definition of "fixed") (emphasis added).

Critically, when "a work consisting of sounds, images, or both [is] transmitted" – like the Unlisted Video, a copy is only "fixed" when the "fixation of the work is being made ***simultaneously with its transmission***." 17 U.S.C. § 101 (definition of "fixed") (emphasis added). Congress clarified this point in the legislative history of the Copyright Act: the "definition of 'fixation' would ***exclude*** from the concept purely evanescent or transient reproductions such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or captured momentarily in the 'memory' of a computer." H.R. REP. 94-1476, 53, 1976 U.S.C.C.A.N. 5659, 5666 (emphasis added).

The transitory nature of digital streaming (*i.e.*, digital transmission) is emphasized by the Supreme Court's definition of "streaming" as "the process of providing a steady flow of audio or video data so that an internet user is able to access it ***as it is transmitted***." *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 437 (2014) (brackets omitted; emphasis added) (quoting A Dictionary of Computing (6th ed. 2008)); *see also Cartoon Network LP, LLLP v. CSC Holdings, Inc.* 536 F.3d 121, 129-130 (2d Cir. 2008) (holding that streaming a video involves "only a minuscule portion of a work" that does not result in "'a work' [being] embodied" – *i.e.*, the data is "rapidly and automatically overwritten as soon as it is processed."); RJN, ¶ 13, Ex. P, (Merriam Webster Dictionary defining "stream" as "to transfer (digital data, such as audio or video material) in a continuous stream especially for immediate processing and playback).

Therefore, not only does the TAC fail to allege any third-party infringement – it cannot do so as a matter of law.

### B.     The TAC Fails to Allege Direct Financial Benefit from Infringement

As the Court correctly held in the 9/15/23 Order, Triller must allege: (1) that Defendants had "a direct financial interest in the infringing activity"; and (2) "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 13

relationship between the infringing activity and any financial benefit a defendant reaps." Dkt. No. 32, p. 11 (*quoting Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019); *VHT, Inc. v. Zillow Grp., Ind.*, 918 F.3d 723, 745 (9th Cir. 2019) *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)).

As the Ninth Circuit explained, a "website owner can receive a direct financial benefit from the presence of infringing material on his or her website, but only 'where the availability of infringing material acts as a draw for customers.'" *Erickson Prods.*, 921 F.3d at 929 (*quoting Ellison*, 357 F.3d at 1079). If, on the other hand, "the infringing material is 'just an added benefit,' rather than a draw, it does not confer a direct financial benefit on the website owner." *Erickson Prods*, 921 F.3d at 929 (*quoting Ellison*, 357 F.3d at 1078-79).

In the 9/15/23 Order, the Court correctly held that the SAC did not adequately allege "any direct financial interest in the infringing activity." Dkt. No. 32, p. 11. As the Court properly observed, (1) the "alleged infringing activity is only as to the Unlisted Video, not the Distribution Video"; (2) "the Unlisted Video did not contain any sponsorships or offer for sale [of] any merchandise"; (3) Defendants did not "receive revenue for advertisements on that video because the Unlisted Video was not eligible for 'monetization' under the YouTuber Partner Program"; (4) the Unlisted Video "was not eligible" for monetization "because it was not uploaded to H3 Podcast's YouTube account; instead, it was uploaded to a separate channel with less than one thousand subscribers" – which Triller did not dispute; and (5) "because Plaintiff argues that its vicarious-copyright-infringement claim is premised only on the Unlisted Video to avoid Defendants' 'fair use' defense, it is inconsistent to argue that its claim is premised on the Distribution Video for purposes of the 'direct financial interest element.'" Dkt. No. 32, p. 11 (*citing* Dkt. No. 26-6, Exs. D, F, G; Dkt. No. 24, ¶ 34).

Here, the TAC once again doubles down on alleging that the purported direct financial benefit was derived from the Distribution Video and **not** the Unlisted Video. Dkt. No. 36, ¶¶ 36-41. Specifically, the TAC alleges on "information and belief" that: (1) individuals who watched the Unlisted Video "watched the Distribution Video" again "for the purpose of watching commentary of the material they watched in the Unlisted Video"; (2) that rewatching the Distribution Video again created "additional revenue for the H3 Podcast and YouTube Channel through the YouTube Partner program"; (3) Defendants "made the Unlisted Video available to its audience to encourage the audience … to watch the Distribution Video, which was a monetized video, multiple times"; and (4) individuals who watched the Unlisted Video "purchased merchandise offered through the Distribution Video, and/or made purchases from the sponsors of the Distribution Video" – which also benefited "Teddy Fresh." *Id.*

