Rom Bar-Nissim (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Countercomplainant
Ted Entertainment, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

TRILLER FIGHT CLUB II LLC, a
Delaware limited liability company,

Plaintiff,

v.

TED ENTERTAINMENT, INC., a
California corporation; TEDDY
FRESH, INC., a California
corporation; ETHAN KLEIN, an
individual; HILA KLEIN, an
individual; and DOES 1-10

Defendants.

_____

TED ENTERTAINMENT, INC, a
California corporation,

Countercomplainant,

v.

TRILLER FIGHT CLUB II, LLC, a
Delaware limited liability company

Counter-defendant.

Case No.: 2:21-cv-03942-JAK-KS

**TED ENTERTAINMENT, INC'S
COUNTERCOMPLAINT AGAINST
TRILLER FIGHT CLUB II, LLC**

**JURY TRIAL DEMANDED**

Assigned to: Hon. John A. Kronstadt

## COUNTERCLAIM

Pursuant to Federal Rule of Civil Procedure Rule 13(b), countercomplainant Ted Entertainment, Inc. ("TEI") brings the following countercomplaint against counter-defendant Triller Fight Club II, LLC ("Triller") and alleges as follows:

## INTRODUCTION

1.      Triller engaged in a false advertising campaign in violation of 15 U.S.C. Section 1125(a). Triller made these statements to advertise and promote its so-called "amnesty program" for individuals who viewed *Jake Paul vs. Ben Askren* (the "Broadcast") without authorization. In the course of advertising and promoting its so-called "amnesty program" Triller made false and misleading statements that TEI's podcast episode entitled *Jake Paul Fight Was A Disaster – H3 Podcast # 244* (the "Podcast") infringed the Broadcast and that anyone who viewed the Podcast engaged in copyright infringement. Even worse, Triller made false and misleading statements about the financial ramifications of watching the Podcast to persuade the public to pay Triller $49.99 each to participate in Triller's so-called amnesty program. This counterclaim is directed at exposing Triller's false and misleading statements and force it to account for its deception.

## BACKGROUND OF H3H3PRODUCTIONS AND THE H3 PODCAST

2.      TEI is the owner of various YouTube channels. Its first YouTube channel was h3h3Productions (the "h3h3 Channel"). The h3h3 Channel featured short form, highly edited videos of Ethan and Hila Klein criticizing bad actors in the online community and their content.

3.      For many in the YouTube community, the content on h3h3 Channel epitomized how online content creators should make a fair use of third-party content. This was put to the test when Ethan and Hila Klein were sued for copyright infringement, misrepresentation under 17 U.S.C. Section 512(f) and defamation for videos posted on the h3h3 Channel and another channel owned by TEI called Ethan and Hila (the "Ethan and Hila Channel"). Ultimately, Ethan and Hila Klein

1   prevailed. *See Hosseinzadeh v. Klein*, 276 F.Supp.3d 34 (S.D.N.Y. 2017). Notably,

2   the court found that video on the Ethan and Hila Channel provided "quintessential

3   criticism and comment[ary]." *Id.* at 45.

4       4.    In 2017, TEI established a new YouTube channel entitled the H3

5   Podcast (the "H3 Podcast Channel"). The H3 Podcast Channel contained content

6   similar to content on the h3h3 Channel and Ethan and Hila Channel – namely

7   critique of bad actors in the online community and their content. Unlike the content

8   on the h3h3 Channel and Ethan and Hila Channel, content on the H3 Podcast

9   Channel comprised of long form unedited discussions between Ethan and Hila Klein

10  and would include discussions on various online trends or interviews online content

11  creators.

12  ## TEI'S HISTORY OF CRITQUEING JAKE PAUL

13      5.    Jake Paul is a highly controversial and polarizing social media

14  influencer. Jake Paul – by his own admission – creates content for children ages 8

15  through 16.[1] Jake Paul is infamous for engaging in highly aggressive, manipulative

16  and avaricious marketing practices to his child audience to induce them to purchase

17  his merchandise – including teaching his child audience how to manipulate their

18  parents into making such purchases. Jake Paul is also infamous for exemplifying bad

19  and unruly behavior to his child audience. Jake Paul's behavior was so outlandish

20  that Disney fired him from the children's television show *Bizaardvark*.[2]

21      6.    Jake Paul became a pariah in the online commentary community. Not

22  only were online commentators concerned about the extremely adverse impact Jake

23  Paul had on children, the online commentary community was also concerned about

24  [1] *See* Catherine Thorbecke, ABC News, "Self-described 'imperfect role model' Jake
    Paul opens up about his YouTube super-stardom" (March 20, 2018), *available at*:
25  https://abcnews.go.com/GMA/Culture/imperfect-role-model-jake-paul-opens-youtube-super/story?id=53856269.