None of these allegations are sufficient to demonstrate that Defendants received a



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 14

direct financial benefit from their alleged infringement – *i.e.*, the Unlisted Video. First, the TAC makes the fatal judicial admission that the Unlisted Video qualified as a fair use by alleging that individuals who watched the Unlisted Video "watched the Distribution Video" again "***for the purpose of watching commentary of the material they watched in the Unlisted Video***." Dkt. No. 35, ¶ 38 (emphasis added). "Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact" because they are "conclusively binding on the party who made them." *In re Barker*, 839 F.3d 1189, 1195 (9th Cir. 2016) (*quoting Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)). In other words, the TAC admits that people watched the Distribution Video (which the 9/15/23 Order held was a fair use), typed in the URL to the Unlisted Video from the Distribution Video, watched the Unlisted Video and then rewatched the Distribution Video to evaluate the commentary of Unlisted Video/Broadcast and not merely "to see Plaintiff's work." Dkt. No. 32, pp. 7-11.

Second, the TAC doubles down on alleging a direct financial benefit – not from the alleged infringing content (*i.e.*, the Unlisted Video) – but from non-infringing sources and content (*i.e.*, ad revenue from the Distribution Video, sponsorships received for the Distribution Video and people who purchased Teddy Fresh merchandise. As the Ninth Circuit recently explained, the direct financial benefit must be from "***infringing posts on that page specifically***." *Long v. Dorset*, 854 Fed.Appx. 861, 864 (9th Cir. 2021) (emphasis added). Indeed, as the Supreme Court explained, vicarious liability "allows imposition of liability when the ***defendant profits directly from the infringement***." *Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931 fn. 9 (2005) (emphasis added). As the Ninth Circuit further explained, "any financial benefit" must be "***from the specific infringement alleged***" by the plaintiff and, to hold otherwise, would create "significant tension with Article III's standing requirement." *Perfect 10, Inc. v. Giganews, Inc.* ("*Giganews*", 847 F.3d 657, 674 (9th Cir. 2017) (emphasis added).

Third, the allegations contained in Paragraph 36 of the SAC (which the Court found to be insufficient to allege direct financial benefit) and Paragraph 36 of the TAC are ***identical***. *Compare* Dkt. No. 36, ¶ 36 *with* Dkt. No. 24, ¶ 36. Further, the additional allegation contained in Paragraphs 37-41 of the TAC merely restate the substance of Paragraph 36.

Fourth, cases that have analyzed whether a plaintiff has properly alleged a direct financial benefit on a motion to dismiss are highly instructive. In such cases, the plaintiff alleged that: (1) the defendant received commissions from the sale of plaintiff's content; (2) the defendant placed advertisements next to the infringing content; or (3) the defendant received payment for providing access to the infringing content. *See Keck v. Alibaba.com Hong Kong Ltd.*, 369 F.Supp.3d 932, 938-39 (N.D. Cal. 2019) (denying motion to dismiss because plaintiff alleged "Defendants receive commissions from the



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 15

sale of unauthorized copies of [plaintiff's] artwork and that the unauthorized display, reproduction and sale of copyrighted works owned by [plaintiff] and others draws visitors to Defendants' platforms); *IO Group, Inc. v. Jordon*, 708 F.Supp.2d 989, 999 (N.D. Cal. 2010) (denying motion to dismiss because plaintiff alleged the defendant "earned revenue by selling advertising on" the defendant's website "directly next to the locations displaying Plaintiff's infringed work."); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) (reversing grant of motion to dismiss because swap meet landlord received a direct financial benefit from "a daily rental fee by each of the infringing vendors" and "admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices.").

Additionally, cases that have found the existence of a direct financial benefit at later stages of litigation are also instructive. In such cases, the defendant received a direct financial benefit by: (1) receiving payment for the ability to access the infringing work; (2) solicited money in connection with the promotion of the infringing work; or (3) used the existence of the infringed content to attract new customers or users. *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1155 (9th Cir. 2012) (owner of jazz lounge "derived a financial benefit from the musical performances in the lounge"); *Henley v. DeVore*, 733 F.Supp.2d 1144, 1159, 1164 (C.D. Cal. 2010) (infringing music videos "contained a link to [the defendant's] campaign website, where one could make online donations to the campaign); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (website's "future revenue" was "dependent upon 'increases in user base" and more users would register  from the availability of the infringed works on the website).