26  [2] *See* Seth Abramovitch, The Hollywood Reporter, "YouTube Star Jake Paul on
    Getting Fired by Disney, Feuding With Neighbors: "I Feel Like a Zoo Animal"
27  (August 24, 2017) *available at*: https://www.hollywoodreporter.com/news/general-news/jake-paul-youtube-sensation-getting-fired-by-disney-1031550/.

28

TED ENTERTAINMENT, INC'S COUNTERCOMPLAINT AGAINST TRILLER FIGHT CLUB II, LLC

the impact Jake Paul would have on various online platforms, including YouTube. This was exacerbated when Jake Paul's equally problematic brother, Logan Paul, created a video for his child audience that display the body of an individual who committed suicide in a Japanese forest.

7.     Some of the most prominent and well received criticism of Jake Paul was created by TEI – first on the h3h3 Channel and later on the H3 Podcast Channel. TEI made several videos on both channels criticizing Jake Paul's content, behavior, avarice and impact on children.

      a.  Examples of TEI content from the h3h3 Channel critiquing Jake Paul include:

          i.  *Sit Down Jake Paul (It's Every Day Bro)* (June 3, 2017) *available at*:
https://youtu.be/ybCeaYsrM6s?si=_B9rtx8Twj1vrRl2;

          ii.  *The Viner Invasion of 2017* (July 3, 2017) *available at*:
https://youtu.be/Mdi-ZdCRfBs?si=C2CuHPqYBGfYtRyd;

          iii.  *Jake Paul Ruins Los Angeles* (July 19, 2017) *available at*:
https://youtu.be/8D3uG0u2__o?si=cbbXIPOHcAJtPW7Q;

          iv.  *Jake Paul Doxes Post Malone* (July 22, 2017) *available at*:
https://youtu.be/RcRsHhsuhHw?si=UgIKchIt2fleNFnf;

          v.  *Jake Paul Corrects Our Grammer* (August 1, 2017) *available at*:
https://youtu.be/aGAxKpNWIA0?si=IBZSdr5fojbK41qo;

          vi.  *The Logan Paul Odyssey* (Jan. 16, 2018) *available at*:
https://youtu.be/N3Dlpky9ey8?si=GwhrxIXE44GM6jqD;

          vii.  *Jake Paul & RiceGum Promote Gambling To Kids* (Jan. 2, 2019) *available at*:
https://youtu.be/3ewyEF3Wd9M?si=VQrPgBjUTQdKzOTv.

      b.  Examples of TEI content from the H3 Podcast Channel critiquing

Jake Paul include:

    i. *H3 Podcast #22 – Jake Paul & KTLA Reporter Chris Wolfe* (August 19, 2017) *available at*: https://youtu.be/q_faWNnWhcw?si=wzLyYqQIMqCwSJ3H;

    ii. *H3 Podcast #45 – Jake & Logan Paul's Predatory Merch Machine* (December 30, 2017) *available at*: https://youtu.be/hOLCEvGO-SU?si=dKMlI-zSHbfsfhLO;

    iii. *Logan Paul Rips Off Shane Dawson & New Jake Paul Song Is Awful – H3 Podcast #108* (March 15, 2019) *available at*: https://www.youtube.com/watch?v=qejmBpzCXOE;

    iv. *Jake Paul's New Scam – H3 Podcast #176* (February 19, 2020) *available at*: https://youtu.be/X9bdbCGiSJ8?si=MKRvXERo-rgu-GgY;

    v. *Jake Paul Arrested For Looting & The Karen Invasion – H3 Podcast #193* (June 13, 2020) *available at*: https://youtu.be/MJVM5bWcbgk?si=m1GHquU6qFBZoEai;

8. Beginning in 2018, Jake Paul began to transition from creating online content to becoming an amateur (and subsequently professional) boxer. Initially, Jake Paul fought online content creators. On August 25, 2018, Jake Paul fought the online content creator Deji Olatunji p/k/a ComedyShortsGamer – who Jake Paul defeated in the fifth round. On January 30, 2020, Jake Paul fought another online content creator Ali Eson Gib p/k/a AnEsonGib – who Jake Paul defeated in the first round.

9. After his first two fights, Jake Paul began to box retired professional athletes. On November 28, 2020, Jake Paul boxed the retired professional basketball player, Nate Robinson, who was 13 years older than Jake Paul. Jake Paul defeated Nate Robinson in the second round.