Here, the TAC does not (because it cannot) allege that Defendants: (1) received any commissions from the sale of the Unlisted Video; (2) placed advertisements next to the Unlisted Video; (3) received payment from the ability to access the Unlisted Video; (4) promoted the existence of the Unlisted Video – let alone solicited money while promoting it; or (4) any other financial benefit derived directly from the Unlisted Video.

Finally, the law on direct and indirect profits for purposes of 17 U.S.C. Section 504(b) is instructive for the direct financial benefit analysis. *See Milton H. Greene Archives, Inc. v. Julien's Auction House LLC*, 345 Fed.Appx. 244, 248 (9th Cir. 2009) ("The district court also properly instructed the jury that 'direct profit' required direct financial (monetary) benefit."). "Direct profits" are "those that are generated by selling an infringing product" – while "indirect profits" involve "revenue that has a more ***attenuated nexus*** to the infringement." *Mackie v. Rieser*, 295 F.3d 909, 914 (9th Cir. 2002) (emphasis added). "In other words, indirect profits arise when the alleged infringer does not sell the copyrighted work itself but rather uses the copyrighted work to sell another product." *Masterson Marketing, Inc. v. KSL Recreation Corp.*, 495 F.Supp.2d



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 16

1044, 1049 fn. 5 (S.D. Cal. 2007) (*citing Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003)).

Both profits and direct financial benefit depend on causation. *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 ("We take this opportunity to reaffirm that a plaintiff in a § 504(b) action must establish this causal connection, and that this requirement is akin to tort principles of causation and damages") (*citing Mackie*, 296 F.3d at 915 & fn. 6, 916-17); *Erickson Prods.*, 921 F.3d at 829 ("The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps") (*quoting Ellison*, 357 F.3d at 1079). Where "an infringer's profits are only remotely and speculatively attributable to infringement," a plaintiff is unable to demonstrate any profits attributable to infringement and, consequently, demonstrate a direct financial benefit. *Polar Bear Prods*, 384 F.3d at 711 fn. 7; *Ellison*, 357 F.3d at 1079 (plaintiff failed to demonstrate that "customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available).

Here, since the TAC does not allege any direct financial benefit from the Unlisted Video, it alleges an indirect financial benefit. Specifically, the TAC speculates "upon information and belief" that Defendants indirectly benefited from: (1) alleged additional views to the Distribution Video, which purportedly resulted in additional advertising revenue; (2) purchases from the sponsors of the Distribution Video (which is not a financial benefit to Defendants but third-parties); and (3) purchases of Teddy Fresh products (which is not a direct financial benefit to TEI or the Kleins). Dkt. No. 36, ¶¶ 36-41.

None of these allegations demonstrate a direct financial benefit from the Unlisted Video. Nor could they. The webpage for the Unlisted Video did not contain a link to (or otherwise prompt viewers to) (1) the Distribution Video; (2) the sponsors for the Distribution Video; or (3) for Teddy Fresh merchandise. Nor did the Unlisted Video itself contain any information about the same.

Therefore, for these various reasons, the TAC fails to allege a direct financial benefit from the Unlisted Video to support a vicarious copyright infringement claim.

## IV.    **Meet and Confer**

Defendants are willing to meet and confer in good faith about the potential motion to dismiss. Defendants' position, however, is that Triller should: (1) dismiss Teddy Fresh and the Kleins from this action with prejudice; and (2) dismiss the vicarious copyright infringement claim with prejudice.



Farhad Novian, Michael O'Brien, Lauren Woodland and Alexander Kandel
October 2, 2023
Page 17

     Since Defendants must file their motion to dismiss by Friday, October 13, 2023 (*see* F.R.C.P. Rule 15(a)(3)), Local Rule 7-3 requires us to meet and confer telephonically by Friday, October 6, 2023. ***Please inform us when you will be available to meet and confer telephonically prior to the <u>October 6, 2023</u> deadline.***

     This letter does not constitute a complete statement of all of Defendants' rights, defenses, contentions, legal theories or the facts in support thereof.  Nothing stated herein is intended, nor shall it constitute, a waiver or relinquishment of any of Defendants' rights, defenses, or remedies, whether legal or equitable, all of which are hereby expressly reserved.

     Sincerely,

     Lincoln D. Bandlow