10. Like his online content career, Jake Paul's boxing career drew heavy

criticism. TEI produced episodes on the H3 Podcast Channel that criticized Jake Paul's boxing matches as being horribly lopsided in favor of Jake Paul because he was either significantly larger or younger than his opponents. These episodes produced by TEI also criticized Jake Paul's boxing matches as cash grabs intended to bait the audience to pay steep pay-per-view prices in the hope of seeing Jake Paul defeated.

### JAKE PAUL VS. BEN ASKREN

11.     In 2021, it was announced that Jake Paul's next opponent would be Ben Askren. Ben Askren was a former Olympic wrestler and, in 2009, began his career as a professional MMA fighter. On November 18, 2019 (*i.e.*, ten years later), Ben Askren retired as a professional MMA fighter. Nearly one year later, Ben Askren underwent hip surgery. Like Nate Robinson, Ben Askren was 13 years older than Jake Paul.

12.     Triller was the promoter and organizer for the boxing match between Jake Paul and Ben Askren. Tickets to view the boxing match were sold for $49.99 on the Triller app – a social media application that bears an uncanny resemblance to (yet is far less successful than) the social media application, TikTok.

13.     On April 17, 2021, Triller streamed the Broadcast through the streaming platform Fite TV. The Broadcast was 3:57:04 hours long and comprised of only six boxing matches (including Jake Paul vs. Ben Askren). Instead of focusing on boxing, the Broadcast was far more entertainment-oriented with musical performances by The Black Keys, Diplo, Doja Cat, Justin Bieber, Major Lazer, Saweetie, Snoop Dogg, Ice Cube, Too $hort and E-40 and was hosted by the former *Saturday Night Live* comedian, Pete Davidson.

14.     Jake Paul's boxing match with Ben Askren was – to put it delicately – underwhelming. Ben Askren was visibly out of shape and, due to being significantly older than Jake Paul and only recently recovered from hip surgery, Jake Paul defeated Ben Askren in the first round.

15.     The Broadcast became a lightning rod of criticism both before and after it was shown to the public. Prior to the Broadcast, both sports and online commentators ridiculed the matchup between Jake Paul and Ben Askren as, once again, a cash grab and lopsided to artificially portray Jake Paul as a talented boxer. Many did not want to support the Broadcast or Jake Paul by paying the $49.99 pay-per-view fee. The Broadcast merely validated the criticism of sports and online commentators as being a farce that degraded the sport of boxing by introducing live music performances and comedy into the sport.

16.     Jake Paul claimed that the Broadcast received 1,500,000 pay-per-view buys and $75,000,000 in revenue.[3] However, whether because individuals refused to financially support Jake Paul or because the price point was prohibitively expensive for his target audience, Triller claimed that nearly 2,000,000 individuals watched the Broadcast via unauthorized streams. *See* Exhibit A.

**TEI'S CRITIQUE OF THE BROADCAST**

17.     Prior to the Broadcast, TEI decided to review the Broadcast on the H3 Podcast Channel. To conduct this critique, TEI employees would have to watch the Broadcast. TEI, however, did not want to provide any financial support for Jake Paul (or for any other endeavor involving Jake Paul). Consequently, on April 17, 2021 (*i.e.*, the day of the Broadcast), TEI employees watched an unauthorized stream of the Broadcast on the Internet. TEI did not make a simultaneous copy of the Broadcast when it was viewed on April 17, 2021. TEI did pay the $49.99 viewing fee for the Broadcast at a later date.

18.     After viewing the Broadcast, TEI began formulating its critique of the Broadcast. One aspect TEI decided to critique was the boxing match between Jake Paul and Ben Askren. TEI further decided that, to properly illustrate the critique of the boxing match, brief excerpts of the boxing match from the Broadcast was

[3] Jake Paul, Instagram (April 18, 2021) *available at*:
https://www.instagram.com/p/CN0m1V9ho4M/?utm_source=ig_embed&ig_rid=d5b ed9cc-7bc4-43e4-89e4-da41dffd7a93

1  necessary to properly contextualize the critique.

2      19.    On August 18, 2021 (*i.e.*, the day after the Broadcast), TEI located a

3  13:57 minute excerpt of the Broadcast on YouTube that contained the boxing match

4  between Jake Paul and Ben Askren. Out of concern that the video would be taken

5  down prior to the Podcast airing on April 22, 2021, TEI made copy and uploaded this

6  13:57 minute excerpt as an unlisted video to the Zach the Sound Lad channel (the

7  "Reference Video").

8      20.    TEI used the Zach the Sound Lad channel to store videos that were

9  taken down (or likely to be taken down) for purposes of commentary and critique on

10 the H3 Podcast Channel. Videos on the Zach the Sound Lad channel were unlisted –

11 which means the videos could only be accessed by someone with the exact URL for

12 the particular video. TEI does not set videos on the Zach the Sound Lad channel on

13 private because other TEI employees are unable to access private videos through

14 their YouTube accounts. TEI took this same approach with the Reference Video.

15     21.    On April 22, 2022, TEI produced the Podcast – *i.e.*, *Jake Paul Fight*

16 *Was A Disaster – H3 Podcast # 244* – and aired it on YouTube via the H3 Podcast

17 Channel. During the Podcast, TEI critiqued: (1) the Broadcast in general, including

18 its quality and decision to include mainstream musical acts in a fight between a

19 YouTuber and a former wrestler and mixed martial arts fighter; (2) Ben Askren's

20 physical fitness to participate in the fight, including comparing his previous physical

21 fitness with his current physical fitness and how this created a lopsided matchup in

22 favor of Jake Paul; (3) Ben Askren's ability to box; (4) how Jake Paul knocked out

23 Ben Askren; (5) the fight between Jake Paul and Ben Askren, including its brevity

24 and the referee's decision to call the fight for Jake Paul; (6) whether Ben Askren

25 "took a dive" to give Jake Paul the victory; (7) the reported views of the Broadcast;

26 (8) the reported revenue from the Broadcast; and (9) Jake Paul's financial take from

27 the Broadcast.

28     22.    During the Podcast, TEI used only 42 seconds of the Reference Video

(*i.e.*, 5.9% of the Reference Video and .3% of the Broadcast) to facilitate TEI's criticism of the Broadcast. The 42 seconds used by TEI was comprised of: (1) five seconds exclusively of audio; (2) nine seconds of both audio and video; and (3) 28 seconds exclusively of video without any audio.

23.     To show the excerpt of the Reference Video in the Podcast, a screenshot of Ethan's web browser was shown on the Podcast. This included the URL for the Reference Video in the far upper right corner of the screen. The URL was so tiny as to render it illegible to the casual viewer. *See* Dkt. No. 36, ¶ 5.

24.     TEI did not: (1) provide a hyperlink to the Reference Video in any manner; (2) instruct viewers to watch the Reference Video; (3) direct viewers' attention to the URL for the Reference Video; or (4) intend for anyone to view the Reference Video on its own. Rather, the only way to potentially discern the URL for the Reference Video and watch it would be to: (1) pause the Podcast when the URL was shown; (2) enlarge the Podcast to full screen mode on a large screen; (3) zoom in on the URL; (4) manually write down the URL for the Reference Video; and (5) manually type the URL for the Reference Video into the user's internet browser.

### TRILLER'S INITIAL LAWSUIT FOR COPYRIGHT INFRINGEMENT

25.     On April 23, 2021, Triller's parent company, Triller, Inc. (which became Triller Platform Co. on June 27, 2022) sued various defendants for copyright infringement of the Broadcast in an action entitled *Triller, Inc. v. Filmdaily.com* (Case No. 2:21-cv-03502-PA-RAO) (the "Filmdaily Action"). TEI (nor anyone associated with TEI) was named in the initial complaint of the Filmdaily Action.

26.     On August 29, 2021, Triller filed an amended complaint that: (1) changed the plaintiff from Triller, Inc. to Triller; and (2) included as defendants the "H3 Podcast" and "H3H3 Productions." Neither the Podcast nor the Reference Video were identified in Triller's amended complaint.

### THE TRILLER PRESS RELEASE

27.     On or around May 3, 2021, Triller's head of piracy, Matt St. Claire,

1    sent a press release to various media outlets that advertised and promoted Triller's

2    so-called amnesty program for individuals who allegedly watched unauthorized

3    streams of the Broadcast (the "Triller Press Release"). One of those media outlets

4    that Triller sent the Triller Press Release to was the news agency, Reuters.

5        28.     On May 3, 2021, Reuters published an article authored by Rory Carroll

6    entitled "EXCLUSIVE Triller offers clemency to boxing fans who pirated Jake Paul

7    bout if they pay up" (the "Reuters Article"). The Reuters Article was publicly

8    accessible for free on Reuters' website at:

9    https://www.reuters.com/lifestyle/sports/exclusive-triller-offers-clemency-boxing-

10    fans-who-pirated-jake-paul-bout-if-they-2021-05-03/. A true and correct copy of the

11    Reuters Article is attached hereto and incorporated herein as **Exhibit A**.

12        29.     The Reuters Article contained several quotes from the Triller Press

13    Release or summarized statements made in the Triller Press Release. Examples

14    include:

15            a.   The lede for the Reuters Article states: "Triller will not pursue legal

16               action against boxing fans who pirated the platform's April 17 fight

17               between Jake Paul and Ben Askren provided those individuals pay

18               the original $49.99 price before June 1, a company executive told

19               Reuters."

20            b.   The "company executive" referred to in the Reuters Article was

21               "Triller's head of piracy Matt St. Claire."

22        30.     Several of these statements from the Triller Press Release were false

23    and/or misleading. The false and/or misleading statements from the Triller Press

24    Release incorporated into the Reuters Article include:

25            a.   "Triller filed legal action on April 23 in U.S. District Court of [the]

26               Central [District] of California against the owners of **the**

27               ***H3Podcast*** [*sic*] website for piracy of the event, and a dozen other

28               sites that ***restreamed and profited from as many as hundreds of***

*thousands of users each, the company said*" (emphasis added).

    b. "'***The fines are calculated at $150,000 per instance, so for H3 and other sites who rebroadcast the event to many people, the (potential) damages are large,' St. Claire said***" (emphasis added).

    c. "'Triller will pursue ***the full $150,000 penalty per person per instance*** for anyone who doesn't do the right thing and pay before the deadline,' [St. Claire] added" (emphasis added).

    d. "'In the case of the offending sites, it's worse [than theft] because ***they also then resold it to many people, illegally profiting from work they do not own***'" (emphasis added).

31.    The aforementioned statements from the Triller Press Release gave the false and misleading impression of fact that: (1) the Podcast itself constituted copyright infringement; (2) anyone who viewed the Podcast was liable for copyright infringement; (3) that the potential exposure for each view of the Podcast was up to $150,000 per view; (4) that TEI runs a criminal enterprise; and (5) TEI resold the Broadcast and profited from doing so.

32.    The aforementioned statements were false and misleading because:

    a. The Podcast did not infringe any copyright in the Broadcast and any person purportedly knowledgeable of copyright (such as Triller's head of piracy, Mr. St. Claire) should have been able to recognize this fact (*see* Dkt. No. 32);

    b. Statutory damages are not awarded per infringement. Rather, as any person purportedly knowledgeable of copyright knows (such as Triller's head of piracy, Mr. St. Claire), statutory damages are awarded per ***work*** infringed. Further, when the defendants are jointly and severally liable for infringing a work (such as downstream infringement), the plaintiff is entitled to only one statutory damages award for all the various infringements of the

work by the jointly and severally liable defendants. *See* 17 U.S.C. § 504(c)(1); *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1261-72 (9th Cir. 2021). Rather, the only provision in the Copyright Act that awards statutory damages per instance is 17 U.S.C. Section 1203(c)(3) and is limited to $200 to $2,500; and

   c. TEI did not resell the Broadcast whatsoever.

33.    It is readily apparent from the Reuters Article that Triller issued the Triller Press Release to advertise and promote its so-called amnesty program to the public at large. This purpose is discernable: (1) because the Reuters Article contained the URL to Triller's so-called amnesty program to encourage readers of the Reuters Article to participate and pay Triller the $49.99 settlement; (2) from the statements outlined above that seek to encourage readers of the Reuters Article who watched the Podcast to participate in the so-called amnesty program; and (3) additional statements from the Triller Press Release that are contained in the Reuters Article claiming Triller was able to identify all individuals who watched the Broadcast without authorization (including those who watched the Podcast).

34.    Triller issued the Triller Press Release to media outlets because Triller knew that doing so would result in the wide dissemination of the Triller Press Release. Triller issued the Triller Press Release to Reuters (in particular) because Triller knew that Reuters articles are widely syndicated so that the Triller Press Release (including Triller's promotion of the so-called amnesty program) would reach as broad an audience and garner as many participants as possible. Some examples of the Reuters Article's syndication include:

   a. Yahoo! *available at*:
      https://www.yahoo.com/entertainment/exclusive-triller-offers-clemency-boxing-221259828.html;

   b. NASDAQ *available at*: https://www.nasdaq.com/articles/exclusive-triller-offers-clemency-to-boxing-fans-who-pirated-jake-paul-bout-

if-they-pay-up;

    c.  Metro *available at*: https://www.metro.us/exclusive-triller-offers-clemency/;

    d.  KFGO *available at*: https://kfgo.com/2021/05/03/exclusive-triller-offers-clemency-to-boxing-fans-who-pirated-jake-paul-bout-if-they-pay-up/;

    e.  News 18 *available at*: https://www.news18.com/news/sports/triller-offers-clemency-to-boxing-fans-who-pirated-jake-paul-bout-if-they-pay-up-3705179.html

    f.  The Straits Times *available at*:
https://www.straitstimes.com/sport/boxing-triller-offers-clemency-to-boxing-fans-who-pirated-jake-paul-bout-if-they-pay-up;

    g.  Inquirer *available at*: https://usa.inquirer.net/69772/triller-offers-clemency-to-boxing-fans-who-pirated-jake-paul-if-they-pay-up;
and

    h.  The Independent *available at*:
https://www.independent.co.uk/sport/boxing/jake-paul-askren-fight-triller-lawsuit-b1841669.html

35.    The statements by Triller in the Triller Press Release deceived a substantial segment of the audience of the Triller Press Release (both the media outlets and their reports about the Triller Press Release). After the Triller Press Release was disseminated on May 3, 2021, countless online posts were made claiming that TEI engaged in criminal copyright infringement and would face criminal liability or crushing civil liability. Examples include:

    a.  A May 3, 2021 tweet by Daniel "Keemstar" Keem stating: "Wait so if H3h3 broadcasted the @triller fight to 1 million people @ the PPV was $50 does that mean Ethan caused Triller $50,000,000 dollars in damages ?" *available at*:

https://twitter.com/KEEMSTAR/status/1389363354238607364



b. A May 4, 2021 video by the YouTube channel *DramaAlert* that contained excerpts of Triller's press release and viewed over 1,000,000 times entitled *H3H3 may go to ( PRISON ) for this! available at*:

https://youtu.be/ppg1ZsWUvww?si=Rjc6yQgNyFFWw7cL/

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18

   c.  A May 4, 2021 video from the YouTube channel Bowblax that

referenced Triller's press release and was viewed over 125,00 times

entitled: *H3H3 Caught LYING (Triller Jake Paul Lawsuit)*

*available at*:

https://youtu.be/5dvFIbamxms?si=w9Xh33bKaAMZ98hQ

19
20
21
22
23
24
25
26
27
28



TED ENTERTAINMENT, INC'S COUNTERCLAIM AGAINST TRILLER FIGHT CLUB II, LLC

36.     On information and belief, a substantial segment of individuals who read and saw the media reports discussing the Triller Press Release and watched the Podcast were deceived (or had a tendency to be deceived) into believing that they: (1) were liable for copyright infringement because they watched the Podcast; and (2) the only way to avoid liability was to participate in Triller's so-called amnesty program.

37.     The aforementioned false and misleading statements made by Triller in the Triller Press Release to media outlets were material in that they were directed at influencing individuals who read or heard about: (1) the Triller Press Release and watched the Podcast to participate in Triller's so-called amnesty program; (2) the Triller Press Release to not watch the Podcast to avoid liability for copyright infringement; and/or (3) The Triller Press Release and avoid TEI content in general.

38.     TEI suffered both financial and reputational damages as a result of the Triller Press Release. The H3 Podcast Channel was branded as an illegal (and even criminal) enterprise. As a result of the Triller Press Release, (1) the number of views for H3 Podcast episodes decreased; (2) the number of H3 Podcast Channel subscribers decreased; (3) the number of third-party sponsors for the H3 Podcast Channel and the amount the sponsors paid in sponsorships decreased dramatically; and (2) TEI content was stigmatized as being illegal and those associated with it were part of a criminal enterprise.

39.     The Triller Press Release was also directly responsible for driving traffic to the Reference Video. As demonstrated by the screenshot below of the Reference Video's analytics from YouTube, prior to May 3, 2021, the Reference Video only received a handful of views. On May 3, 2021, the views on the Reference Video spiked. Shortly after becoming aware of the Triller Press Release, TEI noticed the spike and private the Reference Video to prevent additional views.

/ / /

/ / /





## **ADDITIONAL RELEVANT FACTS**

40.     It is equally readily apparent that, when Triller issued the Triller Press Release, it was referring to the Podcast and not the Reference Video. Such evidence includes:

a.  The statement in the Reuters Article that TEI "restreamed and profited from as many as hundreds of thousands of users." At the time the Triller Press Release was disseminated, the Podcast had received hundreds of thousands of views. Prior to the Triller Press Release being distributed, the Reference Video had only received a handful of views.

b.  The statement in the Triller Press Release referring to "the H3Podcast [*sic*] website" – which clearly refers to the H3 Podcast Channel. The Podcast was posted to the H3 Podcast Channel, while the Reference Video was not.

c.  The social media posts identified above show the Podcast (and not the Reference Video) and calculate liability based on the Podcast's views (and not the Reference Video's views).

d.  In the initial complaint filed in the present action on May 10, 2021 (*i.e.*, a week after the Triller Press Release was disseminated) (the

"Initial Complaint"), Triller alleged that TEI operated the Podcast on the H3 Podcast Channel and the Podcast constituted copyright infringement. In the Initial Complaint, Triller did not mention the Reference Video or the Zach the Sound Lad channel. *See* Dkt. No. 1, ¶¶ 2-4.

e. Triller further alleged in the Initial Complaint that TEI was liable for "stealing and diverting upwards of 1,000,000 unique viewers" of the Broadcast. Dkt. No. 1, ¶ 5. As mentioned, at the time the Initial Complaint was filed, the Podcast had approximately one million views, but the Reference Video had only 65 total views and 51 unique viewers.

41.     Triller's intent to deceive the public to participate in its so-called amnesty program is illustrated by its attempt to enlist TEI to make false and misleading statements about the so-called amnesty program as well. On May 14, 2021, Triller's lawyers, Novian & Novian LLP (who also represented Triller, Inc. and its majority and controlling owner at the time, Ryan Kavanaugh, through his entity Proxima Media), sent TEI a demand letter. The May 14, 2021 letter offered to settle the claims alleged in the Initial Complaint in exchange for: (1) $900,000; and (2) TEI making a public statement.

42.     The public statement Triller demanded TEI to make was: "We are pleased to announce that we have reached a settlement with Triller Fight Club. As a result of us pirating the event, Triller surprisingly has embedded watermark technology unlike anything we've seen to date. We had to pay millions to settle in order to avoid $50 million or more in potential liability. We encourage anyone who pirated the event to take Triller's amnesty offer very seriously and pay the $50 before what happened to us happens to you. Triller is incredibly serious about this and we do believe they will find most if not all people who pirated."

43.     By this statement, Triller requested TEI to falsely represent: (1) that

1  TEI paid millions of dollars to settle the Initial Complaint – despite Triller

2  demanding only $900,000; and (2) TEI was knowledgeable of Triller's watermark

3  technology – as no such information was shared with TEI. The clear purpose of this

4  statement, just like Triller's Press Release, was to advertise and promote Triller's so-

5  called amnesty program (in general) and to TEI's audience (in particular).

6                                       **JURISDICTION**

7         44.    Pursuant to 28 U.S.C. Sections 1331 and 1338(a), this Court has

8  subject matter jurisdiction over TEI's counterclaim for false advertising that arises

9  under 15 U.S.C. Section 1125.

10                                **FIRST CLAIM FOR RELIEF**

11                            **(False Advertising 15 U.S.C. § 1125)**

12        45.    TEI incorporates by reference paragraphs 1 through 44 above as

13  though fully set forth herein.

14        46.    As set in greater detail above, Triller made false statements of fact in a

15  commercial advertisement about the Podcast in the Triller Press Release.

16        47.    As set forth in greater detail above, the Triller Press Release

17  constituted a commercial advertisement because: (1) it contained statements about a

18  competitor in the online entertainment industry; (2) Triller's Press Release was made

19  for the purpose of influencing consumers to pay Triller $49.99 to participate in its so-

20  called amnesty program service; and (3) the contents of the Triller Press Release

21  were widely disseminated to the relevant purchasing public (*i.e.*, viewers of the

22  Podcast and individuals who watched the Broadcast without authorization) through

23  the Reuters Article, the Reuters Article's syndication and other media outlets.

24        48.    As set forth in greater detail above, the Triller Press Release contained

25  false and/or misleading statements of fact about the Podcast by claiming: (1) it

26  constituted copyright infringement; and (2) anyone who watched the Podcast was

27  liable for copyright infringement and liable for up to $150,000 for each view of the

28  Podcast.

49.     As set forth in greater detail above, the Triller Press Release actually deceived or tended to deceive a substantial segment of the audience for the Triller Press Release to: (1) participate in Triller's so-called amnesty program; and (2) avoid watching the Podcast and TEI content, including the Podcast.

50.     As set forth in greater detail above, the statements identified above from the Triller Press Release were material to the public's decision to: (1) participate in Triller's so-called amnesty program; and (2) avoid watching the Podcast and other TEI content.

51.     As set forth in greater detail above, the Triller Press Release entered into interstate commerce when portions of it were quoted or summarized in the Reuters Article – which was publicly available for free on Reuters' website (including websites that syndicated the Reuters Article) and other media outlets that were publicly accessible for free.

52.     As set forth in greater detail above, Triller's false and/or misleading statements about the Podcast and TEI in the Triller Press Release have damaged TEI financially and have damaged TEI's reputation.

## **PRAYER FOR RELIEF**

WHEREFORE, TEI prays for judgment against Triller as follows

53.     Disgorgement of Triller's profits, in accordance with proof;

54.     TEI's actual damages to both its reputation and monetary damages from lost viewers and subscribers, in accordance with proof;

55.     An award of treble damages pursuant to 15 U.S.C. Section 1117(a);

56.     A determination that this case is an exceptional case pursuant to 15 U.S.C. Section 1117(a) and award TEI its reasonable attorneys' fees;

57.     An award of TEI's costs;

58.     Pre-judgment and post-judgment interest on all damages awarded to the maximum extent authorized by law; and

59.     For such other and further relief as the Court may deem just and

proper.

## **JURY TRIAL DEMAND**

TEI demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38 and the 7th Amendment to the United State Constitution.

Dated: January 23, 2024                    **HEAH BAR-NISSIM LLP**

By _____
ROM BAR-NISSIM
Attorneys for Countercomplainant
Ted Entertainment, Inc.

# EXHIBIT A

1/23/24, 2:58 PM
Case 2:21-cv-03942-DAK-JS Document 56 Filed 01/23/24 Page 23 of 25 PageID #:767
EXCLUSIVE Triller offers clemency to boxing fans who pirated Jake Paul bout if they pay up | Reuters



Learn more about **LSEG**

REUTERS®

My View    Following    Saved

Sports

# EXCLUSIVE Triller offers clemency to boxing fans who pirated Jake Paul bout if they pay up

By Rory Carroll

May 3, 2021 3:16 PM PDT · Updated 3 years ago

  



[1/3] Apr 24, 2021; Jacksonville, Florida, USA; YouTube star Jake Paul looks on before Anthony Smith (Red Gloves) fights Jimmy Crute (Blue Gloves) during UFC 261 at VyStar Veterans Memorial Arena.... *Acquire Licensing Rights* ⧉  Read more

LOS ANGELES, May 3 (Reuters) - Triller will not pursue legal action against boxing fans who pirated the platform's April 17 fight between Jake Paul and Ben Askren provided those individuals pay the original $49.99 price before June 1, a company executive told Reuters.

More than 2 million illegal streams of the Triller Fight Club bout occurred, the company said, and it will be pursuing those individuals for the maximum penalty of $150,000 per illegal stream of the fight.

"VPNs all have to comply and turn over the actual IP addresses of each person who stole the fight in discovery," Triller's head of piracy Matt St. Claire said.

"We will be able to identify each and every person, VPN or not, as each stream has a unique fingerprint embedded in the content," he said.

"Triller will pursue the full $150,000 penalty per person per instance for anyone who doesn't do the right thing and pay before the deadline," he added.

Advertisement · Scroll to continue

Paul, a YouTube star who has made a name for himself in the boxing world, knocked out retired mixed martial arts (MMA) fighter Askren in the first round.

Triller has set up a website for those who want to pay the amount before the deadline - https://www.fite.tv/page/041721piracysettlement/

Triller filed legal action on April 23 in U.S. District Court of Central California against the owners of the H3Podcast website for piracy of the event, and a dozen other sites that restreamed and profited from as many as hundreds of thousands of users each, the company said.

Advertisement · Scroll to continue

H3Podcast did not immediately respond to a request for comment.

"The fines are calculated at $150,000 per instance, so for H3 and other sites who rebroadcast the event to many people, the (potential) damages are large," St. Claire said.

"We are taking this position because it is outright theft. It is no different than walking into a store and stealing a video game off the shelf," he said.

"In the case of the offending sites, it's worse because they also then resold it to many people, illegally profiting from work they do not own."

Advertisement · Scroll to continue

Case 2:21-cv-03942-BMC-JS Document 56 Filed 01/23/24 Page 25 of 25 PageID #: 769

Triller Fight Club's next event will pit Teofimo Lopez against George Kambosos, Jr. on June 5.

Reporting by Rory Carroll in Los Angeles; Editing by Bill Berkrot

Our Standards: **The Thomson Reuters Trust Principles.** 🗗

Acquire Licensing Rights



**Rory Carroll**
Thomson Reuters

Los Angeles-based sports reporter who interviews the most impactful athletes and executives in the world. Covers breaking news ranging from the highs of championship victories to the lows of abuse scandals. My work highlights the ways in which sports and the issues of race, gender, culture, finance, and technology intersect.

 

## Read Next



## More from Reuters

A clown 'comes back to life' in Bolivia's Carnival (0:43) - January 22, 2024
Watch more videos




A clown 'comes back to life' in Bolivia's Carnival
00:43


Brazilian Samba school warms up for Carnival
01:08


Peru celebrates Paso horse with competition
00:39


Acid attack survivor fronts fashion book